Jonathan K. Levine (SBN 220289)
Elizabeth C. Pritzker (SBN 146267)
Caroline C. Corbitt (SBN 305492)
PRITZKER LEVINE LLP
1900 Powell Street, Suite 450
Emeryville, CA 94608
Telephone: (415) 692-0772
Facsimile: (415) 366-6110
jkl@pritzkerlevine.com
ecp@pritzkerlevine.com
ccc@pritzkerlevine.com

David S. Golub (admitted *pro hac vice*)
Steven L. Bloch (admitted *pro hac vice*)
Ian W. Sloss (admitted *pro hac vice*)
SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491
Facsimile: (203) 325-3769
dgolub@sgtlaw.com
sbloch@sgtlaw.com
isloss@sgtlaw.com

*Attorneys for Plaintiffs and
the Proposed Classes*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NORTHERN CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| C.H., a minor, by and through their guardian ad litem NICHOLE HUBBARD; E.J., N.J., A.J., and L.J., minors, by and through their guardian ad litem CARA JONES; J.A.E. and J.R.E., minors, by and through their guardian ad litem JUSTIN EFROS; M.W., a minor, by and through their guardian ad litem RENEE GILMORE; A.G., a minor, by and through their guardian ad litem JAY GOODWIN; T.B. and S.B., minors, by and through their guardian ad litem DEREK BUCHANAN; D.T. and D.T., minors, by and through their guardian ad litem AMANDA SEELEY; B.H., a minor, by and through their guardian ad litem JASON HOFFMAN, P.A. and J.A., minors, by and through their guardian ad litem ANTONIO ALVAREZ, S.H. and D.M, minors, by and through their guardian ad litem VERONICA HICKS, C.L.P., a minor, by and through their guardian ad litem SARAH DUNAWAY, A.A., a minor, by and through their guardian ad litem PENNIE FRAZIER, J.C. and E.M., minors, by and through their guardian ad litem LEZLIE COLLINS, L.D., D.D., A.D, minors, by and through their guardian ad litem HOLLIE DORSO, E.B., A.B., C.B., Z.B., and I.B., minors, by and through their guardian ad litem STEVEN BURDA, M.W., B.N., and W.N., minors, by and | Case No. 5:19-cv-07016-SVK<br><br>CLASS ACTION<br><br>**SIXTH AMENDED COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

through their guardian ad litem MICHELLE WALL, , G.W., a minor, by and through their guardian ad litem DOUG WILKERSON, M.W.D., C.J.D., and C.A.D., minors, by and through their guardian ad litem BILLY DARDANELLI, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

GOOGLE LLC; YOUTUBE LLC; CARTOON NETWORK, INC.; CARTOON NETWORK STUDIOS, INC.; CHUCHU TV STUDIOS; DREAMWORKS ANIMATION LLC; DREAMWORKS ANIMATION TELEVISION, LLC; HASBRO, INC.; HASBRO STUDIOS LLC; MATTEL, INC.; POCKETWATCH, INC.; REMKA, INC.; RTR PRODUCTION LLC; AND RFR ENTERTAINMENT, INC.

Defendants.

Minor Plaintiffs C.H., E.J., N.J., A.J., L.J, J.A.E., J.R.E., M.W., A.G., T.B., S.B., D.T., D.T, B.H, P.A, J.A., S.H., D.M., C.L.P., G.W., A.A., J.C., E.M., L.D., D.D., A.D., E.B., A.B., C.B., Z.B., I.B., M.W., B.N., W.N., M.W.D, C.J.D., and C.A.D. (collectively, "Minor Plaintiffs" or "Plaintiffs"), by and through their respective guardians ad litem and their undersigned counsel, hereby allege the following against Defendants, on behalf of themselves and all others similarly situated, based on personal knowledge, information and belief, the investigation of counsel, and public sources.

## **<u>NATURE OF THE ACTION</u>**

1.      This action arises out of Defendants' invasive and unfair business practices directed toward millions of American children under the age of 13 in violation of the law and societal norms. Specifically, from July 1, 2013 through April 1, 2020 (the "Class Period"), Google, YouTube, and the owners of many of the most popular YouTube video channels baited vulnerable children using cartoons, nursery rhymes, and other child-directed content to cause them to view YouTube channels so Defendants could collect intimate, deeply intrusive data points about them and their behavior without parental consent. Defendants engaged in this illegal conduct to feed their massively profitable advertising business, which was dependent on collecting this data.

2.      Defendants' conduct violated the "Little FTC Acts" proscribing unfair trade practices enacted by a majority of states and constituted an invasion of the right to privacy and reasonable expectation of privacy of millions of American children. Plaintiffs thus bring claims, on behalf of themselves and for all other similarly-situated children under the age of 13 injured by Defendants' conduct, pursuant to: (a) the unfair competition laws, or "Little FTC Acts," of California, Colorado, Illinois, Indiana, Massachusetts, Michigan, Mississippi, Missouri, New Hampshire, New Jersey, Pennsylvania, Tennessee, and Washington; (b) the common law right to be free from intrusion upon seclusion in Alabama, California, Florida, Illinois, Kansas, Missouri, New Hampshire, New Jersey, Oklahoma, Pennsylvania, and Washington; (c); for relief from Defendants' unjust enrichment at the expense of minor children in Alabama, California, Colorado, Florida, Illinois, Indiana, Kansas, Massachusetts, Michigan, Mississippi, Missouri, New Hampshire, New Jersey, Oklahoma, Pennsylvania,  Tennessee, and Washington; and (d) the right to privacy enumerated in the California Constitution.

3.     Defendants Google LLC and YouTube LLC (collectively, "Google") operate the video-sharing platform YouTube, which contains videos created by individuals and entities that have registered with YouTube and uploaded their videos and created a "channel." YouTube is accessible as a website (www.youtube.com), mobile application, or as an application on a set top streaming device.

4.     Individuals do not have to register or sign in to view videos uploaded to YouTube. Anyone, regardless of age, who visits the YouTube website can browse through and view videos that have been uploaded. And anyone using a device on which the YouTube app has been installed can watch videos on YouTube without verifying his or her age.

5.     Defendants know that YouTube is a top online destination for children.  Indeed, studies have shown that YouTube is "the #1 website regularly visited by kids."  Because of its popularity and its known regular use by children, popular child product brands, such as Defendant toy companies Mattel and Hasbro, among others, maintain YouTube channels and create content specifically for their YouTube channels designed to attract child viewers.

6.     During the Class Period, Google generated revenue from YouTube via YouTube channels whose owners agreed to "monetize" their channels – *i.e.*, agreed to allow Google to place paid advertising on their YouTube channels in return for a share of the resulting advertising revenue, with 45% of the revenue going to Google, and a larger, 55% share of the revenue, going to the channel owners.

7.     Google gave owners of monetized channels a choice between two types of paid advertising to show on their monetized channels: (1) contextual advertising; or (2) behavior-based, or "behavioral" advertising. Contextual advertising (the less lucrative option) shows ads calculated to be of interest to the viewer based on the channel's content. Behavioral advertising (by far the more lucrative option for both channel owners and Google) shows advertisements calculated to be of interest to viewers based on the viewer's own personal information, including persistent identifiers, collected by Google.

8.     Behavioral advertising is the most valuable type of advertising to Google and channel owners because past human behavior, which is what behavioral advertising relies upon, is considered the most effective method of inferring an individuals' interests. It is also the most intrusive. When a channel owner elects to show behavioral advertising on its channel, Google (at the direction of the

SIXTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

channel owner) collects all available information, including intrusive personal information such as persistent identifiers and geolocation data, available about the viewer. Google analyzes this data to infer, based on past behavior, which types of advertisements would most effectively influence that individual and accordingly displays that advertisement.

9. Collection of this data allows Google to develop profiles of individuals over time by tracking their activities across multiple websites or internet-based services. Studies have found that Google is capable of tracking activity across 80% of the internet.

10. During the Class Period, numerous child-directed content creator owners of YouTube channels (1) uploaded their child-directed content to their YouTube channels; (2) agreed to monetize their channels; and (3) elected to show behavioral advertising on their YouTube channels, thus directing Google to collect the personal information of viewers of their child-directed content, including those under the age of 13, for the purpose of showing behavioral advertising. This includes Defendants The Cartoon Network, Inc., Cartoon Network Studios, Inc., Chu Chu TV Studios, DreamWorks Animation LLC, DreamWorks Animation TV, LLC, Hasbro, Inc., Hasbro Studios LLC, Mattel, Inc., Pocketwatch, Inc., Remka, Inc., RTR Production LLC, and RFR Entertainment, Inc. (collectively, the "Channel Owner Defendants").

11. Neither Google nor the Channel Owner Defendants obtained verifiable parental consent (or any consent at all), to collect the personal information of children under 13 watching the Channel Owner Defendants' child-directed content on YouTube.

12. Each Channel Owner Defendant made this election, and Google permitted it, despite it being in contravention of the law and societal norms, to maximize their respective profits. As FTC Commissioner Slaughter has noted: "YouTube has long allowed channel owners to turn off default behavioral advertising and serve instead contextual advertising that does not track viewers, but vanishingly few content creators would elect to do so, in no small part because they receive warnings that disabling behavioral advertising can 'significantly reduce your channel's revenue.' In short, both

YouTube and the channels have a strong financial incentive to use behavioral advertising."[1]

13.    The Children's Online Privacy Protection Act ("COPPA"), 15 U.S.C. § 501, *et seq.*, protects children under 13 years old from having their personal information ("Personal Information") collected by operators of websites or online services directed to children, or operators with actual knowledge that they are collecting Personal Information online from children under 13, unless their parent has first given verifiable consent. The Federal Trade Commission ("FTC") has expressly interpreted COPPA as applying not only to YouTube, but to each individual YouTube channel as if it were its own standalone website or online service.

14.    Since 2013, persistent identifiers have been included within the definition of "Personal Information" that operators of websites and online services are barred by COPPA from collecting from children under 13 years old without verifiable parental consent.

15.    COPPA violations "shall be treated as a violation of a rule defining an unfair … act or practice prescribed under section 18(a)(1)(B) of the Federal Trade Commission Act (the "FTC Act"), 15 U.S.C. § 57a(a)(1)(B)." In other words, a violation of COPPA constitutes an unfair trade practice under Section 5 of the FTC Act. 15 U.S.C. § 45(a).

16.    As a result of the above-described conduct, on September 4, 2019, the FTC and the New York State Office of the Attorney General filed a Complaint for Permanent Injunction, Civil Penalties, and Other Equitable Relief (the "FTC Complaint") against Google, complaining of Google's wrongful collection and misuse of minors' Personal Information without parental consent in violation of COPPA.

17.    Google entered into a Judgment on September 4, 2019, agreeing to pay $170 million as a civil penalty for its misconduct, but did not agree to immediately cease the misconduct, enabling Google to collect and misuse Personal Information about millions of minors for continuing improper financial gain. Instead, Google agreed to stop the data collection practices complained of by the FTC

---

[1] Dissenting Statement of FTC Commissioner Rebecca Kelly Slaughter *In the Matter of Google LLC and YouTube, LLC*, available for download at https://www.ftc.gov/system/files/documents/public_statements/1542971/slaughter_google_youtube_statement.pdf (accessed Jan. 14, 2021).

after four months from the Judgment, and to comply with COPPA going forward.

18.    Unfortunately for children in the United States, but unsurprising given Google's history of privacy violation recidivism, recent reports from research and consumer advocacy groups have credibly shown that Google continues to collect Personal Information of minor children under 13 in violation of COPPA and Google's November 2019 Judgment with the FTC.

19.    The above-described conduct engaged in by Google and each of the Channel Owner Defendants not only violates COPPA, but also independently violates the state statutes prohibiting unfair and/or unlawful business practices which are modeled, patterned after, and/or which take interpretive guidance from, the FTC Act (the "Little FTC Acts"), including those enacted by California, Colorado, Illinois, Indiana, Massachusetts, Michigan, Mississippi, Missouri, New Hampshire, New Jersey, Pennsylvania, Tennessee, and Washington.

20.    Additionally, the conduct of Google and each of the Channel Owner Defendants constitutes unwarranted invasions of privacy in violation of the substantial protections Alabama, California, Florida, Illinois, Kansas, Missouri, New Hampshire, New Jersey, Oklahoma, Pennsylvania, and Washington provide their citizens with.  These states recognize the common law right to be free from intrusion upon seclusion, as formulated by § 652B of the Restatement (Second) of Torts, which prohibits intentional intrusion upon the solitude or seclusion of another or his or her private affairs or concerns.  In addition, the California Constitution provides California citizens and residents an enumerated right to privacy.

21.    During the Class Period, Plaintiffs watched monetized YouTube channels owned and/or operated by the Channel Owner Defendants. While Plaintiffs viewed videos on YouTube, Defendants unfairly and unlawfully collected Plaintiffs' Personal Information, including persistent identifiers, in order to deliver targeted advertisements to Plaintiffs that were intended to influence their behavior.

22.    Accordingly, Plaintiffs, through their parents and guardians, bring this action for the relief asserted herein, on behalf of themselves and the Classes of similarly-situated minors whose privacy rights have, like Plaintiffs, been violated by Defendants, for damages, restitution, and appropriate injunctive and/or equitable relief to address Defendants' unlawful practices.

**JURISDICTION AND VENUE**

23.    This Court has general personal jurisdiction over Defendants Cartoon Networks Studios, Inc., DreamWorks Animation LLC, DreamWorks Animation Television, LLC, Google LLC, YouTube LLC, Hasbro Studios LLC, Mattel, Inc., and Pocketwatch, Inc. because their principal places of business are in California. Additionally, all Defendants are subject to specific personal jurisdiction in this State because a substantial part of the events and conduct giving rise to Plaintiffs' claims occurred in this State.

24.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C §1332(d), because the amount in controversy for the Classes exceeds $5,000,000 exclusive of interest and costs, there are more than 100 potential class members, defined below, and minimal diversity exists because the majority of potential class members are citizens of a state different than Defendants.

25.    This Court also has jurisdiction pursuant to 28 U.S.C §1332(d), because the amount in controversy exceeds $75,000 and is between citizens of different states.

26.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because a substantial portion of the conduct described in this Complaint was carried out in this District. Furthermore, Defendants Google LLC and YouTube LLC are headquartered in this District and subject to personal jurisdiction in this District.

**INTRADISTRICT ASSIGNMENT**

27.    Assignment to the San Jose Division is proper under Northern District of California Civil Local Rule 3-2(c) because a substantial part of the events or omissions which give rise to the claims asserted herein occurred in Santa Clara County and Defendant Google LLC's principal place of business is located in Santa Clara County, California. Under Civil Local Rule 3-2(e), all civil actions which arise in the County of Santa Clara shall be assigned to the San Jose Division.

**PARTIES**

**I.    Plaintiffs**

28.    Plaintiff C.H. is a natural person and is a resident and citizen of the State of California. C.H. was under the age of 13 during the Class Period. C.H.'s parent and legal guardian is Nichole Hubbard, who is also a resident and citizen of the State of California.

29.     Plaintiffs E.J, N.J, A.J, and L.J are natural persons and are residents and citizens of the State of Colorado. E.J, N.J, A.J, and L.J were under the age of 13 during the Class Period. Their parent and legal guardian is Cara Jones, who is also a resident and citizen of the State of Colorado.

30.     Plaintiffs J.A.E. and J.R.E. are natural persons and are residents and citizens of the State of New Jersey. J.A.E. and J.R.E. were under the age of 13 during the Class Period. Their parent and legal guardian is Justin Efros, who is also a resident and citizen of the State of New Jersey.

31.     Plaintiff M.W. is a natural person and is a resident and citizen of the State of Tennessee. M.W. was under the age of 13 during the Class Period. M.W.'s parent and legal guardian is Renee Gilmore, who is also a resident and citizen of the State of Tennessee.

32.     Plaintiff A.G. is a natural person and is a resident and citizen of the Commonwealth of Massachusetts. A.G. was under the age of 13 during the Class Period. A.G.'s parent and legal guardian is Jay Goodwin, who is also a resident and citizen of the Commonwealth of Massachusetts.

33.     Plaintiffs T.B. and S.B. are natural persons and are residents and citizens of the State of Indiana. T.B. and S.B. were both under the age of 13 during the Class Period. T.B. and S.B.'s parent and legal guardian is Derek Buchanan, who is also a resident and citizen of the State of Indiana.

34.     Plaintiffs D.T. and D.T. are natural persons and residents and citizens of the State of Alabama. D.T. and D.T. were under the age of 13 during the Class Period. D.T.'s and D.T.'s parent and legal guardian is Amanda Seeley, who is also a resident and citizen of the State of Alabama.

35.     Plaintiff B.H. is a natural person and is a resident and citizen of the State of Florida. B.H. was under the age of 13 during the Class Period. B.H's parent and legal guardian is Jason Hoffman, who is also a resident and citizen of the State of Florida.

36.     Plaintiffs P.A. and J.A. are natural persons and are residents and citizens of the State of Illinois. P.A. and J.A. were under the age of 13 during the Class Period. P.A.'s and J.A.'s parent and legal guardian is Antonio Alvarez, who is also a resident and citizen of the State of Florida.

37.     Plaintiffs S.H. and D.M. are natural persons and are residents and citizens of the State of Kansas. S.H. and D.M. were under the age of 13 during the Class Period. S.H.'s and D.M.'s parent and legal guardian is Veronica Hicks, who is also a resident and citizen of the State of Kansas.

38.     Plaintiff G.W. is a natural person and is a resident and citizen of the State of Michigan.

G.W. was under the age of 13 during the Class Period. A.A.'s parent and legal guardian is Doug Wilkerson, who is also a resident and citizen of the State of Michigan.

39.     Plaintiff A.A. is a natural person and is a resident and citizen of the State of Mississippi. A.A. was under the age of 13 during the Class Period. A.A.'s parent and legal guardian is Pennie Frazier, who is also a resident and citizen of the State of Mississippi.

40.     Plaintiffs J.C. and E.M. are natural persons and are residents and citizens of the State of Missouri. J.C. and E.M. were under the age of 13 during Class Period. J.C.'s and E.M.'s parent and legal guardian is Lezlie Collins, who is also a resident and citizen of the State of Missouri.

41.     Plaintiffs L.D., D.D., and A.D., are natural persons and are residents and citizens of the State of New Hampshire. L.D., D.D., and A.D. were under the age of 13 during the Class Period. L.D.'s, D.D.'s, and A.D.'s parent and legal guardian is Hollie Dorso, who is also a resident and citizen of the State of New Hampshire.

42.     Plaintiffs M.W.D., C.J.D., and C.A.D. are natural persons and are residents and citizens of the State of New York. M.W.D., C.J.D., and C.A.D. were under the age of 13 during the Class Period. M.W.D., C.J.D., and C.A.D.'s parent and legal guardian is Billy Dardanelli, who is also a resident and citizen of the State of New York.

43.     Plaintiff C.L.P. is a natural person and is a resident and citizen of the State of Oklahoma. C.L.P. was under the age of 13 during the Class Period. C.L.P..'s parent and legal guardian is Sarah Dunaway, who is also a resident and citizen of the State of Oklahoma.

44.     Plaintiffs E.B., A.B., C.B., Z.B., and I.B. are natural persons and are residents and citizens of the Commonwealth of Pennsylvania. E.B., A.B., C.B., Z.B., and I.B. were under the age of 13 during the Class Period. E.B., A.B., C.B., Z.B., and I.B.'s parent and legal guardian is Steven Burda, who is also a resident and citizen of the Commonwealth of Pennsylvania.

45.     Plaintiffs M.W., B.N., and W.N. are natural persons and are residents and citizens of the State of Washington.  M.W., B.N., and W.N. were under the age of 13 during the Class Period. M.W.'s, B.N.'s, and W.N.'s parent and legal guardian is Michelle Wall, who is also a resident and citizen of the State of Washington.

SIXTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

1

## II.  Defendants

### A.  Google Defendants

46.  Defendant Google LLC is a business incorporated under the laws of the State of Delaware with its principal place of business in Mountain View, California. Google LLC is a wholly-owned subsidiary of Alphabet, Inc. and is the parent company of Defendant YouTube LLC.

47.  Defendant YouTube LLC is a wholly-owned subsidiary of Google LLC, incorporated under the laws of the State of Delaware with its principal place of business in San Bruno, California. At all times mentioned herein, acting alone or in concert with Google LLC, YouTube LLC has advertised, marketed, and distributed its YouTube video sharing platform to consumers throughout the United States.

### B.  Channel Owner Defendants

#### i.  Cartoon Network

48.  Defendant The Cartoon Network, Inc. ("Cartoon Network") is a Delaware corporation with its principal place of business in Atlanta, Georgia.

49.  Defendant Cartoon Network Studios, Inc. ("Cartoon Network Studios") is a Georgia corporation with its principal place of business in Burbank, California.

50.  Collectively, the Cartoon Network and Cartoon Network Studios are referred to as the "Cartoon Network Defendants."

#### ii.  ChuChu TV

51.  Defendant ChuChu TV Studios ("ChuChuTV") is an Indian company with its principal place of business located in Chennai, India. ChuChuTV availed itself of the benefits of conducting business in the United States during the Class Period by targeting United States residents with ChuChuTV's content.

#### iii.  DreamWorks

52.  DreamWorks Animation LLC ("DreamWorks") is a Delaware corporation with its principal place of business in Glendale, California.

53.  DreamWorks Animation Television, LLC ("DreamWorks TV") is a Delaware corporation with its principal place of business in Glendale, California.

9

54. Collectively, DreamWorks and DreamWorks TV are referred to as the "DreamWorks Defendants."

### iv. Hasbro

55. Defendant Hasbro, Inc. ("Hasbro") is a Rhode Island corporation with its principal place of business in Pawtucket, Rhode Island.

56. Defendant Hasbro Studios LLC ("Hasbro Studios") is a Rhode Island corporation with its principal place of business in Burbank, California.

57. Collectively, Defendants Hasbro and Hasbro Studios are referred to as the "Hasbro Defendants."

### v. Mattel

58. Defendant Mattel, Inc. ("Mattel") is a Delaware corporation with its principal place of business in El Segundo, California.

### vi. Ryan's World (f/k/a Ryan ToysReview)

59. Defendant Remka, Inc. ("Remka") is a Texas corporation with its principal place of business in Houston, Texas.

60. Defendant RTR Production, LLC ("RTR Production") is a Texas corporation with its principal place of business in Houston, Texas.

61. Defendant RFR Entertainment, Inc. ("RFR Entertainment") is a Texas corporation with its principal place of business in Houston, Texas.

62. Defendant Pocketwatch, Inc. ("Pocketwatch") is a Delaware corporation with its principal place of business in Culver City, California.

63. Collectively, Remka, RTR Production, RFR Entertainment, and Pocketwatch are referred to as the "Ryan's World Defendants."

## FACTUAL BACKGROUND

### I. Google and YouTube

64. Google is a multinational internet technology and advertising company that owns the world's two most-visited internet webpages: www.google.com and www.youtube.com. Google is best known for operating a search engine that catalogues websites and organizes information on the internet

to allow Google users to search the internet's content. Google uses information that it learns from Google users' searches and web traffic patterns on websites it owns (including YouTube) and websites that use Google's advertising services to deliver targeted advertisements. Advertising is Google's primary source of revenue, accounting, for example, for approximately $116 billion out of Google's $136.2 billion in revenue in 2018.

65.     YouTube LLC operates YouTube, an online video-sharing platform. YouTube allows its visitors and/or users to view user-generated content that has been uploaded by registered YouTube users to YouTube.

66.     YouTube videos are viewable by anyone who accesses YouTube by visiting www.youtube.com or using the YouTube mobile or streaming device app. During the Class Period, individuals did not have to be registered with Google, nor signed into YouTube, to view YouTube videos. And Google did not verify the age of an individual opening an already-installed YouTube mobile app on a mobile device or through other electronic media, including computers.

67.     Google was, at all times throughout the Class Period, aware that minor children access YouTube's channels and actively sought to increase viewing on YouTube by children through content directed toward those children, while publicly representing that such minors were not permitted to access YouTube – and has been very successful attracting this young viewership.

## II.     Google's Advertising Practices

68.     Google offers a number of services, such as YouTube and the email service Gmail, free of charge. Google earns revenue from these services via advertising.

### A.     Google's Data Collection Practices

69.     During the Class Period and at the direction of channel owners, including each of the Channel Owner Defendants, Google collected Personal Information from individuals who accessed YouTube for purposes of showing behavioral advertising to those individuals. The Personal Information was collected by Google from the vast network of websites and online services that used Google's advertising services.

SIXTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

70.     Google, at the direction of channel owners, including each of the Channel Owner Defendants, collected, *inter* alia, the following information about YouTube's users for purposes of showing them behavioral advertising:

- **User Activity**: searches run, videos watched, views and interactions with content and ads, voice and audio information, purchase activity, people with whom a user communicated, browsing history, and activity on third-party sites and apps that used Google services, which includes Google's advertising services;

- **Location Information:** GPS, internet protocol ("IP") address, device sensor data, and data from devices located near a user;

- **Unique Identifiers:** cookie ID, advertising ID, device ID, among others.[2]

### i.     Cookies

71.     Google stores some unique identifiers in a text file stored on an individual's browser. These text files are known as "cookies." The type of information stored in cookies can include websites the user has previously visited, the duration of website visits, videos viewed, advertisements viewed, duration of video views, and advertisements clicked, among other information. One popular use of cookies is to enable an individual to visit a series of affiliated websites, for example Gmail and YouTube, without having to re-enter his or her user name and password on each. Each cookie contains a string of characters, or a "cookie ID," that allows the website or service to recognize that specific browser. Cookies, and the unique identifiers stored in cookies, can generally be deleted.

### ii.     Persistent Identifiers

72.     Some data and/or information Google collects cannot be easily deleted or reset. Because these data points remain constant, or "persist," they are colloquially referred to as "persistent identifiers." Since persistent identifiers are difficult to change or reset, they are seen by advertisers as a more reliable method of identifying and tracking users over time than cookies.

---

[2] During the Class Period, Google defined the term "unique identifiers" as a string of characters that can be used to uniquely identify a browser, app, or device.  Unique identifiers can arise from a variety of applications, websites, sensors, and devices.

SIXTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

73.     One example of a persistent identifier collected by Google during the Class Period was a user's IP address. An IP address is a numerical label assigned to each device connected to a computer network, such as the internet. Another example of a persistent identifier collected by Google was a device's International Mobile Equipment Identity ("IMEI") number. Every mobile phone and smartphone is assigned a unique IMEI that cannot be changed.

74.     During the Class Period, Google used persistent identifiers to track individuals' internet behavior. For example, a website that used Google's advertising services to deliver ads to its visitors would send Google its visitors' IP address and/or IMEI number. When another website that used Google's advertising services sent Google the same IP address or IMEI number, Google knew that individual had visited both websites. Studies have found that Google is capable of tracking individuals *over 80% of the internet*.[3]

75.     Google uses this information to build detailed individual profiles that include identifiers correlating with individual users. Most individuals have no idea that Google is tracking their activity across the internet, and virtually no minor child would have had any understanding of this activity. The data that Google gathers is stitched into a single profile of a user which gives Google the most accurate, up-to-date, snapshot of a user's attributes and behaviors. Google uses this data to deliver targeted advertisements to YouTube video viewers based on preferences inferred from their profiles. User profiles such as those developed by Google have been called the "holy grail" of advertising[4] and allows Google to charge advertisers increased advertising rates.

76.     Google uses unique and persistent identifiers to track individuals' activity on any webpage that was using Google's advertising services. An individual's activity on those websites is shared with Google:

---

[3] Steven Englehardt & Arvin Narayanan, *Online Tracking: A 1-million-site Measurement and Analysis*, Princeton University WebTAP Project, http://randomwalker.info/publications/OpenWPM_1_million_site_tracking_measurement.pdf (accessed Oct. 21, 2019) (emphasis added).

[4] Randell Cotta, Sr., *Overcoming the Last Hurdle in the Quest for the "Holy Grail" of Marketing*, KD NUGGETS, https://www.kdnuggets.com/2017/02/quest-holy-grail-marketing.html (accessed Oct. 21, 2019).

**Your activity on other sites and apps**

This activity might come from your use of Google services, like from syncing your account with Chrome or your visits to sites and apps that partner with Google. Many websites and apps partner with Google to improve their content and services. For example, a website might use our advertising services (like AdSense) or analytics tools (like Google Analytics), or it might embed other content (such as videos from YouTube). These services may share information about your activity with Google and, depending on your account settings and the products in use (for instance, when a partner uses Google Analytics in conjunction with our advertising services), this data may be associated with your personal information.[5]

77.     During the Class Period, Google stated that it used these profiles to deliver "more relevant search results and ads" to YouTube video viewers.[6] To illustrate this point, Google offered the following example: "if you watch videos about baking on YouTube, you may see more ads which relate to baking as you browse the web."[7]

78.     Google did not have a separate data collection policy for minor children as of October 2019 or later. Google applied the data collection practices described herein to each individual who visited YouTube, Google, or any website using any of Google's services during the Class Period, irrespective of that individual's age – even for viewers of children's content on YouTube, for which the primary audience, as Google knew full well, was children, including children under the age of 13.[8]

79.     After settling with the FTC and the New York Attorney General in fall 2019, Google announced that it would begin complying with COPPA on YouTube for the first time beginning in January 2020:

> ***We are changing how we treat data for children's content on YouTube.*** Starting in about four months, we will treat data from anyone watching children's content on YouTube as coming from a child, regardless of the age of the user. This means that we will limit data

---

[5] Google Privacy Policy (accessed Oct. 21, 2019).

[6] *Id.*

[7] *Ads you'll find most useful*, Google Privacy & Terms, https://policies.google.com/privacy/example/ads-youll-find-most-useful?hl=en (accessed Oct. 16, 2019) (emphasis added).

[8] *An update on kids and data protection on YouTube*, YouTube Official Blog, Sept. 4, 2019, https://youtube.googleblog.com/2019/09/an-update-on-kids.html (accessed Jan. 20, 2021).

collection and use on videos made for kids only to what is needed to support the operation of the service. We will also stop serving personalized ads on this content entirely, and some features will no longer be available on this type of content, like comments and notifications. In order to identify content made for kids, creators will be required to tell us when their content falls in this category, and we'll also use machine learning to find videos that clearly target young audiences, for example those that have an emphasis on kids characters, themes, toys, or games.[9] (emphasis added).

YouTube also committed to introducing a new annual training for its teams regarding COPPA.

80.     Subsequent to the filing of Plaintiffs' initial complaint, Google also created a "Privacy Notice for Google Accounts Managed with Family Link, for Children under 13 (or applicable age in your country).[10] In this Privacy Notice, Google admitted to collecting minor children's Personal Information and tracking their activities across the Internet, including to provide recommendations, personalized content, and customized search results.[11] Now, in a change from its former practice, Google represented that it "will not serve personalized ads to your child, which means ads will not be based on information from your child's account. Instead, ads may be based on information like the content of the website or app your child is viewing, the current search query, or general location (such as city or state)."[12]  Google also now purports to allow children or parents to delete minor children's activity.[13]  None of these disclosures about its collection and tracking of minor children's Personal Information and internet activities or purported creation of a right to delete collected information about minor children existed during the Class Period or at the time this action was filed.

**B.     Google's Targeted Advertising Techniques**

81.     During the Class Period, advertising on YouTube could be either behavioral or contextual targeting. Behavioral targeting is the delivery of advertisements to individuals based on that user's personal information, which is tracked across multiple websites, apps, and devices. The information Google collected was incorporated into an algorithm which inferred which types of advertisements were

---

[9] *Id.*

[10] https://families.google.com/familylink/privacy/child-policy/ (accessed Dec. 2, 2020).

[11] *Id.*

[12] *Id.*

[13] *Id.*

SIXTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

likely to have the greatest impact on the user associated with the information (*i.e.,* most likely to be clicked).

82.     Google preferred showing behavior-based, or "behavioral" advertising because it was the most lucrative for both Google and YouTube channel owners. Because of this, Google programmed behavioral advertising as the default method of advertising employed on monetized YouTube channels, but gave channel owners the ability to choose the form of advertising to show and opt out of behavioral advertising, instead showing contextual advertising.

83.     Contextual targeting is a process by which Google matches advertisements to relevant YouTube channels using keywords provided by the advertiser. Google's system analyzes the content of a YouTube channel to determine its central theme, which is then matched to an advertiser's advertisements using a variety of factors including keywords and topic selections. Contextual targeting does not rely on user-specific data to provide ads.

84.     Because behavioral advertising is more effective than contextual targeting, advertisers paid Google more to run behavioral advertising, and Google in turn paid YouTube channel owners more for allowing Google to run behavioral advertising on their channels than they would have paid them for only allowing contextual advertising.

### C.     YouTube Channel Monetization

85.     YouTube channel owners that pass a viewership threshold set by Google can choose to "monetize" their channel by allowing Google to run advertisements on that channel. Advertisements can take the form of a video clip played before, during, or after the channel owner's video is played, or can be displayed as a banner. Google and the owners of monetized YouTube channels share the advertising revenue, with Google keeping 45% and the channel owners receiving 55%.[14]

86.     Owners of monetized YouTube channels could then elect which type of advertisements to show to viewers of their content: contextual advertising or behavioral advertising. As early as January

---

[14] *See* Eric Rosenberg, *How YouTube Ad Revenue Works*, INVESTOPEDIA (Oct. 7, 2018), https://www.investopedia.com/articles/personal-finance/032615/how-youtube-ad-revenue-works.asp (accessed Oct. 24, 2019).

2016, all monetized channel owners, including each of the Channel Owner Defendants, were given the option to disable behavioral advertising on their monetized channels. To turn off behavioral ads, the channel owners were required to actively check a box in the "Advertisements" section of YouTube's "Advanced Video Manager Options" menu. The checkbox that allowed the channel owner to opt out of behavioral advertising contained text stating that doing so "may significantly reduce [the] channel's revenue." When a channel owner opted out of behavioral advertisements on a monetized channel, Google served contextual advertising instead, which generated less revenue for the channel owner and Google.

87.    As FTC Commissioner Kelly Slaughter stated, "YouTube has long allowed channel owners to turn off default behavioral advertising and serve instead contextual advertising that does not track viewers, but vanishingly few content creators would elect to do so, in no small part because they receive warnings that disabling behavioral advertising can 'significantly reduce your channel's revenue.' In short, both YouTube and the channels have a strong financial incentive to use behavioral advertising."[15]

**III.    The Children's Online Privacy Protection Act of 1998**

88.    Congress passed COPPA, codified at 15 U.S.C. § 6501, *et seq.,* in 1998 in response to concerns that children's online activities were being tracked by operators of websites and online services. COPPA is intended to "maintain the security of personally identifiable information of children collected online" and to "protect children's privacy by limiting the collection of personal information from children without parental consent."[16]  The standards in COPPA have given rise to, and correlate with, accepted norms throughout society for defining the expectations of privacy for minor children.

89.    COPPA applies to any operator of a commercial website or online service directed to children under 13 years of age that collects, uses, and/or discloses Personal Information from children.

---

[15] Dissenting Statement of FTC Commissioner Rebecca Kelly Slaughter *In the Matter of Google LLC and YouTube, LLC*, available for download at https://www.ftc.gov/system/files/documents/ public_statements/1542971/slaughter_google_youtube_statement.pdf (accessed Jan. 14, 2021).

[16] 144 CONG. REC. S12787.

SIXTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

The FTC considers parties with actual knowledge that they are collecting Personal Information from users of a child-directed site or service as "operators" under COPPA.

90.     COPPA "prohibits unfair ... acts or practices in connection with the collection, use, and/or disclosure of personal information from and about children on the Internet." 16 C.F.R. § 312.1.

91.     COPPA provides, in pertinent part, that:

> It is unlawful for an operator of a website or online service directed to children, or any operator that has actual knowledge that it is collecting personal information from a child, to collect personal information from a child in a manner that violates the regulations prescribed [by the Federal Trade Commission]. 15 U.S.C. § 6502(a).

92.     COPPA thus prohibits, *inter alia*, the collection of persistent identifiers for behavioral advertising absent notice and verifiable parental consent. 16 C.F.R. §§ 312.5(c)(7), 312.2.

93.     COPPA specifically requires an "operator" covered by COPPA to give notice to parents and obtain their verifiable consent before collecting children's Personal Information online. 16 C.F.R. §§ 312.4 and 312.5. This includes but is not limited to:

   a.     Posting a privacy policy on its website or online service providing clear, understandable, and complete notice of its information practices, including what information the website operator collects from children online, how it uses such information, its disclosure practices for such information, and other specific disclosures set forth by COPPA;

   b.     Providing clear, understandable, and complete notice of its information practices, including specific disclosures directly to parents; and

   c.     Obtaining verifiable parental consent prior to collecting, using, and/or disclosing Personal Information from children.

94.     The FTC has interpreted "operators of website or online services directed to children" and "operators with actual knowledge that they are collecting personal information online from children under 13" as used under COPPA to include YouTube and channel owners. In fact, the FTC has interpreted COPPA as viewing "content creators and channel owners" as both "standalone 'operators'

under COPPA, subject to strict liability for COPPA violations."[17]

95.     Websites or online services that collect Personal Information from users of other child-directed websites or online services are deemed as "child-directed" if the website or online service "has actual knowledge that it is collecting personal information directly from users of another Web site or online service directed to children." 16 C.F.R. § 312.2.

96.     In order to determine whether a website or online service is "directed to children" the FTC will:

> [C]onsider [the website's or online service's] subject matter, visual content, use of animated characters or child-oriented activities and incentives, music or other audio content, age of models, presence of child celebrities or celebrities who appeal to children, language or other characteristics of the Web site or online service, as well as whether advertising promoting or appearing on the Web site or online service is directed to children.

16 CFR § 312.2.

97.     In 2013, COPPA was enhanced (the "2013 COPPA Enhancement") to provide further protection for children against online tracking and to "giv[e] parents greater control over the online collection of their children's personal information." The 2013 enhancement widened the definition of children's "Personal Information" to include "persistent identifiers" such as cookies that track a child's activity online, geolocation information, photos, videos, and audio recordings.

98.     The 2013 COPPA Enhancement was the culmination of two years of rulemaking by the FTC and reflected society's growing recognition of the surreptitious surveillance tactics used by advertising companies to track children online and advertise to them while using the internet.

99.     For example, the FTC published a 2012 report entitled *Mobile Apps for Kids: Disclosures Still Not Making the Grade* (the "FTC Kids Mobile App Report") addressing privacy dangers for children using mobile devices with persistent identifiers to access the internet. The FTC Kids Mobile

---

[17] Statement of Joseph J. Simons & Christine S. Wilson, *Regarding FTC and People of the State of New York v. Google LLC and YouTube, LLC*, FEDERAL TRADE COMMISSION, https://www.ftc.gov/system/files/documents/public_statements/1542922/simons_wilson_google_youtube_statement.pdf (accessed Oct. 21, 2019).

SIXTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

App Report warned that companies like Google link persistent identifiers and geolocation data they collect with additional Personal Information such as name, address, and email address—allowing those entities and their partners to identify individual users whom they profile with indisputably individual specificity.

100.    By expressly including persistent identifiers and geolocation data in COPPA's definition of Personal Information, the FTC intended to deter advertising companies and advertising network operators such as Google and the Channel Owner Defendants from exploiting young children via tracking, profiling, and advertising online.

101.    Pursuant to Section 1303(c) of COPPA, 15 U.S.C. § 6502(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of COPPA constitutes an unfair … act or practice in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

102.    While COPPA does not itself provide a private right of action for individuals to seek redress for harms arising from COPPA violations, and contains a limited preemption clause barring the imposition of liability by states and local governments "inconsistent" with COPPA (15 U.S.C. § 6502(d)), the United States Court of Appeals for the Ninth Circuit has held that "COPPA's preemption clause does not bar state-law causes of action that are parallel to, or proscribe the same conduct forbidden by, COPPA." *Jones v. Google LLC*, 73 F.4th 636 (9th Cir. 2023).

103.    Therefore, individuals harmed by conduct which violates COPPA such as the conduct described herein may seek redress for harms via state law causes of action.

## **SUBSTANTIVE ALLEGATIONS**

**I.    Google Knowingly Targeted and Tracked Children Under 13 on YouTube**

104.    On September 4, 2019, Google issued a statement in conjunction with its settlement with the FTC and New York Attorney General's office for alleged violations of COPPA that included, inter alia, the following:

> From its earliest days, YouTube has been a site for people over 13, but with a boom in family content and the rise of shared devices, the likelihood of children watching without supervision has increased. We've been taking a hard look at areas where we can do more to address this, informed by feedback from parents, experts, and regulators, including COPPA concerns raised by the U.S. Federal Trade Commission and the New York

Attorney General that we are addressing with a settlement announced today. [18]

105.    But the facts establish that Google has always targeted children as a core audience on YouTube. During the Class Period, Google solicited and encouraged the creation of content that was directly aimed at children under 13 and made that content available on YouTube for the purpose of attracting young children to YouTube.

### A.    Google Lured Children to YouTube with Child-Directed Content

106.    During the Class Period, Google engaged in a concerted effort to lure millions of minor children, including minor children under the age of 13, to use YouTube so that Google could collect their Personal Information, track them across the internet, and show them advertisements for profit, which they shared with YouTube channel owners to gain their participation.

107.    For example, YouTube created a rating system whereby channel owners could signal that their videos were intended for children under 13. The ratings options were Y (generally intended for ages 0-7); G (intended for any age); PG (generally intended for ages 10+); Teen (generally intended for ages 13+); MA (generally intended for ages 16+); and X (generally intended for ages 18+). At one point, YouTube also used the classification "Made for Kids" for certain videos shown on YouTube.

108.    Google not only encouraged content creators to accurately categorize their content so that they could properly target child viewers with advertisements, but Google also reviewed *all* content uploaded to YouTube to provide an additional layer of analysis of the content for advertising purposes.

109.    To further promote the creation of child-directed content for YouTube, Google created the "YouTube Academy" to offer advice on creating "family-friendly" content to YouTube channel owners to enable them be more successful (*i.e.*, get more views and earn more money). As the screenshot below formally contained on YouTube's website shows (the page has now been removed from YouTube's website), the YouTube Academy provided specific guidance on creating content intended for young children on YouTube (not YouTube Kids).

---

[18] *An update on kits and data protection on YouTube*, YouTube Official Blog, Sept. 4, 2019, https://youtube.googleblog.com/2019/09/an-update-on-kids.html (accessed Oct. 22, 2019).

110.   Google also used the creation the existence of the YouTube Kids App as guise to generate child-directed content which was then shown on YouTube. YouTube Kids' was YouTube's application "Made Just for Kids," and was "designed to be a safer and simpler place for kids to explore their interests through online video."[19] Yet every video that was available on the YouTube Kids App was also uploaded to YouTube. Because every video on the YouTube Kids App was directed towards young children, this necessarily meant that Google was knowingly uploading content to YouTube that was designed specifically to attract child viewers and was thus "child-directed" as defined under COPPA. Despite this knowledge, Google tracked every single viewer of these child-directed videos on YouTube. And, as described herein, the viewership of YouTube – the new "Saturday Morning Cartoons" – dwarfed that of YouTube Kids.

111.   Significantly, until 2019, the YouTube Kids App was *only* available as a mobile app (meaning it was harder to access), and was *not* accessible via web browser. This meant that when a child searched (likely using Google) for his or her favorite show on a web browser, the child would be shown links to child-directed content hosted on YouTube and not the YouTube Kids App, which Google did not use to employ its tracking and behavioral advertising scheme. If the child clicked any of those links and watched those videos, they would be tracked as if they were an adult YouTube user.

112.   As the screenshot below shows (the page has now been removed from YouTube's website), Google was aware and encouraged content creators to post child-directed content on YouTube – YouTube Academy provided specific guidance on creating content intended for young children on YouTube (not YouTube Kids):

---

[19] https://www.youtube.com/intl/ALL_us/kids/safer-experience/?gclid=Cj0KCQiAjKqABhDLARIsABbJrGmo2SCCYT5X9FGB8mJtmE14Y-AE2-H1IfLOdYEFfTO513LmMMpO7rYaAmiJEALw_wcB&gclsrc=aw.ds (accessed Jan. 22, 2021.)

SIXTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



113.    While the Channel Owner Defendants signaled what age groups their videos were intended for, Google viewed and "rate[d] all videos uploaded to YouTube, as well as the channels as a whole. Defendants assign[ed] each channel and video a rating . . . Defendants assign[ed] these ratings through both automated and manual review." Through this process, Google acquired actual knowledge of the child-directed nature of this content.

**B.    Google Was Aware It Was Tracking Children**

114.    Google knew that the unfair and unlawful tactics it employed to bait, steer, and lure children to YouTube were successful in drawing millions of American children to use YouTube, and that far fewer children used YouTube Kid's compared to YouTube. For example, an August 2019 study that ranked 350 children's brands across 19 consumer categories ranked YouTube #1 and YouTube Kids #50. Another study found that almost twice as many children used YouTube (83%) as used YouTube Kids (45%).

SIXTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

115.    Additional studies confirm that Google's efforts throughout the Class Period to attract young children to YouTube were successful. For example:

- A 2014 study by The Marketing Store and Kid Say ("2014 Global Kids Study") found that YouTube was voted as the unanimous favorite website of kids 2-12 and that 93% of tweens (children aged 8-11) used YouTube;[20]

- A 2015 study by Nielson MRI ("2015 Nielson Study") found that YouTube was the "leader in reaching children age 6-11 against top TV channels. The study found that 63% of children age 6-11 watched YouTube, tying TV channel Nickelodeon and beating the Disney Channel (57%) and Cartoon Network (49%);[21]

- A 2016 study by LMX ("2016 LMX Study") found that YouTube was "the #1 website regularly visited by kids," beating out the likes of Disney, Cartoon Network, PBS, and Amazon;[22]

- A July 2016 Google Consumer Survey ("2016 Google Consumer Survey") of 1683 parents of children ages 2-14 found that "YouTube is the #1 source where children discovery new toys + games;"[23]

- A 2017 study by Smarty Pants ("2017 Smart Pants Study") found that 96% of children ages 6-12 were aware of YouTube and that 94% either love (71%) or like (24%) YouTube.[24] The same study found that 90% of the children that know YouTube say they use it, 83% of whom use it *daily*;[25] and

---

[20] *Complaint for Permanent Injunction, Civil Penalties, and other Equitable Relief* ("FTC Complaint") – Ex. B, No. 19-cv-2642, ECF No. 3-1, Sept. 4, 2019 ("FTC Exhibit B").

[21] *FTC Complaint – Ex. A*, ("FTC Exhibit A").

[22] FTC *Complaint – Ex. C*, ("FTC Exhibit C").

[23] *Id.*

[24] Smarty Pants, *2017 Brand Love Study: 2017 Kid & Family Trends*, at 7 (2017), https://daks2k3a4ib2z.cloudfront.net/5435eb4d1e426bb420ac990f/5a316f4f4a2f7d000196532b_2017%20Kid%20and%20Family%20Trends%20Report%20EXCERPT.PDF (emphasis added).

[25] *Id.*

- A 2019 by Pew Research ("2019 Pew Study") study found that videos that "videos that were directly aimed at a young audience and *also* featured a child under the age of 13 were more popular than any other type of content identified in [the] analysis as measured by view counts."[26]

116.    As one of the world's most sophisticated advertising and data companies, Google did not need these studies to know that it was successfully attracting millions of child viewers to YouTube. However, in case there was any doubt as to Google's awareness of YouTube's popularity among young children, evidence establishes that Google used these very studies to market YouTube to companies that make toys and other children's products, including Defendants Hasbro and Mattel, as a top destination for children. For example, Google gave a presentation entitled "Insight on Families Online" to Mattel and cited the 2015 Nielsen Study.[27] Mattel's YouTube presence includes several channels directed towards children, including: Barbie, Monster High, and Thomas & Friends.

117.    Google also included a section called "Stat Pack: Additional insight into mobile usage among parents + children" in a presentation to the Hasbro Defendants. In the presentation, Google cited the 2014 Global Kids Study. In a second presentation to the Hasbro Defendants, Google included a section entitled "2016 Kids + Family Digital Trends" and cited both the 2016 LMX Study and Google's own 2016 Google Consumer Survey.[28]

118.    While Google was citing these studies privately to toy companies, it was simultaneously reiterating publicly the false contention that YouTube was not intended for children. For example, when a consumer advocacy group filed a complaint with the FTC over YouTube's data collection practices, a YouTube spokesman told the New York Times: "Because YouTube is not for children, we've invested significantly in the creation of the YouTube Kids app to offer an alternative specifically designed for

---

[26] Patrick Van Kessel, *A Week in the Life of Popular YouTube Channels*, PEW RESEARCH CENTER, July 25, 2019, https://www.pewinternet.org/2019/07/25/a-week-in-the-life-of-popular-youtube-channels/ (accessed Oct. 16, 2019) (emphasis in original).

[27] FTC Exhibit A.

[28] FTC Exhibit C.

SIXTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

children." This was misleading at best because what YouTube Kids really allowed Google to do was to openly solicit the development of more child-directed content from its Channel Owner Defendant partners that could also be posted on YouTube for their mutual profit through behavioral advertising targeting young children.

119. As a result of the above-described, Google had actual knowledge that children under 13 were using YouTube, yet did not obtain verifiable parental consent before collecting the Personal Information of those children in violation of COPPA, the FTC Act, and the consumer protection laws of many of the states. These acts also constituted an intrusion upon the seclusion of children under 13 watching videos on YouTube as well as a violation of their reasonable expectation of privacy.

## II. Economic Incentives Drove the Channel Owner Defendants to Bait and Exploit Children Using Nursery Rhymes, Cartoons, and Other Child-Directed Content

120. Each of the Channel Owner Defendants recognized the economic benefits of creating child-directed YouTube content that could be used to track Personal Information of minor children and entered into agreements with Google to monetize their YouTube channels during the Class Period. By choosing to monetize their YouTube channels and allow Google to employ the more lucrative behavioral targeted advertising, each of the Channel Owner Defendants knew (or should have known) that given the nature of the behavioral targeted advertising, Google was in fact targeting minor children, including children under the age of 13, by tracking Personal Information about those children.  As discussed above, to further their unity of purpose, Google shared 55% of the advertising revenue generated by the Channel Owner Defendants with them. All Defendants therefore acted with a common purpose and jointly economically benefited when the Channel Owner Defendants' content successfully lured children on to YouTube and Google showed these children behavioral targeted advertisements.

121. Each of the Channel Owner Defendants accomplished this common purpose by creating content intentionally designed to attract children, including especially children under the age of 13, with content featuring nursery rhymes and children's songs, toys, and already-popular cartoons. Google knew this, as confirmed by the Attorney General of New York's discovery that a "well-known channel owner . . . repeatedly informed Google and YouTube that its videos were directed to children younger than 13-

years-old."[29]

122.　This exploitation and manipulation of children constitutes unfair, and unconscionable conduct, and was an egregious invasion of privacy.

## A. Defendant ChuChuTV

123.　Defendant ChuChuTV created the ChuChuTV Nursey Rhymes & Kids Songs YouTube channel in 2013[30] and opted to monetize the channel the Class Period. Defendant ChuChuTV is thus a "content creator[] who upload[ed] child-directed content and monetize[ed] [its] channels with behavioral advertising that uses persistent identifiers to track children without verifiable parental consent" described by FTC Commissioner Rebecca Kelly Slaughter as the primary violators of COPPA on YouTube.[31]

124.　Google gave Defendant ChuChuTV the option to turn off behavioral advertising and to instead show contextual advertising to its viewers, thus giving Defendant ChuChuTV the authority to control the unfair and unlawful conduct at issue. Upon information and belief, because it would have earned less revenue, Defendant ChuChuTV agreed to allow behavioral advertising to viewers on YouTube.

125.　Defendant ChuChuTV's child-directed YouTube channels were included as part of the

---

[29] Letitia James, *Google and YouTube to Pay Record Figure For Illegally Tracking And Collecting Personal Information From Children,* New York State Office of the Attorney General, Sept. 4, 2019, https://ag.ny.gov/press-release/2019/ag-james-google-and-youtube-pay-record-figure-illegally-tracking-and-collecting (accessed Oct. 21, 2019).

[30] Alexis C. Madrigal, *Raised by* YouTube, THE ATLANTIC (Nov. 2018), http://www.theatlantic.com/magazine/archive/2018/11/raised-by-youtube/570838/ (accessed Oct. 21, 2019).

[31] *See* Rebecca Kelly Slaughter, *Dissenting Statement of Commissioner Rebecca Kelly Slaughter In the Matter of Google LLC and YouTube, LLC*, FEDERAL TRADE COMMISSION (Sept. 4, 2019), https://www.ftc.gov/system/files/documents/public_statements/1542971/slaughter_google_youtube_statement.pdf ("YouTube is likely the online service that today hosts the most violations of COPPA. Those violations are primarily committed by content creators who upload child-directed content and monetize their channels with behavioral advertising that uses persistent identifiers to track children without verifiable parental consent.")

SIXTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

Google's Preferred "Parenting & Family" Lineup as of March 2018.[32] Because advertisers signing up to advertise to Google Preferred Lineups had the option to serve behavior-based targeted advertising to viewers of those channels, upon information and belief, a channel could not be part of Google's Preferred "Parenting & Family" Lineup without enabling behavioral advertising on its channel.[33]

126.    During the Class Period, ChuChuTV Nursery Rhymes & Kids Songs YouTube channel had over 27 million subscribers and 18 billion views.[34] ChuChuTV Nursery Rhymes & Kids Songs' homepage features digital animal cartoons and cartoons of children. The "About" section of ChuChuTV Nursery Rhymes & Kids Songs' YouTube channel states:

> ChuChuTV is designed to engage children through a series of upbeat nursery rhymes and educational songs with colorful animations. Our ChuChuTV characters will teach kids their favorite nursery rhymes, colors, shapes, numbers etc. and more importantly good human values which we feel is very important for the next generation champions.[35]

127.    Defendant ChuChuTV's first YouTube video featured a character named Chu Chu modeled after ChuChuTV's founder's baby daughter (whose nickname was Chu Chu) "dancing to the popular . . . Indian nursery rhyme "Chubby Cheeks ("Curly hair, very fair / Eyes are blue, lovely too / Teacher's pet, is that you?")."[36] Within a few weeks of the upload of its first video, ChuChuTV had amassed 300,000 views and 5,000 followers.[37] Despite the fact that ChuChuTV's video was clearly directed towards young children – whom Google claims are not allowed to and do not use YouTube – a

---

[32] *See In the Matter of Request to Investigate Google's YouTube Online Service and Advertising Practices for Violating the Children's Online Privacy Protection Act,* Center for Digital Democracy, *et al.,* p. 12.

[33] *See, e.g.* Tim Peterson, *With an eye on TV ad budgets, YouTube debuts search-based video ad targeting,* DIGIDAY (Mar. 13, 2018), https://digiday.com/future-of-tv/youtube-adds-search-based-targeting-tv-style-google-preferred-ad-program/; ("the Google-owned video service is adding the search-based targeting option to its Google Preferred ad-buying program, which packages the most popular 5 percent of YouTube channels into category-specific bundles that brands can advertise against.").

[34]    ChuChu   TV   Nursery   Rhymes   &   Kids   Songs,   *About   Section*,   YOUTUBE, https://www.youtube.com/user/TheChuChuTV/about (accessed Oct. 21, 2019).

[35] *Id.*

[36] *Id.*

[37] *Id.*

YouTube representative contacted ChuChuTV shortly after its launch to say "[y]ou guys are doing some magic with your content."[38]

### B.  The Ryan's World Defendants

128.    The Ryan's World Defendants operate the YouTube channel Ryan's World (f/k/a Ryans ToysReview), which features videos of Ryan Kaji (a minor child during the Class Period) unboxing toys and others children's products. The Ryan's World Defendants agreed to monetize the Ryan's World channel during the Class Period. The Ryan's World Defendants are thus "content creators who upload[ed] child-directed content and monetize[ed] their channels with behavioral advertising that uses persistent identifiers to track children without verifiable parental consent."[39]

129.    Ryan's World's first video was posted in 2015. During the Class Period, with the help of Defendant Pocketwatch, a kids-entertainment company, Ryan's World became the second most popular YouTube channel, with approximately 22.5 million subscribers and over 33 billion views.[40]

130.    Throughout the Class Period, The Ryan's World Defendants lured young children to the Ryan's World YouTube Channel by frequently posting disguised advertising directed at children under the age of five to its YouTube channel using popular children's products. These practices have been the subject of a formal complaint letter filed by Truth in Advertising, Inc. ("TINA") with the FTC and "misleadingly blurs the distinction between advertising and organize content" for Ryan's World's audience and was intended to overcome preschooler's lack of ability to identify and understand that they are being presented with marketing materials.

131.    A review by TINA of videos posted to the Ryan's World YouTube channel concluded that "[t]he target audience for [Ryan's World] is preschool children, i.e., children under the age of five . . . an appraisal of every video published on [Ryan's World] between January 1 and July 31, 2019 reveals that 92 percent promote at least one product or television/YouTube program that is appropriate

---

[38] *Id.*

[39] *See* fn. 31 above.

[40] Ryan ToysReview, *About Section*, YouTube, https://www.youtube.com/channel/UChGJGh Z9SOOHvBB0Y4DOO_w/about, (accessed Oct. 21, 2019).

for – and targeted at – children under the age of five."

132.    Google gave the Ryan's World Defendants the option to turn off behavioral advertising and to instead show contextual advertising to its viewers, thus giving the Ryan's World Defendants the authority to control the unfair and unlawful conduct at issue. Upon information and belief, because they would have earned less revenue, the Ryan's World Defendants opted to allow behavioral advertising to viewers on YouTube.

133.    Ryan's World's "About" section described itself as "Ryan loves Toys. Toys Review for kids by a kid! Join Ryan to see him play with toys and review toys for kids! Ryan will also love doing fun and easy science experiments for kids!" Ryan's World generated over $11 million in revenue in 2018 and over $22 million in 2019.[41] Because Google takes 45% of all ad revenues,[42] Google earned approximately $15 million from Ryan's World alone in 2018-2019.

### C.    The Hasbro Defendants

134.    The Hasbro Defendants created the My Little Pony Official YouTube channel in 2013 and opted to monetize the channel during the Class Period. The Hasbro Defendants are thus "content creators who upload[ed] child-directed content and monetize[ed] their channels with behavioral advertising that uses persistent identifiers to track children without verifiable parental consent."[43]

135.    The Hasbro Defendants' YouTube offerings included the following channels: Play-Doh, Official Play-Doh How To Videos, Baby Alive Official, NERF Official, and TRANSFORMER OFFICIAL. According to Hasbro, the target demographic for My Little Pony is children ages 5-8. During the Class Period, My Little Pony's About section read:

---

[41] Amanda Perelli, *The world's top-earning YouTube star is an 8-year-old boy who made $22 million a single year reviewing toys,* BUSINESS INSIDER, https://www.businessinsider.com/8-year-old-youtube-star-ryan-toysreview-made-22-million-2019-10 (accessed Oct. 21, 2019).

[42] Eric Rosenberg, *How YouTube Ad Revenue Works*, INVESTOPEDIA (Oct. 7, 2018), https://www.investopedia.com/articles/personal-finance/032615/how-youtube-ad-revenue-works.asp. (accessed Jan. 13, 2021).

[43] *See* fn. 31 above.

Welcome to the official home of My Little Pony & Equestrian Girls! Discover the magic of friendship with Twilight Sparkle, Rainbow Dash, Pinkie Pie, Rarity, Fluttershy, Applejack and friends. Join the #RainbowSquad and subscribe today! [44]

136.    Google gave the Hasbro Defendants the option to turn off behavioral advertising and to instead show contextual advertising to its viewers, thus giving the Hasbro Defendants the authority to control the unfair and unlawful conduct at issue. Upon information and belief, because they would have earned less revenue, the Hasbro Defendants agreed to allow behavioral advertising to viewers on YouTube.

137.    The FTC's complaint against Google specifically cited the Hasbro Defendants as part of a group of YouTube channel owners that hosted child-directed content and knowingly assisted Google to collect the Personal Information of viewers of Hasbro's YouTube channel to show behavioral advertising, resulting in "close to $50 million" in revenue for Google. [45]

138.    In addition to producing child-directed content that was posted on YouTube, the Hasbro Defendants were cited by the New York State Office of the Attorney General for violating COPPA by engaging in an advertising campaign that tracked child visitors to the Nerf section of Hasbro's website in order to serve Hasbro advertisements to those same users as they visited other websites at a later time (a type of online behavioral advertising prohibited by COPPA known as "remarketing") and for integrating a third-party plug-in into many of its websites that allowed users to be tracked across websites and introduced other third parties that engaged in the type of tracking, profiling, and targeted advertising prohibited under COPPA. [46]

---

[44] My Little Pony, About section, YOUTUBE, https://www.youtube.com/user/mlpequestriagirls/about (accessed Oct. 21, 2019).

[45] *See* FTC Complaint, ¶ 31 (describing the Hasbro Defendants' YouTube channel content); *see also* FTC Complaint ¶ 41 ("[Google] earned close to $50 million from behavioral advertising on these channels, which represent only a few examples of the possible universe of child-directed content on YouTube."). Under their revenue sharing agreements with Google, channel owners obtained roughly an additional $60 million from that behavioral advertising.

[46] Press Release, *A.G Schneiderman Announces Results Of "Operation Child Tracker," Ending Illegal Online Tracking Of Children At Some Of Nation's Most Popular Kids' Websites,* https://ag.ny.gov/press-release/2016/ag-schneiderman-announces-results-operation-child-tracker-ending-illegal-online (assessed Jan. 14, 2021).

139.    Defendant Hasbro was required to adopt comprehensive reforms as part of a settlement with the office of the Attorney General of the State of New York, including the following:

a.    Conducting regular electronic scans to monitor for unexpected third party tracking technologies that may appear on their children's websites.

b.    Adopting procedures for vetting third parties before they are introduced onto their children's websites to determine whether and how the third parties collect, use, and disclose, and allow others to collect, use, and disclose, personal information from users.

c.    Providing notice to third parties that collect, use, or disclose personal information of users with information sufficient to enable the third parties to identify the websites or sections of websites that are child directed pursuant to COPPA.

d.    Updating website privacy policies with either (a) information sufficient to enable parents and others to identify the websites and portions of websites that are directed to children under COPPA or (b) a means of contacting the company so that parents and others may request such information.

140.    Upon information and belief, the Hasbro Defendants continued to post child-directed content to YouTube and opted to show visitors behavioral advertising after entering into its settlement agreement with the NY AG in 2016.

**D.    Defendant Mattel**

141.    Defendant Mattel operated several monetized YouTube channels during the Class Period, including Barbie, Monster High, Hot Wheels, and Thomas & Friends. Defendant Mattel is thus a "content creator[] who upload[ed] child-directed content and monetize[ed] [its] channels with behavioral advertising that uses persistent identifiers to track children without verifiable parental consent."[47]

142.    Google gave Defendant Mattel the option to turn off behavioral advertising and to instead show contextual advertising to its viewers, thus giving Defendant Mattel the authority to control the

---

[47] *See* fn. 31 above.

SIXTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

unfair and unfair and unlawful conduct at issue. Upon information and belief, because it would have earned less revenue, Defendant Mattel agreed to allow behavioral advertising to viewers on YouTube.

143.    The FTC's complaint against Google specifically cited Defendant Mattel as part of a group of YouTube channel owners that hosted child-directed content and knowingly assisted Google to collect the Personal Information of viewers of Mattel's YouTube channel to show behavioral advertising, resulting in "close to $50 million" in revenue for Google. [48]

144.    During the Class Period, Mattel's YouTube channels had tens of millions of subscribers and billions of views. Each channel showed child-directed content featuring popular children's toys belonging to Mattel's brands. For example, the Barbie YouTube channel featured animated videos of Barbie and related toys, including the "Junior Rainbow Princesses." The Barbie YouTube channel also featured episodes of "Barbie Dreamtopia," a show that, according to the FTC and New York Attorney General, Mattel described as "targeting 3-6 year olds."

145.    In addition to producing child-directed content that was posted on YouTube, Defendant Mattel was fined $250,000 in 2016 by the New York State Office of the Attorney General for the following:

a.    Mattel deployed a tracking technology supplied by a third-party data broker across its Barbie, Hot Wheels, Fisher-Price, Monster High, Ever After High, and Thomas & Friends websites.  Mattel used the tracking technology for measuring website metrics, such as the number of visitors to each site, a practice permitted under COPPA. However, the tracking technology supplied by the data broker introduced many other third-party tracking technologies in a process known as "piggy backing." Many of these third parties engage in the type of tracking, profiling, and targeted advertising prohibited by COPPA.

---

[48] *See* FTC Complaint, ¶ 29 (describing Defendant Mattel's YouTube channel content); *see also* FTC Complaint ¶ 41 ("[Google] earned close to $50 million from behavioral advertising on these channels, which represent only a few examples of the possible universe of child-directed content on YouTube.")

    b.      A tracking technology that Mattel deployed on the e-commerce portion of the American Girl website, which is not directed to children or covered by COPPA, was inadvertently introduced onto certain child-directed webpages of the American Girl website.

    c.      Mattel uploaded videos to Google's YouTube.com, a video hosting platform, and then embedded some of these videos onto the child-directed portion of several Mattel websites, including the Barbie website. When the embedded videos were played by children, it enabled Google tracking technologies, which were used to serve behavioral advertisements.[49]

146. Defendant Mattel was required to adopt comprehensive reforms as part of a settlement with the office of the Attorney General of the State of New York, including the following:

    a.      Conducting regular electronic scans to monitor for unexpected third-party tracking technologies that may appear on their children's websites and provide regular reports to the office regarding the results of the scans.

    b.      Adopting procedures for vetting third parties before they are introduced onto their children's websites to determine whether and how the third parties collect, use, and disclose, and allow others to collect, use, and disclose, personal information from users.

    c.      Providing notice to third parties that collect, use, or disclose personal information of users with information sufficient to enable the third parties to identify the websites or sections of websites that are child directed pursuant to COPPA.

    d.      Updating website privacy policies with either (a) information sufficient to enable parents and others to identify the websites and portions of websites that are directed to children under COPPA or (b) a means of contacting the company so that parents and others may request such information.

---

[49] *See* fn. 48 above.

SIXTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

147.    Upon information and belief, Defendant Mattel continued to post child-directed content to YouTube and opted to show visitors behavioral advertising after entering into its settlement agreement with the NY AG in 2016.

### E.    The Cartoon Network Defendants

148.    The Cartoon Network Defendants operated several monetized YouTube channels directed towards children during the Class Period, including Steven Universe, the Powerpuff Girls, and Teen Titans Go. The Cartoon Network Defendants are thus "content creators who upload[ed] child-directed content and monetize[ed] their channels with behavioral advertising that uses persistent identifiers to track children without verifiable parental consent."[50]

149.    Google gave the Cartoon Network Defendants the option to turn off behavioral advertising and to instead show contextual advertising to their viewers, thus giving the Cartoon Network Defendants the authority to control the unfair and unlawful conduct at issue. Upon information and belief, because they would have earned less revenue, the Cartoon Network Defendants agreed to allow behavioral advertising to viewers on YouTube.

150.    The FTC's complaint against Google specifically cited the Cartoon Network Defendants as part of a group of YouTube channel owners that hosted child-directed content and knowingly assisted Google to collect the Personal Information of viewers of the Cartoon Network's YouTube channel to show behavioral advertising, resulting in "close to $50 million" in revenue for Google.[51]

151.    During the Class Period, The Cartoon Network Defendants' YouTube channel had over 6 million subscribers and its content had been viewed over 5.3 billion times. According to the FTC and New York Attorney General, Google selected a clip from the Cartoon Network YouTube channel in a "Creating for Kids Playbook," as an example of family-friendly content and also marketed the Cartoon Network YouTube channel as a "popular YouTube Channel[] kids are watching."

---

[50]  *See* fn. 31 above.

[51]  *See* FTC Complaint, ¶ 30 (describing the Cartoon Network Defendants' YouTube channel content); *see also* FTC Complaint ¶ 41 ("[Google] earned close to $50 million from behavioral advertising on these channels, which represent only a few examples of the possible universe of child-directed content on YouTube.")

SIXTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

F.      **The DreamWorks Defendants**

152.    The DreamWorks Defendants operated the child-directed monetized DreamWorksTV YouTube channel during the Class Period. The DreamWorks TV YouTube channel's content included several popular children's shows, including Race to the Edge, Trollhunters, and Shrek. The DreamWorks Defendants are thus "content creators who upload[ed] child-directed content and monetize[ed] their channels with behavioral advertising that uses persistent identifiers to track children without verifiable parental consent."[52]

153.    The "About" section of the DreamWorks TV YouTube channel described the channel as "made just for kids!" throughout the Class Period. The DreamWorksTV YouTube channel had 6.3 million subscribers and its content had been viewed over 4.7 billion times during the Class Period.

154.    Google gave the DreamWorks Defendants the option to turn off behavioral advertising and to instead show contextual advertising to their viewers, thus giving the DreamWorks Defendants the authority to control the unfair and unlawful conduct at issue. Upon information and belief, because they would have earned less revenue, the DreamWorks agreed to allow behavioral advertising to viewers on YouTube.

155.    The FTC's complaint against Google specifically cited the DreamWorks Defendants as part of a group of YouTube channel owners that hosted child-directed content and knowingly assisted Google to collect the Personal Information of viewers of DreamWorks' YouTube channel to show behavioral advertising, resulting in "close to $50 million" in revenue for Google.[53]

III.    **Economic Incentives Drove Google to Unlawfully Track, Profile, and Target Children with Behavioral Targeting**

156.    The design and marketing of channels such as ChuChuTV Nursery Rhymes & Kids Songs, Ryan ToysReview, My Little Pony Official, Barbie, and Monster High, among others, as well as

---

[52] *See* fn. 31 above.

[53] *See* FTC Complaint, ¶ 32 (describing the DreamWorks Defendants' YouTube channel content); *see also* FTC Complaint ¶ 41 ("[Google] earned close to $50 million from behavioral advertising on these channels, which represent only a few examples of the possible universe of child-directed content on YouTube.")

each of the Channel Owner Defendants' own categorization of their videos, clearly provided notice to Google that children, including children under the age of 13, were viewing these channels.

157.    As described below, Plaintiffs watched many of the Channel Owner Defendants' YouTube channels during the Class Period, and were therefore subjected to Google's behavioral targeting, which included collection of their Personal Information. Google used behavioral targeting to show minor children advertisements that were uniquely tailored to them for Google and the Channel Owner Defendants' financial gain.

158.    Targeting advertisements to children adds more value than targeting to adults because children are generally unable to distinguish between content and advertisements. This is especially true in the digital realm, where children are less likely to identify and counteract the persuasive intent of advertising. This results in children, especially those under the age of eight, accepting advertising information in commercials "uncritically . . . [and as] truthful, accurate, and unbiased."[54]

159.    Despite their knowing collection of Personal Information about minor children, including children under the age of 13, Google and each of the Channel Owner Defendants knowingly disregarded their obligation to comply with federal and state laws designed to protect children's privacy by claiming no children watched videos on YouTube. Google did so because it knew it could not both abide by federal and state law *and* offer highly profitable behavioral targeting of children.

160.    As the Attorney General of New York put it, Google knew that stopping the illegal tracking, profiling, and targeting practices would result in a substantial loss of revenue:

> Google and YouTube knowingly and illegally monitored, tracked, and served targeted ads to young children just to keep advertising dollars rolling in . . . These companies put children at risk and abused their power, which is why we are imposing major reforms to their practices and making them pay one of the largest settlements for a privacy matter in

---

[54] Report of the APA Task Force on Advertising and Children (American Psychological Association, Feb. 20, 2004), at pp.7-8, available at https://www.apa.org/pi/families/resources/advertising-children.pdf (accessed July 22, 2024).

SIXTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

U.S. history.[55]

161.   Faced with a choice between complying with federal and state privacy laws and their advertising revenue, Google and each of the Channel Owner Defendants chose the money. During the Class Period, Google and the Channel Owner Defendants collectively realized hundreds of millions of dollars, if not more, as a result of their common purpose and joint actions.

162.   The harmful intrusions of personal privacy of the Minor Plaintiffs, and all similarly-situated children they seek to represent, resulting from Defendants' actions cannot be overstated. During the Class Period, Google collected the Personal Information of millions of children, including but not limited to children under the age of 13, who viewed monetized YouTube channels, including the each of the Channel Owner Defendants' channels. This included the collection of persistent identifiers, which Google used to track minor children across the internet, internally develop a profile of the inferred preferences and interests of those children, and target those children with advertisements designed to influence their behavior.

163.   And even though Google purported to give individuals some control over their data during the Class Period, it did "not disclose the full extent of the information it collects . . . nor the valuable inferences it draws from this data."[56] While Google claims to enable users to control their data, Google "*omits* much of the data the company collects, which is often far more invasive and revealing."[57]

164.   Moreover, children themselves cannot properly consent to this profiling, and Google and each of the Channel Owner Defendants did not obtain parental consent to perform this profiling. Nonetheless, Google developed and used these profiles to manipulate and exploit children. Google makes more money through YouTube by capturing more of an individual's time. Google thus

---

[55] *Google and YouTube to Pay Record Figure For Illegally Tracking And Collecting Personal Information From Children,* NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL, Sept. 4, 2019, https://ag.ny.gov/press-release/2019/ag-james-google-and-youtube-pay-record-figure-illegally-tracking-and-collecting (accessed Oct. 21, 2019).

[56] Oracle, *Google's Shadow Profile: A Dossier of Consumers Online and Real World Life* (Feb. 2019), https://assets.publishing.service.gov.uk/media/5e1c4985e5274a06b7450a13/Oracle_-_Response_to_SoS_-_Appendix_4_-_Google_Shadow_Profiles.pdf (accessed Mar. 12, 2020).

[57] *Id.*

manipulated children using their Personal Information into extending their time on YouTube, which in turn increased the number of targeted advertisements shown to them, and increased the revenue earned by Google and each of the Channel Owner Defendants.13

## IV.   Defendants' Tracking, Profiling, Targeting and Exploitation of Children Without Parental Consent Constitutes Unfair and Unlawful Conduct

165.   State legislatures across the country have enacted consumer protection statutes proscribing the same unfair and unlawful business conduct proscribed by the FTC Act and rules promulgated thereunder. These "Little FTC Acts" were often enacted for the specific purpose of supplementing the FTC's mission of protecting consumers from unfair and/or unlawful acts or practices by providing state citizens with a private right of action to seek redress for harm arising out of acts those acts which are also prohibited by the FTC Act, which lacks a private right of action.

166.   Thus, the conduct which the FTC determined violated COPPA jointly carried out by Defendants as described above, not only constitutes "unfair" and therefore unlawful acts that violate COPPA and the FTC Act, but also constitutes "unfair" and therefore unlawful acts pursuant to the Little FTC Acts enacted by many American states.

167.   Specifically, the acts carried out by Defendants described above constitute "unfair" acts under the Little FTC Acts pursuant to which Plaintiffs bring claims because they: (1) caused substantial injury to Plaintiffs and those similarly situated by intrusively and invasively collecting their Personal Information without parental consent in violation of COPPA, the FTC Act, and societal norms; and (2) attempted to (and often did) manipulate the behavior of Plaintiffs and the millions of similarly situated American children by collecting their Personal Information without parental consent and using that illegally-collected Personal Information for Defendants' own financial benefit.  These injuries were not reasonably avoided by the vulnerable children under 13 years of age that Google and each of the Channel Owner Defendants—sophisticated corporations—targeted. Nor were the injuries to Plaintiffs and similarly situated American children caused by Google and each of the Channel Owner Defendants outweighed by countervailing benefits to consumers.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**V.     Plaintiffs and The Members of The Classes have Suffered Economic Loss and Injury as a Result of Defendants' Unfair and Deceptive Conduct.**

168.     Courts have recognized that internet users have a property interest in their Personal Information and that Personal Information is, thus, an asset with economic value.[58]  Through their unfair and deceptive conduct, Defendants misappropriated the Personal Information of Plaintiffs and the members of the Classes, destroyed the principal aspect of the Personal Information that provided its value to Plaintiffs and the members of the Classes, and diminished the value of the Personal Information.

169.     As a result of Defendants' unfair and deceptive conduct, Plaintiffs and the members of the Classes have, thus, suffered economic loss and injury in one or more of the following respects:

a.   Defendants unlawfully took possession of and commercially exploited the Personal Information of Plaintiffs and the members of the Classes without their permission and without compensation; and

b.   Defendants' unlawful collection and exploitation of the Personal Information of Plaintiffs and the members of the Classes have destroyed the private quality of the Personal Information and have deprived Plaintiffs and the members of the Classes of the ability to determine whether or not to keep their Personal Information private and when or if to sell their Personal Information --  valuable aspects of their rights of ownership that were of paramount importance to Plaintiffs and the members of the Classes in this case – and, thus, diminished the value of the Personal Information.

**A.     Personal Information is an Asset that has Economic Value.**

170.     The information Google collects and uses had and continues to have massive economic value during the Class Period. This value is well understood in the e-commerce industry, and Personal Information is now viewed as a form of currency.

---

[58] *See CTC Real Estate Servs. v. Lepe*, 140 Cal. App. 4th 856, 860, 44 Cal.Rptr.3d 823 (2006) ("A person's identifying information is a valuable asset."); *accord In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 600 (9th Cir. 2020) (citing *Lepe* and holding that the plaintiffs had suffered economic injury after Facebook allegedly took their personal information in a similar process to that alleged here).

SIXTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

171.    Research on the market for Personal Information dates back well before the Class Period,[59] and demonstrates a growing consensus that consumers' sensitive and valuable Personal Information would become the new frontier of financial exploit.

172.    Professor Paul M. Schwartz noted in the Harvard Law Review:

Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information.[60]

173.    Likewise, in *The Wall Street Journal*, former fellow at the Open Society Institute (and current principal technologist at the ACLU) Christopher Soghoian noted:

The dirty secret of the Web is that the "free" content and services that consumers enjoy come with a hidden price: their own private data. Many of the major online advertising companies are not interested in the data that we knowingly and willingly share.  Instead, these parasitic firms covertly track our web-browsing activities, search behavior and geolocation information. Once collected, this mountain of data is analyzed to build digital dossiers on millions of consumers, in some cases identifying us by name, gender, age as well as the medical conditions and political issues we have researched online.

174.    Although we now regularly trade our most private information for access to social-networking sites and free content, the terms of this exchange were never clearly communicated to consumers.[61]

175.    As the thirst has grown for Personal Information,[62] it has become apparent that the world's

---

[59]  "Markets and Privacy" by Kenneth C Laudon, Communications of the ACM, 1996. https://canvas.harvard.edu/files/4164376/download?download_frd=1.

[60]  Paul M. Schwartz, Property, *Privacy and Personal Data*, 117 HARV. L. REV. 2055, 2056–57 (2004).

[61]  Julia Angwin, *How Much Should People Worry About the Loss of Online Privacy?*, THE WALL STREET JOURNAL (Nov. 15, 2011).

[62]  *Exploring the Economic of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD Digital Economy Paper No. 220 at 7 (Apr. 2, 2013), http://dx.doi.org/10.1787/5k486qtxldmq-en; *Supporting Investment in Knowledge Capital, Growth and Innovation*, OECD, at 319 (Oct. 13, 2013), https://www.oecd.org/sti/inno/newsourcesofgrowthknowledge-basedcapital.htm; Pauline Glickman and Nicolas Glady, *What's the Value of Your Data?* TechCrunch (Oct. 13, 2015). https://techcrunch.com/2015/ 10/13/whats-the-value-of-your-data/; Paul Lewis and Paul Hilder, *Former Cambridge Analytica exec says she wants lies to stop*, The Guardian (March 23, 2018) https://www.theguardian.com/uk-news/2018/mar/  23/former-cambridge-analytica-executive-brittany-kaiser-wants-to-stop-lies; Shoshanna Zuboff, *The Age of Surveillance Capitalism 166* (2019).

SIXTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

most valuable resource is no longer oil, but instead consumers' data in the form of their Personal Information.[63]

176.    The cash value of the Personal Information unlawfully collected by Google during the Class Period can be quantified.  For example, in a study authored by Tim Morey, researchers studied the value that 180 internet users placed on keeping personal data secure.[64] Contact information of the sort that Google requires was valued by the study participants at approximately $4.20 per year. Demographic information was valued at approximately $3.00 per year. However, web browsing histories were valued at a much higher rate: $52.00 per year. The chart below summarizes the findings:



177.    Similarly, the study *Your Browsing Behavior for a Big Mac: Economics of Personal Information Online* by Juan Pablo Carrascal and colleagues employed a detailed methodology to understand how users their Personal Information in exchange for internet-based services.[65]  Participants

[63] *The world's most valuable resource is no longer oil, but data*, The Economist (May 6, 2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data.

[64] Tim Morey*, What's Your Personal Data Worth?* DESIGN MIND (Jan. 18, 2011), https://web.archive.org/web/20131206000037/http://designmind.frogdesign.com/blog/what039s- your-personal-data-worth.html.

[65] Juan Pablo Carrascal et al., *Your Browsing Behavior for a Big Mac: Economics of Personal Information Online*, arXiv preprint arXiv:1112.6098 (2011), https://arxiv.org/abs/1112.6098.

installed a browser plugin that logged their web browsing activities, including the URLs visited and the time of access.[66] The plugin also categorized the websites into eight predefined categories: Email, Entertainment, Finance, News, Search, Shopping, Social, and Health and asked participants questions designed to gather information about their perceptions of privacy, their knowledge of how their Personal Information might be monetized, and their valuation of specific pieces of PI as they visited certain websites.[67]  To calculate the value users placed on their Personal Information, Carrascal and colleagues employed a reverse second-price auction mechanism in which participants bid on the minimum amount of money they would accept to sell specific pieces of their Personal Information in exchange for internet-based services they were using.[68]

178.    The results of Carrascal's study were the following Personal Information valuations:

    a.  Offline information (age address, economic stats): €25

    b.  Browsing History: €7

    c.  Interactions on social networks: €12

    d.  Search History: €2

    e.  Shopping Activity: €5

179.    What these studies, and others[69] show is that individuals place an economic value on their Personal Information, and are willing to engage in economic transactions in which they will grant access to their Personal Information in exchange for internet-based services. Defendants' unauthorized collection of their Personal Information deprived individuals of this opportunity.

180.    On the open market, Personal Information is often mined, compiled, and resold by data brokers.  Further, there is a market for consumers to monetize Personal Information and the behavioral

---

[66] *Id.*

[67] *Id.*

[68] *Id.*

[69] Jacopo Staiano et al., *Money Walks: A Human-Centric Study on the Economics of Personal Mobile Data*, arXiv preprint arXiv:1407.0566 (2014), https://arxiv.org/abs/1407.0566 (finding that location information is the most valued type of personal data, with a median value of approximately €25, and that participants showed significant sensitivity towards monetizing their personal information collected via mobile phones).

SIXTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

preferences that Defendants have usurped.  Published analyses and studies have placed a value in excess of $200 on an individual's Personal Information..[70]

181.    A child's Personal Information has equivalent (or potentially greater) value than that of an adult.  It is well-established that children are more susceptible to being influenced by advertisements and often cannot tell the difference between content and advertisements in child-directed videos..[71]  And Defendants may be able to utilize children's Personal Information to show them behavior-targeted advertising for the duration of their lives.

182.    The value of user-correlated internet browsing history can also be quantified, because Google itself has been willing to pay users for the exact type of information that Google has illegally used to develop profiles of Plaintiffs and the other members of the Classes during the Class Period.

183.    For example, Google has a product called "Google Screenwise Trends" which is designed "to learn more about how everyday people use the Internet."  Upon becoming a panelist, internet users add a browser extension that shares with Google the sites they visit and how they use them. The panelists consent to Google tracking such information for three months in exchange for one of a number of "gifts," including gift cards to retailers such as Barnes & Noble, Walmart, and Overstock.com. After three months, Google also agreed to pay panelists additional gift cards "for staying with" the panel. These gift cards, mostly valued at exactly $5, demonstrate that internet industry participants understand the enormous value in internet users' browsing habits. Google has paid Screenwise panelists up to $3 per week to be tracked.

184.    Personal Information also has a value based on consumers' privacy interests. In a recent study by the Pew Research Center, 93% of Americans said it was "important" for them to be "in control of who can get information" about them. Seventy-four percent said it was "very important." Eighty-seven

---

[70] *Can you Put a Price on Your Personal Data*, June 28, 2019, NYTimes, https://www.nytimes.com/2019/06/28/technology/data-price-big-tech.html.

[71] Google is well aware of the special vulnerability of minors when it comes to behavioral advertising. As an internal Google presentation produced in discovery emphasizes, ███████████

████████████████████████████████████████████████████

*See* GOOG-HUB-00005818.

SIXTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

percent of Americans said it was "important" for them not to have someone watch or listen to them without their permission.  Sixty-seven percent said it was "very important." And 90% of Americans said it was "important" that they be able to "control[] what information is collected about [them]." Sixty-five percent said it was very important. [72]

185.    Likewise, in a 2011 Harris Poll study, 76% of Americans agreed that "online companies, such as Google or Facebook, control too much of our personal information and know too much about our browsing habits." [73]

186.    Google itself has placed a value on consumers' willingness to give up their privacy interests in their Personal Information by paying users specifically for their browsing data. [74]

187.    Google has further recognized – and quantified -- the economic value of Plaintiffs' and the Classes' privacy interests in their Personal Information: in 2014, Google established a YouTube Premium service and in 2018, it established a YouTube Premium Student Plan, both of which provide YouTube programming without advertising for a monthly subscription fee (currently $13.99 for YouTube Premium, discounted for YouTube Premium Student Plan).  User/parent willingness to pay these amounts to avoid the targeted advertising that minor YouTube users were bombarded with based on the profiles developed from their tracked Personal Information provides a further basis for determining the economic value of Plaintiffs' and Class members' privacy interests in in maintaining uncollected/unexploited Personal Information.

188.    During the Class Period, a number of platforms have appeared that allow consumers to directly monetize their own data and prevent tech companies from targeting them absent their express consent:

---

[72]    https://www.pewresearch.org/internet/2015/05/20/americans-attitudes-about-privacy-security-and-surveillance/#:~:text=93%25%20of%20adults%20say%20that,it%20is%20%E2%80%9Csomewhat%20important.%E2%80%9D.

[73]        https://www.prnewswire.com/news-releases/majorities-think-some-online-companies-are-too-powerful-121986453.html

[74] Jack Marshall, *Google Pays Users for Browsing Data,* DigiDay (Feb. 10, 2012), https://digiday.com/media/google-pays-users-for-browsing-data/.

a. Brave's web browser, for example, will pay users to watch online targeted ads, while blocking out everything else. [75]

b. Loginhood states that it "lets individuals earn rewards for their data and provides website owners with privacy tools for site visitors to control their data sharing," via a "consent manager" that blocks ads and tracking on browsers as a plugin. [76]

c. Andrew Yang's "Data Dividend Project" aims to help consumers, "[t]ake control of your personal data.  If companies are profiting from it, you should get paid for it." [77]

d. Killi is a new data exchange platform that allows consumers to own and earn from their data. [78]

e. Similarly, BIGtoken "is a platform to own and earn from your data. You can use the BIGtoken application to manage your digital data and identity and earn rewards when your data is purchased." [79]

f. The Nielsen Company, famous for tracking the behavior of television viewers' habits, has extended its reach to computers and mobile devices through the Nielsen Computer and Mobile Panel. By installing the application on a consumer's computer, phone, tablet, e-reader, or other mobile device, Nielsen tracks the user's activity, enters that user into

---

[75] Get Paid to Watch Ads in the Brave Web Browser, at: https://lifehacker.com/get-paid-to- watch-ads-in-the-brave-web-browser-1834332279#:~:text=Brave%2C%20a%20chromium-based%20web%20browser%20that%20boasts%20an,a%20more%20thoughtful%20way%20than%20we%E2%80%99re%20accustomed%20to (Lifehacker, April 26, 2019) ("The model is entirely opt-in, meaning that ads will be disable by default. The ads you view will be converted into Brave's cryptocurrency, Basic Attention Tokens (BAT), paid out to your Brave wallet monthly").

[76] https://loginhood.io/.  *See also*,  https://loginhood.io/product/chrome-extension  ("[s]tart  earning rewards for sharing data – and block others that have been spying on you. Win-win.").

[77] How Does It Work, at: https://www.datadividendproject.com/ ("Get Your Data Dividend…We'll send you $$$ as we negotiate with companies to compensate you for using your personal data.").

[78] https://killi.io/earn/.

[79] https://bigtoken.com/faq#general_0 ("Third-party applications and sites access BIGtoken to learn more about their consumers and earn revenue from data sales made through their platforms. Our BIG promise: all data acquisition is secure and transparent, with consumers made fully aware of how their data is used and who has access to it.").

SIXTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

sweepstakes with monetary benefits, and allows the user to earn points worth up to $50 per month.[80]

189.    Technology companies recognize the monetary value of users' Personal Information, insofar as they encourage users to install applications explicitly for the purpose of selling that information to technology companies in exchange for monetary benefits.[81]

190.    The California Consumer Protection Act ("CCPA") recognizes that consumers' personal data is a property right. Not only does the CCPA prohibit covered businesses from discriminating against consumers that opt-out of data collection, the CCPA also expressly provides that: "[a] business may offer financial incentives, including payments to consumers as compensation, for the collection of personal information, the sale of personal information, or the deletion of personal information." Cal. Civ. Code § 1798.125(b)(1). The CCPA provides that, "[a] business shall not use financial incentive practices that are unjust, unreasonable, coercive, or usurious in nature." Cal. Civ. Code § 1798.125(b)(4).

**B.    Defendants Have Taken Possession of and Commercially Exploited the Personal Information of Plaintiffs and the Members of the Class without Permission and Without Compensation.**

191.    Defendants have unlawfully taken possession of and commercially exploited the Personal Information of Plaintiffs and the members of the Classes without their permission and without compensating them for the use of their assets.  As Google's advertising revenue (of $116 billion in 2018) tellingly demonstrates, this information has tremendous value to Defendants and advertisers.

192.    Defendants' illegal and improper collection of children's Personal Information also has given them a significant "first mover" advantage that cannot be undone. Google operates the first and second-most visited websites in the world, and as a result of its unlawful conduct, Google's algorithms

---

[80] Kevin Mercandante, Ten Apps for Selling Your Data for Cash, Best Wallet Hacks (June 10, 2020), https://wallethacks.com/apps-for-selling-your-data/.

[81] *Kari Paul, Google launches app that will pay users for their data*, The Guardian (June 11, 2019), https://www.theguardian.com/technology/2019/jun/11/facebook-user-data-app-privacy- study;  Saheli Roy Choudhury and Ryan Browne, *Facebook pays teens to install an app that could collect all kinds of data*, CNBC (Jan. 30, 2019), https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html; Jay Peters, *Facebook will now pay you for your voice recordings*, The Verge (Feb. 20, 2020), https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-pronunciations-app.

now incorporate ill-gotten data from billions of children's YouTube video views. The deep insights gleaned from these viewing sessions will enable Google to keep children viewing YouTube, to use the Personal Information of children for potentially the duration of their lives, and will solidify Google's dominance in the market for child-related content.

193.    Defendants' exploitation of Plaintiffs' and the members of the Classes' Personal Information, without compensation, has caused Plaintiffs and the members of the Classes to suffer economic loss and injury.

194.    Defendants' exploitation of Plaintiffs' and the members of the Classes' Personal Information, without compensation, has caused Plaintiffs and the members of the Classes to suffer ascertainable losses.

**C.    The Unlawful Collection and Exploitation of Plaintiffs' and Class Members' Personal Information Has Deprived Them of the Value of Protecting That Information From Being Sold and Exploited in the Digital Information Marketplace, and Has Diminished its Value, Causing Economic Loss and Injury.**

195.    Defendants' unlawful collection and commercial exploitation of the Personal Information of Plaintiffs' and the members of the Classes has deprived Plaintiffs and Class members of the right and privilege of ownership that was most important to them – the right to maintain the privacy of their Personal Information and NOT to sell it. Defendants' conduct has thus destroyed the fundamental quality of the asset, and diminished its value to Plaintiffs and the Class members.  And, for those Plaintiffs and Class members who would choose to sell their Personal Information in what is a well-established and readily available marketplace, Defendants' conduct has diminished the amount a knowledgeable buyer would be willing to pay for the Information.

196.    Once a child's Personal Information has been collected and exploited by Defendants, it is no longer possible for the child or the child's parents to maintain the confidentiality of the data – the aspect of the data that provides the major component of its value to the children and their parents and that, correspondingly, determines the price a seller would be willing to accept – and that a buyer would need to offer – for the data.  Researchers have explored the economic implications and market dynamics under such circumstances and have determined that Defendants' conduct thus diminishes the value of the child's Personal Information since a knowledgeable buyer of the data would understand that the data has

been deprived of its primary value to the user and would decrease the amount it would be willing to pay – and the amount the user would be willing to accept – for the data.[82]

197.     The value of the Personal Information of Plaintiffs' and the members of the Classes has also been diminished by Defendants' wrongful conduct because, as a consequence of gathering the Personal Information of a massive number of child YouTube users, Google has been able to develop large subsets of YouTube users with correlated interests – *i.e.*, users who share interests in similar (or opposite) areas and who can be expected to respond similarly to behavioral advertising or to targeted programming.[83]   Researchers have also studied the market dynamics in such a scenario for additional members of such subsets whose preferences correlate with other users in a given subset.[84] Because Google already possesses tracking information from other members of the subset sufficient to identify user preferences, Google has and other market participants have less need for the Personal Information of additional subset members and the value of their Personal Information is, thus, decreased.[85]

198.     In both of the above scenarios, the desire/willingness of the user to protect his or her data from exposure is diminished, and the amount of compensation required to cause the user to expose (*i.e.*, sell) the data – and the amount of a buyer would need to offer -- is diminished.  And, because the user's data is now available to either Google or a competitor at a reduced price, the value of the correlated data of all of the other members of the subset is, likewise, diminished.

---

[82] "Too Much Data: Prices and Inefficiencies in Data Markets," by Daron Acemoglu (MIT), Ali Makhdoumi (Duke University), Azarakhsh Malekian (University of Toronto), and Asu Ozdaglar (MIT), American Economic Journal: Microeconomics, 14(4), 218–256, 2022, https://www.aeaweb.org/articles?id=10.1257/mic.20200200, accessed 7/14/24.

[83] *See, e.g.*, https://www.indexexchange.com/2023/12/12/google-privacy-sandbox-get-started/ (accessed 7/14/24), https://developers.google.com/privacy-sandbox/overview/relevance-and-measurement-faqs (accessed 7/14/24), and https://developers.google.com/privacy-sandbox/relevance/protected-audience (accessed 7/14/24).

[84] *See, e.g.*, https://www.indexexchange.com/2023/12/12/google-privacy-sandbox-get-started/ (accessed 7/14/24), https://developers.google.com/privacy-sandbox/overview/relevance-and-measurement-faqs (accessed 7/14/24), and https://developers.google.com/privacy-sandbox/relevance/protected-audience (accessed 7/14/24).

[85] *See* fn. 82. *See, also*, "Privacy and personal data collection with information externalities," by Jay Pil Choi, Doh-Shin Jeon and Byung-Cheol Kim, Journal of Public Economics, 173, 113–124, 2019.

199.    For children (or their parents) for whom the sole value of the Personal Information derives from maintaining user privacy, the economic value of the Personal Information has been completely destroyed by Defendants' collection and use of it.

200.    Defendants' unlawful exploitation of the Personal Information of Plaintiffs and Class members has, thus, diminished the value of their Personal Information, causing Plaintiffs and Class members to suffer economic loss and injury for which Plaintiffs and Class members can never be made whole.

201.    Defendants' unlawful exploitation of the Personal Information of Plaintiffs and the members of the Classes has, thus, diminished the value of their Personal Information, causing Plaintiffs and the members of the Classes to suffer ascertainable economic loss.

## VI.    Defendants' Tracking, Profiling, Targeting and Exploitation of Children Without Parental Consent Violated Plaintiffs' and Class Members' Reasonable Expectations of Privacy and is Highly Offensive

202.    Google and each of the Channel Owner Defendants' joint conduct in violating privacy rights and reasonable expectations of privacy of Plaintiffs and Class members is particularly egregious because Google (by collecting the information) and each of the Channel Owner Defendants (by ordering Google to collect the information and providing Google with the means of doing so) violated societal norms and laws designed to protect a group – children – that society has long recognized as vulnerable to exploitation and manipulation.

203.    Parents' interest in the care, custody, and control of their children is one of the most fundamental liberty interests recognized by society. It has long been recognized that parents should maintain control over who interacts with their children and how.

204.    Because children are more susceptible to exploitation than adults, society has recognized the importance of providing added legal protections for children, often in the form of parental consent requirements.

205.    In fact, as discussed above, the FTC's enhancements of COPPA in 2013 reflect the specific concern with mobile app tracking and tracking internet users via persistent identifiers, and reflect the offensiveness with which society regards this behavior.

1

206.    Children develop the ability to use smartphones and tablets by the age of two.[86] Almost

2

every family with a child younger than eight in America has a smartphone (95%) and/or tablet (78%) in

3

the household.[87]

4

207.    Often, children are given their own devices, with one 2015 study finding that by age four,

5

75% of children had their own tablet, smartphone, or iPod.[88]

6

208.    Nearly all parents in the United States (94%) say their children under 13 use online apps,

7

with top apps used being video streaming (64%), video gaming (58%) and show/movie streaming

8

(58%).[89]

9

209.    Four in five parents (80%) whose children under 13 use online apps say they worry about

10

their children's privacy when using those apps,[90] with the top concern (69%) being data tracking.[91]

11

210.    Nearly 3 in 4 parents whose children under 13 use online apps (73%) say they are

12

concerned about their children's location being tracked by those apps; those residing in urban or rural

13

areas are more likely than those residing in suburban areas to share this sentiment (88% and 87% vs.

14

73%).[92]

15

16

17

18

19

[86] Elyse Wanshel, *10 Reason Why You Shouldn't Give a Child a Smartphone or Tablet*, LITTLE THINGS, https://www.littlethings.com/reasons-not-to-give-children-technology (accessed Oct. 21, 2019).

20

21

[87] Victoria Rideout, *The Common Sense Census: Media Use By Kids Age Zero To Eight*, COMMON SENSE MEDIA (2017) at 3, https://www.commonsensemedia.org/research/the-common-sense-census-media-use-by-kids-agezero-to-eight-2017 (accessed Oct. 21, 2019).

22

23

24

[88] *The Dangers of YouTube for Kids*, THE ATLANTIC (Nov. 2018), https://www.theatlantic.com/magazine/archive/2018/11/raised-by-youtube/570838/ (accessed Oct. 22, 2019) ("[A] team of pediatricians at Einstein Medical Center, in Philadelphia, found that YouTube was popular among device-using children under the age of 2. Oh, and 97 percent of the kids in the study had used a mobile device. By age 4, 75 percent of the children in the study had their own tablet, smartphone, or iPod. And that was in 2015.).

25

[89] https://www.pixalate.com/blog/childrens-online-privacy-harris-poll-recap.

26

[90] *Id.*

27

[91] https://www.cdpinstitute.org/news/childrens-privacy-data-tracking-is-a-big-concern-for-parents-and-trust-levels-in-companies-are-low/.

28

[92] https://www.pixalate.com/blog/childrens-online-privacy-harris-poll-recap.

211.    More than three-quarters (77%) of parents are concerned about protecting their family's digital privacy.[93]

212.    73% of parents are concerned about personal data being collected by third parties, without their consent.[94]

213.    And parents also recognize the importance of protecting their children's identity (90%), location (88%), health data (87%), age (85%), school records (85%), and browsing history (84%).[95]

214.    Additionally, as further evidence of Class Members' reasonable expectations with respect to children's privacy, a survey conducted by the Center for Digital Democracy ("CDD") and Common Sense Media of more than 2,000 adults found overwhelming support for the basic principles of privacy embedded in the California Constitution, state common law, as well as federal law.[96] The parents who were polled responded as follows when asked whether they agreed or disagreed with the following statements:

a.    "It is okay for advertisers to track and keep a record of a child's behavior online if they give the child free content."

- 5 percent strongly agree
- 3 percent somewhat agree
- 15 percent somewhat disagree
- **75 percent strongly disagree**
- 3 percent do not know or refused to answer

b.    "As long as advertisers don't know a child's name and address, it is okay for them to collect and use information about the child's activity online."

- 3 percent strongly agree

---

[93] https://trustedfuture.org/childrens-digital-privacy-and-safety.

[94] *Id.*

[95] *Id.*

[96] Center for Digital Democracy, *Survey on Children and Online Privacy, Summary of Methods and Findings*, https://www.democraticmedia.org/sites/default/files/COPPA%20Executive%20 Summary%20and%20Findings.pdf (accessed Oct. 21, 2019).

- 17 percent somewhat agree
- 10 percent somewhat disagree
- **69 percent strongly disagree**
- 1 percent do not know or refused to answer

c.  "It is okay for advertisers to collect information about a child's location from that child's mobile phone."

- 6 percent strongly agree
- 3 percent somewhat agree
- 7 percent somewhat disagree
- **84 percent strongly disagree**
- less than 1 percent do not know or refused to answer

d.  "Before advertisers put tracking software on a child's computer, advertisers should receive the parent's permission."

- **89 percent strongly agree**
- 5 percent somewhat agree
- 2 percent somewhat disagree
- 4 percent strongly disagree
- less than 1 percent do not know or refused to answer

e.  "There is a federal law that says that online sites and companies need to ask parents' permission before they collect Personal Information from children under age 13. Do you think the law is a good idea or a bad idea?"

- **93 percent said it was a good idea**
- 6 percent said it was a bad idea
- 1 percent did not know or refused to answer.

215.    The proliferation of internet-connected device usage by children under 13, coupled with the concerns express by parents, renders Defendants' conduct highly offensive and an egregious breach of social norms.

216.    Defendants' concert of action, unity of purpose or design, and acts in furtherance of a common purpose with the knowledge and consent of the others, as alleged herein, exploited children under 13 for financial gain by luring them with child-directed content and manipulating them into remaining engaged with YouTube to the detriment of their mental health, so that they could earn advertising revenue.

217.    Defendants benefit from increased YouTube usage. The longer and more often a child views videos on YouTube, the more data Defendants can exfiltrate and the more advertisements they can show the child.

218.    Defendants have thus also been incentivized to develop ways to addict children to websites, apps, and online services such as YouTube, which operators of these services refer to as "retention."

219.    Google's unfair and unlawful collection of Personal Information – enabled by and with the knowledge of each of the Channel Owner Defendants – and manipulative YouTube recommendation feature substantially affects the amount of time minor children, including children under the age of 13, spend on YouTube.

220.    Defendants' unfair and unlawful tracking, profiling, and targeting of children is all the more troubling in light of Google's inability to prevent obscene content from being uploaded on YouTube. For example, one report found that "hundreds of . . . videos of children's cartoon characters with inappropriate themes" such as graphic violence on YouTube.[97] The effect of this content – which Defendants cannot apparently prevent from being uploaded to YouTube – on children is profound. One child psychotherapist has stated that "over time the she has seen a rise in cases of children suffering from anxiety triggered by videos they have watched on YouTube" and that the children "exhibit loss of

---

[97] Anisa Subedar & Will Yates, *The disturbing YouTube videos that are tricking children*, BBC Trending (Mar. 27, 2017), https://www.bbc.com/news/blogs-trending-39381889 (accessed Oct. 22, 2019).

appetite, sleeplessness, crying fits and fear."[98]

221.     By failing to (i) obtain parental consent, (ii) disclose to parents the nature and purpose of their data collection practices (and use of that data), and (iii) take other steps to preclude the capture of children's Personal Information, and by manipulating and exploiting the habits of minors for their economic gain, Defendants have breached the privacy rights and reasonable expectations of privacy of Plaintiffs' minor children and the millions of minors in the Classes who have viewed YouTube's monetized channels, in contravention of privacy norms that are reflected in consumer surveys, centuries of common law, state and federal statutes, legislative commentaries, industry standards and guidelines, and scholarly literature.

### A.     Targeting vulnerable, protected children transforms commercial activity into highly offensive, egregious conduct

222.     Defendants' pervasive, illegal tracking, profiling and targeting of children under 13 using YouTube online represents a stark deviation from the long-standing American societal and legal tradition of protecting minors from exposure to harmful and addictive activities and/or products. For decades, the United States has recognized the inherent vulnerability of children and has instituted robust regulatory frameworks to shield them from the harms associated with addictive substances and behaviors, such as tobacco, firearms, alcohol, and gambling.

223.     These protections include age restrictions on the use of addictive or dangerous products such as tobacco, firearms, alcohol, and gambling *and* restrictions on advertising directed towards young children concerning the same. This dual pronged approach of restricting access/use and advertising is rooted in American societal consensus that children, by virtue of their developmental stage, require

---

[98] Josephine Bila, *YouTube's dark side could be affecting your child's mental health,* CNBC (Feb. 13, 2018),       https://www.cnbc.com/2018/02/13/youtube-is-causing-stress-and-sexualization-in-young-children.html (accessed Oct. 23, 2019).

heightened safeguards to ensure their health, well-being, and future potential.[99]

224.   Commercial actors who have ignored these societal values and regulations have been punished severely, reflecting society's view that commercially exploiting children by exposing them to harmful and/or dangerous activities and products is unacceptable. For example, the 1998 Master Settlement Agreement between the attorneys general of 46 states and the American tobacco industry condemned the cigarette companies' targeting of their harmful and addictive products to minors and resulted in a payment of over $206 billion over 25 years, and barred tobacco companies from using cartoon characters (such as Joe Camel), sponsoring youth-oriented events, and placing ads near schools.

225.   More recently, in 2022, Juul agreed to pay over $700 million ($438.5 million to settle investigations by 34 states and U.S. territories, and $300 to private plaintiffs) to settle litigation concerning its marketing and sales practices which were alleged to improperly target minors. Investigations had found that Juul's advertising appealed to young people, using influencers and social media to promote its products. The settlement included stringent restrictions on Juul's marketing, sales, and distribution practices to prevent future targeting of youth.

226.   Likewise, the egregiousness of Defendants' conduct here – which illegally tracked, profiled and targeted *tens of millions of young children under the age of 13* -- is confirmed by the FTC's enforcement action, which resulted in imposition of a $136 million civil penalty on Google in September 2019.  That fine was, at the time, by far the largest COPPA penalty ever imposed by the FTC (by a factor of over 20).[100]  And two FTC Commissioners dissented because they considered the fine inadequate to

---

[99] *See, e.g. Family Smoking Prevention and Tobacco Control Act*, 21 U.S.C. §§ 387a-387u (restricting manufacture, marketing, and distribution of tobacco products to protect the public health generally and to reduce tobacco use by minors); *Stop Tobacco Access to Kids Enforcement (STAKE) Act,* Cal. Bus. & Prof. Code § 22958 (West 2023) (restricting sale of tobacco products in California to people 21 years of age or older); *National Minimum Drinking Age Act of 1984*, 23 U.S.C. § 158 (1984) (establishing minimum age requirement of 21 years old to drink alcohol).

[100] The largest fine imposed by the FTC pursuant to COPPA was previously a $5.7 million civil penalty imposed on Tik Tok  **Error! Main Document Only.**based on the collection of COPPA-protected Personal Information by Tik Tok's former app, Musical.ly in February 2019.  **Error! Main Document Only.**See FTC February 27, 2019 Press Release announcing COPPA civil penalty of $5.7 million imposed on Tik Tok and describing the fine as "the largest monetary recovery [by the FTC] in a COPPA

punish Google for its egregious misconduct and the enormous profits that misconduct had produced.[101]

227.     American society has, thus, long believed that children must be shielded from what would otherwise be considered routine commercial practices concerning addictive or harmful activities and/or products directed towards adults.  COPPA fits squarely within this tradition.

### *Events leading up to the passage of COPPA*

228.     The events leading up to the adoption of COPPA make clear that parents, public interest groups, the FTC and members of Congress were motivated by precisely these long-standing concerns about the need to protect young children – this time, in the context of safeguarding their privacy rights — who were seen as uniquely vulnerable to marketing manipulation from new forms of online targeting.

229.     The Center for Media Education (CME), a nonprofit advocacy group, was one of the first to raise the alarm about online marketing to children in its report *Web of Deception: Threats to Children from Online Marketing* released in March 1996.  As CME explained:

> Armed with sophisticated new research, advertisers and marketers have begun to target the rapidly growing numbers of children online. World Wide Web sites and other interactive online services are being designed to capture the loyalty and spending power of the "lucrative cybertot category." A variety of new interactive advertising and marketing techniques have been developed specifically for this new medium. *Many of them threaten to manipulate children and rob them of their privacy*. If allowed to develop without any intervention, these practices will become widespread and even more egregious.[102]

230.     CME's investigation highlighted the threat to young children's existing privacy rights posed by new forms of online targeting.  The report "uncovered a number of disturbing new practices.

---

case."    Accessible    at    https://www.ftc.gov/news-events/news/press-releases/2019/02/video-social-networking-app-musically-agrees-settle-ftc-allegations-it-violated-childrens-privacy.                 The exponentially larger civil penalty imposed on Google may fairly be said to reflect the FTC's view of the far greater egregiousness of Google's misconduct, not just Google's greater size, as the FTC has imposed smaller COPPA penalties on comparably sized social media companies.  **Error! Main Document Only.**See FTC May 31, 2023 Press Release announcing $25 million COPPA penalty imposed on Amazon, Inc., described in the press release as "one of the world's biggest retailers."  Accessible at https://www.ftc.gov/news-events/news/press-releases/2023/05/ftc-doj-charge-amazon-violating-childrens-privacy-law-keeping-kids-alexa-voice-recordings-forever

[101] *See* Slaughter & Chopra dissents, n.1, 31, 178, 179, and 182.

[102] CME, *Web of Deception: Threats to Children from Online Marketing* (1986) at 1 (emphasis added).

They pose two kinds of threats: 1) invasion of children's privacy through solicitation of personal information and tracking of online computer use; and 2) exploitation of vulnerable, young computer users through new unfair and deceptive forms of advertising."[103]

231.    CME called on the FTC to conduct a comprehensive investigation of these practices and to create a set of effective policies designed to protect children from these new practices. Joining in this call were the National PTA, the Academy of Child and Adolescent Psychiatry, the American Psychological Association, Center for Science in the Public Interest, Consumer Federation of America, and the Electronic Information Center.[104]

232.    CME's report was widely covered in the national press. *See, e.g.*, *Internet Marketing to Kids Is Seen as a Web Of Deceit*, L.A. Times, Mar. 29, 1996; *On-Line Marketing Aimed at Children Needs Federal Regulation, Groups Say*, Wall Street J. Mar. 29, 1996.

233.    Not long after, two members of Congress introduced bills that would require the FTC to take action to protect children's privacy.  On May 22, 1996, Rep. Franks (with others) introduced HR 3508, Children's Privacy Protection and Parental Empowerment Act of 1996.  On June 20, 1996, Rep. Markey introduced HR 3685, Communications Privacy and Consumer Empowerment Act.

*The FTC's Response*

234.    On June 4-5, 1996, the FTC's Bureau of Consumer Protection held a public workshop on consumer online privacy, and devoted a special session to the collection and use of information about children.[105] In a follow-up staff report issued in December 1996, the FTC specifically addressed the special, long-standing protections of the privacy rights of children:

---

[103] *Id*.  CME noted that "Marketers have developed a variety of techniques to collect detailed data and compile individual profiles on children.  …Tracking technologies make it possible to monitor every interaction between a child and an advertisement.  The ultimate goal is to create personalized interactive ads designed to 'microtarget' the individual child."

[104] CME Press Release Mar. 28, 1996.

[105] FTC, Bureau of Consumer Protection, Public Workshop on Consumer Privacy on the Global Information Infrastructure ("Workshop Report") (footnotes omitted). Available at https://www.ftc.gov/reports/staff-report-public-workshop-consumer-privacy-global-information-infrastructure.

In law and policy, children are usually treated as a special, vulnerable class. This status is premised on the belief that children lack the analytical abilities and judgment of adults. It is evidenced by an array of federal and state laws, including those that ban sales of tobacco and alcohol to minors, prohibit child pornography, require parental consent for medical procedures, and make contracts with children voidable. In the specific arenas of marketing and privacy rights, moreover, several federal statutes and regulations recognize the need for special protections for children as well as the special role that parents have in implementing those protections. [106]

235.    The Workshop Report also observed the consensus of government, children advocacy organizations and industry that the special privacy protections long afforded to children should be maintained in online practices.  The Report noted:

(1) children are a special audience; (2) information collection from children raises special concerns; (3) there is a need for some degree of notice to parents of Web sites' information practices; and (4) parents need to have some level of control over the collection of their children's information. As one industry participant observed, virtually all Workshop participants had essentially agreed that "Knowledge, Notice and No" are the paradigms to address information collection issues." [107]

*The Kidscom Complaint*

236.    During this time frame, on May 13, 1996, CME filed a complaint with the FTC alleging that a child-directed internet site called KidsCom, which billed itself as an educational and entertainment site for children, was actually promoting products to and conducting market research on children.

237.    On July 15, 1997, the FTC's Director of Consumer Protection responded with a letter concluding that certain of Kidscom practices were deceptive and unfair in violation of Section 5 of the FTC Act.  Among other things, it was an unfair practice "to collect personally identifiable information (such as name, e-mail address, home address or phone number) from children and sell or otherwise disclose such identifiable information to third parties without providing parents with adequate notice, . . . and an opportunity to control the collection and use of the information."  Significantly, the FTC's statement of these principles reflected the FTC's view of the existing (*i.e*, pre-COPPA) privacy rights of children.

---

[106] FTC, Workshop Report at 30-31.

[107] *Id*. at 36 (footnotes omitted).

SIXTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

238.     Although this was not its usual practice, the FTC issued a Press Release about the Kidscom letter in order to publicly set forth the FTC's view of the existing privacy rights of children with respect to online collection of information from them.  It announced that

> In response to a petition from the Center for Media Education, the staff of the Federal Trade Commission today released a letter that outlines several principles that it believes should generally apply to the collection of personally identifiable information from children online. The FTC staff letter concludes that it is a deceptive practice to represent that a Web site is collecting personally identifiable information from a child for a particular purpose, when the information also will be used for another purpose that parents would find material, in the absence of a clear and prominent notice to a parent regarding the practice. Additionally, the FTC staff letter concludes that a Web site that has collected identifiable information about children must obtain parental consent *prior* to releasing that identifiable information to third parties. [108]

### *The FTC Report to Congress*

239.     In June 1998, the FTC issued a report calling on Congress to "develop legislation placing parents in control of the online collection and use of personal information from their children." [109]  In the Report, the FTC explained that

> In making this recommendation, the Commission has drawn on its extensive experience in addressing business practices affecting children, as well as its three-year study of online privacy issues…. [T]he Commission has recognized a growing consensus reflected in consumer survey evidence and some industry self-regulatory guidelines that parental involvement is necessary in the collection and use of information from children. …. Accordingly, the Commission concludes that as a matter of policy additional steps should now be taken to ensure adequate online privacy protections for children. [110]

240.     The Report to Congress noted:

> There is considerable concern about online collection practices that bypass parents, who have traditionally protected children from marketing abuses. Children generally lack the developmental capacity and judgment to give meaningful consent to the release of personal

---

[108]     (https://www.ftc.gov/news-events/news/press-releases/1997/07/ftc-staff-sets-forth-principles-online-information-collection-children).

[109]   Privacy Online:  A Report to Congress at iii.  Survey data cited by the FTC in its Report confirmed that parents had long strongly believed that the collection and use of personal information from and about their children should be limited. For example, 97% of parents whose children use the Internet believe Web sites should not sell or rent personal information relating to children, and 72% object to a Web site's requesting a child's name and address when the child registers at the site, even if such information is used only internally.  *Id.* at 5-6 (footnotes omitted).

[110] *Id. at* 42.

information to a third party. This is an even greater problem when children are offered an incentive for releasing personal information, or when release of personal information is a prerequisite to registering for a contest, joining a kid's club, or playing a game. [111]

The FTC recommended that Congress act now to adopt legislation placing parents in control of the online collection and use of information from their children. [112]

*Congress passes COPPA*

241.   The next month, on July 17, 1998, Senators Bryan, McCain and Burns introduced the "Children's Online Privacy Protection Act of 1998" (S. 2326) to protect the privacy of children under 16 by, *inter alia*, requiring websites and online services to get verifiable parental consent before collecting personal information from children.  In introducing the legislation, Senator Bryan explained,

> Unfortunately, the same marvelous advances in computer and telecommunication technology that allow our children to reach out to new resources of knowledge and cultural experiences are also leaving them unwittingly vulnerable to exploitation and harm by deceptive marketers and criminals.  …  Companies are attempting to build a wealth of information about you and your family without an adult's approval – a profile that will enable them to target and to entice your children to purchase a wide range of products.  The Internet gives marketers the capability of interacting with your children and developing a relationship without your knowledge. Where can this interactive relationship go?  Will your child be receiving birthday cards and communications with online cartoon characters for particular products? [113]

242.   Then FTC Chairman Robert Pitofsky testified in support of S. 2326, stating:

> [The] Commission believes that legislation such as S. 2326 is important and necessary to protect the privacy of our youngest consumers when they go online. …. [T]he Internet's technology enables marketers to establish direct and ongoing one-to-one relationships with individual children in ways previously unavailable to traditional media. …. [The] increasing number of children online coupled with their growing economic impact create enormous opportunities for marketers to promote their products and services to an eager, targeted, and vulnerable audience.  …. "In contrast to the real world, where such information ordinarily would be solicited from young children only with the involvement of a parent, in cyberspace the vast majority of children's sites collect personal information without notice to, or even an opportunity for control by parents. [114]

---

[111] *Id.* at 5.

[112] *Id.* at 42.

[113] 144 Cong. Rec. S8482-83.

[114] September 23, 1988 Testimony of Robert Pitofsky before the Senate Commerce Committee, at 1-3

243.    FTC Chairman Pitofsky cited parent support for protecting children's privacy, noting that the widespread collection of information from young children described in the Report contrasts sharply with the strongly expressed preferences of parents. Indeed, a Louis Harris and Associates survey found that 97% of parents whose children use the Internet believe Web sites should not sell or rent personal information relating to children, and 72% object to a Web site's requesting a child's name and address when the child registers at the site, even if such information is only used internally. [115]

244.    In early October 1988, the Senate Commerce Committee unanimously voted to send a revised version of S. 2326 to the Senate floor. Senator Bryan introduced this version as an amendment to the Internet Tax Act on October 7, 1998.  He explained that:

> The goals of this legislation are: (1) to enhance parental involvement in a child's online activities in order to protect the privacy of children in the online environment; (2) to enhance parental involvement to help protect the safety of children in online fora such as chatrooms, home pages, and pen-pal services in which children may make pubic postings of identifying information; (3) to maintain the security of personally identifiable information of children collected online; and (4) to protect children's privacy by limiting the collection of personal information without parental consent. [116]

245.    The bill was passed as part of the Omnibus Appropriations Act and signed into law by President Clinton on October 21, 1998.  Pub. L. 105-277. The law directed the FTC to adopt implementing regulations within one year.

246.    The FTC has recognized the seriousness and highly offensive nature of violations of the privacy rights of minors protected by COPPA where a wrongdoer has, as here, engaged in large-scale tracking, profiling and targeting of young children.  Thus, in addition to the $136 million civil penalty imposed on Google by the FTC in this case, the FTC has taken measures to enforce COPPA and impose multi-million sanctions for similar conduct by other social media companies.

247.    In December 2022, the FTC brought a complaint against Epic Games, Inc. for tracking, profiling and targeting of young children using Epic's Fortnite game and imposed a $275 million fine for

---

[115] *Id.* at 3.

[116] 144 Cong. Rec. S12741 (Oct. 7, 1998) and the other is to page S11657 of the Cong. Rec. (Oct. 7, 1998).

SIXTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

Epic's COPPA violations. [117]   In May 2023, the FTC fined Amazon $25 million based on Amazon's improper retention of minors' voice recordings and geolocation data captured by Amazon's Alexa voice assistant in violation of COPPA. [118]

**B.      The Offensiveness and Egregiousness of Defendants' Invasion of the Privacy Rights of Plaintiffs and the Members of the Classes is Heightened by Google's Lies to the Public and to YouTube Content Creators and Advertisers.**

248.    Defendants' violations of the privacy rights of minors are even more egregious in light of Google's lies to the public and its misleading statements to YouTube content creators and advertisers about Google's compliance with legal requirements and, in particular, YouTube's compliance with COPPA.

**1.      Google's False Representations to the Public of its Compliance with the Law, Including COPPA**

249.    Google has been aware, since its formation, of the public's concern with the privacy issues surrounding its business model and, while knowing that it was illegally tracking, profiling and targeting young children on YouTube in violation of COPPA, repeatedly assured the public that it was committed to complying with all privacy laws, including COPPA.

250.    Google's founders sought from the outset to assure the public that Google was different than other online operators (*i.e*, Facebook), that it was committed to assuring the rights of its users and that, to do so, Google would always comply with the highest standards of ethical conduct.  The company publicly trumpeted a corporate motto of "Don't be evil" – in public statements, in SEC filings, and in a highly publicized Google Code of Conduct, which Google expressly stated was "meant for public consumption."  As the company explained in the Preface to its Code of Conduct:

---

[117] *See* FTC December 19, 2022 Press Release announcing imposition of $275 million fine for Epic Games, Inc. for COPPA violations.  Accessible at https://www.ftc.gov/news-events/news/press-releases/2022/12/fortnite-video-game-maker-epic-games-pay-more-half-billion-dollars-over-ftc-allegations.

[118] *See* DOJ July 19, 2023 Press Release announcing imposition of $25 million fine for Amazon for COPPA violations.  Accessible at https://www.justice.gov/opa/pr/amazon-agrees-injunctive-relief-and-25-million-civil-penalty-alleged-violations-childrens.

Googlers generally apply those words to how we serve our users. But "Don't be evil" is much more than that. ...[I]t's also about doing the right thing more generally – following the law, acting honorably.

251.    In its Code of Conduct, Google made clear the company's core message: "Being Googlers means striving toward the highest possible standard of ethical business conduct," and emphasized that principle was to apply to all of the company's employees, officers and directors. Section VII of the Google Code of Conduct in place throughout the Class Period expressly affirmed Google's ethical value – and commitment – to obeying the law, stating: "Google takes its responsibilities to comply with the laws and regulations applicable to it very seriously."  Google specifically acknowledged that its public reputation – and the success of its business – depended on such compliance: "We must all always remember that our reputation is the foundation of our present and future success – and that earning, and then, maintaining that reputation requires attention and effort to stay in compliance."

252.    These representations by Google extended to its compliance with laws pertaining to the privacy of user data: Google has publicly promised that it is "committed to complying with applicable data protection laws" and is "always working to stay compliant with applicable privacy regulations."[119]

253.    And, most important, when confronted in 2018 with a complaint by child advocacy groups and two congressmen that it was improperly collecting young children's personal information on YouTube in violation of COPPA, Google issued public statements falsely asserting that its practices on YouTube were in compliance with COPPA and falsely denying that it allowed advertisers on YouTube to deliver personalized ads to children under 13 or collect their personal information.[120]   These representations were knowingly false and were intended to reassure parents and induce them to continue to allow their young children to use YouTube.

**2.    Google's Misleading Representations to Content Creators and Advertisers**

254.    To lure children to YouTube, Google needed child-directed content. To obtain child-directed content, Google needed to persuade the creators of child-directed content to place their videos

---

[119] *See, e.g.,* https://safety.google/privacy/data/, last accessed on July 20, 2024.

[120] New York Times, Maheshwari, Sapna, "New Pressure on Google and You Tube Over Children's Data," September 20, 2018.

SIXTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

on YouTube.

255.    Google's YouTube marketing strategy predictably generated concerns from potential advertisers and content creators that a channel owner creating child-directed content would run afoul of COPPA if it placed its content on YouTube and then showed behavioral or "interest-based" advertising to the viewers of that content.

256.    To counter these concerns and populate YouTube with popular children's content, Google developed a strategy of misrepresenting YouTube's COPPA compliance and/or YouTube's need to comply with COPPA at all to potential advertising and content creator partners.

257.    ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. These misrepresentations were successful in enabling Google to procure sufficient child-directed content to drive American children to the YouTube platform.

258.    ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████:

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[121]

---

[121] GOOG-HUB-00163720 (emphasis added).

259.    In response to the above question, ███████████████
██████████████████████████████████████████████████████
███████████████████

███████████████████████████████████████████████████
██████████████████

260.    ████████████████████████████████████████████████
██████████████████████████████████

261.    Google repeated these, and other false claims to child-directed content creators and potential advertisers through the Class Period, and relied on these statements to convince content creators to place child-directed content on YouTube.

262.    As yet another example, in May 2016, another prominent children's content company, Nickelodeon, took the position that "████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
███████████████

263.    ████████████████████████████████████████████████
████████████████████████████████████

██████████████████████

███████████████████████████
███████████████████████████████████████████
███████████████████

<hr>

[122] Id.

[123] GOOG-HUB-00163762.

[124] GOOG-HUB-00101976 (emphasis in original).

[125] Id.

264.    Later in the same email thread on June 8, 2016, Google wrote the following:

[REDACTED]

265.    [REDACTED]

[REDACTED]

[REDACTED]

266.    This statement was false and misleading. Obviously, this statement would only have been truthful if YouTube did not have a substantial number of users who were under 13 (it did and still does), or if YouTube was not intended and/or designed for users who are under 13 (it was and still is). Google knew this was not true, yet pushed this "narrative" anyway because it knew COPPA compliance would lead to a sharp decrease in the posting of child-directed content on YouTube and a reduction in advertising revenue.

267.    As yet another example of Google's campaign of deception, in February 2017,

[REDACTED]

[REDACTED]

[REDACTED]

---

[126] *Id.*
[127] *Id.*



268.

269.   A few weeks later, however,

270.   This statement, like the previously cited false statements Google made to potential child-directed content creator partners, was also obviously false and misleading. Not only did Google know YouTube had millions of users who were "below 13," but Google was in fact bragging about its popularity with those very children and promoting YouTube to advertisers based on such popularity. Indeed, during this time, Google pitched YouTube to several popular children's brands, boasting that YouTube "is today's leader in reaching children age 6-11;" "the new 'Saturday Morning Cartoons';" "unanimously voted as the favorite website of kids 2-12;" "the #1 website regularly visited by kids;" and used by "93% of tweens.".[131]

271.   In a presentation to Defendant Hasbro, Google specifically boasted of YouTube's immense popularity among children, noting that it was "unanimously voted as the favorite website of kids 2-12" and that "93% of tweens" use the product..[132] Google's presentations led to Hasbro posting child-directed content on YouTube.

---

[128] GOOG-HUB-00016578.

[129] GOOG-HUB-00016577.

[130] GOOG-HUB-00016576.

[131] Complaint for Permanent Injunction, Civil Penalties, and Other Equitable Relief, *FTC v. Google LLC et al.*, No. 1-19-cv-02642-BAH, at 3,12, and 6-7 (D.D.C. Sept. 4, 2019) Dkt. #1-1. https://www.ftc.gov/system/files/documents/cases/youtube_complaint_exhibits.pdf.

[132] *Id.*

272.     In 2015, Google gave a similar presentation to Defendant Mattel highlighting children's widespread use of YouTube to persuade Mattel to display digital ads on the site.[133] Google's presentations and representations led to Mattel posting child-directed content on YouTube.

273.     These lies, or "narrative" were developed for the specific purpose of overcoming child content-creators hesitancy to post child-directed content on a non-COPPA-compliant platform and were a key to Google's ability to develop the content needed to attract young children, as many content creators would have opted not to post their content on YouTube, resulting in fewer children under 13 watching YouTube, and less advertising revenue for Google.

274.     Google's use of these lies to induce third parties to participate in Google's violations of COPPA was highly improper and adds to the offensiveness and egregiousness of Defendants' invasions of the privacy rights of Plaintiffs and the members of the Classes.

### C.     Google's Use of the Personal Information of Plaintiffs and Class Members to Foster Compulsive Use of YouTube is Particularly Insidious and Highly Offensive.

275.     COPPA prohibits web operators from both <u>collecting</u> and <u>using</u> Personal Information of children under the age 13 viewing child-directed content without verifiable parental consent.  Plaintiffs have described above how Google unlawfully used young children's Personal Information to create profiles that enable targeted behavioral advertising. But that is not the only use Google made of the Personal Information, as Google also used these same profiles to fuel YouTube's "Recommendation Engine" – an insidious feature that feeds a continuing series of targeted videos to minors and is specifically designed to keep minors watching YouTube and maximize the children's exposure to advertisements.

276.     YouTube primarily generates revenue by selling advertising. The more people who use YouTube and spend time on the site, the more ads YouTube can sell.[134] To drive greater revenue,

---

[133] *Id.*

[134] Mark Bergen, *YouTube Executives Ignored Warnings, Letting Toxic Videos Run Rampant*, Bloomberg (Apr. 2, 2019), https://www.bloomberg.com/news/features/2019-04-02/youtube-executives-ignored-warnings-letting-toxic-videos-run-rampant.

"YouTube . . . set a company-wide objective to reach one billion hours of viewing a day[.]"[135]  As Susan Wojcicki, YouTube's CEO explained, the goal of a "billion hours of daily watch time gave our tech people a North Star."[136] Google decided that "the best way to keep eyes on the site" was to introduce a feature that would "[recommend] videos, [that would play] after one was finished."[137]

277.    YouTube's Recommendation Engine uses a recommendation algorithm to identify and push additional videos to users, which YouTube plays automatically, through a feature called "autoplay." Autoplay begins the next video as soon as the previous videos ends, creating a constant stream of content.

278.    YouTube's Recommendation Engine algorithm relies on Personal Information and other information collected from YouTube users to identify and push the additional videos to YouTube users.[138] Every YouTube user's Personal Information, regardless of age, is collected by Google and fed into the Recommendation Engine.

279.    Google misleadingly promotes the Recommendation Engine as designed to help YouTube users find videos they find interesting, stating, for example, that "[r]ecommendations help you discover more of the videos you love, whether it's a great new recipe to try or your next favorite song."[139]

280.    But this is false and misleading. YouTube's Recommendation Engine is designed to maximize user's YouTube watch time, which increases Google's revenues. As YouTube's Head of Content Creator Communications has admitted: "When we suggest videos, we focus on those that increase the amount of time that the viewer will spend watching videos on YouTube, not only on the

---

[135] *Id.*

[136] *Id.*

[137]  *Id.*

[138] Alexis C. Madrigal, *How YouTube's Algorithm Really Works*, Atlantic (Nov. 8, 2018), https://www.theatlantic.com/technology/archive/2018/11/how-youtubes-algorithm-really-works/575212/; Paul Covington et al., *Deep Neural Networks for YouTube Recommendations*, Google (2016), https://storage.googleapis.com/pub-tools-public-publication-data/pdf/45530.pdf.

[139]https://www.youtube.com/howyoutubeworks/product-features/recommendations/#:~:text= How%20does%20YouTube's%20recommendation%20system,you%20may%20want%20to%20watch.

70

next view, but also successive views thereafter."[140]

281.    YouTube's Recommendation Engine is incredibly effective at maximizing users' YouTube watch time. According to YouTube Chief Product Officer Neal Mohan, mobile device users watch YouTube for more than 60 minutes on average per session "because of what [YouTube's] recommendations engines are putting in front of [them]."[141] And, according to Mohan, the Recommendation Engine was responsible for more than 70% of users' time using the product.[142] That is, more than 70% of the time users, including children under 13, spend on YouTube is the result of the YouTube's commendation Engine pushing videos on them, rather than individual selection.

282.    YouTube's Recommendation Engine works. Today, YouTube "has over 2 billion monthly logged-in users."[143] And that 2 billion figure does not capture all product usage because YouTube, by design, allows users to consume videos without logging in or registering an account.  And many of YouTube's most-viewed videos are kid-focused, and the most subscribed and highest paid YouTubers are children. With over 12 billion views, "Baby Shark Dance," a video aimed at toddlers, is the most viewed video in the history of YouTube– and it and five other child focused videos make up the top ten YouTube videos of all time.[144]

283.    Child creators, such as Ryan Kaji of Defendant Remka, have been among YouTube's Top 10 most-subscribed channels in the United States since 2016.[145] Ryan started Ryan's World in 2015

---

[140] https://blog.youtube/news-and-events/youtube-now-why-we-focus-on-watch-time/

[141] Joan E. Solsman, *YouTube's AI Is the Puppet Master over Most of What You Watch*, CNET (Jan. 20, 2018), https://www.cnet.com/tech/services-and-software/youtube-ces-2018-neal-mohan/

[142] *Id.*

[143] *YouTube for Press*, YouTube, https://blog.youtube/press/. 770 Emily Vogels et al., *Teens, Social Media and Technology 2022*, Pew Rsch. Ctr. (Aug. 10, 2022), https://www.pewresearch.org/internet/2022/08/10/teens-social-media-and-technology-2022.

[144] Most Viewed Videos of All Time • (Over 700M views) - YouTube. https://www.youtube.com/playlist?list=PLirAqAtl_h2r5g8xGajEwdXd3x1sZh8hC.

[145] Madeline Berg, *The Highest-Paid YouTube Stars of 2019: The Kids Are Killing It*, Forbes (Dec. 18, 2019), https://www.forbes.com/sites/maddieberg/2019/12/18/the-highest-paid-youtube-stars-of-2019-the-kids-are-killing-it/?sh=4c3df9a438cd; Madeline Berg, *The Highest-Paid YouTube Stars 2017: Gamer DanTDM Takes The Crown With $16.5 Million*, Forbes (Dec. 7, 2017), https://www.forbes.com/sites/maddieberg/2017/12/07/the-highest-paid-youtube-stars-2017-gamer-dantdm-takes-the-crown-with-16-5-million/?sh=72de79413979.

when he was only 3. By 2017, his videos had over 8 billion views, and by 2018, he was the highest earning YouTuber in the world.[146]

284.    Google's collection and analysis of users' Personal Information allows it to assemble virtual dossiers on the young children who watch YouTube child-content, covering hundreds if not thousands of user-specific data segments. This, in turn, allows advertisers to micro-target marketing and advertising dollars to very specific categories of users, who can be segregated into pools or lists using Google's data segments. Advertisers purchase ad real estate space on users' feeds, which allow them to place the right ads in front of these micro-targeted segments of users--including children, both in the main YouTube frame and in the YouTube Kids product. Only a fraction of these data segments come from content knowingly designated by users for publication or explicitly provided by users in their account profiles. Instead, many of these data segments are collected by YouTube through surveillance of each user's activity while using the product and even when logged off the product.[147]

285.    Google's secret virtual dossiers on its child users, developed from Defendants' illegal tracking and profiling, train YouTube's Recommendation Engine algorithms to direct constant streams of content to minor viewers.  A Google engineer explained in a 2014 presentation:

> What do I mean by a training example? It's a single-user experience. On YouTube, perhaps it's that one [Thomas the Tank Engine] webpage my son saw six months ago, along with all the recommendations that we showed him. We also record the outcome to know whether the recommendations we made are good or whether they're bad. That's a single training exercise. On a large property, you can easily get into hundreds of billions of these.[148]

---

[146] *Gamer DanTDM Takes The Crown With $16.5 Million*, Forbes (Dec. 7, 2017), https://www.forbes.com/sites/maddieberg/2017/12/07/the-highest-paid-youtube-stars-2017-gamer-dantdm-takes-the-crown-with-16-5-million/?sh=72de79413979; Natalie Robehmed & Madeline Berg, *Highest-Paid YouTube Stars 2018: Markiplier, Jake Paul, PewDiePie And More*, Forbes (Dec. 3, 2018), https://www.forbes.com/sites/natalierobehmed/2018/12/03/highest-paid-youtube-stars-2018-markiplier-jake-paul-pewdiepie-and-more/?sh=7d909c3f909a.

[147] About Targeting for Video Campaigns, Google, https://support.google.com/youtube/answer/2454017?hl=en.

[148] Alex Woodie, *Inside Sibyl, Google's Massively Parallel Machine Learning Platform, Datanami* (Jul. 17, 2014) https://www.datanami.com/2014/07/17/inside-sibyl-googles-massively-parallel-machine-learning-platform/.

SIXTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

286.    Through these and other efforts, YouTube has delivered massive amounts of advertising revenue to Google. In 2021 alone, YouTube generated about $29 billion in revenue selling ads on its site.[149]

287.    The Recommendation Engine's effectiveness has led to it being labeled "an addiction engine" by computer scientist Francis Irving, who has studied YouTube's software systems and raised concerns with YouTube staff, who responded to Irving with incredulity, indicating that they had no incentives to change how YouTube's software worked. After all, they explained, the algorithm works as intended: "it makes a lot of money."[150]

288.    YouTube's use of children's Personal Information to maximize the effectiveness of the Recommendation Engine is deeply disturbing because YouTube's Recommendation Engine regularly recommends inappropriate, harmful content to viewers of content *rated for toddlers.* That is, even if a YouTube viewer starts a viewing session with a video rated for 1-5 year olds, the Recommendation Engine frequently recommends unsafe disturbing videos next for that user. For example, the study *Disturbed YouTube for Kids: Characterizing and Detecting Inappropriate Videos Targeting Young Children* conducted a live simulation of a toddler's browsing on YouTube and concluded that any one toddler had a 3.5% chance of encountering an inappropriate video within ten "hop" or video changes from an initially benign, age-appropriate video. More disturbingly, the study "that most of the inappropriate videos are found early [in the viewing session] (*i.e.*, at the first hop) [which] highlight[s] that the problem of inappropriate videos on YouTube emerges quite early when users are browsing the platform starting from benign toddler-oriented search terms."[151] Thus, even a short browsing session

---

[149] Andrew Hutchinson, *YouTube Generated $28.8 Billion in Ad Revenue in 2021, Social Media Today* (Feb. 2, 2021), https://www.socialmediatoday.com/news/youtube-generated-288-billion-in-ad-revenue-in-2021-fueling-the-creator/618208/; Jennifer Elias, *YouTube Is a Media Juggernaut That Could Soon Equal Netflix in Revenue,* CNBC (Apr. 27, 2021), https://www.cnbc.com/2021/04/27/youtube-could-soon-equal-netflix-in-revenue.html.

[150] Mark Bergen, *YouTube Executives Ignored Warnings, Letting Toxic Videos Run Rampant*, Bloomberg (Apr. 2, 2019), https://www.bloomberg.com/news/features/2019-04-02/youtube-executives-ignored-warnings-letting-toxic-videos-run-rampant.

[151] Kostantinos Papadamou et al., *Disturbed YouTube for Kids: Characterizing and Detecting Inappropriate Videos Targeting Young Children*, 14 Proc. Int'l AAAI Conf. on Web & Soc. Media 522 (2020).

can expose children to disturbing content, which can have detrimental effects on early childhood development.[152]

289.    Another comprehensive study by Muhsin Yesilada and Stephan Lewandowsky entitled *Systematic review: YouTube recommendations and problematic content* published in the Internet Policy Review in 2022 systematically reviewed the impact of YouTube's recommendation system on the accessibility of problematic content.[153] The authors analyzed 23 studies and found that YouTube's recommendation algorithms often lead users, *including children*, to inappropriate and harmful content, which can result in increased instances of mental health issues such as anxiety, depression, and behavioral problems.[154]

290.    Unsurprisingly, studies have found that exposure to harmful content on YouTube can have negative effects on YouTube user's mental health. For example, the study *The Impact of YouTube on Loneliness and Mental Health*, conducted by Luke Balcombe and Diego De Leo conducted an integrative review of 32 empirical and theoretical studies and found that while YouTube may social interaction and information, *its recommendation algorithms can expose vulnerable users, especially children and adolescents, to potentially harmful content*, promoting loneliness and mental health issues.[155]

291.    It is well-accepted that exposing children to age-inappropriate content can have harmful effects on their development and mental health, which is why American society has developed content rating systems for movies, video games, and is why YouTube offers age-rating on the platform. Recent studies have shown that children's exposure to harmful content in YouTube has had harmful effects on America's children. In 2021, the Mozilla Foundation studied 37,000 YouTube users, finding that 71% of all reported negative user experiences came from videos recommended to users by Google's

---

[152] *Id.*

[153] Yesilada, Muhsin & Stephan Lewandowsky, *Systematic Review: YouTube Recommendations and Problematic Content*, 11 Internet Pol'y Rev. (2022), https://doi.org/10.14763/2022.1.1652.

[154] *Id.* (emphasis added).

[155] Balcombe, L., & De Leo, D. (2023). *The Impact of YouTube on Loneliness and Mental Health. Informatics*, 10(39). https://doi.org/10.3390/informatics10020039. (emphasis added)

recommendation algorithms.[156] Mental health experts have warned that YouTube is a growing source of anxiety in minors,[157] with "increased rates of anxiety" causing minors to "exhibit loss of appetite, sleeplessness, crying fits and fear."[158]

292.    Indeed, one study determined that using YouTube's platform was "consistently and negatively related to sleep outcomes."[159] According to Dr. Alon Avidan, director of the UCLA Sleep Disorders Center, YouTube is particularly sleep disruptive because its recommendation algorithm and Autoplay feature make it "so easy to finish one video" and watch the next.[160] Sleep deprivation is, in turn, associated with poor health outcomes, as "insufficient sleep negatively affects cognitive performance, mood, immune function, cardiovascular risk, weight, and metabolism.[161]

293.    Compounding the harm caused by the Recommendation Engine is the fact that the harmful inappropriate content often produces a dopamine response, making it more likely that a user will watch the harmful video, which the algorithm interprets as signaling interest and preference.[162] Former Google engineers told the Wall Street Journal that "[t]he algorithm doesn't seek out extreme videos . . . but looks for clips that data show are already drawing high traffic and keeping people on the

---

[156] *YouTube Regrets: A crowdsourced investigation into YouTube's recommendation algorithm* at 13, Mozilla Found. (July 2021), ttps://assets.mofoprod.net/network/documents/Mozilla_YouTube_Regrets_Report.pdf.

[157] Josephine Bila, *YouTube's Dark Side Could be Affecting Your Child's Mental Health*, CNBC (Feb. 13, 2018), https://www.cnbc.com/2018/02/13/youtube-is-causing-stress-and-sexualization-in-young-children.html.

[158] *Id.*

[159] Meg Pillion *et al.*, *What's 'app'-ning to adolescent sleep? Links between device, app use, and sleep outcomes*, 100 Sleep Med. 174–182, 179 (Dec.2022), https://www.sciencedirect.com/science/article/abs/pii/S1389945722010991?via%3Dihub [https://perma.cc/PJ5C-CTMP].

[160] Cara Murez, *One App Is Especially Bad for Teens' Sleep*, U.S. News & World Rep. (Sept. 13, 2022), https://www.usnews.com/news/health-news/articles/2022-09-13/one-app-is-especially-bad-for-teens-sleep.

[161] Jessica C. Levenson *et al.*, *The association between social media use and sleep disturbance among young adults*, 85 Preventive Med. 36–41, 36 (2016), https://www.sciencedirect.com/science/article/abs/pii/S0091743516000025 [https://perma.cc/QYE5-92M4].

[162] Josephine Bila, *YouTube's Dark Side Could be Affecting Your Child's Mental Health*, CNBC (Feb. 13, 2018), https://www.cnbc.com/2018/02/13/youtube-is-causing-stress-and-sexualization-in-young-children.html.

site. Those videos often tend to be sensationalist.".[163] An investigation by *Bloomberg* put it simply: "In the race to one billion hours, a formula emerged: Outrage equals attention.".[164] Thus, in order to increase the number of advertisements Google served to children, it exposed them to content that was more likely to frighten them.

294.    And once a child YouTube user watches one harmful recommended video, The Recommendation Engine is likely to suggest similar harmful content to watch next, pushing children down "rabbit holes," which "[lead] viewers to incrementally more extreme videos or topics, which . . . hook them in.".[165] For example, a user might "[w]atch clips about bicycling, and YouTube might suggest shocking bike race crashes.".[166] In this way, the algorithm makes it more likely that youth will encounter content that is violent, sexual, or encourages self-harm, among other types of harmful content – all for the purpose of serving children advertising.

295.    These effects combine to compel children to overuse YouTube, increasing children's exposure to unsafe, harmful, age inappropriate videos which in turn can adversely affect mental health. These harms to children are collateral damage for Google – the goal is to maximize ad delivery at all costs.

296.    These dangers were recently underscored by the United States Surgeon General's advisory entitled Social Media and Youth Mental Health, which observed, *inter alia*, that "[a]lthough age 13 is commonly the required minimum age used by social media platforms in the U.S.,3 nearly 40% of children ages 8–12 use social media" and that "[t]here are increasing concerns among researchers,

---

[163] *Why is YouTube Suggesting Extreme and Misleading Content (2/7/2018)*, https://www.youtube.com/watch?v=7AjA3Df6i6o; *see also* Josephine Bila, *YouTube's Dark Side Could be Affecting Your Child's Mental Health*, CNBC (Feb. 13, 2018), https://www.cnbc.com/2018/02/13/youtube-is-causing-stress-and-sexualization-in-young-children.html.

[164] Mark Bergen, *YouTube Executives Ignored Warnings, Letting Toxic Videos Run Rampant*, Bloomberg (Apr. 2, 2019), https://www.bloomberg.com/news/features/2019-04-02/youtube-executives-ignored-warnings-letting-toxic-videos-run-rampant.

[165] Max Fisher & Amanda Taub, *On YouTube's Digital Playground, an Open Gate for Pedophiles,* NY Times (June 3, 2019), https://www.nytimes.com/2019/06/03/world/americas/youtube-pedophiles.html.

[166] *Id.*

SIXTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

parents and caregivers, young people, healthcare experts, and others about the impact of social media on youth mental health."[167]

297.    Defendants have, thus, through their unlawful collection and use of Personal Information, knowingly promoted compulsive use of YouTube by young children, knowing that such compulsive use exposed the young children to harmful content and promoted serious mental health problems. Defendants' use of such Personal Information for these purposes not only violates the privacy rights of Plaintiffs and the members of the Classes, but also is highly offensive and outrageous.

## VII.    Evidence Suggests Google Is Continuing to Cause and/or Facilitate COPPA Violations by Continuing to Collect the Personal Information of Children Under 13 Without Consent and May Be Using that Personal Information

298.    Throughout the Class Period, Google collected and used COPPA-protected Personal Information from Plaintiffs and members of the Classes viewing YouTube, without obtaining the verified parental consent required by COPPA for such collection and use.

299.    On September 10, 2019, Google entered into a Stipulated Order for Permanent Injunction and Civil Money Judgment (the "FTC Injunction") with the FTC that, *inter alia*, required Google (a) to refrain (by January 10, 2020) from collecting such Personal Information from children under the age of 13 without verifiable parental consent or otherwise violating COPPA; and (b) to refrain (by April 10, 2020) from using or benefitting from Personal Information previously collected from children under the age of 13 from any YouTube channels designated  as child-directed by the channel owner by December 10, 2019.

300.    The FTC Injunction was far from comprehensive and left ample opportunity for Google to continue its misuse of the Personal Information of Plaintiffs and Class members in three important respects.  First, the FTC Injunction entered against Google did not and does not prevent Google from using or benefitting from Plaintiffs' and the Classes' Personal Information obtained from any YouTube channel, unless the channel owner affirmatively designated its channel as child-directed by December

---

[168] Dissenting Statement of FTC Commissioner Rebecca Kelly Slaughter, dated September 4, 2019, at 3-4 (accessible at https://www.ftc.gov/system/files/documents/public_statements/1542971/slaughter _google_youtube_statement.pdf).

10, 2019. The FTC Injunction does not impose any requirement on any channel owner to provide Google with that information and does not contain any provisions requiring Google (or any channel owner) to verify the accuracy of the channel owner's self-designation or even to report whether such designation(s) have occurred. The FTC Injunction leaves Google free to continue to use any of Plaintiffs' or the Classes' Personal Information obtained by Google in violation of COPPA if a channel owner failed to provide Google with a timely designation of its channel as child-directed. This is an exception to the injunctive relief afforded by the FTC Injunction large enough to moot its intended effect of preventing Google from profiting from its misconduct.

301. FTC Commissioner Rebecca Kelly Slaughter dissented from the terms of the FTC Order and Injunction precisely because of this deficiency in the terms of the FTC Injunction. While recognizing that *some* channel owners would responsibly (and timely) acknowledge their channels to be child-directed (and bear the financial consequences of lowered ad revenue), she stated:

> My concern is with the vast universe of content creators who will conduct a different cost-benefit analysis in which the perceived payoff of monetizing child-directed content through behavioral advertising outweighs the perceived risk of being caught violating COPPA. And that universe is indeed vast. .... Many if not most of those channels are located outside the United States and therefore likely beyond COPPA's and the FTC's practical reach. Many are small enterprises with opaque operations that would be difficult subjects to investigate. Under the order, they will all have to make a designation of whether their content is child-directed. In light of the steep financial cost of such a designation—and the low likelihood of COPPA enforcement for channels under the radar or originating outside of the United States—it is reasonable to anticipate that there will be significant deceit.[168]

302. Commissioner Slaughter thus concluded that the FTC Injunction lacked a critical provision requiring Google to verify that it has stopped collecting tracking information on all of You Tube's child-directed channels:

---

[168] Dissenting Statement of FTC Commissioner Rebecca Kelly Slaughter, dated September 4, 2019, at 3-4 (accessible at https://www.ftc.gov/system/files/documents/public_statements/1542971/slaughter_google_youtube_statement.pdf).

The order does not require YouTube to police the channels that deceive by mis-designating their content, such as by requiring YouTube to put in place a technological backstop to identify undesignated child-directed content and turn off behavioral advertising..[169]

303.    Commissioner Slaughter's concerns about the cost-benefit analysis that content creators would engage in were well-founded, as demonstrated by a Power Point created to assist YouTube's sales team in dealing with its partners around necessary changes as a result of the FTC Injunction:

304.

305.    Given the importance of this revenue to content creators and the opportunity to self-designate, the FTC Injunction invites the non-compliance of channel owners and the willful ignorance of Google.

306.    Second, the FTC Injunction does not provide individualized protection from misuse of the Personal Information of any child under the age of 13 who was victimized by Google's wrongful conduct. The FTC Injunction does not require Google to notify Plaintiffs and members of the Classes – or the FTC – of whether specific Plaintiffs' or specific Class members' Personal Information was wrongly collected and exploited by Defendants or whether specific Plaintiffs' or specific Class members' Personal Information has been designated by any channel owner and is subject to the FTC Injunction.  The FTC Injunction further does not authorize any individual to enforce its provisions barring use of the child's tracked information.

---

[169] Id. at 4.
[170] GOOG-HUB-00076066.
[171] GOOG-HUB-00076102.

SIXTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

307.    Third, and most notably, the FTC Injunction does not require Google to destroy the Personal Information of Plaintiffs and members of the Classes that Google collected in violation of COPPA.

308.    Because the wrongfully collected Personal Information of Plaintiffs and the members of the Classes remains in the possession of Google, it is subject to misuse by Google – either because it was collected from a YouTube channel not timely designated by the channel owner as child-directed channel by December 10, 2019 and is, thus, not subject to the FTC Injunction; or because it may be intentionally misused by Google – either of which results in continuing harm to Plaintiffs and Class members for which there is no adequate remedy at law.

309.    As discussed above, there is a significant likelihood that channel owners will not properly designate their channels as child-directed, leaving the tracked information in Google's possession unprotected.  In addition, as FTC Commissioner Rohit Chopra noted in his dissent from the FTC Order, Google is a serial violator of privacy regulations, having been sanctioned three times by the FTC since 2011.[172] Google further has a history of violating FTC consent orders.[173] Moreover, as FTC Commissioner Alvaro M. Bedoya recently expressed, there is a danger that Google's retention of wrongly collected Personal Information exposes Plaintiffs and the members of the Classes to the dangers of "hacks and data breaches."[174]  COPPA's protections include a prohibition on an operator's retention of COPPA-protected Personal Information, and Plaintiffs and the members of the Classes are entitled to the security of that statutory protection.

310.    Furthermore, the FTC Injunction does not require Google to forfeit the profits they realized from their wrongful exploitation of Plaintiffs' and Class members' Personal Information, thus

---

[172] Dissenting Statement of FTC Commissioner Rahit Chopra, dated September 4, 2019, at 1 (accessible at   https://www.ftc.gov/system/files/documents/public_statements/1542957/chopra_google_youtube_dissent.pdf).

[173] *See e.g., U.S. v. Google Inc.,* No. CV 12–04177 SI, 2012 WL 5833994 (N.D. Cal. Nov. 16, 2012) (approving Stipulated Order for Permanent Injunction and Civil Penalty Judgment based on Google's violation of a previous consent order with the FTC).

[174] Statement of FTC Commissioner Alvaro M. Bedoya on the Issuance of the Notice of Proposed Rulemaking to Update the Children's Online Privacy Protection Rule (COPPA Rule), December 20, 2023, at 2.

allowing Google to retain the enormous profits it obtained through its illegal use of Plaintiffs' and Class members' Personal Information to profile and target Plaintiffs and Class members.  No remedy at law available to Plaintiffs and the Classes reaches these profits or is available to prevent Google from retaining such profits. The law requires imposition of equitable orders of non-restitutionary disgorgement to prevent Google from profiting from their misconduct even without any showing of a corresponding economic harm suffered by the Plaintiffs and the members of the Classes from Defendants' receipt of such profits.[175]

311.    Money damages will not protect Plaintiffs and the members of the Classes from the non-economic harms discussed herein posed by misuse of their Personal Information collected in violation of COPPA or Google's impermissible profit from its misconduct, and Plaintiffs and the Classes, thus, have no adequate remedy at law. Moreover, even if money damages might otherwise provide an adequate remedy at law, there is at a minimum substantial doubt that any remedy at law is available, as the Court has ruled that the claims at law asserted by Plaintiffs and the members of the Classes in their Fifth Amended Complaint do not satisfy the requisite elements for relief.  Plaintiffs and the members of the Classes dispute the Court's holding and further believe that their claims at law as asserted in this Sixth Amended Complaint are legally and factually sufficient.  However, to the extent that money damages, if available, would constitute an adequate remedy at law barring recovery, Plaintiffs and the members of the Classes assert their claims for the equitable relief set forth herein as an alternative remedy pending a final determination of the availability of a remedy at law.

312.    For these reasons, Plaintiffs and the Classes seek entry of a permanent injunction: (a) requiring Google to destroy all Personal Information of Plaintiffs and the Classes in the possession of Google that was collected in violation of COPPA; (b) requiring Google to notify each Plaintiff and Class member that his or her Personal Information was collected and has been destroyed; (c) restraining Google from directly or indirectly using or benefiting from the Personal Information of Plaintiffs and the Classes that it wrongly collected, including precluding the use of any profile of any Plaintiff or Class member

---

[175] *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589, 599–600 (9th Cir. 2020).

developed in whole or in part based on such information and serving targeted or behavioral advertising; and (d) requiring Google's relinquishment of all ill-gotten gains.

313.    There is, moreover, substantial credible evidence that the FTC Injunction has not deterred Google from continuing its violations of COPPA. Recent analyses of Google's post-injunction practices demonstrate that Google is still collecting Personal Information from minors using YouTube in violation of COPPA

314.    Contemporaneously with Google's settlement with the FTC, YouTube's CEO published a statement saying that going forward, YouTube: "will treat data from anyone watching children's content on YouTube as coming from a child, regardless of the age of the user" and "will limit data collection and use on videos made for kids only to what is needed to support the operation of the service [and] will also stop serving personalized ads on this content entirely."

315.    But recent research reports dispute that Google has been complying with the terms of the FTC Injunction and its own statements made in the aftermath of the settlement's announcement. Specifically, advertising research and consumer groups have documented that Google, via their artificial intelligence-based ad-targeting system "Performance Max," is engaging in the continued collection of children's Personal Information in violation of COPPA.

316.    On August 17, 2023, advertising research firm Adalytics released a report entitled *Are YouTube Advertisers Inadvertently Harvesting Data From Millions of Children?* [176] Specifically, Adalytics and its partner, publisher quality intelligence firm DeepSee.io, detailed their observations as of July 2023 that Google is engaging in ongoing COPPA-violative YouTube data collection practices by:

    a.    Setting long-lasting cookies specifically for the purposes of ad targeting and tracking on the browsers of consumers watching YouTube videos that are clearly labeled as "for kids."

    b.    Serving behaviorally and demographically targeted ads on YouTube videos that are clearly labeled as "for kids." In some (adult) brands' personalized ad campaigns, the top YouTube channels by clicks or clickthrough rate are popular "made for kids" YouTube channels such as "ChuChu TV Nursery Rhymes & Kids Songs", "CoComelon Nursery Rhymes & Kids Songs", or "Kids Diana Show." The viewers of "made for kids" YouTube

---

[176] https://adalytics.io/blog/are-youtube-ads-coppa-compliant.

videos appear to be clicking on ads, and brands' websites – such as Michigan State Police, Disney, BMW, Hyundai, and Verizon – that are harvesting and sharing meta-data on those viewers with dozens of data brokers upon click through. This raises the possibility that brands have "data poisoned" their first party datasets with data derived from thousands of viewers of "made for kids" videos.

c.   Failing to provide certain technical indicators to programmatic advertisers that the content is targeted towards kids.

d.   Setting and sharing a unique ad tracking ID every time a viewer on a "for kids" channel clicks on a YouTube ad on the YouTube iPhone mobile app. Specifically, The YouTube iPhone iOS app creates unique click IDs called "wbraid", which get shared with the advertiser's website even if the click comes from the viewer of a "made for kids" video on YouTube; although Google alleges this "wbraid" is compliant with Apple's App Tracking Transparency (ATT) framework, the "wbraid" ID was observed as being harvested by third party data brokers such as TikTok, Facebook, Trade Desk, and Microsoft, which could theoretically use it to perform record linkage or data matching. The YouTube iOS app does not appear to ask for parental consent before injecting the "wbraid" ID on a user's device pursuant to an ad click on a "made for kids" video.

e.   Opening the advertiser's website in a special in-app "webview" browser when a viewer clicks on an ad adjacent to a "for kids" video on the iPhone YouTube app, where Google then both set various ad targeting and tracker IDs on the viewer's iPhone, and the YouTube app allows other data brokers and ad personalization vendors to gather and share unique identifiers on the viewer.

317.   One of the most troubling findings by Adalytics, confirmed by Plaintiffs' expert, is the presence of advertisements on child-directed YouTube channels that permits data-sharing about the user with third-parties.  In one example provided by Adalytics, it "observe[d] that BMO Bank had ads for its credit cards placed on a 'made for kids' YouTube channel called "Kids Diana Show" showing a Barbie (Barbie is owned by defendant Mattel) themed show. "If the viewer of this made for kids YouTube video were to click on the particular BMO Bank ad, their device would open the bmo.com website. The query string parameters suggest that the campaign was a Performance Max campaign. The bmo.com website appears to share data about the viewer of the made for kids YouTube video with dozens of third-party ad tech and data brokers – without first asking for informed parental consent."  Once a user clicks on an ad and information is sent to a third-party, additional advertisements will be served to that user.[177]

---

[177] *Id.*

SIXTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

318.    In another example, Adalytics "observe[d] an ad for "ADT Solar incentives Programs" being served on the "made for kids" YouTube video "Wheels on the bus - Zoo Friends - Animals Song Collection + More ChuChu TV Nursery Rhymes for Babies", which is on the YouTube "made for kids" channel titled: "ChuChu TV Nursery Rhymes & Kids Songs".[178]

319.    In a third example, Adalytics "observe[d] an ad for Urban Science Access Success being served on the "made for kids" YouTube video "SuperHero Ryan Red Titan and Daddy save the City!", which is on the YouTube "made for kids" channel titled: "Ryan's World. The landing page for the ad shows the presence of various clickthrough tracking UTM strings, including "utm_source" = "google-performance-max". Similar to the first example, the UTM strings show that the advertiser is using Google's Performance Max ad-targeting and can tell where its visitors are coming from.[179]

320.    When Adalytics shared these finding with industry advertising executives, one commented that "the presence of advertising on children's content on YouTube . . . creates significant and unacceptable reputational and regulatory risks for advertisers."   He went on to note that the "exfiltration of American children's data across the advertising data ecosystem" posed significant risks to children.[180]

321.    A second advertising executive expressed disgust upon learning that Google continues to advertise on child-oriented content, stating that:

> There is no reasonable excuse for ads running on content intended primarily for kids other than to extort advertisers through a toddler-enabled click farm. The observations around Pmax (Preschooler Max) are damning given the hard sell Google is putting on us to trust their so-called AI black box. We're overdue real transparency and Google needs to be made accountable - refunding us for all ads on this content and explaining themselves to the FTC.[181]

---

[178] *Id.*

[179] *Id.*

[180] *Id.*

[181] *Id.*

SIXTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

322.     After Google denied the findings in the Adalytics report, a coalition of organizations including Fairplay and the Center for Digital Democracy wrote to FTC Chair Lina M. Khan, FTC Commissioner Alvaro Bedoya, and FTC Commissioner Rebecca Kelly Slaughter requesting an investigation into the above-described practices and detailing findings of their own investigation of YouTube's ongoing COPPA-violative tracking practices.

323.     The details of Fairplay's investigation are as follows:

Fairplay ran its own test ad purchase on YouTube in order to examine the veracity of Google and YouTube's claim that it treats all users watching "made for kids" videos as children . . . On YouTube, Fairplay selected a series of attributes and affinities for ad targeting, such as "retiring soon" and "cloud service power users." Fairplay then instructed Google to only run the ads on a list of 996 channels that Google and YouTube have identified as "made for kids." Our $10 ad campaign resulted in 1,446 impressions across 46 "made for kids" channels such as Miraculous Ladybug and CVS 3D Rhymes and Kids' Song. An "Audience Segment Report" provided by Google confirmed that Fairplay's ads reached viewers with its desired characteristics. For example, 432 of those 1,466 ad impressions came from users identified by Google as "motorcycle enthusiasts," and 70 impressions came from "cloud services power users."[182]

324.     In sum, "Fairplay ran a test ad campaign where it selected a series of attributes and affinities for ad targeting, such as "retiring soon" and "cloud service power users." Fairplay then instructed Google to only run the ads on a list of 996 channels that Google has identified as "made for kids," and Google ran the ads." But Fairplay's campaign should have results in zero placements because Google says it does not run personalized, behavioral advertising on "made for kids" channels. Instead, it resulted in over 1,400 placements on "made for kids" channels.

325.     In response to Google's denial of Adalytics' finding, Adalytics released a supplemental report on August 23, 2023 further documenting evidence of behaviorally targeted, "personalized" ads on "made for kids" YouTube channels in light of Google's denials that documented the results of four ad

---

[182] https://fairplayforkids.org/wp-content/uploads/2023/08/FTCRequestForInvestigationAug23.pdf

campaigns where the ad buyer selected several behavior traits or audience characteristics (i.e. elected to run behavioral advertising). Below is a description of the results of one of the four campaigns:

> [The] media buyer configured a YouTube ad campaign to target several dozen different user audience segments. These included "Affinity segments", such as "Motorcycle Enthusiasts". The media buyer did not select or enable "audience expansion". Furthermore, the buyer configured their targeted audience demographics to exclude users for whom Google says the user is a "Parent". The media buyer inputted a list of several hundred "made for kids" YouTube channels as part of an "inclusion list" of channels to target for the campaign.
>
> After the ad campaign had begun serving, the media buyer downloaded a detailed Placement report, audience segment report (using "audience reporting"), and demographic report to analyze their YouTube ad campaign performance. The third media buyer's reports were shared with Adalytics, which analyzed the reports on behalf of the buyer in Python Jupyter notebooks.
>
> The placement report revealed that 100% of the impressions and views generated by this behaviorally targeted ad campaign were apparently served on "made for kids" channels such as "Miraculous Ladybug". (emphasis added).[183]

326.    The ad campaigns detailed in Adalytics' August 23, 2023 report provide clear evidence that Google is violating the terms of the FTC Injunction and acting in direct contravention of Google's statements following the FTC settlement that it would not run personalized, behavioral advertising on "made for kids" YouTube channels.

327.    In sum, Google continues to violate COPPA and the terms of the FTC Injunction by collecting, and causing others to collect, the Personal Information of children under 13.

328.    Plaintiffs and members of the Classes continue to use YouTube and other aspects of the internet controlled by Google and have a legitimate desire to avoid having their profiles used by Google for advertising or other intrusive purposes. Plaintiffs and members of the Classes are likely to use YouTube in the future and seek protection from Google's continuing violations of COPPA protections.

---

[183]https://adalytics.io/blog/is-there-evidence-of-personalized-ads-on-made-for-kids-youtube-videos#:~:text=A%20media%20buyer%20configured%20a,or%20enable%20%E2%80%9Caudience%20expansion%E2%80%9D.

329.    Throughout the Class Period, the Channel Owner Defendants were aware that COPPA prohibited them from using their YouTube channels to assist Google in collecting Personal Information from children under the age of 13 or from benefiting from Google's wrongful collection of the Personal Information of Plaintiffs and the members of the Classes.

330.    Throughout the Class Period, the Channel Owner Defendants knowingly assisted Google in collecting Personal Information from children under the age of 13 who used their channels, knowing and intending that they would benefit financially from Google's collection (and use) of such Personal Information on their behalf to generate lucrative behavioral advertising.

331.    Plaintiffs and members of the Class are likely to use the Channel Owner Defendants' channels in the future and seek protection from each Channel Owner Defendant' continuing violations of COPPA protections.

332.    In addition, as with Google, public policy requires entry of equitable orders of non-restitutionary disgorgement preventing each Channel Owner Defendant from profiting from its wrongful conduct, even without any showing of a corresponding economic harm suffered by the Plaintiffs and the members of the Classes from each Channel Owner Defendant's receipt of such profits.  There is no remedy at law available to Plaintiffs and the Classes to reach the enormous profits and benefits each Channel Owner Defendant realized from its participation with Google in illegally collecting Plaintiffs' and the Classes' Personal Information, nor is there any remedy at law available to prevent the Channel Owner Defendants from retaining such profits.

333.    The Channel Owners are not subject to the FTC Injunction, and in light of each Channel Owner's knowing violations of COPPA, Plaintiffs and the members of the Class have a reasonable fear that each of the Channel Owner Defendant will, in the future, directly or indirectly, collect their Personal Information in violation of COPPA or cause and/or enable or assist a third party to collect such information for the Channel Owner Defendant's benefit.

334.    Money damages will not protect Plaintiffs and the members of the Classes from the non-economic harms discussed herein posed by misuse of their Personal Information collected in the future by or behalf of the Channel Owner Defendants in violation of COPPA, and Plaintiffs and the Classes, thus, have no adequate remedy at law. Moreover, even if money damages might otherwise provide an

adequate remedy at law, there is at a minimum substantial doubt that any remedy at law is available, as the Court has ruled that the claims at law asserted by Plaintiffs and the members of the Classes in their Fifth Amended Complaint do not satisfy the requisite elements for relief.  Plaintiffs and the members of the Classes dispute the Court's holding and further believe that their claims at law as asserted in this Sixth Amended Complaint are legally and factually sufficient.  However, to the extent that money damages, if available, would constitute an adequate remedy at law barring recovery, Plaintiffs and the members of the Classes assert their claims for the equitable relief set forth herein as an alternative remedy pending a final determination of the availability of a remedy at law.

335.    For these reasons, Plaintiffs and the Classes seek entry of a permanent injunction restraining each of the Channel Owner Defendants  (a) from directly or indirectly causing and/or enabling or assisting Google to collect Personal Information of Plaintiffs and the Classes in violation of COPPA and the state law privacy and unfair and deceptive practices laws asserted herein for the Channel Owner Defendants' benefit;; (b) requiring each Channel Owner Defendant to notify Plaintiffs and members of the Classes whether the Channel Owner Defendant timely notified Google that its channel was child-directed pursuant to the FTC Injunction; (c) restraining each Channel Owner Defendant  from directly or indirectly using or benefiting from the Personal Information of Plaintiffs and the Classes wrongly collected from its channels, including precluding the use of any profile of any Plaintiff or Classes member developed in whole or in part based on such information; and (d) requiring each Channel Owner Defendant's relinquishment of all ill-gotten gains from their misconduct alleged herein.

## ALLEGATIONS RELATING TO PLAINTIFFS

### A.    Plaintiff C.H.

336.    During the Class Period, Plaintiff C.H. watched videos and advertisements on YouTube.

337.    C.H. viewed child-directed content on multiple monetized YouTube channels, including:

    a.  **ChuChuTV-owned Channels:** ChuChu Nursery Rhymes & Kids Songs;

    b.  **Hasbro-owned Channels:** Hasbro: My Little Pony;

    c.  **Remka-owned Channels:** Ryan's World: Ryan Toys Review

338.    Google, ChuChuTV, Hasbro, and Remka each and together collected and enabled collection of C.H.'s Personal Information for the purposes of tracking, profiling, and targeting C.H. with

advertisements as C.H. watched Defendant ChuChuTV's, Hasbro's, and Remka's child-directed content on their YouTube channels.

339.    Neither Google, ChuChuTV, Hasbro, or Remka obtained verifiable parental consent prior to the collection of C.H.'s Personal Information.

340.    Neither Plaintiff C.H. nor their parent and guardian Nichole Hubbard could have reasonably discovered this conduct earlier through investigation. Plaintiff C.H. is a minor unable to consent to or understand Defendants' tracking of personal information, and Defendants concealed from and misled Nichole Hubbard about their tracking, profiling, and targeting of her child.

341.    The tracking, profiling, and targeting of C.H. without parental consent by Google, ChuChuTV, Hasbro, and Remka is highly offensive and constitutes an invasion of C.H.'s privacy.

342.    C.H. is likely to use YouTube in the future and seeks protection from the Google and Channel Owner Defendants' continuing violations of COPPA protections.

**B.    Plaintiffs E.J., N.J., A.J., and L.J.**

343.    During the Class Period, Plaintiffs E.J., N.J., A.J., and L.J. watched videos and advertisements on YouTube.

344.    E.J., N.J., A.J., and L.J. viewed child directed content on multiple monetized YouTube channels, including:

a.    **Hasbro-owned Channels:** Hasbro and Hasbro: My Little Pony;

b.    **ChuChu TV-owned Channels**: ChuChu Nursery Rhymes & Kids Songs, ChuChu TV Surprise Egg Toys, and ChuChu TV Funzone;

c.    **Dreamworks-owned Channels:** Dreamworks TV World;

d.    **Remka-owned Channels:** Ryan's Toy Review;

345.    Google, ChuChu TV, Hasbro, Dreamworks, and Remka each and together collected and enabled collection of E.J.'s, N.J.'s, A.J.'s, and L.J.'s Personal Information for the purposes of tracking, profiling, and targeting E.J., N.J., A.J., and L.J. with advertisements as they watched Defendant ChuChu TV's, Hasbro's, Dreamworks, and Remka's child directed content on their YouTube channels.

346.    Neither Google, ChuChu TV, Hasbro, Dreamworks, nor Remka obtained verifiable parental consent prior to the collection of E.J., N.J., A.J., and L.J.'s Personal Information.

347.   Neither Plaintiffs E.J., N.J., A.J., and L.J. nor their parent and guardian Cara Jones could have reasonably discovered this conduct earlier through investigation. Plaintiffs E.J., N.J., A.J., and L.J. are minors unable to consent to or understand Defendants' tracking of personal information, and Defendants concealed from and misled Cara Jones about their tracking, profiling, and targeting of her children.

348.   The tracking, profiling, and targeting of E.J., N.J., A.J., and L.J. without parental consent by Google, ChuChu TV, Hasbro, Dreamworks, and Remka is highly offensive and constitutes an invasion of E.J.'s, N.J.'s, A.J.'s, and L.J.'s privacy.

349.   E.J., N.J., A.J., and L.J are likely to use YouTube in the future and seek protection from the Google and Channel Owner Defendants' continuing violations of COPPA protections.

**C.      Plaintiffs J.A.E. and J.R.E.**

350.   During the Class Period, Plaintiffs J.A.E. and J.R.E. watched videos and advertisements on YouTube.

351.   J.A.E. and J.R.E. viewed child-directed content on multiple monetized YouTube channels, including:

  a.   **Mattel-owned Channels:** Thomas & Friends;

  b.   **Cartoon Network-owned Channels:** Cartoon Network, The Amazing World of Gumball, and Boomerang Official;

  c.   **Remka-owned Channels:** Ryan's Toy Review

352.   Google, Mattel, Cartoon Network, and Remka each and together collected and enabled collection of J.A.E.'s and J.R.E.'s Personal Information for the purposes of tracking, profiling, and targeting J.A.E. and J.R.E. with advertisements as they watched Defendant Mattel's, Cartoon Network's, and Remka's child-directed content on their YouTube channels.

353.   Neither Google, Mattel, Cartoon Network, nor Remka obtained verifiable parental consent prior to the collection of J.A.E.'s and J.R.E.'s Personal Information.

354.   Neither Plaintiffs J.A.E. and J.R.E. nor their parent and guardian Justin Efros could have reasonably discovered this conduct earlier through investigation. Plaintiffs are minors unable to consent to or understand Defendants' tracking of personal information, and Defendants concealed from and

misled Justin Efros about their tracking, profiling, and targeting of his children.

355. The tracking, profiling, and targeting of J.A.E. and J.R.E. without parental consent by Google, Mattel, Cartoon Network, and Remka is highly offensive and constitutes an invasion of J.A.E.'s and J.R.E.'s privacy.

356. J.A.E. and J.R.E. are likely to use YouTube in the future and seek protection from the Google and Channel Owner Defendants' continuing violations of COPPA protections.

**D.    Plaintiff M.W.**

357. During the Class Period, Plaintiff M.W. watched videos and advertisements on YouTube.

358. M.W. viewed child-directed content on multiple monetized YouTube channels, including:

  a. **Mattel-owed Channels:** Barbie, and Polly Pocket;

  b. **Cartoon Network-owned Channels:**  Amazing World of Gumball;

  c. **Hasbro-owned Channels:** Transformers, Play Doh, Baby Alive, and My Little Pony;

  d. **Remka-owned Channels**: Ryan's Toy Reviews;

359. Google, Mattel, Cartoon Network, Hasbro, and Remka collected and enabled collection of M.W.'s Personal Information for the purposes of tracking, profiling, and targeting M.W. with advertisements as M.W. watched Mattel's, Cartoon Network's, Hasbro's, and Remka's child-directed content on their YouTube channels.

360. Neither Google, Mattel, Cartoon Network, Hasbro, or Remka obtained verifiable parental consent prior to the collection of M.W.'s Personal Information.

361. Neither Plaintiff M.W. nor their parent and guardian Renee Gilmore could have reasonably discovered this conduct earlier through investigation. Plaintiff is a minor unable to consent to or understand Defendants' tracking of personal information, and Defendants concealed from and misled Renee Gilmore about their tracking, profiling, and targeting of her child.

362. The tracking, profiling, and targeting of M.W without parental consent by Google, Mattel, Cartoon Network, Hasbro, and Remka is highly offensive and constitutes an invasion of M.W's privacy.

363.    M.W. is likely to use YouTube in the future and seeks protection from the Google and Channel Owner Defendants' continuing violations of COPPA protections.

**E.      Plaintiff A.G.**

364.    During the Class Period, Plaintiff A.G. watched videos and advertisements on YouTube.

365.    A.G. viewed child-directed content on multiple monetized YouTube channels, including:

    a.    **Mattel-owned Channels:** American Girl Wellwisher;

    b.    **Cartoon Network-owned Channels:** DC Super Hero Girls;

    c.    **Remka-owned Channels:** Ryan's Toy Reviews

366.    Google, Mattel, Cartoon Network, and Remka collected and enabled collection of A.G.'s Personal Information for the purposes of tracking, profiling, and targeting A.G. with advertisements as A.G. watched Defendant Mattel's, Cartoon Network's, Chad Alan's, and Remka's child-directed content on their YouTube channels.

367.    Neither Google, Mattel, Cartoon Network, or Remka obtained verifiable parental consent prior to the collection of A.G.'s Personal Information.

368.    Neither Plaintiff A.G. nor their parent and guardian Jay Goodwin could have reasonably discovered this conduct earlier through investigation. Plaintiff is a minor unable to consent to or understand Defendants' tracking of personal information, and Defendants concealed from and misled Jay Goodwin about their tracking, profiling, and targeting of his child.

369.    The tracking, profiling, and targeting of A.G. without parental consent by Google, Mattel, Cartoon Network, and Remka is highly offensive and constitutes an invasion of A.G.'s privacy.

370.    A.G. is likely to use YouTube in the future and seeks protection from the Google and Channel Owner Defendants' continuing violations of COPPA protections.

**F.      Plaintiffs T.B. and S.B.**

371.    During the Class Period, Plaintiffs T.B. and S.B. watched videos and advertisements on YouTube.

372.    T.B. and S.B.  viewed child-directed content on multiple monetized YouTube channels, including:

    a.    **Mattel-owned Channels:** Barbie, Fisher Price, and Polly Pocket;

b. **Hasbro-owned Channels:** Hasbro, Transformers, Play Doh, and My Little Pony;

c. **Cartoon Network-owned Channels:** Cartoon Network, Adventure Time, The Amazing World of Gumball, Ben 10, DC Super Hero, Powerpuff and Boomerang;

d. **Remka-owned Channel:**  Ryan's Toy Review;

e. **Dreamworks-owned Channels:** Dreamworks TV;

f. **ChuChu TV:** Storytime – Bedtime Stories & Cartoon Shows

373.    Google, Mattel, Hasbro, Cartoon Network, Remka, Dreamworks and ChuChu TV each and together collected and enabled collection of T.B.'s and S.B.'ss Personal Information for the purposes of tracking, profiling, and targeting them with advertisements as theywatched Defendant Cartoon Network's child-directed content on their YouTube channels.

374.    Neither Google nor the Cartoon Network obtained verifiable parental consent prior to the collection of T.B and S.B.'s Personal Information.

375.    Neither Plaintiffs T.B. and S.B. nor their parent and guardian BobbiDerek Buchanan could have reasonably discovered this conduct earlier through investigation. Plaintiff is a minor unable to consent to or understand Defendants' tracking of personal information, and Defendants concealed from and misled Derek Buchanan about their tracking, profiling, and targeting of his children.

376.    The tracking, profiling, and targeting of T.B. and S.B. without parental consent by Google and the Cartoon Network is highly offensive and constitutes an invasion of T.B's and S.B's privacy

377.    T.B. and S.B. are likely to use YouTube in the future and seek protection from the Google and Channel Owner Defendants' continuing violations of COPPA protections.

**G.  Plaintiffs D.T. and D.T.**

378.    During the Class Period, Plaintiffs D.T. and D.T. watched videos and advertisements on YouTube.

379.    D.T. and D.T. viewed child-directed content on multiple monetized YouTube channels, including:

a. **Mattel-owned Channels:** Mattel, Hot Wheels, Fisher-Price, Thomas & Friends,

93

American Girl, and Mattel Action;

    b. **Hasbro-owned Channels:** Hasbro, Transformers Official, Nerf Official, Play Doh, Official Play Doh, Baby Alive, and My Little Pony;

    c. **Cartoon Network-owned Channels:** Cartoon Network, Adventure Time, The Amazing World of Gumball, Ben 10, DC Super Hero, Power Players, Powerpuff, Steven Universe, and Boomerang Official;

    d. **Dreamworks-owned Channels:** Dreamworks;

380. Google, Mattel, Hasbro, Cartoon Network, and Dreamworks collected and enabled collection of D.T.'s and D.T.'s Personal Information for the purposes of tracking, profiling, and targeting D.T. and D.T. with advertisements as D.T. and D.T. watched Mattel's, Hasbro's, Cartoon Network's, and Dreamworks' child-directed content on their YouTube channels .

381. Neither Google, Mattel, Hasbro, Cartoon Network, nor Dreamworks obtained verifiable parental consent prior to the collection of D.T.'s and D.T.'s Personal Information.

382. Neither Plaintiffs D.T. and D.T. nor their parent and guardian Amanda Seeley could have reasonably discovered this conduct earlier through investigation. Plaintiffs are minors unable to consent to or understand Defendants' tracking of personal information, and Defendants concealed from and misled Amanda Seeley about their tracking, profiling, and targeting of her children.

383. The tracking, profiling, and targeting of D.T. and D.T. without parental consent by Google, Mattel, Hasbro, Cartoon Network, and Dreamworks is highly offensive and constitutes an invasion of D.T.'s and D.T.'s privacy.

384. T.B. and S.B. are likely to use YouTube in the future and seek protection from the Google and Channel Owner Defendants' continuing violations of COPPA protections.

**H. Plaintiff B.H.**

385. During the Class Period, Plaintiff B.H. watched videos and advertisements on YouTube.

386. B.H. viewed child-directed content on multiple monetized YouTube channels, including:

    a. **Mattel-owned Channels:** Thomas & Friends and Polly Pocket;

    b. **Hasbro-owned Channels:** Hasbro, Play Doh, and Official Play Doh;

    c. **ChuChu TV-owned Channels:** ChuChu;

    d. **Cartoon Networked-owned Channels:** Cartoon Network, Adventure Time, Gumball, Ben 10, and Power Players;

    e. **Dreamworks Animation-owned Channels:** Dreamworks;

    f. **Remka-owned Channels:** Ryan's Toy Reviews;

387. Google, Mattel, Hasbro, ChuChu TV, Cartoon Network, Dreamworks, and Remka each and together collected and enabled collection of B.H.'s Personal Information for the purposes of tracking, profiling, and targeting B.H. with advertisements as B.H. watched Defendant Mattel's, Hasbro's, ChuChu TV's, Cartoon Network's, Dreamworks', and Remka's child-directed content on their YouTube channels.

388. Neither Google, Mattel, Hasbro, ChuChu TV, Cartoon Network, Dreamworks, n or Remka obtained verifiable parental consent prior to the collection of B.H.'s Personal Information.

389. Neither Plaintiff B.H. nor Plaintiff B.H.'s parent and guardian Jason Hoffman could have reasonably discovered this conduct earlier through investigation. Plaintiff is a minor unable to consent to or understand Defendants' tracking of personal information, and Defendants concealed from and misled Jason Hoffman about their tracking, profiling, and targeting of his child.

390. The tracking, profiling, and targeting of B.H. without parental consent by Google, Mattel, Hasbro, ChuChu TV, Cartoon Network, Dreamworks, and Remka is highly offensive and constitutes an invasion of B.H.'s privacy.

391. B.H. is likely to use YouTube in the future and seeks protection from the Google and Channel Owner Defendants' continuing violations of COPPA protections.

**I. Plaintiffs P.A. and J.A.**

392. During the Class Period, Plaintiffs P.A. and J.A. watched videos and advertisements on YouTube.

393. P.A. and J.A. viewed child-directed content on multiple monetized YouTube channels, including:

    a. **Remka-owned Channels:** Ryan's Toy Reviews;

    b. **Hasbro-owned Channels:** Hasbro, Play Doh, Official Play Doh How To Videos, Baby Alive, and My Little Pony;

SIXTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

c. **Mattel-owned Channels:** Mattel, Barbie, Hot Wheels, Thomas & Friends, American Girl, American Girl Welliewishers, and Polly Pocket;

d. **ChuChu TV-owned Channels:** ChuChu TV, ChuChu TV Nursery Rhymes & Kids Songs, ChuChu TV Surprise Egg Toys, Storytime – Bedtime Stories & Cartoon Shows, and ChuChu TV Funzone

394. Google, Remka, Hasbro, Mattel, and ChuChu TV each and together collected and enabled collection of P.A.'s and J.A.'s Personal Information for the purposes of tracking, profiling, and targeting P.A. and J.A. with advertisements as P.A. and J.A. watched Remka's, Hasbro's, Mattel's, and ChuChu TV's child-directed content on their YouTube channels.

395. Neither Google, Remka, Hasbro, Mattel, or ChuChu TV obtained verifiable parental consent prior to the collection of P.A.'s and J.A.'s Personal Information.

396. Neither Plaintiffs P.A. and J.A. nor their parent and guardian Antonio Alvarez could have reasonably discovered this conduct earlier through investigation. Plaintiffs are minors unable to consent to or understand Defendants' tracking of personal information, and Defendants concealed from and misled Antonio Alvarez about their tracking, profiling, and targeting of his children.

397. The tracking, profiling, and targeting of P.A. and J.A. without parental consent by Google, Remka, Hasbro, Mattel, and ChuChu TV is highly offensive and constitutes an invasion of P.A.'s and J.A.'s privacy.

398. P.A. and J.A. are likely to use YouTube in the future and seek protection from the Google and Channel Owner Defendants' continuing violations of COPPA protections.

**J. Plaintiffs S.H. and D.M.**

399. During the Class Period, Plaintiffs S.H. and D.M. watched videos and advertisements on YouTube.

400. S.H. and D.M. viewed child-directed content on multiple monetized YouTube channels, including:

a. **Mattel-owned Channels:** Mattel, Barbie, Hot Wheels, Fisher-Price, Thomas & Friends, American Girl, American Girl Wellwisher, Mattel Action, Max Steel, and Polly Pocket;

SIXTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

b. **Hasbro-owned Channels:** Hasbro, Nerf Official, Play Doh, Play Doh Official, and My Little Pony;

c. **Cartoon Network-owned Channels:** Cartoon Network, Adventure Time, Gumball, Ben 10, DC Super Hero, Powerpuff, and Steven Universe;

401.   Google, Mattel, Hasbro, and Cartoon Network each and together collected and enabled collection of S.H.'s and D.M.'s Personal Information for the purposes of tracking, profiling, and targeting S.H. and D.M. with advertisements as S.H. and D.M. watched Defendant Mattel's, Hasbro's, and Cartoon Network's child-directed content on their YouTube channels.

402.   Neither Google, Mattel, Hasbro, or Cartoon Network obtained verifiable parental consent prior to the collection of S.H.'s and D.M.'s Personal Information.

403.   Neither Plaintiffs S.H. and D.M. nor their parent and guardian Veronica Hicks could have reasonably discovered this conduct earlier through investigation. Plaintiffs are minors unable to consent to or understand Defendants' tracking of personal information, and Defendants concealed from and misled Veronica Hicks about their tracking, profiling, and targeting of her children.

404.   The tracking, profiling, and targeting of S.H. and D.M. without parental consent by Google, Mattel, Hasbro, and Cartoon Network is highly offensive and constitutes an invasion of S.H.'s and D.M.'s privacy.

405.   S.H. and D.M. are likely to use YouTube in the future and seek protection from the Google and Channel Owner Defendants' continuing violations of COPPA protections.

**K. Plaintiff G.W.**

406.   During the Class Period, Plaintiff G.W. watched videos and advertisements on YouTube.

407.   G.W. viewed child-directed content on multiple monetized YouTube channels, including:

a. **Mattel-owned Channels:** Barbie and American Girl Wellieiwishers;

b. **Hasbro-owned Channels:** Official Play Doh and My Little Pony;

c. **Cartoon Networked-owned Channels:** Cartoon Network;

408.   Google, Mattel, Hasbro, and Cartoon Network each and together collected and enabled collection of G.W.'s Personal Information for the purposes of tracking, profiling, and targeting G.W. with advertisements as G.W. watched Defendant Mattel's, Hasbro's, and Cartoon Network's child-

directed content on their YouTube channels.

409.    Neither Google, Mattel, Hasbro, and Cartoon Network obtained verifiable parental consent prior to the collection of G.W.'s Personal Information.

410.    Neither Plaintiff G.W. nor Plaintiff G.W.'s parent and guardian Doug Wilkerson could have reasonably discovered this conduct earlier through investigation. Plaintiff is a minor unable to consent to or understand Defendants' tracking of personal information, and Defendants concealed from and misled Doug Wilkerson about their tracking, profiling, and targeting of his child.

411.    The tracking, profiling, and targeting of G.W. without parental consent by Google, Mattel, Hasbro, and Cartoon Network is highly offensive and constitutes an invasion of G.W.'s privacy.

412.    G.W. is likely to use YouTube in the future and seeks protection from the Google and Channel Owner Defendants' continuing violations of COPPA protections.

**L.  Plaintiff A.A.**

413.    During the Class Period, Plaintiff A.A. watched videos and advertisements on YouTube.

414.    A.A. viewed multiple monetized YouTube channels owned by Channel Owner Defendants during the Class Period, including, among others, the following channels: (i) Mattel: Thomas & Friends, (ii) Hasbro: Transformers Official, Nerf Official, (iii) Cartoon Network: Boomerang Official, (iv) DreamWorks: Dream-Works TV, Ethan Gamer, Gamer Chad, and (v) Ryan's World: Ryan Toys Review.

415.    Google and these Channel Owner Defendants collected and enabled collection of A.A.'s Personal Information for the purposes of tracking, profiling, and targeting A.A. with advertisements as A.A. watched these Channel Owner Defendants' YouTube videos.

416.    Neither Google nor these Channel Owner Defendants obtained verifiable parental consent prior to the collection of A.A.'s Personal Information.

417.    Neither Plaintiff A.A. nor Plaintiff A.A.'s parent and guardian Pennie Frazier could have reasonably discovered this conduct earlier through investigation. Plaintiff is a minor unable to consent to or understand Defendants' tracking of personal information, and Defendants concealed from and misled Pennie Frazier about their tracking, profiling, and targeting of her child.

418.    The tracking, profiling, and targeting of A.A. without parental consent by Google and

these Channel Owner Defendants is highly offensive and constitutes an invasion of A.A.'s privacy.

419.    A.A. is likely to use YouTube in the future and seeks protection from the Google and Channel Owner Defendants' continuing violations of COPPA protections.

**M. Plaintiffs J.C. and E.M.**

420.    During the Class Period, Plaintiffs J.C. and E.M. watched videos and advertisements on YouTube.

421.    J.C. and E.M. viewed child-directed content on multiple monetized YouTube channels, including:

      a.   **Mattel-owned Channels:** Mattel, Barbie, Hot Wheels, Fisher-Price, Thomas & Friends, American Girl, and American Welliewishers;

      b.   **Hasbro-owned Channels:** Hasbro, Transformers Official, Nerf Official, Play Doh, Official Play Doh, Baby Alive, and My Little Pony;

      c.   **Cartoon Network-owned Channels:** Cartoon Network, Adventure Time, Gumball, Ben 10, DC Superhero, Power Players, Powerpuff, Steven Universe, and Boomerang;

      d.   **Dreamworks-owned Channels:** Dreamworks TV;

      e.   **Remka-owned Channels:** Ryan's Toy Reviews

422.    Google, Mattel, Hasbo, Cartoon Network, Dreamworks, and Remka each and together collected and enabled collection of J.C. and E.M.'s Personal Information for the purposes of tracking, profiling, and targeting J.C. and E.M. with advertisements as J.C. and E.M. watched Defendant Mattel's, Hasbo's, Cartoon Network's, Dreamworks', and Remka's child-directed content on their YouTube channels.

423.    Neither Google, Mattel, Hasbo, Cartoon Network, Dreamworks, nor Remka obtained verifiable parental consent prior to the collection of J.C.'s and E.M.'s Personal Information.

424.    Neither Plaintiffs J.C. and E.M. nor their parent and guardian Lezlie Collins could have reasonably discovered this conduct earlier through investigation. Plaintiffs are minors unable to consent to or understand Defendants' tracking of personal information, and Defendants concealed from and

misled Lezlie Collins about their tracking, profiling, and targeting of her children.

425.   The tracking, profiling, and targeting of J.C. and E.M. without parental consent by Google, Mattel, Hasbo, Cartoon Network, Dreamworks, and Remka is highly offensive and constitutes an invasion of J.C.'s and E.M.'s privacy.

426.   J.C. and E.M. are likely to use YouTube in the future and seek protection from the Google and Channel Owner Defendants' continuing violations of COPPA protections.

**N.  Plaintiffs L.D., D.D., and A.D.**

427.   During the Class Period, Plaintiffs L.D., D.D., and A.D. watched videos and advertisements on YouTube.

428.   L.D., D.D., and A.D. viewed child-directed content on multiple monetized YouTube channels, including:

        a.   **Mattel-owned Channels:** Fisher-Price and Barbie;

        b.   **Cartoon Network-owned Channels:** Cartoon Network, Adventure Time, The Amazing World of Gumball, DC Super Hero Girls, and The Powerpuff Girls;

        c.   **Hasbro-owned Channels:** Baby Alive, My Little Pony, and Hasbro;

        d.   **ChuChu TV-owned Channels:** ChuChu TV Nursery Rhymes & Kids Songs, ChuChu TV Surprise Egg Toys; Storytime – Bedtime Stories and Cartoon Shows, and ChuChu TV Funzone;

429.   Google, Mattel, Cartoon Network, Hasbro, and Remka each and together collected and enabled collection of L.D.'s, D.D.'s, and A.D. 's Personal Information for the purposes of tracking, profiling, and targeting L.D., D.D., and A.D. with advertisements as L.D., D.D., and A.D. watched Defendant Mattel's, Cartoon Network's, Hasbro's, and Remka's child-directed content on their YouTube channels.

430.   Neither Google Mattel, Cartoon Network, Hasbro, or Remka obtained verifiable parental consent prior to the collection of L.D.'s, D.D.'s, and A.D.'s Personal Information.

431.   Neither Plaintiffs L.D., D.D., and A.D. nor their parent and guardian Hollie Dorso could have reasonably discovered this conduct earlier through investigation. Plaintiffs are minors unable to consent to or understand Defendants' tracking of personal information, and Defendants concealed from

and misled Hollie Dorso about their tracking, profiling, and targeting of her children.

432.    The tracking, profiling, and targeting of L.D., D.D., and A.D. without parental consent by Google, Mattel, Cartoon Network, Hasbro, and Remka is highly offensive and constitutes an invasion of L.D.'s, D.D.'s, and A.D.'s privacy.

433.    L.D., D.D., and A.D. are likely to use YouTube in the future and seek protection from the Google and Channel Owner Defendants' continuing violations of COPPA protections.

**O.  Plaintiff C.L.P.**

434.    During the Class Period, Plaintiff C.L.P. watched videos and advertisements on YouTube.

435.    C.L.P. viewed child-directed content on multiple monetized YouTube channels, including:

> a. **Mattel-owned Channels:** Thomas & Friends, and Max Steel;
>
> b. **Hasbro-owned Channels:**  Hasbro, Nerf, Transformers;
>
> c. **Cartoon Network-owned Channels:** Cartoon Network, Ben 10, DC Super Hero, Powerpuff Girls, Steven Universe, Adventure Time, and Boomerang;
>
> d. **Remka-owned Channels:** Ryan's Toy Reviews;
>
> e. **Dreamworks-owned Channels:**  Dreamworks TV
>
> f. **ChuChu TV:**  Nursery Rhymes & Kids Songs, Storytime – Bedtime Stories & Cartoon Shows, Funzone

436.    Google, Mattel, Hasbro, Cartoon Network, Remka, Dreamworks and ChuChu TV each and together collected and enabled collection of C.L.P.'s Personal Information for the purposes of tracking, profiling, and targeting C.L.P. with advertisements as C.L.P. watched Defendants Mattel's Hasbro's, Cartoon Network's,Remka's, Dreamworks' and ChuChu TV's child-directed content on their YouTube channels.

437.    Neither Google, Mattel, Hasbro, Cartoon Network, Remka, Dreamworks nor ChuChu TV obtained verifiable parental consent prior to the collection of C.L.P.'s Personal Information.

438.    Neither Plaintiff C.L.P. nor Plaintiff C.L.P.'s parent and guardian Sarah Dunaway could have reasonably discovered this conduct earlier through investigation. Plaintiff is a minor unable to

consent to or understand Defendants' tracking of personal information, and Defendants concealed from and misled Sarah Dunawayabout their tracking, profiling, and targeting of his child.

439.    The tracking, profiling, and targeting of C.L.P. without parental consent by Google, Mattel, Hasbro, Cartoon Network, Remka, Dreamworks and ChuChu TV is highly offensive and constitutes an invasion of C.L.P.'s privacy.

440.    C.L.P. is likely to use YouTube in the future and seeks protection from the Google and Channel Owner Defendants' continuing violations of COPPA protections.

**P.  Plaintiffs E.B., A.B., C.B., Z.B., and I.B.**

441.    During the Class Period, Plaintiffs E.B., A.B., C.B., Z.B., and I.B. watched videos and advertisements on YouTube.

442.    E.B., A.B., C.B., Z.B., and I.B. viewed child-directed content on multiple monetized YouTube channels, including:

  a.  **Mattel-owned Channels:** Barbie, American Girl, Hot Wheels, Thomas & Friends, and Mattel Action

  b.  **Hasbro-owned Channels:** Hasbro,, Play Doh, My Little Pony, and Transformers;

  c.  **Cartoon Network-owned Channels:** Cartoon Network, Amazing World of Gumball, Ben 10, DC Super Hero, Powerpuff Girls, Steven Universe, and Adventure Time;

  d.  **Remka-owned Channels:** Ryan's Toy Review

  e.  **ChuChu TV:** Nursery Rhymes & Kids Songs, Surprise Egg Toys, Storytime – Bedtime Stories & Cartoon Shows, and Funzone

443.    Google, Mattel, Hasbro, Cartoon Network, Remka and ChuChu TV  each and together collected and enabled collection of E.B.'s, A.B.'s, C.B.'s, Z.B.'s, and I.B.'s's Personal Information for the purposes of tracking, profiling, and targeting E.B., A.B., C.B., Z.B., and I.B. with advertisements as E.B., A.B., C.B., Z.B., and I.B. watched Defendant Mattel's, Hasbro's, Cartoon Network's, Remka's and ChuChu TV's  child-directed content on their YouTube channels.

444.    Neither Google, Mattel, Hasbro, Cartoon Network, Remka, nor ChuChu TV  obtained

102

verifiable parental consent prior to the collection of E.B.'s, A.B.'s, C.B.'s, Z.B.'s, and I.B.'sPersonal Information.

445.    Neither Plaintiffs E.B., A.B., C.B., Z.B., and I.B. nor their parent and guardian Steven Burda could have reasonably discovered this conduct earlier through investigation. Plaintiffs are minors unable to consent to or understand Defendants' tracking of personal information, and Defendants concealed from and misled Steven Burda about their tracking, profiling, and targeting of his children.

446.    The tracking, profiling, and targeting of E.B., A.B., C.B., Z.B., and I.B. without parental consent by Google, Mattel, Hasbro, Cartoon Network, Remka and ChuChu TV  is highly offensive and constitutes an invasion of E.B.'s, A.B.'s, C.B.'s, Z.B.'s, and I.B.'s  privacy.

447.    E.B., A.B., C.B., Z.B., and I.B. are likely to use YouTube in the future and seek protection from the Google and Channel Owner Defendants' continuing violations of COPPA protections.

**Q.  Plaintiffs M.W., B.N., and W.N.**

448.    During the Class Period, Plaintiffs M.W., B.N., and W.N. watched videos and advertisements on YouTube.

449.    M.W., B.N., and W.N. viewed child-directed content on multiple monetized YouTube channels, including:

> a.   **Mattel-owned Channels:** Barbie;
>
> b.   **Hasbro-owned Channels:** Baby Alive;
>
> c.   **Cartoon Network-owned Channels:** Cartoon Network and Adventure Time;
>
> d.   **Remka-owned Channels:** Ryan's Toys Review

450.    Google, Mattel, Hasbro, Cartoon Network, and Remka each and together collected and enabled collection of M.W.'s, B.N.'s, and W.N.'s Personal Information for the purposes of tracking, profiling, and targeting M.W., B.N., and W.N. with advertisements as M.W., B.N., and W.N. watched Defendant Mattel's, Hasbro's, Cartoon Network's, and Remka's child-directed content on their YouTube channels.

451.    Neither Google, Mattel, Hasbro, Cartoon Network, or Remka obtained verifiable parental consent prior to the collection of M.W.'s, B.N.'s, and W.N.'s Personal Information.

452.    Neither Plaintiffs M.W., B.N., and W.N. nor their parent and guardian Michelle Wall could have reasonably discovered this conduct earlier through investigation. Plaintiffs are minors unable to consent to or understand Defendants' tracking of personal information, and Defendants concealed from and misled Michelle Wall about their tracking, profiling, and targeting of her children.

453.    The tracking, profiling, and targeting of M.W., B.N., and W.N. without parental consent by Google, Mattel, Hasbro, Cartoon Network, and Remka is highly offensive and constitutes an invasion of M.W.'s, B.N.'s, and W.N.'s privacy.

454.    M.W., B.N., and W.N.  are likely to use YouTube in the future and seek protection from the Google and Channel Owner Defendants' continuing violations of COPPA protections.

**R.  Plaintiffs M.W.D., C.J.D., and C.A.D.**

455.    During the Class Period, Plaintiffs M.W.D., C.J.D., and C.A.D. watched videos and advertisements on YouTube.

456.    M.W.D., C.J.D., and C.A.D. viewed child-directed content on multiple monetized YouTube channels, including:

a.    **Mattel-owned Channels:** Barbie, American Girl/Wellwisher, Hot Wheels, Fisher Price,Thomas & Friends, Max Steel, Polly Pocket, and Mattel Action;

b.    **Hasbro-owned Channels:** Hasbro, Nerf Official, Play Doh, My Little Pony, Transformers, Baby Alive Official;

c.    **Remka Channel:** Ryan's Toy Review

d.    **Cartoon Network-owned Channels:** Cartoon Network, Adventure Time, DC Super Hero, and The Powerpuff Girls;

e.    **Dreamworks-owned Channels:** DreamWorks TV World;

f.    **ChuChu TV:**  Nursery Rhymes & Kids Songs, Storytime-Bedtime Stories & Cartoon Shows

457.    Google, Mattel, Hasbro, Cartoon Network, and Dreamworks each and together collected and enabled collection of M.W.D., C.J.D., and C.A.D.'s Personal Information for the purposes of tracking, profiling, and targeting M.W.D., C.J.D., and C.A.D. with advertisements as M.W.D., C.J.D., and C.A.D. watched Defendant Mattel's, Hasbro's, Cartoon Network's, Remka's and Dreamworks'

1   child-directed content on their YouTube channels.

2   458.   Neither Google, Mattel, Hasbro, Cartoon Network, Remka or Dreamworks obtained

3   verifiable parental consent prior to the collection of M.W.D., C.J.D., and C.A.D.'s Personal Information.

4   459.   Neither Plaintiff M.W.D., C.J.D., and C.A.D. nor their parent and guardian Billy

5   Dardanelli could have reasonably discovered this conduct earlier through investigation. Plaintiffs are

6   minors unable to consent to or understand Defendants' tracking of personal information, and Defendants

7   concealed from and misled Billy Dardanelli about their tracking, profiling, and targeting of his children.

8   460.   The tracking, profiling, and targeting of M.W.D., C.J.D., and C.A.D. without parental

9   consent by Google, Mattel, Hasbro, Cartoon Network, Remka, and Dreamworks is highly offensive and

10  constitutes an invasion of M.W.D., C.J.D., and C.A.D.'s privacy.

11  461.   M.W.D., C.J.D., and C.A.D. are likely to use YouTube in the future and seek protection

12  from the Google and Channel Owner Defendants' continuing violations of COPPA protections.

13  ### TOLLING, ESTOPPEL AND RELATION BACK

14  **I.      Discovery Rule Tolling**

15  462.   Plaintiffs and the Classes had no way of knowing about Defendants' conduct with respect

16  to the collection and impermissible and unauthorized use of, and profit from, the Personal Information

17  of Plaintiffs and the members of the Classes.

18  463.   Neither Plaintiffs nor any other members of the Classes, through the exercise of

19  reasonable diligence, could have discovered the conduct alleged herein. Further, Plaintiffs and the

20  members of the Classes did not discover, and did not know of facts that would have caused a reasonable

21  person to suspect, that Defendants were engaged in the conduct alleged herein.

22  464.   For these reasons, all applicable statutes of limitation have been tolled by operation of

23  the discovery rule with respect to claims asserted by Plaintiffs and the Classes.

24  **II.     Fraudulent Concealment Tolling**

25  465.   By failing to provide notice of the collection and use of the Personal Information and

26  obtain verifiable consent, in violation of COPPA and societal norms and conventions, Defendants

27  concealed their conduct and the existence of the claims asserted herein from Plaintiffs and the members

28  of the Classes.

466.    Upon information and belief, Defendants intended by their acts to conceal the facts and claims from Plaintiffs and members of the Classes.  Plaintiffs and the members of the Classes were unaware of the facts alleged herein without any fault or lack of diligence on their part and could not have reasonably discovered Defendants' conduct. For this reason, any statute of limitations that otherwise may apply to the claims of Plaintiffs or members of the Classes should be tolled.

**III.    Estoppel**

467.    Despite their duties and obligations under COPPA, Defendants failed to provide notice of the collection and use of the Personal Information and obtain verifiable consent in breach and violation thereof.

468.    Defendants therefore are estopped from relying on any statutes of limitations in defense of this action.

**IV.    Relation Back**

469.    The claims asserted by Plaintiffs D.T. and D.T. (Alabama), B.H. (Florida), P.A. and J.A. (Illinois), S.H. and D.M. (Kansas), G.W. (Michigan), A.A. (Mississippi), J.C. and E.M. (Missouri), L.D., D.D., and A.D. (New Hampshire), M.W.D., C.J.D., and C.A.D. (New York), C.L.P. (Oklahoma), E.B., A.B., C.B., Z.B., and I.B. (Pennsylvania), and M.W., B.N. and W.N. (Washington) relate back to, at least, January 19, 2021 (prior to the filing of the Third Amended Complaint ("TAC") on January 22, 2021) pursuant to Federal Rule of Civil Procedure 15(c) because these claims arose out of the same conduct and occurrences set forth in the TAC, Defendants had adequate notice of the claims of the Plaintiffs set forth above, Defendants will not be unfairly prejudiced by the inclusion of these claims, and there is an identity of interests between the Plaintiffs in the TAC and the Plaintiffs set forth above.

## CLASS ACTION ALLEGATIONS

470.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3).

**I.    The Alabama Class**

471.    Plaintiffs D.T. and D.T., through their parent and guardian Amanda Seeley, seek class certification for the common law claim of intrusion upon seclusion, as well as a claim for unjust enrichment on behalf of an Alabama class defined as follows:

All persons residing in the State of Alabama who were 13 or younger when they used YouTube, and from whom Defendants collected, caused to be collected, used, or disclosed Personal Information without first obtaining verified parental consent during the Class Period.

## II.   The California Class

472.   Plaintiff C.H., through their parent and guardian Nicole Hubbard, seeks class certification of a claim for violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*, a claim for violation of the State of California Constitution Right to Privacy, for the common law claim of intrusion upon seclusion, as well as a claim for unjust enrichment on behalf of a California class defined as follows:

All persons residing in the State of California who were 13 or younger when they used YouTube, and from whom Defendants collected, caused to be collected, used, or disclosed Personal Information without first obtaining verified parental consent during the Class Period.

## III.   The Colorado Class

473.   Plaintiffs L.J., A.J., N.J. and E.J., through their parent and guardian Cara Jones, seek class certification for the common law claim of intrusion upon seclusion, as well as a claim for unjust enrichment on behalf of a Colorado class defined as follows:

All persons residing in the State of Colorado who were 13 or younger when they used YouTube, and from whom Defendants collected, caused to be collected, used, or disclosed Personal Information without first obtaining verified parental consent during the Class Period.

## IV.   The Florida Class

474.   Plaintiff B.H., through their parent and guardian Jason Hoffman, seeks class certification of a claim for violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.201 et seq., as well as a claim for unjust enrichment on behalf of a Florida class defined as follows:

All persons residing in the State of Florida who were 13 or younger when they used YouTube, and from whom Defendants collected, caused to be collected, used, or disclosed

Personal Information without first obtaining verified parental consent during the Class Period.

## V.   The Illinois Class

475.   Plaintiffs P.A. and J.A., through their parent and guardian Antonio Alvarez, seek class certification of a claim for violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq., for the common law claim of intrusion upon seclusion, as well as a claim for unjust enrichment on behalf of an Illinois class defined as follows:

> All persons residing in the State of Illinois who were 13 or younger when they used YouTube, and from whom Defendants collected, caused to be collected, used, or disclosed Personal Information without first obtaining verified parental consent during the Class Period.

## VI.   The Indiana Class

476.   Plaintiffs T.B. and S.B.., through their parent and guardian Derek Buchanan, seek class certification of a claim for violation of the Indiana Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5-3, as well as a claim for unjust enrichment on behalf of an Indiana class defined as follows:

> All persons residing in the State of Indiana who were 13 or younger when they used YouTube, and from whom Defendants collected, caused to be collected, used, or disclosed Personal Information without first obtaining verified parental consent during the Class Period.

## VII.   The Kansas Class

477.   Plaintiffs S.H. and D.M., through their parent and guardian Veronica Hicks, seek class certification for the common law claim of intrusion upon seclusion, as well as a claim for unjust enrichment on behalf of a Kansas class defined as follows:

> All persons residing in the State of Kansas who were 13 or younger when they used YouTube, and from whom Defendants collected, caused to be collected, used, or disclosed

Personal Information without first obtaining verified parental consent during the Class Period.

## VIII.   The Massachusetts Class

478.    Plaintiff A.G., through their parent and guardian Jay Goodwin, seeks class certification of a claim for violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws. Ann. Ch. 93A, § 1, *et seq.*, as well as a claim for unjust enrichment on behalf of a Massachusetts class defined as follows:

> All persons residing in the Commonwealth of Massachusetts who were 13 or younger when they used YouTube, and from whom Defendants collected, caused to be collected, used, or disclosed Personal Information without first obtaining verified parental consent during the Class Period.

## IX.   The Michigan Class

479.    Plaintiff G.W., through their parent and guardian Doug Wilkerson, seeks class certification of a claim for violation of the Michigan Consumer Protection Act, Mich. Comp. Law Ann. § 445.903 *et seq.*, as well as a claim for unjust enrichment on behalf of a Michigan class defined as follows:

> All persons residing in the State of Michigan who were 13 or younger when they used YouTube, and from whom Defendants collected, caused to be collected, used, or disclosed Personal Information without first obtaining verified parental consent during the Class Period.

## X.   The Mississippi Class

480.    Plaintiff A.A., through their parent and guardian Pennie Frazier, seeks class certification of a claim for violation of the Mississippi Consumer Protection Act, § 75-24-1 et seq., as well as a claim for unjust enrichment on behalf of a Mississippi class defined as follows:

> All persons residing in the State of Mississippi who were 13 or younger when they used YouTube, and from whom Defendants collected, caused to be collected, used, or disclosed Personal Information without first obtaining verified parental consent during the Class Period.

## XI. The Missouri Class

481.     Plaintiffs J.C. and E.M., through their parent and guardian Lezlie Collins, seek class certification of a claim for violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. §§ 407.010, et seq., for the common law claim of intrusion upon seclusion, as well as a claim for unjust enrichment on behalf of a Missouri class defined as follows:

> All persons residing in the State of Missouri who were 13 or younger when they used YouTube, and from whom Defendants collected, caused to be collected, used, or disclosed Personal Information without first obtaining verified parental consent during the Class Period.

## XII. The New Hampshire Class

482.     Plaintiffs L.D., D.D., and A.D., through their parent and guardian Hollie Dorso, seek class certification of a claim for violation of the New Hampshire Consumer Protection Act, RSA 358–A:2., for the common law claim of intrusion upon seclusion, as well as a claim for unjust enrichment on behalf of a New Hampshire class defined as follows:

> All persons residing in the State of New Hampshire who were 13 or younger when they used YouTube, and from whom Defendants collected, caused to be collected, used, or disclosed Personal Information without first obtaining verified parental consent during the Class Period.

## XIII. The New Jersey Class

483.     Plaintiffs J.R.E. and J.A.E., through their parent and guardian Justin Efros, seek class certification of a claim for violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1 *et seq.*, for the common law claim of intrusion upon seclusion, as well as a claim for unjust enrichment on behalf of a New Jersey class defined as follows:

> All persons residing in the State of New Jersey who were 13 or younger when they used YouTube, and from whom Defendants collected, caused to be collected, used, or disclosed Personal Information without first obtaining verified parental consent during the Class Period.

## XIV. The New York Class

484.    Plaintiffs M.W.D., C.J.D., and C.A.D., through their parent and guardian Billy Dardanelli, seeks class certification for a claim for unjust enrichment on behalf of a New York class defined as follows:

> All persons residing in the State of New York who were 13 or younger when they used YouTube, and from whom Defendants collected, caused to be collected, used, or disclosed Personal Information without first obtaining verified parental consent during the Class Period.

## XV.    The Oklahoma Class

485.    Plaintiff C.L.P.., through their parent and guardian Sarah Dunaway, seeks class certification for the common law claim of intrusion upon seclusion, as well as a claim for unjust enrichment on behalf of an Oklahoma class defined as follows:

> All persons residing in the State of Oklahoma who were 13 or younger when they used YouTube, and from whom Defendants collected, caused to be collected, used, or disclosed Personal Information without first obtaining verified parental consent during the Class Period.

## XVI.    The Pennsylvania Class

486.    Plaintiffs E.B., A.B., C.B., Z.B., and I.B., through their parent and guardian Steven Burda, seek class certification of a claim for violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. Ann. §§ 201-1 et seq., for the common law claim of intrusion upon seclusion, as well as a claim for unjust enrichment on behalf of a Pennsylvania class defined as follows:

> All persons residing in the Commonwealth of Pennsylvania who were 13 or younger when they used YouTube, and from whom Defendants collected, caused to be collected, used, or disclosed Personal Information without first obtaining verified parental consent during the Class Period.

## XIX.    The Tennessee Class

487.    Plaintiff M.W., through their parent and guardian Renee Gilmore, seeks class certification of a claim for violation of the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101 et seq., as well as a claim for unjust enrichment on behalf of a Tennessee class defined as follows:

> All persons residing in the State of Tennessee who were 13 or younger when they used YouTube, and from whom Defendants collected, caused to be collected, used, or disclosed Personal Information without first obtaining verified parental consent during the Class Period.

**XX.   The Washington Class**

488.    Plaintiffs M.W., B.N., and W.N., through their parent and guardian Michelle Wall, seek class certification of a claim for violation of the Washington Consumer Protection Act, RCW 19.86.020, et. seq., for the common law claim of intrusion upon seclusion, as well as a claim for unjust enrichment on behalf of a Washington class defined as follows:

> All persons residing in the State of Washington who were 13 or younger when they used YouTube, and from whom Defendants collected, caused to be collected, used, or disclosed Personal Information without first obtaining verified parental consent during the Class Period.

489.    Plaintiffs reserve the right to modify or refine the Class definitions based upon discovery of new information and in order to accommodate any of the Court's manageability concerns.

490.    Excluded from the Classes are: (a) any Judge or Magistrate Judge presiding over this action and members of their staff, as well as members of their families; (b) Defendants and Defendants' predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which any Defendant or its parents have a controlling interest, as well as Defendants' current or former employees, agents, officers, and directors; (c) persons who properly execute and file a timely request for exclusion from the Classes; (d) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (e) counsel for Plaintiffs and Defendants; and (f) the legal representatives, successors, and assigns of any such excluded persons.

491.    **Ascertainability**. The proposed Classes are readily ascertainable because they are defined using objective criteria so as to allow class members to determine if they are part of a Class. Further, the Classes can be identified through records maintained by Defendants.

492.    **Numerosity (Rule 23(a)(1))**. The Classes are so numerous that joinder of individual members herein is impracticable. The exact number of members of the Classes, as herein identified and

SIXTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

described, is not known, but download figures indicate that Google has collected information on millions of children.

493. **Commonality (Rule 23(a)(2))**. Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Class members, including the following:

a. Whether Defendants collected the Personal Information of children;

b. Whether Defendants had knowledge they were collecting the Personal Information of children;

c. Whether Defendants obtained parental consent to collect the Personal Information of children;

d. Whether the collection of Personal Information of children is highly offensive to a reasonable person;

e. Whether the collection of Personal Information of children without parental consent is sufficiently serious and unwarranted as to constitute an egregious breach of social norms;

f. Whether Defendants' conduct constituted an invasion of privacy based on common law protection against intrusion upon seclusion under the laws of Alabama, California, Florida, Illinois, Kansas, Missouri, New Hampshire, New Jersey, Oklahoma, Pennsylvania, and Washington;

g. Whether Defendants' conduct constituted a violation of the California Constitution right to privacy;

h. Whether Defendants' conduct was unfair;

i. Whether Defendants' conduct was unlawful;

j. Whether Defendants' conduct violated the consumer protection acts of California, Colorado, Illinois, Indiana, Massachusetts, Michigan, Mississippi, Missouri, New Hampshire, New Jersey, Pennsylvania, Tennessee, and Washington;

k. Whether Plaintiffs and the Classes are entitled to monetary damages and the measure of those damages;

l. Whether Plaintiff C.H. and the California Class are entitled to restitution and disgorgement;

m. Whether Defendants were unjustly enriched by their conduct under the laws of Alabama, California, Colorado, Florida, Illinois, Indiana, Kansas, Massachusetts, Michigan, Mississippi, Missouri, New Hampshire, New Jersey, New York, Oklahoma, Pennsylvania, Tennessee, and Washington;

n. Whether Defendants fraudulently concealed their conduct; and

o. Whether Plaintiffs and the Classes are entitled to injunctive or other equitable relief.

494. **Typicality (Rule 23(a)(3))**. Plaintiffs' claims are typical of the claims of the other members of the proposed Classes. Plaintiffs and members of the Classes (as applicable) suffered an invasion of privacy and injuries as a result of Defendants' wrongful conduct that is uniform across the Classes.

495. **Adequacy (Rule 23(a)(4))**. Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Classes. Plaintiffs have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs have no interest that is antagonistic to those of the Classes, and Defendants have no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Classes, and they have the resources to do so. Neither Plaintiffs nor Plaintiffs' counsel have any interest adverse to those of the other members of the Classes.

496. **Substantial Benefits**. This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Classes is impracticable. The prosecution of separate actions by individual members of the Classes would impose heavy burdens upon the Courts and Defendants, would create a risk of inconsistent or varying adjudications of the questions of law and fact common to members of the Classes, and would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

497.    Class certification, therefore, is appropriate under Fed. R. Civ. P. 23(b)(3) because the above common questions of law or fact predominate over any questions affecting individual members of the Classes, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

498.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Classes, so that final injunctive relief or corresponding declaratory relief, if any, that may be awarded by the Court is appropriate as to the Classes as a whole.

499.    Plaintiffs reserve the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## CLAIMS FOR RELIEF

### I.    Alabama Claims

### Claim 1
### ALABAMA INTRUSION UPON SECLUSION
### (Against All Defendants on behalf of Plaintiffs D.T., D.T., and the Alabama Class)

500.    Plaintiffs D.T., D.T., and members of the Alabama Class re-allege the foregoing allegations as if fully set forth herein.

501.    D.T.'s, D.T.'s, and members of the Alabama Class's private affairs, concerns, and seclusion includes their interest in their Personal Information as defined by COPPA, which includes data points concerning their location and online activity carried on by D.T., D.T., and members of the Alabama Class while using internet-connected devices.

502.    Defendants each and in concert, through aid or assistance, or pursuant to a common purpose with the knowledge of the others, intentionally intruded upon the private affairs, concerns, and seclusion of Plaintiffs and Alabama class members by improperly accessing Personal Information and using it for improper purposes, including by targeting D.T., D.T., and Alabama class members with behavioral advertising that would be highly offensive to a reasonable person, constituting an egregious breach of social norms and/or enabling the targeting of D.T., D.T., and Alabama class members with such advertisements, as detailed herein.

503.    Defendants' intrusions upon the private affairs, concerns, and seclusion of D.T., D.T., and Alabama class members were substantial, and would be highly offensive to a reasonable person, constituting an egregious breach of social norms, as is evidenced by countless consumer surveys, studies, and op-eds decrying the online tracking of children, centuries of common law, state and federal statutes and regulations including COPPA and FTC regulations, legislative commentaries, enforcement actions undertaken by the FTC, industry standards and guidelines, scholarly literature on consumers' reasonable expectations., the fines imposed on Google by the FTC and the NY AG, as well as the reforms required by the Order & Injunction entered into by Google.

504.    As children aged 13 or younger, D.T., D.T., and members of the Alabama Class lacked the ability to form expectations about reasonable privacy or to consent to Defendants' actions.

505.    Neither D.T., D.T., the Alabama class, nor their parents and/or guardians consented to Defendants'' intrusions upon their private affairs, concerns, and seclusions.

506.    D.T., D.T., and members of the Alabama Class suffered actual and concrete injury as a result of Defendants' intrusions upon D.T., D.T. and Alabama class members' private affairs, concerns, and seclusion.

507.    D.T., D.T., and Alabama class members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate them for the harm to their privacy interests, risk of future invasions of privacy, and the mental and emotional distress caused by Defendants' invasions of privacy, as well as disgorgement of profits realized by Defendants as a result of their intrusions upon D.T., D.T., and Alabama class members' private affairs, concerns, and seclusion.

**Claim 2**
**ALABAMA UNJUST ENRICHMENT**
**(Against All Defendants on behalf of Plaintiffs D.T., D.T., and the Alabama Class)**

508.    Plaintiffs D.T., D.T., and members of the Alabama Class re-allege the foregoing allegations as if fully set forth herein.

509.    By virtue of the unlawful and unfair conduct alleged herein, Defendants have each realized millions of dollars in revenue from their collection and use of the Personal Information of D.T., D.T.,

and Alabama class members through behavioral advertising and commercialization purposes derived from that Personal Information.

510.    Defendants' ill-gotten gains were monetary benefits conferred upon Defendants by D.T., D.T., and the members of the Alabama class.  It would be inequitable and unjust to permit any of the Defendants to retain the economic benefits they have obtained through advertising and commercialization derived from the Personal Information of D.T., D.T., and the members of the Alabama class.

511.    Defendants are each independently liable because they each profited from the conduct alleged.

512.    Defendants will each be unjustly enriched if they are permitted to retain the economic benefits conferred upon them by D.T., D.T., and the members of the Alabama class through Defendants' unlawful, unfair, unauthorized, and impermissible use of the Personal Information of D.T., D.T., and the members of the Alabama class, and allowing Defendants to retain the profits from their unlawful, unfair, unauthorized, and impermissible use of the Personal Information of D.T., D.T., and the members of the Alabama class would be unjust and contrary to public policy.

513.    D.T., D.T., and the members of the Alabama class are therefore entitled to recover the amounts realized by each of the Defendants at the expense of D.T., D.T. and the members of the Alabama class.

514.    D.T., D.T., and members of the Alabama class do not seek recovery in this claim for their own economic harm and have no adequate remedy at law that would divest Defendants of their ill-gotten and unjust profits.   Moreover, even if money damages might otherwise provide an adequate remedy at law for this claim, there is at a minimum substantial doubt that any remedy at law is available, as the Court has ruled that the claims at law asserted by D.T., D.T., and members of the Alabama class in their Fifth Amended Complaint do not satisfy the requisite elements for relief.  D.T., D.T., and members of the Alabama class dispute the Court's holding and further believe that their claims at law as asserted in this Sixth Amended Complaint are legally and factually sufficient.  To the extent that money damages, if available, would constitute an adequate remedy at law barring recovery under this claim,  D.T., D.T., and members of the Alabama class assert their claim for non-restitutionary disgorgement as an alternative remedy pending a final determination of the availability of a remedy at law.

515.    D.T., D.T., and members of the Alabama class are entitled to non-restitutionary disgorgement of each Defendant's ill-gotten gains, and/or the imposition of a constructive trust to recover the amount of each Defendant's ill-gotten gains.

## III.    California Claims

### Claim 3
### CALIFORNIA CONSTITUTIONAL RIGHT TO PRIVACY, Cal. Const. Art. 1, § 1.
### (Against All Defendants on behalf of Plaintiff C.H. and the California Class)

516.    Plaintiff C.H., and members of the California class re-allege the foregoing allegations as if fully set forth herein.

517.    C.H. and members of the California class's private affairs include their behavior on their mobile devices and computers, as well as any other behavior that may be monitored by the surreptitious tracking employed or otherwise enabled by Defendants.

518.    The parents and guardians of C.H. and members of the California class have reasonable expectations of privacy in their children's mobile devices and their online behavior and activities, generally.

519.    C.H. and members of the California class's private affairs, concerns, and seclusion includes their interest in their Personal Information as defined by COPPA, which includes data points concerning their location and online activity while using internet-connected devices.

520.    Defendants each and in concert, through aid or assistance, or pursuant to a common purpose with the knowledge of the others, intentionally intruded upon the private affairs, concerns, and seclusion of C.H. and California class members by improperly accessing C.H. and California class members' Personal Information and using it for improper purposes, including by targeting them with behavioral advertising that would be highly offensive to a reasonable person, constituting an egregious breach of social norms and/or enabling the targeting of C.H. and California class members with such advertisements, as detailed herein.

521.    Defendants' intrusions upon the private affairs, concerns, and seclusion of C.H. and California class members were substantial, and would be highly offensive to a reasonable person, constituting an egregious breach of social norms, as is evidenced by countless consumer surveys, studies, and op-eds decrying the online tracking of children, centuries of common law, state and federal statutes

and regulations including COPPA and FTC regulations, legislative commentaries, enforcement actions undertaken by the FTC, industry standards and guidelines, scholarly literature on consumers' reasonable expectations., the fines imposed on Google by the FTC and the NY AG, as well as the reforms required by the Order & Injunction entered into by Google.

522.    As minor children, C.H. and members of the California class lacked the ability to form expectations about reasonable privacy or to consent to Defendants' actions.

523.    Neither C.H., members of the California class, nor their parents and/or guardians consented to Defendants' intrusions upon their private affairs, concerns, and seclusions.

524.    C.H. and members of the California class suffered actual and concrete injury as a result of Defendants' intrusions upon Plaintiffs' private affairs, concerns, and seclusion.

525.    C.H. and members of the California class seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate them for the harm to their privacy interests, risk of future invasions of privacy, and the mental and emotional distress caused by Defendants' invasions of privacy, as well as disgorgement of profits made by Defendants as a result of their intrusions upon C.H. and members of the California class's private affairs, concerns, and seclusion.

## Claim 4
### CALIFORNIA INTRUSION UPON SECLUSION
### (Against All Defendants on behalf of Plaintiff C.H. and the California Class)

526.    Plaintiff C.H. and members of the California class re-allege the foregoing allegations as if fully set forth herein.

527.    C.H. and members of the California class's private affairs, concerns, and seclusion includes their interest in their Personal Information as defined by COPPA, which includes data points concerning their location and online activity while using internet-connected devices.

528.    Defendants each and in concert, through aid or assistance, or pursuant to a common purpose with the knowledge of the others, intentionally intruded upon the private affairs, concerns, and seclusion of C.H. and California class members by improperly accessing C.H. and California class members' Personal Information and using it for improper purposes, including by targeting them with behavioral advertising that would be highly offensive to a reasonable person, constituting an egregious

breach of social norms and/or enabling the targeting of C.H. and California class members with such advertisements, as detailed herein.

529.   Defendants' intrusions upon the private affairs, concerns, and seclusion of C.H. and California class members were substantial, and would be highly offensive to a reasonable person, constituting an egregious breach of social norms, as is evidenced by countless consumer surveys, studies, and op-eds decrying the online tracking of children, centuries of common law, state and federal statutes and regulations including COPPA and FTC regulations, legislative commentaries, enforcement actions undertaken by the FTC, industry standards and guidelines, scholarly literature on consumers' reasonable expectations., the fines imposed on Google by the FTC and the NY AG, as well as the reforms required by the Order & Injunction entered into by Google.

530.   As minor children, C.H. and members of the California class lacked the ability to form expectations about reasonable privacy or to consent to Defendants' actions.

531.   Neither C.H., members of the California class, nor their parents and/or guardians consented to Defendants' intrusions upon their private affairs, concerns, and seclusions.

532.   C.H. and members of the California class suffered actual and concrete injury as a result of Defendants' intrusions upon C.H. and California class members' private affairs, concerns, and seclusion.

533.   C.H. and members of the California class seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate them for the harm to their privacy interests, risk of future invasions of privacy, and the mental and emotional distress caused by Defendants' invasions of privacy, as well as disgorgement of profits made by Defendants as a result of their intrusions upon C.H. and members of the California class's private affairs, concerns, and seclusion.

### Claim 5
**CALIFORNIA UNFAIR COMPETITION LAW (UCL),**
**Cal. Bus. & Prof. Code § 17200, *et seq*.**
**(Against All Defendants on behalf of Plaintiff C.H. and the California Class)**

534.   Plaintiff C.H. and members of the California class incorporate the foregoing allegations as if fully set forth herein.

535. C.H. and members of the California class are or were residents of California and/or viewed child-directed content in California hosted by Defendant Google on YouTube and created by each of the Channel Owner Defendants.

536. At all times mentioned herein, Defendants each engaged in "trade" or "commerce" in California in that they each engaged in the advertising, offering for sale, sale, and distribution of property or any other articles, commodities, or things of value in California.

537. Defendants each engaged in consumer-oriented acts through the offering, promoting, and/or distributing of YouTube and child-directed content hosted thereon, which significantly impacted the public because YouTube is used nationwide, including in California, and there are millions of users, including C.H. and members of the California class.

538. Cal. Bus. & Prof. Code § 17200, *et seq.* (the "UCL") broadly prohibits "unfair competition", which the UCL defines as including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising[.]"

539. California courts have noted that "the differences [between the UCL and FTC Act] are not of a degree to impair comparison" and that unfair acts respectively proscribed in the two statutes "appear practically synonymous*." People ex rel. Mosk v. Nat'l Rsch. Co. of Cal.*, 201 Cal. App. 2d 765, 773, 20 Cal. Rptr. 516, 521 (Ct. App. 1962). As a result, California courts deem "decisions of the federal court [construing the FTC Act] are more than ordinarily persuasive." *Id.*

540. Defendants each violated Cal. Bus. & Prof. Code § 17200, *et seq.* by engaging in the unfair acts or practices proscribed by Cal. Bus. & Prof. Code § 17200, *et seq.* outlined herein.

541. Defendants at all relevant times knowingly violated legal duties and public policy by unfairly and unlawfully collecting the Personal Information of minor children and tracking, profiling, and targeting those children with behavioral advertising for Defendants' commercial financial gain.

542. As outlined herein, Defendants each at all times had actual knowledge of their own non-compliance with COPPA and other applicable privacy-related laws. Further, Defendants each at all times had actual knowledge of their own collection—via the election of each of the Channel Owner Defendants to serve behavioral advertising rather than contextual advertising to their viewers—of the Personal

SIXTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

Information from C.H. and California class members and the tracking, profiling, and targeting of those children for lucrative behavioral advertising.

543.    As outlined herein, Google intentionally designed YouTube to, among other things, attract minor children by making child-directed content available to them so that Google could collect the Personal Information of those children and serve them with lucrative, intrusive, behavioral advertising for substantial commercial gain.

544.    The inherent characteristics, content, and features of YouTube as designed by Google, including the names, designs, cartoon elements, children's themes, and children's songs, evince that YouTube hosted child-directed content. That is, YouTube was plainly intended for and meant to attract minor children, collect the Personal Information of those children, and serve those children behavioral advertising for substantial commercial gain.

545.    As outlined herein, each of the Channel Owner Defendants knowingly and intentionally created child-directed video content and made that child-directed content available on YouTube with the specific purpose of attracting child viewers under 13 to their respective YouTube channels.

546.    The inherent characteristics, content, and features of each of the Channel Owner Defendants' YouTube channels and the content hosted thereon, including the names, designs, cartoon elements, children's themes, and children's songs, evince that this content posted to and made available on YouTube was child-directed content.

547.    That is, each of the Channel Owner Defendants' YouTube channels and the child-directed content uploaded to, hosted on, and made viewable on these YouTube channels was plainly intended for and meant to attract minor children for the purpose of collecting the Personal Information of those children to serve those children behavioral advertising for substantial commercial gain.

548.    All with Google, each of the Channel Owner Defendants each  individually considered by the FTC to be "operators" as defined under COPPA and FTC regulations.

549.    Each of the Channel Owner Defendants collected—including directing Google to collect— Personal Information from minor children through YouTube channels created, hosted, and maintained by the Channel Owner Defendants, which were directed to children under 13.

550.    In particular, Defendants each and in concert, through aid or assistance, or pursuant to a common purpose with the knowledge of the others, systematically collected, used, and/or disclosed Personal Information from minor children in violation of COPPA, and therefore the FTC Act, to serve them targeted, behavioral advertising by inter alia:

    a.    Failing to provide sufficient notice of the information Defendants collected, or the information that was collected on Defendants' behalf, online from children under 13, how Defendants used such information, their disclosure practices, and all other required content, in violation of Section 312.4(d) of COPPA, 16 C.F.R. § 312.4(d);

    b.    Failing to provide direct notice to parents of the information Defendants collected, or the information that was collected on Defendants' behalf, online from children under 13, how Defendants used such information, their disclosure practices, and all other required content, in violation of Section 312.4(b) and (c) of COPPA, 16 C.F.R. § 312.4(b)-(c);

    c.    Failing to obtain verifiable parental consent before any collection or use of Personal Information from children under 13, in violation of Section 312.5 of COPPA, 16 C.F.R. § 312.5; and

    d.    Failing to establish and maintain reasonable procedures to protect the confidentiality, security, and integrity of Personal Information collected from children under 13, in violation of Section 312.8 of COPPA, 16 C.F.R. § 312.8.

551.    Violations of COPPA and the accompanying FTC regulations "shall be treated as a violation of a rule defining an unfair … act or practice prescribed under 15 U.S.C. § 57a(a)(1)(B)." 15 U.S.C. § 6502(c).  These rules define unfair acts or practices in or affecting commerce within the meaning of 15 U.S.C. § 45(a)(1), which is the model for the various consumer protection statutes in the several states, including the Cal. Bus. & Prof. Code § 17200, *et seq.*.[184]

_____

[184] *See* 16 C.F.R. § 312.1 (COPPA "prohibits unfair or deceptive acts or practices in connection with the collection, use, and/or disclosure or personal information from and about children on the internet.").

552.    Accordingly, Defendants each individually engaged in unfair and unlawful trade acts or practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq*., which is modeled after, proscribes the same conduct as, and gives deference to the definitions of the FTC Act.

553.    Defendants' conduct is unfair, immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers, and there are no greater countervailing benefits to consumers or competition.  Further, C.H. and members of the California class could not have reasonably avoided injury because Defendants each took advantage of the lack of knowledge, ability, experience, and/or capacity of consumers—in this case children under 13—to their detriment.

554.    Defendants willfully engaged in the unfair and unlawful acts described herein and knew or recklessly disregarded the fact that they violated Cal. Bus. & Prof. Code § 17200, *et seq*.

555.    C.H. and members of the California class were harmed by Defendants' practices described herein, which were a substantial factor and caused injury in fact and actual damages to C.H. and members of the California class.

556.    As a direct and proximate result of Defendants' unfair and unlawful acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq*., C.H. and members of the California class have suffered and will continue to suffer an ascertainable loss of money or property, real or personal, and monetary and non-monetary damages, as described herein, including, inter alia, the loss of the value and/or diminishment in value of their Personal Information and the loss of the ability to control the use of their Personal Information.

557.    As outlined herein, there is tangible value in C.H. and members of the California class's Personal Information. C.H. and members of the California class have lost the opportunity to receive value in exchange for their Personal Information.

558.    Defendants' monetization of C.H. and members of the California class's Personal Information demonstrates that there is a market for their Personal Information.

559.    C.H. and members of the California Class's Personal Information is now in the possession of Defendants, who have used and will use it for their financial gain.

560.    Defendants' retention of C.H. and members of the California class's Personal Information presents a continuing risk to them as well as the general public. C.H. and members of the California class

seek relief for the injuries they have suffered as a result of Defendants' unfair and unlawful acts and practices, as provided by Cal. Bus. & Prof. Code § 17200, *et seq*. and applicable law, including all actual damages and attorneys' fees and costs, treble damages, statutory damages, and restitution, as well as an injunction requiring Defendants to each permanently delete, destroy or otherwise sequester the Personal Information collected without parental consent, requiring Defendants to provide a complete audit and accounting of the uses of the Personal Information by them and any other third parties, and other appropriate injunctive and/or declaratory relief.

## IV.  Colorado Claims

**Claim 6**
**COLORADO INTRUSION UPON SECLUSION**
**(Against All Defendants on behalf of Plaintiffs L.J., A.J., N.J., and E.J., and the Colorado Class)**

561.    Plaintiffs L.J., A.J., N.J., and E.J. and members of the Colorado class re-allege the foregoing allegations as if fully set forth herein.

562.    L.J., A.J., N.J., E.J., and members of the Colorado class's private affairs, concerns, and seclusion includes their interest in their Personal Information as defined by COPPA, which includes data points concerning their location and online activity while using internet-connected devices.

563.    Defendants each and in concert, through aid or assistance, or pursuant to a common purpose with the knowledge of the others, intentionally intruded upon the private affairs, concerns, and seclusion by improperly accessing L.J., A.J., N.J., E.J., and Colorado class members' Personal Information and using it for improper purposes, including by targeting them with behavioral advertising that would be highly offensive to a reasonable person, constituting an egregious breach of social norms and/or enabling the targeting of L.J., A.J., N.J., E.J., and Colorado class members with such advertisements, as detailed herein.

564.    Defendants' intrusions upon the private affairs, concerns, and seclusion of L.J., A.J., N.J., E.J. and Colorado class members were substantial, and would be highly offensive to a reasonable person, constituting an egregious breach of social norms, as is evidenced by countless consumer surveys, studies, and op-eds decrying the online tracking of children, centuries of common law, state and federal statutes and regulations including COPPA and FTC regulations, legislative commentaries, enforcement actions undertaken by the FTC, industry standards and guidelines, scholarly literature on consumers' reasonable

expectations., the fines imposed on Google by the FTC and the NY AG, as well as the reforms required by the Order & Injunction entered into by Google.

565. As minor children, L.J., A.J., N.J., E.J., and members of the Colorado class lacked the ability to form expectations about reasonable privacy or to consent to Defendants' actions.

566. Neither L.J., A.J., N.J., E.J., members of the Colorado class, nor their parents and/or guardians consented to Defendants' intrusions upon their private affairs, concerns, and seclusions.

567. L.J., A.J., N.J., E.J., and members of the Colorado class suffered actual and concrete injury as a result of Defendants' intrusions upon Plaintiffs' private affairs, concerns, and seclusion.

568. L.J., A.J., N.J., E.J., and members of the Colorado class seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate them for the harm to their privacy interests, risk of future invasions of privacy, and the mental and emotional distress caused by Defendants' invasions of privacy, as well as disgorgement of profits made by Defendants as a result of their intrusions upon L.J., A.J., N.J., E.J., and members of the Colorado class's private affairs, concerns, and seclusion.

### Claim 7
### COLORADO UNJUST ENRICHMENT
### (Against All Defendants on behalf of Plaintiffs L.J., A.J., N.J., E.J., and the Colorado Class)

569. Plaintiffs L.J., A.J., N.J., E.J., and members of the Colorado class re-allege the foregoing allegations as if fully set forth herein.

570. By virtue of the unlawful and unfair conduct alleged herein, Defendants have each realized millions of dollars in revenue from their collection and use of the Personal Information of L.J., A.J., N.J., E.J. and Colorado class members through behavioral advertising and commercialization purposes derived from that Personal Information.

571. Defendants' ill-gotten gains were monetary benefits conferred upon Defendants by L.J., A.J., N.J., E.J., and members of the Colorado class. It would be inequitable and unjust to permit any of the Defendants to retain the economic benefits they have obtained through advertising and commercialization derived from the Personal Information of L.J., A.J., N.J., E.J., and members of the Colorado class.

572.     Defendants are each independently liable because they each profited from the conduct alleged.

573.     Defendants will each be unjustly enriched if they are permitted to retain the economic benefits conferred upon them by L.J., A.J., N.J., E.J., and members of the Colorado class through Defendants' unlawful, unfair, unauthorized, and impermissible use of the Personal Information of L.J., A.J., N.J., E.J., and members of the Colorado class, and allowing Defendants to retain the profits from their unlawful, unfair, unauthorized, and impermissible use of the Personal Information of L.J., A.J., N.J., E.J., and members of the Colorado class class would be unjust and contrary to public policy.

574.     L.J., A.J., N.J., E.J., and members of the Colorado class are therefore entitled to recover the amounts realized by each of the Defendants at the expense of L.J., A.J., N.J., E.J., and members of the Colorado class.

575.     L.J., A.J., N.J., E.J., and members of the Colorado class do not seek recovery in this claim for their own economic harm and have no adequate remedy at law that would divest Defendants of their ill-gotten and unjust profits.   Moreover, even if money damages might otherwise provide an adequate remedy at law for this claim, there is at a minimum substantial doubt that any remedy at law is available, as the Court has ruled that the claims at law asserted by L.J., A.J., N.J., E.J., and members of the Colorado class in their Fifth Amended Complaint do not satisfy the requisite elements for relief.  L.J., A.J., N.J., E.J., and members of the Colorado class dispute the Court's holding and further believe that their claims at law as asserted in this Sixth Amended Complaint are legally and factually sufficient.  However, to the extent that money damages, if available, would constitute an adequate remedy at law barring recovery under this claim, L.J., A.J., N.J., E.J., and members of the Colorado class assert their claim for non-restitutionary disgorgement as an alternative remedy pending a final determination of the availability of a remedy at law.

576.     L.J., A.J., N.J., E.J., and members of the Colorado class are entitled to non-restitutionary disgorgement of each Defendant's ill-gotten gains, and/or the imposition of a constructive trust to recover the amount of each Defendant's ill-gotten gains.

1

**V.    Florida Claims**

**<u>Claim 8</u>**
**FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (FDUTPA),**
**Fla. Stat. Ann. § 501.201 *et seq.***
**(Against All Defendants on behalf of Plaintiff B.H. and the Florida Class)**

577.    Plaintiff B.H. and members of the Florida class incorporate the foregoing allegations as if fully set forth herein.

578.    B.H. and members of the Florida class are or were residents of Florida and/or viewed child-directed content in Florida hosted by Defendant Google on YouTube and created by each of the Channel Owner Defendants.

579.    At all times mentioned herein, Defendants each engaged in "trade" or "commerce" in Florida in that Defendants each engaged in the advertising, offering for sale, sale, and distribution of property or any other articles, commodities, or things of value in Florida.

580.    Defendants each engaged in consumer-oriented acts through the offering, promoting, and/or distributing of YouTube and child-directed content hosted thereon, which significantly impacted the public because YouTube is used nationwide, including in Florida, and there are millions of users, including B.H. and members of the Florida class.

581.    Fla. Stat. Ann. § 501.204(1) provides "[u]nfair methods of competition, unconscionable acts or practices, and unfair … acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

582.    Defendants violated Fla. Stat. Ann. § 501.204 by engaging in the deceptive or unfair acts or practices proscribed by Fla. Stat. Ann. § 501.204 outlined herein.

583.    As outlined herein, Defendants each at all times had actual knowledge of their own non-compliance with COPPA and other applicable privacy-related laws. Further, Defendants each at all times had actual knowledge of their own collection—via the election of each of the Channel Owner Defendants to serve behavioral advertising rather than contextual advertising to their viewers—of the Personal Information of B.H. and Florida class members and the tracking, profiling, and targeting of those children for lucrative behavioral advertising.

584.     As outlined herein, Google intentionally designed YouTube to, among other things, attract minor children by making child-directed content available to them so that Google could collect the Personal Information of those children and serve them with lucrative, intrusive, behavioral advertising for substantial commercial gain.

585.     The inherent characteristics, content, and features of YouTube as designed by Google, including the names, designs, cartoon elements, children's themes, and children's songs, evince that YouTube hosted child-directed content. That is, YouTube was plainly intended for and meant to attract minor children, collect the Personal Information of those children, and serve those children behavioral advertising for substantial commercial gain.

586.     As outlined herein, each of the Channel Owner Defendants knowingly and intentionally created child-directed video content and made that child-directed content available on YouTube with the specific purpose of attracting child viewers under 13 to their respective YouTube channels.

587.     The inherent characteristics, content, and features of each of the Channel Owner Defendants' YouTube channels and the content hosted thereon, including the names, designs, cartoon elements, children's themes, and children's songs, evince that this content posted to and made available on YouTube was child-directed content.

588.     That is, each of the Channel Owner Defendants' YouTube channels and the child-directed content uploaded to, hosted on, and made viewable on these Defendants' YouTube channels was plainly intended for and meant to attract children under 13 to YouTube for the purpose of collecting the Personal Information of those children to serve those children behavioral advertising for substantial commercial gain.

589.     Along with Google, each of the Channel Owner Defendants is individually considered by the FTC to be "operators" as defined under COPPA and FTC regulations.

590.     Each of the Channel Owner Defendants collected—including directing Google to collect— Personal Information from children under 13 through YouTube channels created, hosted, and maintained by the Channel Owner Defendants, which were directed to children under 13.

591.     In particular, Defendants each and in concert, through aid or assistance, or pursuant to a common purpose with the knowledge of the others, systematically collected, used, and/or disclosed

Personal Information from children under 13 in violation of COPPA, and therefore the FTC Act, to serve them targeted, behavioral advertising by inter alia:

    a.    Failing to provide sufficient notice of the information Defendants collected, or the information that was collected on Defendants' behalf, online from children under 13, how Defendants used such information, their disclosure practices, and all other required content, in violation of Section 312.4(d) of COPPA, 16 C.F.R. § 312.4(d);

    b.    Failing to provide direct notice to parents of the information Defendants collected, or the information that was collected on Defendants' behalf, online from children under 13, how Defendants used such information, their disclosure practices, and all other required content, in violation of Section 312.4(b) and (c) of COPPA, 16 C.F.R. § 312.4(b)-(c);

    c.    Failing to obtain verifiable parental consent before any collection or use of Personal Information from children under 13, in violation of Section 312.5 of COPPA, 16 C.F.R. § 312.5; and

    d.    Failing to establish and maintain reasonable procedures to protect the confidentiality, security, and integrity of Personal Information collected from children under 13, in violation of Section 312.8 of COPPA, 16 C.F.R. § 312.8.

592.    Violations of COPPA and the accompanying FTC regulations "shall be treated as a violation of a rule defining an unfair … act or practice prescribed under 15 U.S.C. § 57a(a)(1)(B)." 15 U.S.C. § 6502(c).  These rules define unfair acts or practices in or affecting commerce within the meaning of 15 U.S.C. § 45(a)(1), which is the model for the various consumer protection statutes in the several states, including the Fla. Stat. Ann. § 501.201, *et seq.*[185]

593.    Accordingly, Defendants each individually engaged in unfair and unlawful trade acts or practices in violation of Fla. Stat. Ann. § 501.204, *et seq.*, which is modeled after, proscribes the same conduct as, and gives deference to the definitions of the FTC Act.

---

[185] *See* 16 C.F.R. § 312.1 (COPPA "prohibits unfair or deceptive acts or practices in connection with the collection, use, and/or disclosure or personal information from and about children on the internet.").

594.    Defendants' conduct is unfair, immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers, and there are no greater countervailing benefits to consumers or competition.  Further, B.H. and members of the Florida class could not have reasonably avoided injury because Defendants each took advantage of the lack of knowledge, ability, experience, and/or capacity of consumers—in this case children under 13—to their detriment.

595.    Defendants willfully engaged in the unfair and unlawful acts described herein and knew or recklessly disregarded the fact that they violated Fla. Stat. Ann. § 501.204, *et seq*.

596.    B.H. and members of the Florida class were harmed by Defendants' practices described herein, which were a substantial factor and caused injury in fact and actual damages to B.H. and members of the Florida class.

597.    As a direct and proximate result of Defendants' unfair and unlawful acts and practices in violation of Fla. Stat. Ann. § 501.204, *et seq*., B.H. and members of the Florida class have suffered and will continue to suffer an ascertainable loss of money or property, real or personal, and monetary and non-monetary damages, as described herein, including, inter alia, the loss of the value and/or diminishment in value of their Personal Information and the loss of the ability to control the use of their Personal Information, which allowed Defendants to profit at the expense of B.H. and members of the Florida class.

598.    As outlined herein, there is tangible value in B.H. and members of the Florida class's Personal Information. B.H. and members of the Florida class have lost the opportunity to receive value in exchange for their Personal Information.

599.    Defendants' monetization of B.H. and members of the Florida class's Personal Information demonstrates that there is a market for their Personal Information.

600.    B.H. and members of the Florida class's Personal Information is now in the possession of Defendants, who have used and will use it for their financial gain.

601.    Defendants' retention of B.H. and members of the Florida class's Personal Information presents a continuing risk to them as well as the general public. B.H. and members of the Florida class seek relief for the injuries they have suffered as a result of Defendants' unfair and unlawful acts and practices, as provided by Fla. Stat. Ann. § 501.204, *et seq*. and applicable law, including all actual

damages and attorneys' fees and costs, treble damages, statutory damages, and restitution, as well as an injunction requiring Defendants to each permanently delete, destroy or otherwise sequester the Personal Information collected without parental consent, requiring Defendants to provide a complete audit and accounting of the uses of the Personal Information by them and any other third parties, and other appropriate injunctive and/or declaratory relief.

### Claim 9
### FLORIDA UNJUST ENRICHMENT
### (Against All Defendants on behalf of Plaintiff B.H. and the Florida Class)

602.    Plaintiff B.H., and members of the Florida class re-allege the foregoing allegations as if fully set forth herein.

603.    By virtue of the unlawful and unfair conduct alleged herein, Defendants have each realized millions of dollars in revenue from their collection and use of the Personal Information of B.H. and Florida class members through behavioral advertising and commercialization purposes derived from that Personal Information.

604.    Defendants' ill-gotten gains were monetary benefits conferred upon Defendants by B.H., and members of the Florida class. It would be inequitable and unjust to permit any of the Defendants to retain the economic benefits they have obtained through advertising and commercialization derived from the Personal Information of B.H., and members of the Florida class.

605.    Defendants are each independently liable because they each profited from the conduct alleged.

606.    Defendants will each be unjustly enriched if they are permitted to retain the economic benefits conferred upon them by B.H., and members of the Florida class through Defendants' unlawful, unfair, unauthorized, and impermissible use of the Personal Information B.H., and members of the Florida class, and allowing Defendants to retain the profits from their unlawful, unfair, unauthorized, and impermissible use of the Personal Information of B.H., and members of the Florida class would be unjust and contrary to public policy.

607.    B.H., and members of the Florida class are therefore entitled to recover the amounts realized by each of the Defendants at the expense of B.H., and members of the Florida class.

608.    B.H., and members of the Florida class do not seek recovery in this claim for their own economic harm and have no adequate remedy at law that would divest Defendants of their ill-gotten and unjust profits.   Moreover, even if money damages might otherwise provide an adequate remedy at law for this claim, there is at a minimum substantial doubt that any remedy at law is available, as the Court has ruled that the claims at law asserted by B.H., and members of the Florida class in their Fifth Amended Complaint do not satisfy the requisite elements for relief.  B.H., and members of the Florida class dispute the Court's holding and further believe that their claims at law as asserted in this Sixth Amended Complaint are legally and factually sufficient.  However, to the extent that money damages, if available, would constitute an adequate remedy at law barring recovery under this claim, B.H., and members of the Florida class assert their claim for non-restitutionary disgorgement as an alternative remedy pending a final determination of the availability of a remedy at law.

609.    B.H., and members of the Florida class are entitled to non-restitutionary disgorgement of each Defendant's ill-gotten gains, and/or the imposition of a constructive trust to recover the amount of each Defendant's ill-gotten gains.

**VI.    Illinois Claims**

<u>**Claim 10**</u>
**ILLINOIS INTRUSION UPON SECLUSION**
**(Against All Defendants on behalf of Plaintiffs P.A., J.A., and the Illinois Class)**

610.    Plaintiffs P.A., J.A., and members of the Illinois class re-allege the foregoing allegations as if fully set forth herein.

611.    P.A., J.A., and members of the Illinois class's private affairs, concerns, and seclusion includes their interest in their Personal Information as defined by COPPA, which includes data points concerning their location and online activity while using internet-connected devices.

612.    Defendants each and in concert, through aid or assistance, or pursuant to a common purpose with the knowledge of the others, intentionally intruded upon the private affairs, concerns, and seclusion of P.A., J.A., and member of the Illinois class by improperly accessing their Personal Information and using it for improper purposes, including by targeting P.A., J.A., and members of the Illinois class with behavioral advertising that would be highly offensive to a reasonable person,

constituting an egregious breach of social norms and/or enabling the targeting of P.A., J.A., and members of the Illinois class with such advertisements, as detailed herein.

613.    Defendants' intrusions upon the private affairs, concerns, and seclusion of P.A., J.A., and members of the Illinois class were substantial, and would be highly offensive to a reasonable person, constituting an egregious breach of social norms, as is evidenced by countless consumer surveys, studies, and op-eds decrying the online tracking of children, centuries of common law, state and federal statutes and regulations including COPPA and FTC regulations, legislative commentaries, enforcement actions undertaken by the FTC, industry standards and guidelines, scholarly literature on consumers' reasonable expectations., the fines imposed on Google by the FTC and the NY AG, as well as the reforms required by the Order & Injunction entered into by Google.

614.    As minor children, P.A., J.A., and members of the Illinois class lacked the ability to form expectations about reasonable privacy or to consent to Defendants' actions.

615.    Neither P.A., J.A., members of the Illinois class, nor their parents and/or guardians consented to Defendants' intrusions upon their private affairs, concerns, and seclusions.

616.    P.A., J.A., and members of the Illinois class suffered actual and concrete injury as a result of Defendants' intrusions upon P.A., J.A., and Illinois class members' private affairs, concerns, and seclusion.

617.    P.A., J.A., and members of the Illinois class seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate them for the harm to their privacy interests, risk of future invasions of privacy, and the mental and emotional distress caused by Defendants' invasions of privacy, as well as disgorgement of profits made by Defendants as a result of their intrusions upon P.A., J.A., and members of the Illinois class's private affairs, concerns, and seclusion.

## Claim 11
**ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT,**
**815 Ill. Comp. Stat. Ann. 505/2 *et seq*.**
**(Against All Defendants on behalf of Plaintiffs P.A., J.A., and the Illinois Class)**

618.    Plaintiffs P.A., J.A., and members of the Illinois class incorporate the foregoing allegations as if fully set forth herein.

619.   P.A., J.A., and members of the Illinois class are or were residents of Illinois  and/or viewed child-directed content in Illinois hosted by Defendant Google on YouTube and created by each of the Channel Owner Defendants.

620.   At all times mentioned herein, Defendants each engaged in "trade" or "commerce" in Illinois in that Defendants each engaged in the advertising, offering for sale, sale, and distribution of property or any other articles, commodities, or things of value in Illinois.

621.   Defendants each engaged in consumer-oriented acts through the offering, promoting, and/or distributing of YouTube and child-directed content hosted thereon, which significantly impacted the public because YouTube is used nationwide, including in Illinois, and there are millions of users, including P.A., J.A., and members of the Illinois Class.

622.   815 Ill. Comp. Stat. Ann. 505/2 provides "[u]nfair methods of competition and unfair … acts or practices … in the conduct of any trade or commerce are hereby declared unlawful … In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act."

623.   Defendants each violated 815 Ill. Comp. Stat. Ann. 505/2 by engaging in the unfair acts or practices proscribed by 815 Ill. Comp. Stat. Ann. 505/2 outlined herein.

624.   Defendants at all relevant times knowingly violated legal duties and public policy by unfairly and unlawfully collecting the Personal Information of children under 13 and tracking, profiling, and targeting those children with behavioral advertising for Defendants' commercial financial gain.

625.   As outlined herein, Defendants each at all times had actual knowledge of their own non-compliance with COPPA and other applicable privacy-related laws. Further, Defendants each at all times had actual knowledge of their own collection—via the election of each of the Channel Owner Defendants to serve behavioral advertising rather than contextual advertising to their viewers—of the Personal Information from P.A., J.A. and members of the Illinois class, and the tracking, profiling, and targeting of those children for lucrative behavioral advertising.

626.   As outlined herein, Google intentionally designed YouTube to, among other things, attract children under 13 by making child-directed content available to them so that Google  could collect the

Personal Information of those children under 13 and serve them with lucrative, intrusive, behavioral advertising for substantial commercial gain.

627.    The inherent characteristics, content, and features of YouTube as designed by Google, including the names, designs, cartoon elements, children's themes, and children's songs, evince that YouTube hosted child-directed content. That is, YouTube was plainly intended for and meant to attract children under 13, collect the Personal Information of those children, and serve those children behavioral advertising for substantial commercial gain.

628.    As outlined herein, each of the Channel Owner Defendants knowingly and intentionally created child-directed video content and made that child-directed content available on YouTube with the specific purpose of attracting child viewers under 13 to their respective YouTube channels.

629.    The inherent characteristics, content, and features of each of the Channel Owner Defendants' YouTube channels and the content hosted thereon, including the names, designs, cartoon elements, children's themes, and children's songs, evince that this content posted to and made available on YouTube was child-directed content.

630.    That is, each of the Channel Owner Defendants' YouTube channels and the child-directed content uploaded to, hosted on, and made viewable on those channels was plainly intended for and meant to attract children under 13 to YouTube for the purpose of collecting the Personal Information of those children to serve those children behavioral advertising for substantial commercial gain.

631.    Along with Google, each of the Channel Owner Defendants is individually considered by the FTC to be "operators" as defined under COPPA and FTC regulations.

632.    Each of the Channel Owner Defendants collected—including directing Google to collect - Personal Information from children under 13 through YouTube channels created, hosted, and maintained by the Channel Owner Defendants, which were directed to children under 13.

633.    In particular, Defendants each and in concert, through aid or assistance, or pursuant to a common purpose with the knowledge of the others, systematically collected, used, and/or disclosed Personal Information from children under 13 in violation of COPPA, and therefore the FTC Act, to serve them targeted, behavioral advertising by inter alia:

a.   Failing to provide sufficient notice of the information Defendants collected, or the information that was collected on Defendants' behalf, online from children under 13, how Defendants used such information, their disclosure practices, and all other required content, in violation of Section 312.4(d) of COPPA, 16 C.F.R. § 312.4(d);

b.   Failing to provide direct notice to parents of the information Defendants collected, or the information that was collected on Defendants' behalf, online from children under 13, how Defendants used such information, their disclosure practices, and all other required content, in violation of Section 312.4(b) and (c) of COPPA, 16 C.F.R. § 312.4(b)-(c);

c.   Failing to obtain verifiable parental consent before any collection or use of Personal Information from children under 13, in violation of Section 312.5 of COPPA, 16 C.F.R. § 312.5; and

d.   Failing to establish and maintain reasonable procedures to protect the confidentiality, security, and integrity of Personal Information collected from children under 13, in violation of Section 312.8 of COPPA, 16 C.F.R. § 312.8.

634.   Violations of COPPA and the accompanying FTC regulations "shall be treated as a violation of a rule defining an unfair … act or practice prescribed under 15 U.S.C. § 57a(a)(1)(B)." 15 U.S.C. § 6502(c).  These rules define unfair acts or practices in or affecting commerce within the meaning of 15 U.S.C. § 45(a)(1), which is the model for the various consumer protection statutes in the several states, including the 815 Ill. Comp. Stat. Ann. 505/2 et seq.[186]

635.   Accordingly, Defendants each individually engaged in unfair and unlawful trade acts or practices in violation of 815 Ill. Comp. Stat. Ann. 505/2 et seq., which is modeled after, proscribes the same conduct as, and gives deference to the definitions of the FTC Act.

636.   Defendants' conduct is unfair, immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers, and there are no greater countervailing benefits to consumers or

---

[186] *See* 16 C.F.R. § 312.1 (COPPA "prohibits unfair or deceptive acts or practices in connection with the collection, use, and/or disclosure or personal information from and about children on the internet.").

competition.  Further, P.A., J.A., and members of the Illinois class could not have reasonably avoided injury because Defendants each took advantage of the lack of knowledge, ability, experience, and/or capacity of consumers—in this case children under 13—to their detriment.

637.   Defendants willfully engaged in the unfair and unlawful acts described herein and knew or recklessly disregarded the fact that they violated 815 Ill. Comp. Stat. Ann. 505/2 *et seq*.

638.   P.A., J.A., and members of the Illinois class were harmed by Defendants' practices described herein, which were a substantial factor and caused injury in fact and actual damages to P.A., J.A., and members of the Illinois class.

639.   As a direct and proximate result of Defendants' unfair and unlawful acts and practices in violation of 815 Ill. Comp. Stat. Ann. 505/2 et seq., P.A., J.A., and members of the Illinois class have suffered and will continue to suffer an ascertainable loss of money or property, real or personal, and monetary and non-monetary damages, as described herein, including, inter alia, the loss of the value and/or diminishment in value of their Personal Information and the loss of the ability to control the use of their Personal Information.

640.   As outlined herein, there is tangible value in P.A., J.A., and members of the Illinois class's Personal Information.   P.A., J.A., and members of the Illinois class have lost the opportunity to receive value in exchange for their Personal Information.

641.   Defendants' monetization of P.A., J.A., and members of the Illinois class's Personal Information demonstrates that there is a market for their Personal Information.

642.   P.A., J.A., and members of the Illinois class's Personal Information is now in the possession of Defendants, who have used and will use it for their financial gain.

643.   Defendants' retention of P.A., J.A., and members of the Illinois class's Personal Information presents a continuing risk to them as well as the general public. P.A., J.A., and members of the Illinois class seek relief for the injuries they have suffered as a result of Defendants' unfair and unlawful acts and practices, as provided by 815 Ill. Comp. Stat. Ann. 505/2 et seq. and applicable law, including all actual damages and attorneys' fees and costs, treble damages, statutory damages, and restitution, as well as an injunction requiring Defendants to each permanently delete, destroy or otherwise sequester the Personal Information collected without parental consent, requiring Defendants to provide a

complete audit and accounting of the uses of the Personal Information by them and any other third parties, and other appropriate injunctive and/or declaratory relief.

### Claim 12
### ILLINOIS UNJUST ENRICHMENT
#### (Against All Defendants on behalf of Plaintiffs P.A., J.A., and the Illinois Class)

644.    Plaintiffs P.A., J.A., and members of the Illinois class re-allege the foregoing allegations as if fully set forth herein.

645.    By virtue of the unlawful and unfair conduct alleged herein, Defendants have each realized millions of dollars in revenue from their collection and use of the Personal Information of P.A., J.A., and Illinois class members through behavioral advertising and commercialization purposes derived from that Personal Information.

646.    Defendants' ill-gotten gains were monetary benefits conferred upon Defendants by P.A., J.A., and members of the Illinois class. It would be inequitable and unjust to permit any of the Defendants to retain the economic benefits they have obtained through advertising and commercialization derived from the Personal Information of P.A., J.A., and members of the Illinois class.

647.    Defendants are each independently liable because they each profited from the conduct alleged.

648.    Defendants will each be unjustly enriched if they are permitted to retain the economic benefits conferred upon them by P.A., J.A., and members of the Illinois class through Defendants' unlawful, unfair, unauthorized, and impermissible use of the Personal Information of P.A., J.A., and members of the Illinois class, and allowing Defendants to retain the profits from their unlawful, unfair, unauthorized, and impermissible use of the Personal Information of P.A., J.A., and members of the Illinois class would be unjust and contrary to public policy.

649.    P.A., J.A., and members of the Illinois class are therefore entitled to recover the amounts realized by each of the Defendants at the expense of P.A., J.A., and members of the Illinois class.

650.    P.A., J.A., and members of the Illinois class do not seek recovery in this claim for their own economic harm and have no adequate remedy at law that would divest Defendants of their ill-gotten and unjust profits.   Moreover, even if money damages might otherwise provide an adequate remedy at law for this claim, there is at a minimum substantial doubt that any remedy at law is available, as the

Court has ruled that the claims at law asserted by P.A., J.A., and members of the Illinois class in their Fifth Amended Complaint do not satisfy the requisite elements for relief.  P.A., J.A., and members of the Illinois class dispute the Court's holding and further believe that their claims at law as asserted in this Sixth Amended Complaint are legally and factually sufficient.  However, to the extent that money damages, if available, would constitute an adequate remedy at law barring recovery under this claim, P.A., J.A., and members of the Illinois class assert their claim for non-restitutionary disgorgement as an alternative remedy pending a final determination of the availability of a remedy at law.

651.    P.A., J.A., and members of the Illinois class class are entitled to non-restitutionary disgorgement of each Defendant's ill-gotten gains, and/or the imposition of a constructive trust to recover the amount of each Defendant's ill-gotten gains.

**VII.    Indiana Claims**

### Claim 13
**INDIANA DECEPTIVE CONSUMER SALES ACT, Ind. Code §§ 24-5-0.5-1, *et seq*.**
**(Against All Defendants on behalf of Plaintiffs T.B. and S.B.. and the Indiana Class)**

652.    Plaintiffs T.B. and S.B. and members of the Indiana class incorporate the foregoing allegations as if fully set forth herein.

653.    T.B. and S.B. and members of the Indiana class are or were residents of Indiana and/or viewed child-directed content in Indiana hosted by Defendant Google on YouTube and created by each of the Channel Owner Defendants.

654.    Ind. Code §§ 24-5-0.5-3 provides "[a] supplier may not commit an unfair … act, omission, or practice in connection with a consumer transaction."

655.    Ind. Code § 24-5-0.5-2(3)(A) defines "supplier" as "[a] seller, lessor, assignor, or other person who regularly engages in or solicits consumer transactions, including soliciting a consumer transaction by using a telephone facsimile machine to transmit an unsolicited advertisement. The term includes a manufacturer, wholesaler, or retailer, whether or not the person deals directly with the consumer."

656.     At all times mentioned herein, Defendants each engaged in "trade" or "commerce" in Indiana in that they each engaged in the advertising, offering for sale, sale, and distribution of property or any other articles, commodities, or things of value in Indiana.

657.     Defendants each engaged in consumer-oriented acts through the offering, promoting, and/or distributing of YouTube and child-directed content hosted thereon, which significantly impacted the public because YouTube is used nationwide, including in Indiana, and there are millions of users, including T.B. and S.B.. and members of the Indiana class.

658.     Defendants are each "suppliers" as defined by Ind. Code § 24-5-0.5-2(3)(A).

659.     Defendants each violated Ind. Code §§ 24-5-0.5-1, *et seq.* by engaging in the unfair acts or practices proscribed by Ind. Code §§ 24-5-0.5-1, *et seq.* outlined herein.

660.     Defendants at all relevant times knowingly violated legal duties and public policy by unfairly and unlawfully collecting the Personal Information of children under 13 and tracking, profiling, and targeting those children with behavioral advertising for Defendants' commercial financial gain.

661.     As outlined herein, Defendants each at all times had actual knowledge of their own non-compliance with COPPA and other applicable privacy-related laws. Further, Defendants each at all times had actual knowledge of their own collection—via the election of each of the Channel Owner Defendants to serve behavioral advertising rather than contextual advertising to their viewers—of the Personal Information from T.B. and S.B. and members of the Indiana class, and tracking, profiling, and targeting of those children for lucrative behavioral advertising.

662.     As outlined herein, Google intentionally designed YouTube to, among other things, attract children under 13 to the platform by making child-directed content available to them so that Google could collect the Personal Information of those children under 13 and serve them with lucrative, intrusive, behavioral advertising for substantial commercial gain.

663.     The inherent characteristics, content, and features of YouTube as designed by Google, including the names, designs, cartoon elements, children's themes, and children's songs, evince that YouTube hosted child-directed content. That is, YouTube was plainly intended for and meant to attract children under 13, collect the Personal Information of those children, and serve those children behavioral advertising for substantial commercial gain.

664.     As outlined herein, each of the Channel Owner Defendants knowingly and intentionally created child-directed video content and made that child-directed content available on YouTube with the specific purpose of attracting child viewers under 13 to their respective YouTube channels.

665.     The inherent characteristics, content, and features of each of the Channel Owner Defendants' YouTube channels and the content hosted thereon, including the names, designs, cartoon elements, children's themes, and children's songs, evince that each of the Channel Owner Defendants' content posted to and made available on YouTube was child-directed content.

666.     That is, each of the Channel Owner Defendants' YouTube channels and the child-directed content each Channel Owner Defendant uploaded to, hosted on, and made viewable on their YouTube channels was plainly intended for and meant to attract children under 13 for the purpose of collecting the Personal Information of those children to serve those children behavioral advertising for substantial commercial gain.

667.     Along with Google, each of the Channel Owner Defendants are each individually considered by the FTC to be "operators" as defined under COPPA and FTC regulations.

668.     Each of the Channel Owner Defendants collected—including directing Google to collect— Personal Information from children under 13 through YouTube channels created, hosted, and maintained by the Channel Owner Defendants, which were directed to children under 13.

669.     In particular, Defendants each and in concert, through aid or assistance, or pursuant to a common purpose with the knowledge of the others,  systematically collected, used, and/or disclosed Personal Information from children under 13 in violation of COPPA, and therefore the FTC Act, to serve them targeted, behavioral advertising by inter alia:

      a.     Failing to provide sufficient notice of the information Defendants collected, or the information that was collected on Defendants' behalf, online from children under 13, how Defendants used such information, their disclosure practices, and all other required content, in violation of Section 312.4(d) of COPPA, 16 C.F.R. § 312.4(d);

      b.     Failing to provide direct notice to parents of the information Defendants collected, or the information that was collected on Defendants' behalf, online from children under 13, how Defendants used such information, their disclosure practices, and

all other required content, in violation of Section 312.4(b) and (c) of COPPA, 16 C.F.R. § 312.4(b)-(c);

c.    Failing to obtain verifiable parental consent before any collection or use of Personal Information from children under 13, in violation of Section 312.5 of COPPA, 16 C.F.R. § 312.5; and

d.    Failing to establish and maintain reasonable procedures to protect the confidentiality, security, and integrity of Personal Information collected from children under 13, in violation of Section 312.8 of COPPA, 16 C.F.R. § 312.8.

670.    Violations of COPPA and the accompanying FTC regulations "shall be treated as a violation of a rule defining an unfair … act or practice prescribed under 15 U.S.C. § 57a(a)(1)(B)." 15 U.S.C. § 6502(c).  These rules define unfair acts or practices in or affecting commerce within the meaning of 15 U.S.C. § 45(a)(1), which is the model for the various consumer protection statutes in the several states, including the Ind. Code §§ 24-5-0.5-1, *et seq.*.[187]

671.    Accordingly, Defendants each individually engaged in unfair and unlawful trade acts or practices in violation of Ind. Code §§ 24-5-0.5-1, *et seq.*, which is modeled after, proscribes the same conduct as, and gives deference to the definitions of the FTC Act.

672.    Defendants' conduct is unfair, immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers, and there are no greater countervailing benefits to consumers or competition.  Further, T.B. and S.B.. and members of the Indiana class could not have reasonably avoided injury because Defendants each took advantage of the lack of knowledge, ability, experience, and/or capacity of consumers—in this case children under 13—to their detriment.

673.    Defendants willfully engaged in the unfair and unlawful acts described herein and knew or recklessly disregarded the fact that they violated Ind. Code §§ 24-5-0.5-1, *et seq.*

---

[187] *See* 16 C.F.R. § 312.1 (COPPA "prohibits unfair or deceptive acts or practices in connection with the collection, use, and/or disclosure or personal information from and about children on the internet.").

674.    T.B. and S.B. and members of the Indiana class were harmed by Defendants' practices described herein, which were a substantial factor and caused injury in fact and actual damages to T.B., S.B. and members of the Indiana class.

675.    As a direct and proximate result of Defendants' unfair and unlawful acts and practices in violation of Ind. Code §§ 24-5-0.5-1, *et seq.*, T.B., S.B. and members of the Indiana class have suffered and will continue to suffer an ascertainable loss of money or property, real or personal, and monetary and non-monetary damages, as described herein, including, inter alia, the loss of the value and/or diminishment in value of their Personal Information and the loss of the ability to control the use of their Personal Information.

676.    As outlined herein, there is tangible value in T.B. and S.B.. and members of the Indiana class's Personal Information. T.B., S.B.. and members of the Indiana class have lost the opportunity to receive value in exchange for their Personal Information.

677.    Defendants' monetization of T.B.,S.B. and members of the Indiana class's Personal Information demonstrates that there is a market for their Personal Information, but that Personal Information is now in the possession of Defendants, who have used and will use it for their financial gain.

678.    Defendants' retention of T.B.,S.B. and members of the Indiana class's Personal Information presents a continuing risk to them as well as the general public. T.B.,S.B. and members of the Indiana class seek relief for the injuries they have suffered as a result of Defendants' unfair and unlawful acts and practices, as provided by Ind. Code §§ 24-5-0.5-1, *et seq*. and applicable law, including all actual damages and attorneys' fees and costs, treble damages, statutory damages, and restitution, as well as an injunction requiring Defendants to each permanently delete, destroy or otherwise sequester the Personal Information collected without parental consent, requiring Defendants to provide a complete audit and accounting of the uses of the Personal Information by Defendants and any other third parties, and other appropriate injunctive and/or declaratory relief.

**<u>Claim 14</u>**
**INDIANA UNJUST ENRICHMENT**
**(Against All Defendants on behalf of Plaintiffs T.B. and S.B. and the Indiana Class)**

679.    Plaintiffs T.B. and S.B., and members of the Indiana class re-allege the foregoing allegations as if fully set forth herein.

680.     By virtue of the unlawful and unfair conduct alleged herein, Defendants have each realized millions of dollars in revenue from their collection and use of the Personal Information of T.B. and S.B., and Indiana class members through behavioral advertising and commercialization purposes derived from that Personal Information.

681.     Defendants' ill-gotten gains were monetary benefits conferred upon Defendants by T.B. and S.B., and members of the Indiana class.  It would be inequitable and unjust to permit any of the Defendants to retain the economic benefits they have obtained through advertising and commercialization derived from the Personal Information of T.B. and S.B., and members of the Indiana class.

682.     Defendants are each independently liable because they each profited from the conduct alleged.

683.     Defendants will each be unjustly enriched if they are permitted to retain the economic benefits conferred upon them by T.B. and S.B., and members of the Indiana class through Defendants' unlawful, unfair, unauthorized, and impermissible use of the Personal Information of T.B. and S.B., and members of the Indiana class, and allowing Defendants to retain the profits from their unlawful, unfair, unauthorized, and impermissible use of the Personal Information of T.B. and S.B., and members of the Indiana class would be unjust and contrary to public policy.

684.     T.B. and S.B., and members of the Indiana class are therefore entitled to recover the amounts realized by each of the Defendants at the expense of T.B. and S.B., and members of the Indiana class.

685.     T.B. and S.B., and members of the Indiana class do not seek recovery in this claim for their own economic harm and have no adequate remedy at law that would divest Defendants of their ill-gotten and unjust profits.   Moreover, even if money damages might otherwise provide an adequate remedy at law for this claim, there is at a minimum substantial doubt that any remedy at law is available, as the Court has ruled that the claims at law asserted by T.B. and S.B., and members of the Indiana class in their Fifth Amended Complaint do not satisfy the requisite elements for relief.  T.B. and S.B., and members of the Indiana class dispute the Court's holding and further believe that their claims at law as asserted in this Sixth Amended Complaint are legally and factually sufficient.  However, to the extent that money damages, if available, would constitute an adequate remedy at law barring recovery under

this claim, T.B. and S.B., and members of the Indiana class assert their claim for non-restitutionary disgorgement as an alternative remedy pending a final determination of the availability of a remedy at law.

686.    T.B. and S.B., and members of the Indiana class are entitled to non-restitutionary disgorgement of each Defendant's ill-gotten gains, and/or the imposition of a constructive trust to recover the amount of each Defendant's ill-gotten gains.

**VIII.   Kansas Claims**

**Claim 15**
**KANSAS INTRUSION UPON SECLUSION**
**(Against All Defendants on behalf of Plaintiffs S.H., D.M., and the Kansas Class)**

687.    Plaintiffs S.H., D.M., and members of the Kansas class re-allege the foregoing allegations as if fully set forth herein.

688.    S.H., D.M., and members of the Kansas class's private affairs, concerns, and seclusion includes their interest in their Personal Information as defined by COPPA, which includes data points concerning their location and online activity while using internet-connected devices.

689.    Defendants each and in concert, through aid or assistance, or pursuant to a common purpose with the knowledge of the others, intentionally intruded upon the private affairs, concerns, and seclusion of S.H., D.M., and members of the Kansas class by improperly accessing their Personal Information and using it for improper purposes, including by targeting S.H., D.M., and members of the Kansas class with behavioral advertising that would be highly offensive to a reasonable person, constituting an egregious breach of social norms and/or enabling the targeting of S.H., D.M., and members of the Kansas class with such advertisements, as detailed herein.

690.    Defendants' intrusions upon the private affairs, concerns, and seclusion of S.H., D.M., and members of the Kansas class were substantial, and would be highly offensive to a reasonable person, constituting an egregious breach of social norms, as is evidenced by countless consumer surveys, studies, and op-eds decrying the online tracking of children, centuries of common law, state and federal statutes and regulations including COPPA and FTC regulations, legislative commentaries, enforcement actions undertaken by the FTC, industry standards and guidelines, scholarly literature on consumers' reasonable

expectations., the fines imposed on Google by the FTC and the NY AG, as well as the reforms required by the Order & Injunction entered into by Google.

691.    As children aged 13 or younger, S.H., D.M., and members of the Kansas class lacked the ability to form expectations about reasonable privacy or to consent to Defendants' actions.

692.    Neither S.H., D.M., members of the Kansas class, nor their parents and/or guardians consented to Defendants' intrusions upon their private affairs, concerns, and seclusions.

693.    S.H., D.M., and members of the Kansas class suffered actual and concrete injury as a result of Defendants' intrusions upon S.H., D.M., and members of the Kansas class's private affairs, concerns, and seclusion.

694.    S.H., D.M., and members of the Kansas class seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate them for the harm to their privacy interests, risk of future invasions of privacy, and the mental and emotional distress caused by Defendants' invasions of privacy, as well as disgorgement of profits made by Defendants as a result of their intrusions upon S.H., D.M., and members of the Kansas class's private affairs, concerns, and seclusion.

<u>Claim 16</u>
**KANSAS UNJUST ENRICHMENT**
**(Against All Defendants on behalf of Plaintiffs S.H., D.M., and the Kansas Class)**

695.    Plaintiffs S.H., D.M., and members of the Kansas class re-allege the foregoing allegations as if fully set forth herein.

696.    By virtue of the unlawful and unfair conduct alleged herein, Defendants have each realized millions of dollars in revenue from their collection and use of the Personal Information of S.H., D.M., and Kansas class members through behavioral advertising and commercialization purposes derived from that Personal Information.

697.    Defendants' ill-gotten gains were monetary benefits conferred upon Defendants by S.H., D.M., and members of the Kansas class. It would be inequitable and unjust to permit any of the Defendants to retain the economic benefits they have obtained through advertising and commercialization derived from the Personal Information of S.H., D.M., and members of the Kansas class.

698.    Defendants are each independently liable because they each profited from the conduct alleged.

699.    Defendants will each be unjustly enriched if they are permitted to retain the economic benefits conferred upon them by S.H., D.M., and members of the Kansas class through Defendants' unlawful, unfair, unauthorized, and impermissible use of the Personal Information of S.H., D.M., and members of the Kansas class, and allowing Defendants to retain the profits from their unlawful, unfair, unauthorized, and impermissible use of the Personal Information of S.H., D.M., and members of the Kansas class would be unjust and contrary to public policy.

700.    S.H., D.M., and members of the Kansas class are therefore entitled to recover the amounts realized by each of the Defendants at the expense of S.H., D.M., and members of the Kansas class.

701.    S.H., D.M., and members of the Kansas class do not seek recovery in this claim for their own economic harm and have no adequate remedy at law that would divest Defendants of their ill-gotten and unjust profits.   Moreover, even if money damages might otherwise provide an adequate remedy at law for this claim, there is at a minimum substantial doubt that any remedy at law is available, as the Court has ruled that the claims at law asserted by S.H., D.M., and members of the Kansas class in their Fifth Amended Complaint do not satisfy the requisite elements for relief.   S.H., D.M., and members of the Kansas class dispute the Court's holding and further believe that their claims at law as asserted in this Sixth Amended Complaint are legally and factually sufficient.   However, to the extent that money damages, if available, would constitute an adequate remedy at law barring recovery under this claim, S.H., D.M., and members of the Kansas class assert their claim for non-restitutionary disgorgement as an alternative remedy pending a final determination of the availability of a remedy at law.

702.    S.H., D.M., and members of the Kansas class are entitled to non-restitutionary disgorgement of each Defendant's ill-gotten gains, and/or the imposition of a constructive trust to recover the amount of each Defendant's ill-gotten gains.

1

**IX.     Massachusetts Claims**

2

<u>**Claim 17**</u>

3

**MASSACHUSETTS CONSUMER PROTECTION ACT,**
**Mass. Gen. Laws Ann. Ch. 93A, § 1, *et seq.***
**(Against All Defendants on behalf of Plaintiff A.G. and the Massachusetts Class)**

4

5

703.    Plaintiff A.G. and members of the Massachusetts class incorporate the foregoing allegations as if fully set forth herein.

6

7

704.    A.G. and members of the Massachusetts class are or were residents of Massachusetts and/or viewed child-directed content in Massachusetts hosted by Defendant Google and created by each of the Channel Owner Defendants.

8

9

10

705.    A.G., members of the Massachusetts class, and each of the Defendants are "persons" as meant by Mass. Gen. Laws. Ann. Ch. 93A, § 1(a).

11

12

706.    Each of the Defendants operate in "trade or commerce" as meant by Mass. Gen. Laws Ann. ch. 93A, § 1.

13

14

707.    Each of the Defendants advertised, offered, or sold goods or services in Massachusetts and/or engaged in trade or commerce directly or indirectly affecting the people of Massachusetts, as defined by Mass. Gen. Laws Ann. Ch. 93A, § 1(b).

15

16

17

708.    Mass. Gen. Laws Ann. Ch. 93A, § 2(a) provides "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

18

19

20

709.    Mass. Gen. Laws Ann. Ch. 93A, § 2(b) provides "[i]t is the intent of the legislature that in construing paragraph (a) of this section in actions brought under sections four, nine and eleven, the courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended."

21

22

23

24

25

710.    At all times mentioned herein, each of the Defendants engaged in "trade" or "commerce" in Massachusetts in that they engaged in the advertising, offering for sale, sale, and distribution of property or any other articles, commodities, or things of value in Massachusetts.

26

27

28

149

711.    Each of the Defendants engaged in consumer-oriented acts through the offering, promoting, and/or distributing of YouTube and child-directed content hosted thereon, which significantly impacted the public because YouTube is used nationwide, including in Massachusetts, and there are millions of users, including A.G. and members of the Massachusetts class.

712.    Defendants each violated Mass. Gen. Laws Ann. ch. 93A, § 1, *et seq*. by engaging in the unfair and/or unlawful acts or practices proscribed by Mass. Gen. Laws Ann. ch. 93A, § 1, *et seq*. outlined herein.

713.    Defendants at all relevant times knowingly violated legal duties and public policy by unfairly and unlawfully collecting the Personal Information of children under 13 and tracking, profiling, and targeting those children with behavioral advertising for Defendants' commercial financial gain.

714.    As outlined herein, Defendants each at all times had actual knowledge of their own non-compliance with COPPA and other applicable privacy-related laws. Further, Defendants each at all times had actual knowledge of their own collection—via the election of each of the Channel Owner Defendants to serve behavioral advertising rather than contextual advertising to their viewers—of the Personal Information from A.G. and Massachusetts class members created by the Channel Owner Defendants on YouTube, and the tracking, profiling, and targeting of those children for lucrative behavioral advertising.

715.    As outlined herein, Google intentionally designed YouTube to, among other things, attract children under 13 by making child-directed content available to them so that Google could collect the Personal Information of those children under 13 and serve them with lucrative, intrusive, behavioral advertising for substantial commercial gain.

716.    The inherent characteristics, content, and features of YouTube as designed by Google, including the names, designs, cartoon elements, children's themes, and children's songs, evince that YouTube hosted child-directed content. That is, YouTube was plainly intended for and meant to attract children under 13, collect the Personal Information of those children, and serve those children behavioral advertising for substantial commercial gain.

717.    As outlined herein, each of the Channel Owner Defendants knowingly and intentionally created child-directed video content and made that child-directed content available on YouTube with the specific purpose of attracting child viewers under 13 to their respective YouTube channels.

718.    The inherent characteristics, content, and features of each of the Channel Owner Defendants' YouTube channels and the content hosted thereon, including the names, designs, cartoon elements, children's themes, and children's songs, evince that the Channel Owner Defendants' content posted to and made available on YouTube was child-directed content.

719.    That is, each of the Channel Owner Defendants' YouTube channels and the child-directed content each of the Channel Owner Defendants uploaded to, hosted on, and made viewable on their YouTube channels was plainly intended for and meant to attract children under 13 for the purpose of collecting the Personal Information of those children to serve those children behavioral advertising for substantial commercial gain.

720.    Along with Google, each of the Channel Owner Defendants is individually considered by the FTC to be "operators" as defined under COPPA and FTC regulations.

721.    Each of the Channel Owner Defendants collected—including directing Google to collect— Personal Information from children under 13 through YouTube channels created, hosted, and maintained by the each of the Channel Owner Defendants, which were directed to children under 13.

722.    In particular, Defendants each and in concert, through aid or assistance, or pursuant to a common purpose with the knowledge of the others, systematically collected, used, and/or disclosed Personal Information from children under 13 in violation of COPPA, and therefore the FTC Act, to serve them targeted, behavioral advertising by inter alia:

   a.    Failing to provide sufficient notice of the information Defendants collected, or the information that was collected on Defendants' behalf, online from children under 13, how Defendants used such information, their disclosure practices, and all other required content, in violation of Section 312.4(d) of COPPA, 16 C.F.R. § 312.4(d);

   b.    Failing to provide direct notice to parents of the information Defendants collected, or the information that was collected on Defendants' behalf, online from children under 13, how Defendants used such information, their disclosure practices, and all other required content, in violation of Section 312.4(b) and (c) of COPPA, 16 C.F.R. § 312.4(b)-(c);

c. Failing to obtain verifiable parental consent before any collection or use of Personal Information from children under 13, in violation of Section 312.5 of COPPA, 16 C.F.R. § 312.5; and

d. Failing to establish and maintain reasonable procedures to protect the confidentiality, security, and integrity of Personal Information collected from children under 13, in violation of Section 312.8 of COPPA, 16 C.F.R. § 312.8.

723. Violations of COPPA and the accompanying FTC regulations "shall be treated as a violation of a rule defining an unfair … act or practice prescribed under 15 U.S.C. § 57a(a)(1)(B)." 15 U.S.C. § 6502(c). These rules define unfair acts or practices in or affecting commerce within the meaning of 15 U.S.C. § 45(a)(1), which is the model for the various consumer protection statutes in the several states, including the Mass. Gen. Laws Ann. ch. 93A, § 1, *et seq.*.[188]

724. Accordingly, Defendants each individually engaged in unfair and unlawful trade acts or practices in violation of Mass. Gen. Laws Ann. ch. 93A, § 1, *et seq.*, which is modeled after, proscribes the same conduct as, and gives deference to the definitions of the FTC Act.

725. Defendants' conduct is unfair, immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers, and there are no greater countervailing benefits to consumers or competition. Further, A.G. and members of the Massachusetts class could not have reasonably avoided injury because Defendants each took advantage of the lack of knowledge, ability, experience, and/or capacity of consumers—in this case children under 13—to their detriment.

726. Defendants willfully engaged in the unfair and unlawful acts described herein and knew or recklessly disregarded the fact that they violated Mass. Gen. Laws Ann. ch. 93A, § 1, *et seq*.

727. A.G. and members of the Massachusetts class were harmed by Defendants' practices described herein, which were a substantial factor and caused injury in fact and actual damages to A.G. and members of the Massachusetts Class.

---

[188] *See* 16 C.F.R. § 312.1 (COPPA "prohibits unfair or deceptive acts or practices in connection with the collection, use, and/or disclosure or personal information from and about children on the internet.").

728.     As a direct and proximate result of Defendants' unfair and unlawful acts and practices in violation of Mass. Gen. Laws Ann. ch. 93A, § 1, *et seq.*, A.G. and members of the Massachusetts class have suffered and will continue to suffer an ascertainable loss of money or property, real or personal, and monetary and non-monetary damages, as described herein, including, inter alia, the loss of the value and/or diminishment in value of their Personal Information and the loss of the ability to control the use of their Personal Information.

729.     As outlined herein, there is tangible value in A.G. and members of the Massachusetts class's Personal Information. A.G. and members of the Massachusetts Class have lost the opportunity to receive value in exchange for their Personal Information.

730.     Defendants' monetization of A.G. and members of the Massachusetts class's Personal Information demonstrates that there is a market for their Personal Information.

731.     A.G. and members of the Massachusetts class's Personal Information is now in the possession of Defendants, who have used and will use it for their financial gain.

732.     Defendants' retention of A.G. and members of the Massachusetts class's Personal Information presents a continuing risk to them as well as the general public. A.G. and members of the Massachusetts class seek relief for the injuries they have suffered as a result of Defendants' unfair and unlawful acts and practices, as provided by Mass. Gen. Laws Ann. ch. 93A, § 1, *et seq*. and applicable law, including all actual damages and attorneys' fees and costs, treble damages, statutory damages, and restitution, as well as an injunction requiring Defendants to each permanently delete, destroy or otherwise sequester the Personal Information collected without parental consent, requiring Defendants to provide a complete audit and accounting of the uses of the Personal Information by Defendants and any other third parties, and other appropriate injunctive and/or declaratory relief.

### <u>Claim 18</u>
### MASSACHUSETTS UNJUST ENRICHMENT
### (Against All Defendants on behalf of Plaintiff A.G. and the Massachusetts Class)

733.     Plaintiff A.G., and members of the Massachusetts class re-allege the foregoing allegations as if fully set forth herein.

734.    By virtue of the unlawful and unfair conduct alleged herein, Defendants have each realized millions of dollars in revenue from their collection and use of the Personal Information of A.G. and Massachusetts class members through behavioral advertising and commercialization purposes derived from that Personal Information.

735.    Defendants' ill-gotten gains were monetary benefits conferred upon Defendants by A.G. and members of the Massachusetts class. It would be inequitable and unjust to permit any of the Defendants to retain the economic benefits they have obtained through advertising and commercialization derived from the Personal Information of A.G. and members of the Massachusetts class.

736.    Defendants are each independently liable because they each profited from the conduct alleged.

737.    Defendants will each be unjustly enriched if they are permitted to retain the economic benefits conferred upon them by A.G. and members of the Massachusetts class through Defendants' unlawful, unfair, unauthorized, and impermissible use of the Personal Information of A.G. and members of the Massachusetts class, and allowing Defendants to retain the profits from their unlawful, unfair, unauthorized, and impermissible use of the Personal Information of A.G. and members of the Massachusetts class would be unjust and contrary to public policy.

738.    A.G. and members of the Massachusetts class are therefore entitled to recover the amounts realized by each of the Defendants at the expense of A.G. and members of the Massachusetts class.

739.    A.G. and members of the Massachusetts class do not seek recovery in this claim for their own economic harm and have no adequate remedy at law that would divest Defendants of their ill-gotten and unjust profits.   Moreover, even if money damages might otherwise provide an adequate remedy at law for this claim, there is at a minimum substantial doubt that any remedy at law is available, as the Court has ruled that the claims at law asserted by A.G. and members of the Massachusetts class n their Fifth Amended Complaint do not satisfy the requisite elements for relief.  A.G. and members of the Massachusetts class dispute the Court's holding and further believe that their claims at law as asserted in this Sixth Amended Complaint are legally and factually sufficient.  However, to the extent that money damages, if available, would constitute an adequate remedy at law barring recovery under this claim,

A.G. and members of the Massachusetts class assert their claim for non-restitutionary disgorgement as an alternative remedy pending a final determination of the availability of a remedy at law.

740.    A.G. and members of the Massachusetts class are entitled to non-restitutionary disgorgement of each Defendant's ill-gotten gains, and/or the imposition of a constructive trust to recover the amount of each Defendant's ill-gotten gains.

## X.    Michigan Claims

### Claim 19
### MICHIGAN CONSUMER PROTECTION ACT,
### Mich. Comp. Laws. Ann. § 445.903, *et seq*.
### (Against All Defendants on behalf of Plaintiff G.W. and the Michigan Class)

741.    Plaintiff G.W. and the Michigan class incorporate the foregoing allegations as if fully set forth herein.

742.    G.W. and members of the Michigan class are or were residents of Michigan and/or viewed child-directed content in Michigan hosted by Defendant Google on YouTube and created by each of the Channel Owner Defendants.

743.    Mich. Comp. Laws Ann. § 445.903 provides that "[u]nfair [and] unconscionable … methods, acts, or practices in the conduct of trade or commerce are unlawful[.]"

744.    At all times mentioned herein, Defendants each engaged in "trade" or "commerce" in Michigan in that they engaged in the advertising, offering for sale, sale, and distribution of property or any other articles, commodities, or things of value in Michigan.

745.    Defendants violated Mich. Comp. Laws Ann. § 445.903 by engaging in the deceptive or unfair acts or practices proscribed by Mich. Comp. Laws Ann. § 445.903 as outlined herein.

746.    Defendants each engaged in consumer-oriented acts through the offering, promoting, and/or distributing of YouTube and child-directed content hosted thereon, which significantly impacted the public because YouTube is used nationwide, including in Michigan, and there are millions of users, including A.G. and members of the Michigan class.

747.    Defendants at all relevant times knowingly violated legal duties and public policy by unfairly and unlawfully collecting the Personal Information of children under 13 and tracking, profiling, and targeting those children with behavioral advertising for Defendants' commercial financial gain.

748.    As outlined herein, Defendants each at all times had actual knowledge of their own non-compliance with COPPA and other applicable privacy-related laws. Further, Defendants each at all times had actual knowledge of their own collection—via the election of each of the Channel Owner Defendants to serve behavioral advertising rather than contextual advertising to their viewers—of the Personal Information from G.W. and members of the Michigan class created by the Channel Owner Defendants on YouTube, and the tracking, profiling, and targeting of those children for lucrative behavioral advertising.

749.    As outlined herein, Google intentionally designed YouTube to, among other things, attract children under 13 to the platform by making child-directed content available to them so that Google could collect the Personal Information of those children under 13 and serve them with lucrative, intrusive, behavioral advertising for substantial commercial gain.

750.    The inherent characteristics, content, and features of YouTube as designed by Google, including the names, designs, cartoon elements, children's themes, and children's songs, evince that YouTube hosted child-directed content. That is, YouTube was plainly intended for and meant to attract children under 13, collect the Personal Information of those children, and serve those children behavioral advertising for substantial commercial gain.

751.    As outlined herein, each of the Channel Owner Defendants knowingly and intentionally created child-directed video content and made that child-directed content available on YouTube with the specific purpose of attracting child viewers under 13 to their respective YouTube channels.

752.    The inherent characteristics, content, and features of each of the Channel Owner Defendants' YouTube channels and the content hosted thereon, including the names, designs, cartoon elements, children's themes, and children's songs, evince that     the Channel Owner Defendants' content posted to and made available on YouTube was child-directed content.

753.    That is, each of the Channel Owner Defendants' YouTube channels and the child-directed content the Channel Owner Defendants uploaded to, hosted on, and made viewable on their YouTube channels was plainly intended for and meant to attract children under 13 for the purpose of collecting the Personal Information of those children to serve those children behavioral advertising for substantial commercial gain.

754.    Along with Google, each of the Channel Owner Defendants is individually considered by the FTC to be "operators" as defined under COPPA and FTC regulations.

755.    Each of the Channel Owner Defendants collected—including directing Google to collect— Personal Information from children under 13 through YouTube channels created, hosted, and maintained by the Channel Owner Defendants, which were directed to children under 13.

756.    In particular, Defendants each and in concert, through aid or assistance, or pursuant to a common purpose with the knowledge of the others, systematically collected, used, and/or disclosed Personal Information from children under 13 in violation of COPPA, and therefore the FTC Act, to serve them targeted, behavioral advertising by inter alia:

      a.    Failing to provide sufficient notice of the information Defendants collected, or the information that was collected on Defendants' behalf, online from children under 13, how Defendants used such information, their disclosure practices, and all other required content, in violation of Section 312.4(d) of COPPA, 16 C.F.R. § 312.4(d);

      b.    Failing to provide direct notice to parents of the information Defendants collected, or the information that was collected on Defendants' behalf, online from children under 13, how Defendants used such information, their disclosure practices, and all other required content, in violation of Section 312.4(b) and (c) of COPPA, 16 C.F.R. § 312.4(b)-(c);

      c.    Failing to obtain verifiable parental consent before any collection or use of Personal Information from children under 13, in violation of Section 312.5 of COPPA, 16 C.F.R. § 312.5; and

      d.    Failing to establish and maintain reasonable procedures to protect the confidentiality, security, and integrity of Personal Information collected from children under 13, in violation of Section 312.8 of COPPA, 16 C.F.R. § 312.8.

757.    Violations of COPPA and the accompanying FTC regulations "shall be treated as a violation of a rule defining an unfair … act or practice prescribed under 15 U.S.C. § 57a(a)(1)(B)." 15 U.S.C. § 6502(c).  These rules define unfair acts or practices in or affecting commerce within the meaning

of 15 U.S.C. § 45(a)(1), which is the model for the various consumer protection statutes in the several states, including the Mich. Comp. Laws. Ann. § 445.903, *et seq.*.[189]

758.    Accordingly, Defendants each individually engaged in unfair and unlawful trade acts or practices in violation of Mich. Comp. Laws. Ann. § 445.903, *et seq.*, which is modeled after, proscribes the same conduct as, and gives deference to the definitions of the FTC Act.

759.    Defendants' conduct is unfair, immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers, and there are no greater countervailing benefits to consumers or competition.  Further, G.W. and members of the Michigan class could not have reasonably avoided injury because Defendants each took advantage of the lack of knowledge, ability, experience, and/or capacity of consumers—in this case children under 13—to their detriment.

760.    Defendants willfully engaged in the unfair and unlawful acts described herein and knew or recklessly disregarded the fact that they violated Mich. Comp. Laws. Ann. § 445.903, *et seq*.

761.    G.W. and members of the Michigan class were harmed by Defendants' practices described herein, which were a substantial factor and caused injury in fact and actual damages to G.W. and members of the Michigan class.

762.    As a direct and proximate result of Defendants' unfair and unlawful acts and practices in violation of Mich. Comp. Laws. Ann. § 445.903, *et seq.*, G.W. and members of the Michigan class have suffered and will continue to suffer an ascertainable loss of money or property, real or personal, and monetary and non-monetary damages, as described herein, including, inter alia, the loss of the value and/or diminishment in value of their Personal Information and the loss of the ability to control the use of their Personal Information.

763.    As outlined herein, there is tangible value in G.W. and members of the Michigan class's Personal Information. G.W. and members of the Michigan class have lost the opportunity to receive value in exchange for their Personal Information.

---

[189] *See* 16 C.F.R. § 312.1 (COPPA "prohibits unfair or deceptive acts or practices in connection with the collection, use, and/or disclosure or personal information from and about children on the internet.").

764.    Defendants' monetization of G.W. and members of the Michigan class's Personal Information demonstrates that there is a market for their Personal Information.

765.    G.W. and members of the Michigan class's Personal Information is now in the possession of Defendants, who have used and will use it for their financial gain.

766.    Defendants' retention of G.W. and members of the Michigan class's Personal Information presents a continuing risk to them as well as the general public. G.W. and members of the Michigan class seek relief for the injuries they have suffered as a result of Defendants' unfair and unlawful acts and practices, as provided by Mich. Comp. Laws. Ann. § 445.903, *et seq*. and applicable law, including all actual damages and attorneys' fees and costs, treble damages, statutory damages, and restitution, as well as an injunction requiring Defendants to each permanently delete, destroy or otherwise sequester the Personal Information collected without parental consent, requiring Defendants to provide a complete audit and accounting of the uses of the Personal Information by Defendants and any other third parties, and other appropriate injunctive and/or declaratory relief.

## Claim 20
### MICHIGAN UNJUST ENRICHMENT
**(Against All Defendants on behalf of Plaintiff G.W. and the Michigan Class)**

767.    Plaintiff G.W. and members of the Michigan class re-allege the foregoing allegations as if fully set forth herein.

768.    By virtue of the unlawful and unfair conduct alleged herein, Defendants have each realized millions of dollars in revenue from their collection and use of the Personal Information of G.W. and Michigan class members through behavioral advertising and commercialization purposes derived from that Personal Information.

769.    Defendants' ill-gotten gains were monetary benefits conferred upon Defendants by G.W. and members of the Michigan class. It would be inequitable and unjust to permit any of the Defendants to retain the economic benefits they have obtained through advertising and commercialization derived from the Personal Information of G.W. and members of the Michigan class.

770.    Defendants are each independently liable because they each profited from the conduct alleged.

771.     Defendants will each be unjustly enriched if they are permitted to retain the economic benefits conferred upon them by G.W. and members of the Michigan class through Defendants' unlawful, unfair, unauthorized, and impermissible use of the Personal Information of G.W. and members of the Michigan class, and allowing Defendants to retain the profits from their unlawful, unfair, unauthorized, and impermissible use of the Personal Information of G.W. and members of the Michigan class would be unjust and contrary to public policy.

772.     G.W. and members of the Michigan class are therefore entitled to recover the amounts realized by each of the Defendants at the expense of G.W. and members of the Michigan class.

773.     G.W. and members of the Michigan class do not seek recovery in this claim for their own economic harm and have no adequate remedy at law that would divest Defendants of their ill-gotten and unjust profits.   Moreover, even if money damages might otherwise provide an adequate remedy at law for this claim, there is at a minimum substantial doubt that any remedy at law is available, as the Court has ruled that the claims at law asserted by G.W. and members of the Michigan class in their Fifth Amended Complaint do not satisfy the requisite elements for relief.  G.W. and members of the Michigan class dispute the Court's holding and further believe that their claims at law as asserted in this Sixth Amended Complaint are legally and factually sufficient.  However, to the extent that money damages, if available, would constitute an adequate remedy at law barring recovery under this claim, G.W. and members of the Michigan class assert their claim for non-restitutionary disgorgement as an alternative remedy pending a final determination of the availability of a remedy at law.

774.     G.W. and members of the Michigan class are entitled to non-restitutionary disgorgement of each Defendant's ill-gotten gains, and/or the imposition of a constructive trust to recover the amount of each Defendant's ill-gotten gains.

## XI.     Mississippi Claims

### Claim 21
**MISSISSIPPI CONSUMER PROTECTION ACT**,
**Miss. Code. Ann. § 75-24-5, *et seq*.**
**(Against All Defendants on behalf of Plaintiff A.A. and the Mississippi Class)**

775.     Plaintiff A.A. and members of the Mississippi class incorporate the foregoing allegations as if fully set forth herein.

776.    A.A. and members of the Mississippi class are or were residents of Mississippi and/or viewed child-directed content in Mississippi hosted by Defendant Google on YouTube and created by each of the Channel Owner Defendants.

777.    Miss. Code. Ann. § 75-24-5(1) provides "[u]nfair methods of competition affecting commerce and unfair … trade practices in or affecting commerce are prohibited."

778.    At all times mentioned herein, Defendants each engaged in "trade" or "commerce" in Mississippi in that they engaged in the advertising, offering for sale, sale, and distribution of property or any other articles, commodities, or things of value in Mississippi.

779.    Defendants each violated Miss. Code. Ann. § 75-24-5 by engaging in the unfair acts or practices proscribed by Miss. Code. Ann. § 75-24-5 outlined herein.

780.    Defendants each engaged in consumer-oriented acts through the offering, promoting, and/or distributing of YouTube and child-directed content hosted thereon, which significantly impacted the public because YouTube is used nationwide, including in Mississippi, and there are millions of users, including A.A. and members of the Mississippi class.

781.    Defendants at all relevant times knowingly violated legal duties and public policy by unfairly and unlawfully collecting the Personal Information of children under 13 and tracking, profiling, and targeting those children with behavioral advertising for Defendants' commercial financial gain.

782.    As outlined herein, Defendants each at all times had actual knowledge of their own non-compliance with COPPA and other applicable privacy-related laws. Further, Defendants each at all times had actual knowledge of their own collection—via the election of each of the Channel Owner Defendants to serve behavioral advertising rather than contextual advertising to their viewers—of the Personal Information from A.A. and members of the Mississippi class created by the Channel Owner Defendants on YouTube, and the tracking, profiling, and targeting of those children for lucrative behavioral advertising.

783.    As outlined herein, Google intentionally designed YouTube to, among other things, attract children under 13 by making child-directed content available to them so that Google could collect the Personal Information of those children under 13 and serve them with lucrative, intrusive, behavioral advertising for substantial commercial gain.

784.    The inherent characteristics, content, and features of YouTube as designed by Google, including the names, designs, cartoon elements, children's themes, and children's songs, evince that YouTube hosted child-directed content. That is, YouTube was plainly intended for and meant to attract children under 13, collect the Personal Information of those children, and serve those children behavioral advertising for substantial commercial gain.

785.    As outlined herein, each of the Channel Owner Defendants knowingly and intentionally created child-directed video content and made that child-directed content available on YouTube with the specific purpose of attracting child viewers under 13 to their respective YouTube channels.

786.    The inherent characteristics, content, and features of each of the Channel Owner Defendants' YouTube channels and the content hosted thereon, including the names, designs, cartoon elements, children's themes, and children's songs, evince that the Channel Owner Defendants' content posted to and made available on YouTube was child-directed content.

787.    That is, each of the Channel Owner Defendants' YouTube channels and the child-directed content the Channel Owner Defendants uploaded to, hosted on, and made viewable on their YouTube channels was plainly intended for and meant to attract children under 13 for the purpose of collecting the Personal Information of those children to serve those children behavioral advertising for substantial commercial gain.

788.    Along with Google, each of the Channel Owner Defendants is individually considered by the FTC to be "operators" as defined under COPPA and FTC regulations.

789.    Each of the Channel Owner Defendants collected—including directing Google to collect— Personal Information from children under 13 through YouTube channels created, hosted, and maintained by the Channel Owner Defendants, which were directed to children under 13.

790.    In particular, Defendants each and in concert, through aid or assistance, or pursuant to a common purpose with the knowledge of the others, systematically collected, used, and/or disclosed Personal Information from children under 13 in violation of COPPA, and therefore the FTC Act, to serve them targeted, behavioral advertising by inter alia:

    a.    Failing to provide sufficient notice of the information Defendants collected, or the information that was collected on Defendants' behalf, online from children under

13, how Defendants used such information, their disclosure practices, and all other required content, in violation of Section 312.4(d) of COPPA, 16 C.F.R. § 312.4(d);

b.   Failing to provide direct notice to parents of the information Defendants collected, or the information that was collected on Defendants' behalf, online from children under 13, how Defendants used such information, their disclosure practices, and all other required content, in violation of Section 312.4(b) and (c) of COPPA, 16 C.F.R. § 312.4(b)-(c);\

c.   Failing to obtain verifiable parental consent before any collection or use of Personal Information from children under 13, in violation of Section 312.5 of COPPA, 16 C.F.R. § 312.5; and

d.   Failing to establish and maintain reasonable procedures to protect the confidentiality, security, and integrity of Personal Information collected from children under 13, in violation of Section 312.8 of COPPA, 16 C.F.R. § 312.8.

791.   Violations of COPPA and the accompanying FTC regulations "shall be treated as a violation of a rule defining an unfair … act or practice prescribed under 15 U.S.C. § 57a(a)(1)(B)." 15 U.S.C. § 6502(c).  These rules define unfair acts or practices in or affecting commerce within the meaning of 15 U.S.C. § 45(a)(1), which is the model for the various consumer protection statutes in the several states, including the Miss. Code. Ann. § 75-24-5, *et seq.***[190]**

792.   Accordingly, Defendants each individually engaged in unfair and unlawful trade acts or practices in violation of Miss. Code. Ann. § 75-24-5, *et seq.*, which is modeled after, proscribes the same conduct as, and gives deference to the definitions of the FTC Act.

793.   Defendants' conduct is unfair, immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers, and there are no greater countervailing benefits to consumers or competition.  Further, A.A. and members of the Mississippi class could not have reasonably avoided

---

[190] *See* 16 C.F.R. § 312.1 (COPPA "prohibits unfair or deceptive acts or practices in connection with the collection, use, and/or disclosure or personal information from and about children on the internet.").

injury because Defendants each took advantage of the lack of knowledge, ability, experience, and/or capacity of consumers—in this case children under 13—to their detriment.

794.    Defendants willfully engaged in the unfair and unlawful acts described herein and knew or recklessly disregarded the fact that they violated Miss. Code. Ann. § 75-24-5, *et seq*.

795.    A.A. and members of the Mississippi class were harmed by Defendants' practices described herein, which were a substantial factor and caused injury in fact and actual damages to A.A. and members of the Mississippi class.

796.    As a direct and proximate result of Defendants' unfair and unlawful acts and practices in violation of Miss. Code. Ann. § 75-24-5, et seq., A.A. and members of the Mississippi class have suffered and will continue to suffer an ascertainable loss of money or property, real or personal, and monetary and non-monetary damages, as described herein, including, inter alia, the loss of the value and/or diminishment in value of their Personal Information and the loss of the ability to control the use of their Personal Information.

797.    As outlined herein, there is tangible value in A.A. and members of the Mississippi class's Personal Information. A.A. and members of the Mississippi class have lost the opportunity to receive value in exchange for their Personal Information.

798.    Defendants' monetization of A.A. and members of the Mississippi class's Personal Information demonstrates that there is a market for their Personal Information.

799.    A.A. and members of the Mississippi class's Personal Information is now in the possession of Defendants, who have used and will use it for their financial gain.

800.    Defendants' retention of A.A. and members of the Mississippi class's Personal Information presents a continuing risk to them as well as the general public. A.A. and members of the Mississippi class seek relief for the injuries they have suffered as a result of Defendants' unfair and unlawful acts and practices, as provided by Miss. Code. Ann. § 75-24-5, *et seq*. and applicable law, including all actual damages and attorneys' fees and costs, treble damages, statutory damages, and restitution, as well as an injunction requiring Defendants to each permanently delete, destroy or otherwise sequester the Personal Information collected without parental consent, requiring Defendants to provide a

SIXTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

complete audit and accounting of the uses of the Personal Information by Defendants and any other third parties, and other appropriate injunctive and/or declaratory relief.

### Claim 22
### MISSISSIPPI UNJUST ENRICHMENT
**(Against All Defendants on behalf of Plaintiff A.A. and the Mississippi Class)**

801.    Plaintiff A.A., and members of the Mississippi class re-allege the foregoing allegations as if fully set forth herein.

802.    By virtue of the unlawful and unfair conduct alleged herein, Defendants have each realized millions of dollars in revenue from their collection and use of the Personal Information of G.W. and members of the Michigan class through behavioral advertising and commercialization purposes derived from that Personal Information.

803.    Defendants' ill-gotten gains were monetary benefits conferred upon Defendants by G.W. and members of the Michigan class.  It would be inequitable and unjust to permit any of the Defendants to retain the economic benefits they have obtained through advertising and commercialization derived from the Personal Information of G.W. and members of the Michigan class.

804.    Defendants are each independently liable because they each profited from the conduct alleged.

805.    Defendants will each be unjustly enriched if they are permitted to retain the economic benefits conferred upon them by G.W. and members of the Michigan class through Defendants' unlawful, unfair, unauthorized, and impermissible use of the Personal Information of G.W. and members of the Michigan class, and allowing Defendants to retain the profits from their unlawful, unfair, unauthorized, and impermissible use of the Personal Information of G.W. and members of the Michigan class would be unjust and contrary to public policy.

806.    G.W. and members of the Michigan class are therefore entitled to recover the amounts realized by each of the Defendants at the expense of G.W. and members of the Michigan class.

807.    G.W. and members of the Michigan class do not seek recovery in this claim for their own economic harm and have no adequate remedy at law that would divest Defendants of their ill-gotten and unjust profits.   Moreover, even if money damages might otherwise provide an adequate remedy at law

for this claim, there is at a minimum substantial doubt that any remedy at law is available, as the Court has ruled that the claims at law asserted G.W. and members of the Michigan class in their Fifth Amended Complaint do not satisfy the requisite elements for relief.  G.W. and members of the Michigan class dispute the Court's holding and further believe that their claims at law as asserted in this Sixth Amended Complaint are legally and factually sufficient.  However, to the extent that money damages, if available, would constitute an adequate remedy at law barring recovery under this claim, G.W. and members of the Michigan class assert their claim for non-restitutionary disgorgement as an alternative remedy pending a final determination of the availability of a remedy at law.

808.    G.W. and members of the Michigan class are entitled to non-restitutionary disgorgement of each Defendant's ill-gotten gains, and/or the imposition of a constructive trust to recover the amount of each Defendant's ill-gotten gains.

**XII.    Missouri Claims**

**Claim 23**
**MISSOURI INTRUSION UPON SECLUSION**
**(Against All Defendants on behalf of J.C., E.M., and the Missouri Class)**

809.    Plaintiffs J.C., E.M., and members of the Missouri class re-allege the foregoing allegations as if fully set forth herein.

810.    Plaintiffs J.C., E.M., and members of the Missouri class's private affairs, concerns, and seclusion includes their interest in their Personal Information as defined by COPPA, which includes data points concerning their location and online activity while using internet-connected devices.

811.    Defendants each and in concert, through aid or assistance, or pursuant to a common purpose with the knowledge of the others, intentionally intruded upon the private affairs, concerns, and seclusion of J.C., E.M., and members of the Missouri class  by improperly accessing J.C., E.M., and members of the Missouri class's  Personal Information and using it for improper purposes, including by targeting J.C., E.M., and members of the Missouri class with behavioral advertising that would be highly offensive to a reasonable person, constituting an egregious breach of social norms and/or enabling the targeting of J.C., E.M., and members of the Missouri class with such advertisements, as detailed herein.

812.    Defendants' intrusions upon the private affairs, concerns, and seclusion of J.C., E.M., and members of the Missouri class were substantial, and would be highly offensive to a reasonable person, constituting an egregious breach of social norms, as is evidenced by countless consumer surveys, studies, and op-eds decrying the online tracking of children, centuries of common law, state and federal statutes and regulations including COPPA and FTC regulations, legislative commentaries, enforcement actions undertaken by the FTC, industry standards and guidelines, scholarly literature on consumers' reasonable expectations., the fines imposed on Google by the FTC and the NY AG, as well as the reforms required by the Order & Injunction entered into by Google.

813.    As children aged 13 or younger, J.C., E.M., and members of the Missouri class lacked the ability to form expectations about reasonable privacy or to consent to Defendants' actions.

814.    Neither J.C., E.M., members of the Missouri class, nor their parents and/or guardians consented to Defendants' intrusions upon their private affairs, concerns, and seclusions.

815.    J.C., E.M., and members of the Missouri class suffered actual and concrete injury as a result of Defendants' intrusions upon J.C., E.M., and members of the Missouri class's private affairs, concerns, and seclusion.

816.    J.C., E.M., and members of the Missouri class seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate them for the harm to their privacy interests, risk of future invasions of privacy, and the mental and emotional distress caused by Defendants' invasions of privacy, as well as disgorgement of profits made by Defendants as a result of their intrusions upon J.C., E.M., and members of the Missouri class's private affairs, concerns, and seclusion.

### Claim 24
### MISSOURI MERCHANDISING PRACTICES ACT,
#### Mo. Ann. Stat.§ 407.020, *et seq.*
### (Against All Defendants on behalf of Plaintiffs J.C., E.M., and the Missouri Class)

817.    Plaintiffs J.C., E.M., and members of the Missouri class incorporate the foregoing allegations as if fully set forth herein.

818.    J.C., E.M., and members of the Missouri class are or were residents of Missouri and/or viewed child-directed content in Missouri hosted by Defendant Google on YouTube and created by each of the Channel Owner Defendants.

819.    Mo. Ann. Stat. § 407.020 1 provides "[t]he act, use or employment by any person of any … unfair practice … in connection with the sale or advertisement of any merchandise in trade or commerce or the solicitation of any funds for any charitable purpose, as defined in section 407.453, in or from the state of Missouri, is declared to be an unlawful practice."

820.    At all times mentioned herein, Defendants each engaged in "trade" or "commerce" in Missouri in that they engaged in the advertising, offering for sale, sale, and distribution of property or any other articles, commodities, or things of value in Missouri.

821.    Defendants violated Mo. Ann. Stat. § 407.020 by engaging in the unfair acts or practices proscribed by Mo. Ann. Stat. § 407.020 outlined herein.

822.    Defendants each engaged in consumer-oriented acts through the offering, promoting, and/or distributing of YouTube and child-directed content hosted thereon, which significantly impacted the public because YouTube is used nationwide, including in Missouri, and there are millions of users, including J.C., E.M., and members of the Missouri class.

823.    Defendants at all relevant times knowingly violated legal duties and public policy by unfairly and unlawfully collecting the Personal Information of children under 13 and tracking, profiling, and targeting those children with behavioral advertising for Defendants' commercial financial gain.

824.    As outlined herein, Defendants each at all times had actual knowledge of their own non-compliance with COPPA and other applicable privacy-related laws. Further, Defendants each at all times had actual knowledge of their own collection—via the election of each of the Channel Owner Defendants to serve behavioral advertising rather than contextual advertising to their viewers—of the Personal Information from J.C., E.M., and members of the Missouri class created by the Channel Owner Defendants on YouTube, and the tracking, profiling, and targeting of those children for lucrative behavioral advertising.

825.    As outlined herein, Google intentionally designed YouTube to, among other things, attract children under 13 by making child-directed content available to them so that Google could collect the Personal Information of those children under 13 and serve them with lucrative, intrusive, behavioral advertising for substantial commercial gain.

826.     The inherent characteristics, content, and features of YouTube as designed by Google, including the names, designs, cartoon elements, children's themes, and children's songs, evince that YouTube hosted child-directed content. That is, YouTube was plainly intended for and meant to attract children under 13, collect the Personal Information of those children, and serve those children behavioral advertising for substantial commercial gain.

827.     As outlined herein, each of the Channel Owner Defendants knowingly and intentionally created child-directed video content and made that child-directed content available on YouTube with the specific purpose of attracting child viewers under 13 to their respective YouTube channels.

828.     The inherent characteristics, content, and features of each of the Channel Owner Defendants' YouTube channels and the content hosted thereon, including the names, designs, cartoon elements, children's themes, and children's songs, evince that the Channel Owner Defendants' content posted to and made available on YouTube was child-directed content.

829.     That is, each of the Channel Owner Defendants YouTube channels and the child-directed content the Channel Owner Defendants uploaded to, hosted on, and made viewable on their YouTube channels was plainly intended for and meant to attract children under 13 for the purpose of collecting the Personal Information of those children to serve those children behavioral advertising for substantial commercial gain.

830.     Along with Google, each of the Channel Owner Defendants is individually considered by the FTC to be "operators" as defined under COPPA and FTC regulations.

831.     Each of the Channel Owner Defendants collected—including directing Google to collect— Personal Information from children under 13 through YouTube channels created, hosted, and maintained by the Channel Owner Defendants, which were directed to children under 13.

832.     In particular, Defendants each and in concert, through aid or assistance, or pursuant to a common purpose with the knowledge of the others, systematically collected, used, and/or disclosed Personal Information from children under 13 in violation of COPPA, and therefore the FTC Act, to serve them targeted, behavioral advertising by inter alia:

      a.     Failing to provide sufficient notice of the information Defendants collected, or the information that was collected on Defendants' behalf, online from children under

13, how Defendants used such information, their disclosure practices, and all other required content, in violation of Section 312.4(d) of COPPA, 16 C.F.R. § 312.4(d);

b.   Failing to provide direct notice to parents of the information Defendants collected, or the information that was collected on Defendants' behalf, online from children under 13, how Defendants used such information, their disclosure practices, and all other required content, in violation of Section 312.4(b) and (c) of COPPA, 16 C.F.R. § 312.4(b)-(c);

c.   Failing to obtain verifiable parental consent before any collection or use of Personal Information from children under 13, in violation of Section 312.5 of COPPA, 16 C.F.R. § 312.5; and

d.   Failing to establish and maintain reasonable procedures to protect the confidentiality, security, and integrity of Personal Information collected from children under 13, in violation of Section 312.8 of COPPA, 16 C.F.R. § 312.8.

833.   Violations of COPPA and the accompanying FTC regulations "shall be treated as a violation of a rule defining an unfair … act or practice prescribed under 15 U.S.C. § 57a(a)(1)(B)." 15 U.S.C. § 6502(c).  These rules define unfair acts or practices in or affecting commerce within the meaning of 15 U.S.C. § 45(a)(1), which is the model for the various consumer protection statutes in the several states, including the Mo. Ann. Stat.§ 407.020, *et seq.* [191]

834.   Accordingly, Defendants each individually engaged in unfair and unlawful trade acts or practices in violation of Mo. Ann. Stat.§ 407.020, et seq., which is modeled after, proscribes the same conduct as, and gives deference to the definitions of the FTC Act.

835.   Defendants' conduct is unfair, immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers, and there are no greater countervailing benefits to consumers or competition.  Further, J.C., E.M., and members of the Missouri class could not have reasonably avoided

---

[191] *See* 16 C.F.R. § 312.1 (COPPA "prohibits unfair or deceptive acts or practices in connection with the collection, use, and/or disclosure or personal information from and about children on the internet.").

injury because Defendants each took advantage of the lack of knowledge, ability, experience, and/or capacity of consumers—in this case children under 13—to their detriment.

836.    Defendants willfully engaged in the unfair and unlawful acts described herein and knew or recklessly disregarded the fact that they violated Mo. Ann. Stat.§ 407.020, et seq.

837.    J.C., E.M., and members of the Missouri class were harmed by Defendants' practices described herein, which were a substantial factor and caused injury in fact and actual damages to J.C., E.M., and members of the Missouri class.

838.    As a direct and proximate result of Defendants' unfair and unlawful acts and practices in violation of Mo. Ann. Stat.§ 407.020, et seq., J.C., E.M., and members of the Missouri class have suffered and will continue to suffer an ascertainable loss of money or property, real or personal, and monetary and non-monetary damages, as described herein, including, inter alia, the loss of the value and/or diminishment in value of their Personal Information and the loss of the ability to control the use of their Personal Information.

839.    As outlined herein, there is tangible value in J.C., E.M., and members of the Missouri class's Personal Information. J.C., E.M., and members of the Missouri class have lost the opportunity to receive value in exchange for their Personal Information.

840.    Defendants' monetization of J.C., E.M., and members of the Missouri class's Personal Information demonstrates that there is a market for their Personal Information.

841.    J.C., E.M., and members of the Missouri class's Personal Information is now in the possession of Defendants, who have used and will use it for their financial gain.

842.    Defendants' retention of J.C., E.M., and members of the Missouri class's Personal Information presents a continuing risk to them as well as the general public. J.C., E.M., and members of the Missouri class seek relief for the injuries they have suffered as a result of Defendants' unfair and unlawful acts and practices, as provided by Mo. Ann. Stat.§ 407.020, *et seq*. and applicable law, including all actual damages and attorneys' fees and costs, treble damages, statutory damages, and restitution, as well as an injunction requiring Defendants to each permanently delete, destroy or otherwise sequester the Personal Information collected without parental consent, requiring Defendants to provide a complete

audit and accounting of the uses of the Personal Information by Defendants and any other third parties, and other appropriate injunctive and/or declaratory relief.

### Claim 25
### MISSOURI UNJUST ENRICHMENT
**(Against All Defendants on behalf of Plaintiffs J.C., E.M., and the Missouri Class)**

843.    Plaintiffs J.C., E.M., and members of the Missouri class re-allege the foregoing allegations as if fully set forth herein.

844.    By virtue of the unlawful and unfair conduct alleged herein, Defendants have each realized millions of dollars in revenue from their collection and use of the Personal Information of J.C., E.M., and members of the Missouri class through behavioral advertising and commercialization purposes derived from that Personal Information.

845.    Defendants' ill-gotten gains were monetary benefits conferred upon Defendants by J.C., E.M., and members of the Missouri class.  It would be inequitable and unjust to permit any of the Defendants to retain the economic benefits they have obtained through advertising and commercialization derived from the Personal Information of J.C., E.M., and members of the Missouri class.

846.    Defendants are each independently liable because they each profited from the conduct alleged.

847.    Defendants will each be unjustly enriched if they are permitted to retain the economic benefits conferred upon them by J.C., E.M., and members of the Missouri class through Defendants' unlawful, unfair, unauthorized, and impermissible use of the Personal Information of J.C., E.M., and members of the Missouri class, and allowing Defendants to retain the profits from their unlawful, unfair, unauthorized, and impermissible use of the Personal Information of J.C., E.M., and members of the Missouri class would be unjust and contrary to public policy.

848.    J.C., E.M., and members of the Missouri class are therefore entitled to recover the amounts realized by each of the Defendants at the expense of J.C., E.M., and members of the Missouri class.

849.    J.C., E.M., and members of the Missouri class do not seek recovery in this claim for their own economic harm and have no adequate remedy at law that would divest Defendants of their ill-gotten and unjust profits.   Moreover, even if money damages might otherwise provide an adequate remedy at

law for this claim, there is at a minimum substantial doubt that any remedy at law is available, as the Court has ruled that the claims at law asserted by J.C., E.M., and members of the Missouri class in their Fifth Amended Complaint do not satisfy the requisite elements for relief.  J.C., E.M., and members of the Missouri class dispute the Court's holding and further believe that their claims at law as asserted in this Sixth Amended Complaint are legally and factually sufficient.  However, to the extent that money damages, if available, would constitute an adequate remedy at law barring recovery under this claim, J.C., E.M., and members of the Missouri class assert their claim for non-restitutionary disgorgement as an alternative remedy pending a final determination of the availability of a remedy at law.

850.    J.C., E.M., and members of the Missouri class are entitled to non-restitutionary disgorgement of each Defendant's ill-gotten gains, and/or the imposition of a constructive trust to recover the amount of each Defendant's ill-gotten gains.

**XIII.   New Hampshire Claims**

**Claim 26**
**NEW HAMPSHIRE INTRUSION UPON SECLUSION**
**(Against All Defendants on behalf of Plaintiffs L.D., D.D., A.D., and the New Hampshire Class)**

851.    Plaintiffs L.D., D.D., A.D., and members of the New Hampshire class re-allege the foregoing allegations as if fully set forth herein.

852.    L.D.'s, D.D.'s, A.D.'s, and members of the New Hampshire class's private affairs, concerns, and seclusion includes their interest in their Personal Information as defined by COPPA, which includes data points concerning their location and online activity while using internet-connected devices.

853.    Defendants each and in concert, through aid or assistance, or pursuant to a common purpose with the knowledge of the others, intentionally intruded upon the private affairs, concerns, and seclusion of L.D., D.D., A.D., and members of the New Hampshire class by improperly accessing L.D., D.D., A.D., and members of the New Hampshire class's Personal Information and using it for improper purposes, including by targeting L.D., D.D., A.D., and members of the New Hampshire class with behavioral advertising that would be highly offensive to a reasonable person, constituting an egregious breach of social norms and/or enabling the targeting of L.D., D.D., A.D., and members of the New Hampshire class with such advertisements, as detailed herein.

854.    Defendants' intrusions upon the private affairs, concerns, and seclusion of L.D., D.D., A.D., and members of the New Hampshire class were substantial, and would be highly offensive to a reasonable person, constituting an egregious breach of social norms, as is evidenced by countless consumer surveys, studies, and op-eds decrying the online tracking of children, centuries of common law, state and federal statutes and regulations including COPPA and FTC regulations, legislative commentaries, enforcement actions undertaken by the FTC, industry standards and guidelines, scholarly literature on consumers' reasonable expectations., the fines imposed on Google by the FTC and the NY AG, as well as the reforms required by the Order & Injunction entered into by Google.

855.    As children aged 13 or younger, L.D., D.D., A.D., and members of the New Hampshire class lacked the ability to form expectations about reasonable privacy or to consent to Defendants' actions.

856.    Neither L.D., D.D., A.D., members of the New Hampshire class, nor their parents and/or guardians consented to Defendants' intrusions upon their private affairs, concerns, and seclusions.

857.    L.D., D.D., A.D., and members of the New Hampshire class suffered actual and concrete injury as a result of Defendants' intrusions upon L.D., D.D., A.D., and members of the New Hampshire class's private affairs, concerns, and seclusion.

858.    L.D., D.D., A.D., and members of the New Hampshire Class seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate them for the harm to their privacy interests, risk of future invasions of privacy, and the mental and emotional distress caused by Defendants' invasions of privacy, as well as disgorgement of profits made by Defendants as a result of their intrusions upon L.D., D.D., A.D., and members of the New Hampshire class's private affairs, concerns, and seclusion.

### Claim 27
### NEW HAMPSHIRE CONSUMER PROTECTION ACT,
### N.H. Rev. Stat. Ann. § 358-A:2, *et seq*.
### (Against All Defendants on behalf of Plaintiffs L.D., D.D., A.D., and the New Hampshire Class)

859.    Plaintiffs L.D., D.D., A.D., and members of the New Hampshire class incorporate the foregoing allegations as if fully set forth herein.

860. L.D., D.D., A.D., and members of the New Hampshire class are or were residents of New Hampshire and/or viewed child-directed content in New Hampshire hosted by Defendant Google on YouTube and created by each of the Channel Owner Defendants.

861. N.H. Rev. Stat. Ann. § 358-A:2 provides "[i]t shall be unlawful for any person to use any unfair method of competition or any unfair … act or practice in the conduct of any trade or commerce within this state."

862. At all times mentioned herein, Defendants each engaged in "trade" or "commerce" in New Hampshire in that they engaged in the advertising, offering for sale, sale, and distribution of property or any other articles, commodities, or things of value in New Hampshire.

863. Defendants violated N.H. Rev. Stat. Ann. § 358-A:2 by engaging in the unfair acts or practices proscribed by N.H. Rev. Stat. Ann. § 358-A:2 outlined herein.

864. Defendants each engaged in consumer-oriented acts through the offering, promoting, and/or distributing of YouTube and child-directed content hosted thereon, which significantly impacted the public because YouTube is used nationwide, including in New Hampshire, and there are millions of users, including L.D., D.D., A.D., and members of the New Hampshire class.

865. Defendants at all relevant times knowingly violated legal duties and public policy by unfairly and unlawfully collecting the Personal Information of children under 13 and tracking, profiling, and targeting those children with behavioral advertising for Defendants' commercial financial gain.

866. As outlined herein, Defendants each at all times had actual knowledge of their own non-compliance with COPPA and other applicable privacy-related laws. Further, Defendants each at all times had actual knowledge of their own collection—via the election of each of the Channel Owner Defendants to serve behavioral advertising rather than contextual advertising to their viewers—of the Personal Information from L.D., D.D., A.D., and members of the New Hampshire class created by the Channel Owner Defendants on YouTube, and the tracking, profiling, and targeting of those children for lucrative behavioral advertising.

867. As outlined herein, Google intentionally designed YouTube to, among other things, attract children under 13 by making child-directed content available to them so that Google could collect the

Personal Information of those children under 13 and serve them with lucrative, intrusive, behavioral advertising for substantial commercial gain.

868.    The inherent characteristics, content, and features of YouTube as designed by Google, including the names, designs, cartoon elements, children's themes, and children's songs, evince that YouTube hosted child-directed content. That is, YouTube was plainly intended for and meant to attract children under 13, collect the Personal Information of those children, and serve those children behavioral advertising for substantial commercial gain.

869.    As outlined herein, each of the Channel Owner Defendants knowingly and intentionally created child-directed video content and made that child-directed content available on YouTube with the specific purpose of attracting child viewers under 13 to their respective YouTube channels.

870.    The inherent characteristics, content, and features of each of the Channel Owner Defendants' YouTube channels and the content hosted thereon, including the names, designs, cartoon elements, children's themes, and children's songs, evince that the Channel Owner Defendants' content posted to and made available on YouTube was child-directed content.

871.    That is, each of the Channel Owner Defendants' YouTube channels and the child-directed content the Channel Owner Defendants uploaded to, hosted on, and made viewable on their YouTube channels was plainly intended for and meant to attract children under 13 for the purpose of collecting the Personal Information of those children to serve those children behavioral advertising for substantial commercial gain.

872.    Along with Google, each of the Channel Owner Defendants is individually considered by the FTC to be "operators" as defined under COPPA and FTC regulations.

873.    Each of the Channel Owner Defendants collected—including directing Google to collect— Personal Information from children under 13 through YouTube channels created, hosted, and maintained by each of the Channel Owner Defendants, which were directed to children under 13.

874.    In particular, Defendants each and in concert, through aid or assistance, or pursuant to a common purpose with the knowledge of the others, systematically collected, used, and/or disclosed Personal Information from children under 13 in violation of COPPA, and therefore the FTC Act, to serve them targeted, behavioral advertising by inter alia:

a.   Failing to provide sufficient notice of the information Defendants collected, or the information that was collected on Defendants' behalf, online from children under 13, how Defendants used such information, their disclosure practices, and all other required content, in violation of Section 312.4(d) of COPPA, 16 C.F.R. § 312.4(d);

b.   Failing to provide direct notice to parents of the information Defendants collected, or the information that was collected on Defendants' behalf, online from children under 13, how Defendants used such information, their disclosure practices, and all other required content, in violation of Section 312.4(b) and (c) of COPPA, 16 C.F.R. § 312.4(b)-(c);

c.   Failing to obtain verifiable parental consent before any collection or use of Personal Information from children under 13, in violation of Section 312.5 of COPPA, 16 C.F.R. § 312.5; and

d.   Failing to establish and maintain reasonable procedures to protect the confidentiality, security, and integrity of Personal Information collected from children under 13, in violation of Section 312.8 of COPPA, 16 C.F.R. § 312.8.

875.   Violations of COPPA and the accompanying FTC regulations "shall be treated as a violation of a rule defining an unfair … act or practice prescribed under 15 U.S.C. § 57a(a)(1)(B)." 15 U.S.C. § 6502(c).  These rules define unfair acts or practices in or affecting commerce within the meaning of 15 U.S.C. § 45(a)(1), which is the model for the various consumer protection statutes in the several states, including the N.H. Rev. Stat. Ann. § 358-A:2, et seq.[192]

876.   Accordingly, Defendants each individually engaged in unfair and unlawful trade acts or practices in violation of N.H. Rev. Stat. Ann. § 358-A:2, et seq., which is modeled after, proscribes the same conduct as, and gives deference to the definitions of the FTC Act.

877.   Defendants' conduct is unfair, immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers, and there are no greater countervailing benefits to consumers or

---

[192] *See* 16 C.F.R. § 312.1 (COPPA "prohibits unfair or deceptive acts or practices in connection with the collection, use, and/or disclosure or personal information from and about children on the internet.").

competition.  Further, L.D., D.D., A.D., and members of the New Hampshire class could not have reasonably avoided injury because Defendants each took advantage of the lack of knowledge, ability, experience, and/or capacity of consumers—in this case children under 13—to their detriment..

878.    As a direct and proximate result of Defendants' unfair and unlawful acts and practices in violation of N.H. Rev. Stat. Ann. § 358-A:2, et seq., L.D., D.D., A.D., and members of the New Hampshire class have suffered and will continue to suffer an ascertainable loss of money or property, real or personal, and monetary and non-monetary damages, as described herein, including, inter alia, the loss of the value and/or diminishment in value of their Personal Information and the loss of the ability to control the use of their Personal Information.

879.    As outlined herein, there is tangible value in L.D., D.D., A.D., and members of the New Hampshire class's Personal Information. L.D., D.D., A.D., and members of the New Hampshire class have lost the opportunity to receive value in exchange for their Personal Information.

880.    Defendants' monetization of L.D., D.D., A.D., and members of the New Hampshire class's Personal Information demonstrates that there is a market for their Personal Information.

881.    L.D., D.D., A.D., and members of the New Hampshire class's Personal Information is now in the possession of Defendants, who have used and will use it for their financial gain.

882.    Defendants' retention of L.D., D.D., A.D., and members of the New Hampshire class's Personal Information presents a continuing risk to them as well as the general public. L.D., D.D., A.D., and members of the New Hampshire class seek relief for the injuries they have suffered as a result of Defendants' unfair and unlawful acts and practices, as provided by N.H. Rev. Stat. Ann. § 358-A:2, et seq. and applicable law, including all actual damages and attorneys' fees and costs, treble damages, statutory damages, and restitution, as well as an injunction requiring Defendants to each permanently delete, destroy or otherwise sequester the Personal Information collected without parental consent, requiring Defendants to provide a complete audit and accounting of the uses of the Personal Information by Defendants and any other third parties, and other appropriate injunctive and/or declaratory relief.

### Claim 28
### NEW HAMPSHIRE UNJUST ENRICHMENT
**(Against All Defendants on behalf of Plaintiffs L.D., D.D., A.D., and the New Hampshire Class)**

883.    Plaintiffs L.D., D.D., A.D., and members of the New Hampshire class re-allege the foregoing allegations as if fully set forth herein.

884.    By virtue of the unlawful and unfair conduct alleged herein, Defendants have each realized millions of dollars in revenue from their collection and use of the Personal Information of L.D., D.D., A.D., and members of the New Hampshire class through behavioral advertising and commercialization purposes derived from that Personal Information.

885.    Defendants' ill-gotten gains were monetary benefits conferred upon Defendants by L.D., D.D., A.D., and members of the New Hampshire class. It would be inequitable and unjust to permit any of the Defendants to retain the economic benefits they have obtained through advertising and commercialization derived from the Personal Information of L.D., D.D., A.D., and members of the New Hampshire class.

886.    Defendants are each independently liable because they each profited from the conduct alleged.

887.    Defendants will each be unjustly enriched if they are permitted to retain the economic benefits conferred upon them by L.D., D.D., A.D., and members of the New Hampshire class through Defendants' unlawful, unfair, unauthorized, and impermissible use of the Personal Information of L.D., D.D., A.D., and members of the New Hampshire class, and allowing Defendants to retain the profits from their unlawful, unfair, unauthorized, and impermissible use of the Personal Information of L.D., D.D., A.D., and members of the New Hampshire class would be unjust and contrary to public policy.

888.    L.D., D.D., A.D., and members of the New Hampshire class are therefore entitled to recover the amounts realized by each of the Defendants at the expense of L.D., D.D., A.D., and members of the New Hampshire class.

889.    L.D., D.D., A.D., and members of the New Hampshire class do not seek recovery in this claim for their own economic harm and have no adequate remedy at law that would divest Defendants of their ill-gotten and unjust profits.   Moreover, even if money damages might otherwise provide an adequate remedy at law for this claim, there is at a minimum substantial doubt that any remedy at law is available, as the Court has ruled that the claims at law asserted by L.D., D.D., A.D., and members of the New Hampshire class in their Fifth Amended Complaint do not satisfy the requisite elements for relief.

L.D., D.D., A.D., and members of the New Hampshire class dispute the Court's holding and further believe that their claims at law as asserted in this Sixth Amended Complaint are legally and factually sufficient.  However, to the extent that money damages, if available, would constitute an adequate remedy at law barring recovery under this claim, L.D., D.D., A.D., and members of the New Hampshire class assert their claim for non-restitutionary disgorgement as an alternative remedy pending a final determination of the availability of a remedy at law.

890.    L.D., D.D., A.D., and members of the New Hampshire class are entitled to non-restitutionary disgorgement of each Defendant's ill-gotten gains, and/or the imposition of a constructive trust to recover the amount of each Defendant's ill-gotten gains.

## XIV.   New Jersey Claims

### Claim 29
### NEW JERSEY INTRUSION UPON SECLUSION
### (Against All Defendants on behalf of Plaintiffs J.R.E., J.A.E., and the New Jersey Class)

891.    Plaintiffs J.R.E., J.A.E., and members of the New Jersey class re-allege the foregoing allegations as if fully set forth herein.

892.    Plaintiffs J.R.E., J.A.E., and members of the New Jersey class's private affairs, concerns, and seclusion includes their interest in their Personal Information as defined by COPPA, which includes data points concerning their location and online activity while using internet-connected devices.

893.    Defendants each and in concert, through aid or assistance, or pursuant to a common purpose with the knowledge of the others, intentionally intruded upon the private affairs, concerns, and seclusion of J.R.E., J.A.E., and members of the New Jersey class by improperly accessing J.R.E., J.A.E., and members of the New Jersey class's Personal Information and using it for improper purposes, including by targeting J.R.E., J.A.E., and members of the New Jersey class with behavioral advertising that would be highly offensive to a reasonable person, constituting an egregious breach of social norms and/or enabling the targeting of J.R.E., J.A.E., and members of the New Jersey class with such advertisements, as detailed herein.

894.    Defendants' intrusions upon the private affairs, concerns, and seclusion of J.R.E., J.A.E., and members of the New Jersey class were substantial, and would be highly offensive to a reasonable

person, constituting an egregious breach of social norms, as is evidenced by countless consumer surveys, studies, and op-eds decrying the online tracking of children, centuries of common law, state and federal statutes and regulations including COPPA and FTC regulations, legislative commentaries, enforcement actions undertaken by the FTC, industry standards and guidelines, scholarly literature on consumers' reasonable expectations., the fines imposed on Google by the FTC and the NY AG, as well as the reforms required by the Order & Injunction entered into by Google.

895. As children aged 13 or younger, J.R.E., J.A.E., and members of the New Jersey class lacked the ability to form expectations about reasonable privacy or to consent to Defendants' actions.

896. Neither J.R.E., J.A.E., members of the New Jersey class, nor their parents and/or guardians consented to Defendants' intrusions upon their private affairs, concerns, and seclusions.

897. J.R.E., J.A.E., and members of the New Jersey class suffered actual and concrete injury as a result of Defendants' intrusions upon J.R.E., J.A.E., and members of the New Jersey class's private affairs, concerns, and seclusion.

898. J.R.E., J.A.E., and members of the New Jersey class seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate J.R.E., J.A.E., and members of the New Jersey class for the harm to their privacy interests, risk of future invasions of privacy, and the mental and emotional distress caused by Defendants' invasion of privacy, as well as disgorgement of profits made by Defendants as a result of their intrusions upon J.R.E.'s, J.A.E.'s, and members of the New Jersey class's private affairs, concerns, and seclusion.

### Claim 30
### NEW JERSEY CONSUMER FRAUD ACT,
### N.J. Stat. Ann. § 56:8-1, *et. seq.* (NJCFA)
### (Against All Defendants on Behalf of Plaintiffs J.A.E., J.R.E., and the New Jersey Class)

899. Plaintiffs J.A.E. and J.R.E. and members of the New Jersey Class re-allege the foregoing allegations as if fully set forth herein.

900. Defendants are persons within the meaning of N.J. Stat. Ann. § 56:8-1(d).

901. The New Jersey Consumer Fraud Act ("NJCFA") prohibits any "act, use or employment by any person of any unconscionable commercial practice … in connection with the sale or advertisement of any merchandise." See N.J. Stat. § 56:8-2.

902.    YouTube and the each of the Channel Owner Defendants' YouTube channels, and the advertisement placed on each of the Channel Owner Defendants' channels by Google constitute "merchandise" pursuant to § 56:8-1(c), because they constitute commodities or services offered directly or indirectly to the public for sale.

903.    Defendants offered YouTube content for "sale" to J.A.E. and J.R.E. and members of the New Jersey Class within the meaning of N.J. Stat. Ann. § 56:8-1(e) because they attempted directly or indirectly to sell advertised products or services to YouTube viewers.

904.    Defendants willfully and purposefully engaged in unconscionable and unfair acts and practices in connection with the sale of the merchandise as defined by N.J. Stat. § 56:8-1(c) in violation of N.J. Stat. § 56:8-2 as described herein.

905.    Defendants at all relevant times knowingly violated legal duties and public policy by unfairly and unlawfully collecting the Personal Information of children under 13 and tracking, profiling, and targeting those children with behavioral advertising for Defendants' commercial financial gain.

906.    As outlined herein, Defendants each at all times had actual knowledge of their own non-compliance with COPPA and other applicable privacy-related laws. Further, Defendants each at all times had actual knowledge of their own collection—via the election of each of the Channel Owner Defendants to serve behavioral advertising rather than contextual advertising to their viewers—of the Personal Information from J.A.E. and J.R.E. and members of the New Jersey Class created by each of the Channel Owner Defendants on YouTube, and the tracking, profiling, and targeting of those children for lucrative behavioral advertising.

907.    As outlined herein, Google intentionally designed the YouTube Platform to, among other things, attract children under 13 by making child-directed content available to them so that Google could collect the Personal Information of those children under 13 and serve them with lucrative, intrusive, behavioral advertising for substantial commercial gain.

908.    The inherent characteristics, content, and features of YouTube as designed by Google, including the names, designs, cartoon elements, children's themes, and children's songs, evince that YouTube hosted child-directed content. That is, YouTube was plainly intended for and meant to attract

children under 13, collect the Personal Information of those children, and serve those children behavioral advertising for substantial commercial gain.

909.    As outlined herein, each of the Channel Owner Defendants knowingly and intentionally created child-directed video content and made that child-directed content available on YouTube with the specific purpose of attracting child viewers under 13 to their respective YouTube channels.

910.    The inherent characteristics, content, and features of each of the Channel Owner Defendants YouTube channels and the content hosted thereon, including the names, designs, cartoon elements, children's themes, and children's songs, evince that the Channel Owner Defendants' content posted to and made available on YouTube was child-directed content.

911.    That is, each of the Channel Owner Defendants' YouTube channels and the child-directed content the Channel Owner Defendants uploaded to, hosted on, and made viewable on their YouTube channels was plainly intended for and meant to attract children under 13 to the YouTube for the purpose of collecting the Personal Information of those children to serve those children behavioral advertising for substantial commercial gain.

912.    Along with Google, each of the Channel Owner Defendants is individually considered by the FTC to be "operators" as defined under COPPA and FTC regulations.

913.    Each of the Channel Owned Defendants collected—including directing Google to collect— Personal Information from children under 13 through the YouTube channels created, hosted, and maintained by the Channel Owner Defendants, which were directed to children under 13.

914.    In particular, Defendants each and in concert, through aid or assistance, or pursuant to a common purpose with the knowledge of the others, systematically collected, used, and/or disclosed Personal Information from children under 13 in violation of COPPA, and therefore the FTC Act, to serve them targeted, behavioral advertising by *inter alia*:

        a.      Failing to provide sufficient notice of the information Defendants collected, or the information that was collected on Defendants' behalf, online from children under 13, how Defendants used such information, their disclosure practices, and all other required content, in violation of Section 312.4(d) of COPPA, 16 C.F.R. § 312.4(d);

b.     Failing to provide direct notice to parents of the information Defendants collected, or the information that was collected on Defendants' behalf, online from children under 13, how Defendants used such information, their disclosure practices, and all other required content, in violation of Section 312.4(b) and (c) of COPPA, 16 C.F.R. § 312.4(b)-(c);

c.     Failing to obtain verifiable parental consent before any collection or use of Personal Information from children under 13, in violation of Section 312.5 of COPPA, 16 C.F.R. § 312.5; and

d.     Failing to establish and maintain reasonable procedures to protect the confidentiality, security, and integrity of Personal Information collected from children under 13, in violation of Section 312.8 of COPPA, 16 C.F.R. § 312.8.

915.    Violations of COPPA and the accompanying FTC regulations "shall be treated as a violation of a rule defining an unfair … act or practice prescribed under 15 U.S.C. § 57a(a)(1)(B)." 15 U.S.C. § 6502(c). These rules define unfair acts or practices in or affecting commerce within the meaning of 15 U.S.C. § 45(a)(1), which is the model for the various consumer protection statutes in the several states, including the NJCFA. [193]

916.    Accordingly, Defendants each individually engaged in unfair and unlawful trade acts or practices in violation of NJCFA., which is modeled after, proscribes the same conduct as, and/or gives deference to the definitions of the FTC Act.

917.    Defendants' conduct is unfair, immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers, and there are no greater countervailing benefits to consumers or competition. Further, J.A.E., J.R.E., and members of the New Jersey class could not have reasonably avoided injury because Defendants each took advantage of the lack of knowledge, ability, experience, and/or capacity of consumers—in this case children under 13—to their detriment.

---

[193] *See* 16 C.F.R. § 312.1 (COPPA "prohibits unfair or deceptive acts or practices in connection with the collection, use, and/or disclosure or personal information from and about children on the internet.").

918.     Defendants willfully engaged in the unfair and unlawful acts described herein and knew or recklessly disregarded the fact that they violated the NJCFA.

919.     J.A.E., J.R.E., and members of the New Jersey class were harmed by Defendants' practices described herein, which were a substantial factor and caused injury in fact and actual damages to J.A.E., J.R.E., and members of the New Jersey class.

920.     As a direct and proximate result of Defendants' unfair and unlawful acts and practices in violation of NJCFA, J.A.E., J.R.E., and members of the New Jersey class have suffered and will continue to suffer an ascertainable loss of money or property, real or personal, and monetary and non-monetary damages, as described herein, including, *inter alia*, the loss of the value and/or diminishment in value of their Personal Information and the loss of the ability to control the use of their Personal Information.

921.     As outlined herein, there is tangible value in J.A.E., J.R.E., and members of the New Jersey class's Personal Information. J.A.E., J.R.E., and members of the New Jersey class have lost the opportunity to receive value in exchange for their Personal Information.

922.     Defendants' monetization of J.A.E., J.R.E., and members of the New Jersey class's Personal Information demonstrates that there is a market for their Personal Information.

923.     J.A.E., J.R.E., and New Jersey class members' Personal Information is now in the possession of Defendants, who have used and will use it for their financial gain.

924.     Defendants' retention of J.A.E., J.R.E., and members of the New Jersey class's Personal Information presents a continuing risk to them as well as the general public. J.A.E., J.R.E., and members of the New Jersey class seek relief for the injuries they have suffered as a result of Defendants' unfair and unlawful acts and practices, as provided by NJCFA. and applicable law, including all actual damages and attorneys' fees and costs, treble damages, statutory damages, and restitution, as well as an injunction requiring Defendants to each permanently delete, destroy or otherwise sequester the Personal Information collected without parental consent, requiring Defendants to provide a complete audit and accounting of the uses of the Personal Information by Defendants and any other third parties, and other appropriate injunctive and/or declaratory relief.

**Claim 31**
**NEW JERSEY UNJUST ENRICHMENT**
**(Against All Defendants on behalf of Plaintiffs J.R.E., J.A.E., and the New Jersey Class)**

925.    Plaintiffs J.R.E., J.A.E., and members of the New Jersey class re-allege the foregoing allegations as if fully set forth herein.

926.    By virtue of the unlawful and unfair conduct alleged herein, Defendants have each realized millions of dollars in revenue from their collection and use of the Personal Information of J.R.E., J.A.E., and New Jersey class members through behavioral advertising and commercialization purposes derived from that Personal Information.

927.    Defendants' ill-gotten gains were monetary benefits conferred upon Defendants by J.R.E., J.A.E., and members of the New Jersey class.  It would be inequitable and unjust to permit any of the Defendants to retain the economic benefits they have obtained through advertising and commercialization derived from the Personal Information of J.R.E., J.A.E., and members of the New Jersey class.

928.    Defendants are each independently liable because they each profited from the conduct alleged.

929.    Defendants will each be unjustly enriched if they are permitted to retain the economic benefits conferred upon them by J.R.E., J.A.E., and members of the New Jersey class through Defendants' unlawful, unfair, unauthorized, and impermissible use of the Personal Information of J.R.E., J.A.E., and members of the New Jersey class, and allowing Defendants to retain the profits from their unlawful, unfair, unauthorized, and impermissible use of the Personal Information of J.R.E., J.A.E., and members of the New Jersey class would be unjust and contrary to public policy.

930.    J.R.E., J.A.E., and members of the New Jersey class are therefore entitled to recover the amounts realized by each of the Defendants at the expense of J.R.E., J.A.E., and members of the New Jersey class.

931.    J.R.E., J.A.E., and members of the New Jersey class do not seek recovery in this claim for their own economic harm and have no adequate remedy at law that would divest Defendants of their ill-gotten and unjust profits.   Moreover, even if money damages might otherwise provide an adequate remedy at law for this claim, there is at a minimum substantial doubt that any remedy at law is available,

as the Court has ruled that the claims at law asserted by J.R.E., J.A.E., and members of the New Jersey class in their Fifth Amended Complaint do not satisfy the requisite elements for relief.  J.R.E., J.A.E., and members of the New Jersey class dispute the Court's holding and further believe that their claims at law as asserted in this Sixth Amended Complaint are legally and factually sufficient.  However, to the extent that money damages, if available, would constitute an adequate remedy at law barring recovery under this claim, J.R.E., J.A.E., and members of the New Jersey class assert their claim for non-restitutionary disgorgement as an alternative remedy pending a final determination of the availability of a remedy at law.

932.    J.R.E., J.A.E., and members of the New Jersey class class are entitled to non-restitutionary disgorgement of each Defendant's ill-gotten gains, and/or the imposition of a constructive trust to recover the amount of each Defendant's ill-gotten gains.

## XV.    New York Claims

### Claim 32
### NEW YORK UNJUST ENRICHMENT
### (Against Defendants Cartoon Network, ChuChuTV, DreamWorks, Hasbro, Mattel, PocketWatch, and Remka)

933.    Plaintiffs M.W.D., C.J.D., and C.A.D. and members of the New York class re-allege the foregoing allegations as if fully set forth herein.

934.    By virtue of the unlawful and unfair conduct alleged herein, Defendants have each realized millions of dollars in revenue from their collection and use of the Personal Information of M.W.D., C.J.D., and C.A.D. and New York class members through behavioral advertising and commercialization purposes derived from that Personal Information.

935.    Defendants' ill-gotten gains were monetary benefits conferred upon Defendants by M.W.D., C.J.D., and C.A.D. and members of the New York  It would be inequitable and unjust to permit any of the Defendants to retain the economic benefits they have obtained through advertising and commercialization derived from the Personal Information of M.W.D., C.J.D., and C.A.D. and members of the New York.

936.    Defendants are each independently liable because they each profited from the conduct alleged.

937.     Defendants will each be unjustly enriched if they are permitted to retain the economic benefits conferred upon them by M.W.D., C.J.D., and C.A.D. and members of the New York through Defendants' unlawful, unfair, unauthorized, and impermissible use of the Personal Information of M.W.D., C.J.D., and C.A.D. and members of the New York and allowing Defendants to retain the profits from their unlawful, unfair, unauthorized, and impermissible use of the Personal Information of M.W.D., C.J.D., and C.A.D. and members of the New York would be unjust and contrary to public policy.

938.     M.W.D., C.J.D., and C.A.D. and members of the New York are therefore entitled to recover the amounts realized by each of the Defendants at the expense of M.W.D., C.J.D., and C.A.D. and members of the New York.

939.     M.W.D., C.J.D., and C.A.D. and members of the New York do not seek recovery in this claim for their own economic harm and have no adequate remedy at law that would divest Defendants of their ill-gotten and unjust profits.   Moreover, even if money damages might otherwise provide an adequate remedy at law for this claim, there is at a minimum substantial doubt that any remedy at law is available, as the Court has ruled that the claims at law asserted by M.W.D., C.J.D., and C.A.D. and members of the New York in their Fifth Amended Complaint do not satisfy the requisite elements for relief.  M.W.D., C.J.D., and C.A.D. and members of the New York dispute the Court's holding and further believe that their claims at law as asserted in this Sixth Amended Complaint are legally and factually sufficient.  However, to the extent that money damages, if available, would constitute an adequate remedy at law barring recovery under this claim, M.W.D., C.J.D., and C.A.D. and members of the New York assert their claim for non-restitutionary disgorgement as an alternative remedy pending a final determination of the availability of a remedy at law.

940.     M.W.D., C.J.D., and C.A.D. and members of the New York are entitled to non-restitutionary disgorgement of each Defendant's ill-gotten gains, and/or the imposition of a constructive trust to recover the amount of each Defendant's ill-gotten gains.

SIXTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**XVI.   Oklahoma Claims**

<u>**Claim 33**</u>
**OKLAHOMA INTRUSION UPON SECLUSION**
**(Against All Defendants on behalf of Plaintiff C.L.P. and the Oklahoma Class)**

941.    Plaintiff .C.L.P. and members of the Oklahoma class re-allege the foregoing allegations as if fully set forth herein.

942.    .C.L.P. and members of the Oklahoma class's private affairs, concerns, and seclusion includes their interest in their Personal Information as defined by COPPA, which includes data points concerning their location and online activity while using internet-connected devices.

943.    Defendants each and in concert, through aid or assistance, or pursuant to a common purpose with the knowledge of the others, intentionally intruded upon the private affairs, concerns, and seclusion of .C.L.P. and Oklahoma class members by improperly accessing their Personal Information and using it for improper purposes, including by targeting C.L.P. and members of the Oklahoma class with behavioral advertising that would be highly offensive to a reasonable person, constituting an egregious breach of social norms and/or enabling the targeting of .C.L.P. and members of the Oklahoma class with such advertisements, as detailed herein.

944.    Defendants' intrusions upon the private affairs, concerns, and seclusion of C.L.P. and members of the Oklahoma class were substantial, and would be highly offensive to a reasonable person, constituting an egregious breach of social norms, as is evidenced by countless consumer surveys, studies, and op-eds decrying the online tracking of children, centuries of common law, state and federal statutes and regulations including COPPA and FTC regulations, legislative commentaries, enforcement actions undertaken by the FTC, industry standards and guidelines, scholarly literature on consumers' reasonable expectations., the fines imposed on Google by the FTC and the NY AG, as well as the reforms required by the Order & Injunction entered into by Google.

945.    As children aged 13 or younger, .C.L.P. and members of the Oklahoma class lacked the ability to form expectations about reasonable privacy or to consent to Defendants' actions.

946.    Neither .C.L.P., members of the Oklahoma class, nor their parents and/or guardians consented to Defendants' intrusions upon their private affairs, concerns, and seclusions.

947.     C.L.P. and members of the Oklahoma class suffered actual and concrete injury as a result of Defendants' intrusions upon .C.L.P. and Oklahoma class members' private affairs, concerns, and seclusion.

948.     C.L.P. and members of the Oklahoma class seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate them for the harm to their privacy interests, risk of future invasions of privacy, and the mental and emotional distress caused by Defendants' invasions of privacy, as well as disgorgement of profits made by Defendants as a result of their intrusions upon C.L.P. and members of the Oklahoma class's private affairs, concerns, and seclusion.

### Claim 34
### OKLAHOMA UNJUST ENRICHMENT
### (Against All Defendants on behalf of Plaintiff .C.L.P. and the Oklahoma Class)

949.     Plaintiff C.L.P., and members of the Oklahoma class re-allege the foregoing allegations as if fully set forth herein.

950.     By virtue of the unlawful and unfair conduct alleged herein, Defendants have each realized millions of dollars in revenue from their collection and use of the Personal Information of C.L.P. and Oklahoma class members through behavioral advertising and commercialization purposes derived from that Personal Information.

951.     Defendants' ill-gotten gains were monetary benefits conferred upon Defendants by C.L.P., and members of the Oklahoma class. It would be inequitable and unjust to permit any of the Defendants to retain the economic benefits they have obtained through advertising and commercialization derived from the Personal Information of C.L.P., and members of the Oklahoma class.

952.     Defendants are each independently liable because they each profited from the conduct alleged.

953.     Defendants will each be unjustly enriched if they are permitted to retain the economic benefits conferred upon them by C.L.P., and members of the Oklahoma class through Defendants' unlawful, unfair, unauthorized, and impermissible use of the Personal Information of C.L.P., and members of the Oklahoma class, and allowing Defendants to retain the profits from their unlawful, unfair,

unauthorized, and impermissible use of the Personal Information of C.L.P., and members of the Oklahoma class would be unjust and contrary to public policy.

954.    C.L.P., and members of the Oklahoma class are therefore entitled to recover the amounts realized by each of the Defendants at the expense of C.L.P., and members of the Oklahoma class.

955.    C.L.P., and members of the Oklahoma class do not seek recovery in this claim for their own economic harm and have no adequate remedy at law that would divest Defendants of their ill-gotten and unjust profits.   Moreover, even if money damages might otherwise provide an adequate remedy at law for this claim, there is at a minimum substantial doubt that any remedy at law is available, as the Court has ruled that the claims at law asserted by C.L.P., and members of the Oklahoma class in their Fifth Amended Complaint do not satisfy the requisite elements for relief.  C.L.P., and members of the Oklahoma class dispute the Court's holding and further believe that their claims at law as asserted in this Sixth Amended Complaint are legally and factually sufficient.   However, to the extent that money damages, if available, would constitute an adequate remedy at law barring recovery under this claim, C.L.P., and members of the Oklahoma class assert their claim for non-restitutionary disgorgement as an alternative remedy pending a final determination of the availability of a remedy at law.

956.    C.L.P., and members of the Oklahoma class are entitled to non-restitutionary disgorgement of each Defendant's ill-gotten gains, and/or the imposition of a constructive trust to recover the amount of each Defendant's ill-gotten gains.

**XVII.  Pennsylvania Claims**

**Claim 35**
**PENNSYLVANIA INTRUSION UPON SECLUSION**
**(Against All Defendants on behalf of Plaintiffs E.B., A.B., C.B., Z.B., I.B., and the Pennsylvania Class)**

957.    Plaintiffs E.B., A.B., C.B., Z.B., I.B.,and members of the Pennsylvania class re-allege the foregoing allegations as if fully set forth herein.

958.    E.B., A.B., C.B., Z.B., I.B. and members of the Pennsylvania class's private affairs, concerns, and seclusion includes their interest in their Personal Information as defined by COPPA, which includes data points concerning their location and online activity while using internet-connected devices.

SIXTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

959.    Defendants each and in concert, through aid or assistance, or pursuant to a common purpose with the knowledge of the others, intentionally intruded upon the private affairs, concerns, and seclusion of Plaintiffs by improperly accessing E.B., A.B., C.B., Z.B., I.B., and members of the Pennsylvania class's Personal Information and using it for improper purposes, including by targeting them with behavioral advertising that would be highly offensive to a reasonable person, constituting an egregious breach of social norms and/or enabling the targeting of E.B., A.B., C.B., Z.B., I.B., and members of the Pennsylvania class with such advertisements, as detailed herein.

960.    Defendants' intrusions upon the private affairs, concerns, and seclusion of E.B., A.B., C.B., Z.B., I.B., and members of the Pennsylvania class were substantial, and would be highly offensive to a reasonable person, constituting an egregious breach of social norms, as is evidenced by countless consumer surveys, studies, and op-eds decrying the online tracking of children, centuries of common law, state and federal statutes and regulations including COPPA and FTC regulations, legislative commentaries, enforcement actions undertaken by the FTC, industry standards and guidelines, scholarly literature on consumers' reasonable expectations., the fines imposed on Google by the FTC and the NY AG, as well as the reforms required by the Order & Injunction entered into by Google.

961.    As children aged 13 or younger, E.B., A.B., C.B., Z.B., I.B., and members of the Pennsylvania class lacked the ability to form expectations about reasonable privacy or to consent to Defendants' actions.

962.    Neither E.B., A.B., C.B., Z.B., I.B., members of the Pennsylvania class, nor their parents and/or guardians consented to Defendants' intrusions upon their private affairs, concerns, and seclusions.

963.    E.B., A.B., C.B., Z.B., I.B., and members of the Pennsylvania class suffered actual and concrete injury as a result of Defendants' intrusions upon E.B., A.B., C.B., Z.B., I.B., and members of the Pennsylvania class's private affairs, concerns, and seclusion.

964.    E.B., A.B., C.B., Z.B., I.B., and members of the Pennsylvania class seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate them for the harm to their privacy interests, risk of future invasions of privacy, and the mental and emotional distress caused by Defendants' invasions of privacy, as well as disgorgement of profits made by Defendants as a result

of their intrusions upon E.B., A.B., C.B., Z.B., I.B., and members of the Pennsylvania class's private affairs, concerns, and seclusion.

**Claim 36**
### PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW,
### 73 Pa. Stat. Ann. §§ 201-3, *et seq.*
### (Against All Defendants on behalf of Plaintiffs E.B., A.B., C.B., Z.B., I.B., and the Pennsylvania Class)

965.    Plaintiffs E.B., A.B., C.B., Z.B., I.B., and members of the Pennsylvania class incorporate the foregoing allegations as if fully set forth herein.

966.    E.B., A.B., C.B., Z.B., I.B., and members of the Pennsylvania class are or were residents of Pennsylvania and/or viewed child-directed content in Pennsylvania hosted by Defendant Google on YouTube and created by each of the Channel Owner Defendants.

967.    73 Pa. Stat. Ann. § 201-3(a) provides "[u]nfair methods of competition and unfair … acts or practices in the conduct of any trade or commerce as defined by subclauses (i) through (xxi) of clause (4) of section 21 of this act and regulations promulgated under section 3.12 of this act are hereby declared unlawful."

968.    At all times mentioned herein, Defendants each engaged in "trade" or "commerce" in Pennsylvania in that they engaged in the advertising, offering for sale, sale, and distribution of property or any other articles, commodities, or things of value in Pennsylvania.

969.    Defendants each engaged in consumer-oriented acts through the offering, promoting, and/or distributing of YouTube and child-directed content hosted thereon, which significantly impacted the public because YouTube is used nationwide, including in Pennsylvania, and there are millions of users, including E.B., A.B., C.B., Z.B., I.B., and members of the Pennsylvania class.

970.    Defendants each violated 73 Pa. Stat. Ann. § 201-3 by engaging in the deceptive or unfair acts or practices proscribed by 73 Pa. Stat. Ann. § 201-3 outlined herein.

971.    Defendants at all relevant times knowingly violated legal duties and public policy by unfairly and unlawfully collecting the Personal Information of children under 13 and tracking, profiling, and targeting those children with behavioral advertising for Defendants' commercial financial gain.

972.    As outlined herein, Defendants each at all times had actual knowledge of their own non-compliance with COPPA and other applicable privacy-related laws. Further, Defendants each at all times had actual knowledge of their own collection—via the election of each Channel Owner Defendant to serve behavioral advertising rather than contextual advertising to their viewers—of the Personal Information from E.B., A.B., C.B., Z.B., I.B., and members of the Pennsylvania class created by the Channel Owner Defendants on YouTube, and the tracking, profiling, and targeting of those children for lucrative behavioral advertising.

973.    As outlined herein, Google intentionally designed YouTube to, among other things, attract children under 13 by making child-directed content available to them so that Google could collect the Personal Information of those children under 13 and serve them with lucrative, intrusive, behavioral advertising for substantial commercial gain.

974.    The inherent characteristics, content, and features of YouTube as designed by Google, including the names, designs, cartoon elements, children's themes, and children's songs, evince that YouTube hosted child-directed content. That is, YouTube was plainly intended for and meant to attract children under 13, collect the Personal Information of those children, and serve those children behavioral advertising for substantial commercial gain.

975.    As outlined herein, each of the Channel Owner Defendants knowingly and intentionally created child-directed video content and made that child-directed content available on YouTube with the specific purpose of attracting child viewers under 13 to their respective YouTube channels.

976.    The inherent characteristics, content, and features of each of the Channel Owner Defendants' YouTube channels and the content hosted thereon, including the names, designs, cartoon elements, children's themes, and children's songs, evince that the Channel Owner Defendants' content posted to and made available on YouTube was child-directed content.

977.    That is, each of the Channel Owner Defendants' YouTube channels and the child-directed content the Channel Owner Defendants uploaded to, hosted on, and made viewable on their YouTube channels was plainly intended for and meant to attract children under 13 for the purpose of collecting the Personal Information of those children to serve those children behavioral advertising for substantial commercial gain.

978.   Along with Google, each of the Channel Owner Defendants is individually considered by the FTC to be "operators" as defined under COPPA and FTC regulations.

979.   Each of the Channel Owner Defendants collected—including directing Google to collect— Personal Information from children under 13 through YouTube channels created, hosted, and maintained by each of the Channel Owner Defendants, which were directed to children under 13.

980.   In particular, Defendants each and in concert, through aid or assistance, or pursuant to a common purpose with the knowledge of the others, systematically collected, used, and/or disclosed Personal Information from children under 13 in violation of COPPA, and therefore the FTC Act, to serve them targeted, behavioral advertising by inter alia:

    a.   Failing to provide sufficient notice of the information Defendants collected, or the information that was collected on Defendants' behalf, online from children under 13, how Defendants used such information, their disclosure practices, and all other required content, in violation of Section 312.4(d) of COPPA, 16 C.F.R. § 312.4(d);

    b.   Failing to provide direct notice to parents of the information Defendants collected, or the information that was collected on Defendants' behalf, online from children under 13, how Defendants used such information, their disclosure practices, and all other required content, in violation of Section 312.4(b) and (c) of COPPA, 16 C.F.R. § 312.4(b)-(c);

    c.   Failing to obtain verifiable parental consent before any collection or use of Personal Information from children under 13, in violation of Section 312.5 of COPPA, 16 C.F.R. § 312.5; and

    d.   Failing to establish and maintain reasonable procedures to protect the confidentiality, security, and integrity of Personal Information collected from children under 13, in violation of Section 312.8 of COPPA, 16 C.F.R. § 312.8.

981.   Violations of COPPA and the accompanying FTC regulations "shall be treated as a violation of a rule defining an unfair … act or practice prescribed under 15 U.S.C. § 57a(a)(1)(B)." 15 U.S.C. § 6502(c).  These rules define unfair acts or practices in or affecting commerce within the meaning

of 15 U.S.C. § 45(a)(1), which is the model for the various consumer protection statutes in the several states, including the 73 Pa. Stat. Ann. §§ 201-3, et seq. [194]

982.     Accordingly, Defendants each individually engaged in unfair and unlawful trade acts or practices in violation of 73 Pa. Stat. Ann. §§ 201-3, et seq., which is modeled after, proscribes the same conduct as, and gives deference to the definitions of the FTC Act.

983.     Defendants' conduct is unfair, immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers, and there are no greater countervailing benefits to consumers or competition.  Further, E.B., A.B., C.B., Z.B., I.B., and members of the Pennsylvania class could not have reasonably avoided injury because Defendants each took advantage of the lack of knowledge, ability, experience, and/or capacity of consumers—in this case children under 13—to their detriment.

984.     Defendants willfully engaged in the unfair and unlawful acts described herein and knew or recklessly disregarded the fact that they violated 73 Pa. Stat. Ann. §§ 201-3, et seq.

985.     E.B., A.B., C.B., Z.B., I.B., and members of the Pennsylvania class were harmed by Defendants' practices described herein, which were a substantial factor and caused injury in fact and actual damages to E.B., A.B., C.B., Z.B., I.B., and members of the Pennsylvania class.

986.     As a direct and proximate result of Defendants' unfair and unlawful acts and practices in violation of 73 Pa. Stat. Ann. §§ 201-3, et seq., E.B., A.B., C.B., Z.B., I.B., and members of the Pennsylvania class have suffered and will continue to suffer an ascertainable loss of money or property, real or personal, and monetary and non-monetary damages, as described herein, including, inter alia, the loss of the value and/or diminishment in value of their Personal Information and the loss of the ability to control the use of their Personal Information.

987.     As outlined herein, there is tangible value in E.B., A.B., C.B., Z.B., I.B., and members of the Pennsylvania class's Personal Information. E.B., A.B., C.B., Z.B., I.B., and members of the Pennsylvania class have lost the opportunity to receive value in exchange for their Personal Information.

---

[194] *See* 16 C.F.R. § 312.1 (COPPA "prohibits unfair or deceptive acts or practices in connection with the collection, use, and/or disclosure or personal information from and about children on the internet.").

988.     Defendants' monetization of E.B., A.B., C.B., Z.B., I.B., and members of the Pennsylvania class's Personal Information demonstrates that there is a market for their Personal Information.

989.     E.B., A.B., C.B., Z.B., I.B., and members of the Pennsylvania class's Personal Information is now in the possession of Defendants, who have used and will use it for their financial gain.

990.     Defendants' retention of E.B., A.B., C.B., Z.B., I.B., and members of the Pennsylvania class's Personal Information presents a continuing risk to them as well as the general public. E.B., A.B., C.B., Z.B., I.B., and members of the Pennsylvania class seek relief for the injuries they have suffered as a result of Defendants' unfair and unlawful acts and practices, as provided by 73 Pa. Stat. Ann. §§ 201-3, et seq. and applicable law, including all actual damages and attorneys' fees and costs, treble damages, statutory damages, and restitution, as well as an injunction requiring Defendants to each permanently delete, destroy or otherwise sequester the Personal Information collected without parental consent, requiring Defendants to provide a complete audit and accounting of the uses of the Personal Information by Defendants and any other third parties, and other appropriate injunctive and/or declaratory relief.

### Claim 37
### PENNSYLVANIA UNJUST ENRICHMENT
**(Against All Defendants on behalf of Plaintiffs E.B., A.B., C.B., Z.B., I.B., and the Pennsylvania Class)**

991.     Plaintiffs E.B., A.B., C.B., Z.B., I.B., and members of the Pennsylvania class re-allege the foregoing allegations as if fully set forth herein.

992.     By virtue of the unlawful and unfair conduct alleged herein, Defendants have each realized millions of dollars in revenue from their collection and use of the Personal Information of E.B., A.B., C.B., Z.B., I.B., and Pennsylvania class members through behavioral advertising and commercialization purposes derived from that Personal Information.

993.     Defendants' ill-gotten gains were monetary benefits conferred upon Defendants by E.B., A.B., C.B., Z.B., I.B., and members of the Pennsylvania class. It would be inequitable and unjust to permit any of the Defendants to retain the economic benefits they have obtained through advertising and commercialization derived from the Personal Information of E.B., A.B., C.B., Z.B., I.B., and members of the Pennsylvania class.

994.    Defendants are each independently liable because they each profited from the conduct alleged.

995.    Defendants will each be unjustly enriched if they are permitted to retain the economic benefits conferred upon them by E.B., A.B., C.B., Z.B., I.B., and members of the Pennsylvania class through Defendants' unlawful, unfair, unauthorized, and impermissible use of the Personal Information of E.B., A.B., C.B., Z.B., I.B., and members of the Pennsylvania class, and allowing Defendants to retain the profits from their unlawful, unfair, unauthorized, and impermissible use of the Personal Information of E.B., A.B., C.B., Z.B., I.B., and members of the Pennsylvania class would be unjust and contrary to public policy.

996.    E.B., A.B., C.B., Z.B., I.B., and members of the Pennsylvania class are therefore entitled to recover the amounts realized by each of the Defendants at the expense of E.B., A.B., C.B., Z.B., I.B., and members of the Pennsylvania class.

997.    E.B., A.B., C.B., Z.B., I.B., and members of the Pennsylvania class do not seek recovery in this claim for their own economic harm and have no adequate remedy at law that would divest Defendants of their ill-gotten and unjust profits.   Moreover, even if money damages might otherwise provide an adequate remedy at law for this claim, there is at a minimum substantial doubt that any remedy at law is available, as the Court has ruled that the claims at law asserted by E.B., A.B., C.B., Z.B., I.B., and members of the Pennsylvania class in their Fifth Amended Complaint do not satisfy the requisite elements for relief.  E.B., A.B., C.B., Z.B., I.B., and members of the Pennsylvania class dispute the Court's holding and further believe that their claims at law as asserted in this Sixth Amended Complaint are legally and factually sufficient.  However, to the extent that money damages, if available, would constitute an adequate remedy at law barring recovery under this claim, E.B., A.B., C.B., Z.B., I.B., and members of the Pennsylvania class assert their claim for non-restitutionary disgorgement as an alternative remedy pending a final determination of the availability of a remedy at law.

998.    E.B., A.B., C.B., Z.B., I.B., and members of the Pennsylvania class are entitled to non-restitutionary disgorgement of each Defendant's ill-gotten gains, and/or the imposition of a constructive trust to recover the amount of each Defendant's ill-gotten gains.

1    **XIX.   Tennessee Claims**

2                            <u>**Claim 38**</u>
      **TENNEESSEE CONSUMER PROTECTION ACT,**
3              **Tenn. Code Ann. §§ 47-18-101, *et seq.***
4      **(Against All Defendants on behalf of Plaintiff M.W. and the Tennessee Class)**

5        999.   Plaintiff M.W. and members of the Tennessee class re-allege the foregoing allegations as

6    if fully set forth herein.

7        1000.   M.W. and members of the Tennessee class are or were residents of Tennessee and/or

8    viewed child-directed content in Tennessee hosted by Defendant Google on YouTube and created by

9    each of the Channel Owner Defendants.

10       1001.   Plaintiff M.W. and members of the Tennessee class are "consumers" within the meaning

11   of Tenn. Code § 47-18-103(2).

12       1002.   Defendants are "persons" within the meaning of Tenn. Code § 47-18-103(13).

13       1003.   Defendants advertised, offered, or sold goods or services in Tennessee in consumer

14   transactions and engaged in trade or commerce directly or indirectly affecting the people of Tennessee,

15   as defined by Tenn. Code §§ 47-18-103(7), (18) & (19).

16       1004.   Defendants' acts or practices affected the conduct of trade or commerce, under Tenn.

17   Code § 47-18-104.

18       1005.   At all times mentioned herein, Defendants each engaged in "trade" or "commerce" in

19   Tennessee in that Defendants each engaged in the advertising, offering for sale, sale, and distribution of

20   property or any other articles, commodities, or things of value in Tennessee.

21       1006.   Defendants each engaged in consumer-oriented acts through the offering, promoting,

22   and/or distributing of YouTube and child-directed content hosted thereon, which significantly impacted

23   the public because YouTube is used nationwide, including in Tennessee, and there are millions of users,

24   including M.W. and members of the Tennessee Class.

25       1007.   Tenn. Code § 47-18-104(a) provides "[u]nfair … acts or practices affecting the conduct

26   of any trade or commerce constitute unlawful acts or practices[.]"

27       1008.   Tenn. Code § 47-18-115 provides "[i]t is the intent of the general assembly that this part

28   shall be interpreted and construed consistently with the interpretations given by the federal trade

                                         199

commission and the federal courts pursuant to § 5(A)(1) of the Federal Trade Commission Act, codified in 15 U.S.C. § 45(a)(1)."

1009.   Defendants each violated Tenn. Code § 47-18-104(a) by engaging in the unfair acts or practices proscribed Tenn. Code § 47-18-104(a) outlined herein.

1010.   Defendants at all relevant times knowingly violated legal duties and public policy by unfairly and unlawfully collecting the Personal Information of children under 13 and tracking, profiling, and targeting those children with behavioral advertising for Defendants' commercial financial gain.

1011.   As outlined herein, Defendants each at all times had actual knowledge of their own non-compliance with COPPA and other applicable privacy-related laws. Further, Defendants each at all times had actual knowledge of their own collection—via the election of each of the Channel Owner Defendants to serve behavioral advertising rather than contextual advertising to their viewers—of the Personal Information from M.W. and members of the Tennessee class, and the tracking, profiling, and targeting of those children for lucrative behavioral advertising.

1012.   As outlined herein, Google intentionally designed YouTube to, among other things, attract children under 13 by making child-directed content available to them so that Google could collect the Personal Information of those children under 13 and serve them with lucrative, intrusive, behavioral advertising for substantial commercial gain.

1013.   The inherent characteristics, content, and features of YouTube as designed by Google, including the names, designs, cartoon elements, children's themes, and children's songs, evince that YouTube hosted child-directed content. That is, YouTube was plainly intended for and meant to attract children under 13, collect the Personal Information of those children, and serve those children behavioral advertising for substantial commercial gain.

1014.   As outlined herein, each of the Channel Owner Defendants knowingly and intentionally created child-directed video content and made that child-directed content available on YouTube with the specific purpose of attracting child viewers under 13 to their respective YouTube channels.

1015.   The inherent characteristics, content, and features of each of the Channel Owner Defendants' YouTube channels and the content hosted thereon, including the names, designs, cartoon

elements, children's themes, and children's songs, evince that this content posted to and made available on YouTube was child-directed content.

1016.   That is, each of the Channel Owner Defendants' YouTube channels and the child-directed content uploaded to, hosted on, and made viewable on those channels was plainly intended for and meant to attract children under 13 to YouTube for the purpose of collecting the Personal Information of those children to serve those children behavioral advertising for substantial commercial gain.

1017.   Along with Google, each of the Channel Owner Defendants is individually considered by the FTC to be "operators" as defined under COPPA and FTC regulations.

1018.   Each of the Channel Owner Defendants collected—including directing Google to collect - Personal Information from children under 13 through YouTube channels created, hosted, and maintained by the Channel Owner Defendants, which were directed to children under 13.

1019.   In particular, Defendants each and in concert, through aid or assistance, or pursuant to a common purpose with the knowledge of the others, systematically collected, used, and/or disclosed Personal Information from children under 13 in violation of COPPA, and therefore the FTC Act, to serve them targeted, behavioral advertising by inter alia:

    a.    Failing to provide sufficient notice of the information Defendants collected, or the information that was collected on Defendants' behalf, online from children under 13, how Defendants used such information, their disclosure practices, and all other required content, in violation of Section 312.4(d) of COPPA, 16 C.F.R. § 312.4(d);

    b.    Failing to provide direct notice to parents of the information Defendants collected, or the information that was collected on Defendants' behalf, online from children under 13, how Defendants used such information, their disclosure practices, and all other required content, in violation of Section 312.4(b) and (c) of COPPA, 16 C.F.R. § 312.4(b)-(c);

    c.    Failing to obtain verifiable parental consent before any collection or use of Personal Information from children under 13, in violation of Section 312.5 of COPPA, 16 C.F.R. § 312.5; and

d.      Failing to establish and maintain reasonable procedures to protect the confidentiality, security, and integrity of Personal Information collected from children under 13, in violation of Section 312.8 of COPPA, 16 C.F.R. § 312.8.

1020.  Violations of COPPA and the accompanying FTC regulations "shall be treated as a violation of a rule defining an unfair … act or practice prescribed under 15 U.S.C. § 57a(a)(1)(B)." 15 U.S.C. § 6502(c). These rules define unfair acts or practices in or affecting commerce within the meaning of 15 U.S.C. § 45(a)(1), which is the model for the various consumer protection statutes in the several states, including the Tenn. Code Ann. §§ 47-18-101, *et seq*.[195]

1021.  Accordingly, Defendants each individually engaged in unfair and unlawful trade acts or practices in violation of Tenn. Code Ann. §§ 47-18-101, et seq., which is modeled after, proscribes the same conduct as, and gives deference to the definitions of the FTC Act.

1022.  Defendants' conduct is unfair, immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers, and there are no greater countervailing benefits to consumers or competition. Further, M.W. and members of the Tennessee class could not have reasonably avoided injury because Defendants each took advantage of the lack of knowledge, ability, experience, and/or capacity of consumers—in this case children under 13—to their detriment.

1023.  Defendants willfully engaged in the unfair and unlawful acts described herein and knew or recklessly disregarded the fact that they violated Tenn. Code Ann. §§ 47-18-101, *et seq*.

1024.  M.W. and members of the Tennessee class were harmed by Defendants' practices described herein, which were a substantial factor and caused injury in fact and actual damages to M.W. and members of the Tennessee class.

1025.  As a direct and proximate result of Defendants' unfair and unlawful acts and practices in violation of Tenn. Code Ann. §§ 47-18-101, *et seq*., M.W. and members of the Tennessee class have suffered and will continue to suffer an ascertainable loss of money or property, real or personal, and monetary and non-monetary damages, as described herein, including, inter alia, the loss of the value

---

[195] *See* 16 C.F.R. § 312.1 (COPPA "prohibits unfair or deceptive acts or practices in connection with the collection, use, and/or disclosure or personal information from and about children on the internet.").

and/or diminishment in value of their Personal Information and the loss of the ability to control the use of their Personal Information.

1026.   As outlined herein, there is tangible value in M.W. and members of the Tennessee class's Personal Information.   M.W. and members of the Tennessee class have lost the opportunity to receive value in exchange for their Personal Information.

1027.   Defendants' monetization of M.W. and members of the Tennessee class's Personal Information demonstrates that there is a market for their Personal Information.

1028.   M.W. and members of the Tennessee class's Personal Information is now in the possession of Defendants, who have used and will use it for their financial gain.

1029.   Defendants' retention of M.W. and members of the Tennessee class's Personal Information presents a continuing risk to them as well as the general public. M.W. and members of the Tennessee  class seek relief for the injuries they have suffered as a result of Defendants' unfair and unlawful acts and practices, as provided by Tenn. Code Ann. §§ 47-18-101, *et seq.* and applicable law, including all actual damages and attorneys' fees and costs, treble damages, statutory damages, and restitution, as well as an injunction requiring Defendants to each permanently delete, destroy or otherwise sequester the Personal Information collected without parental consent, requiring Defendants to provide a complete audit and accounting of the uses of the Personal Information by them and any other third parties, and other appropriate injunctive and/or declaratory relief.

### Claim 39
**TENNEESSEE UNJUST ENRICHMENT,**
**Tenn. Code Ann. §§ 47-18-101, *et seq.***
**(Against All Defendants on behalf of Plaintiff M.W. and the Tennessee Class)**

1030.   Plaintiff M.W. and members of the Tennessee class re-allege the foregoing allegations as if fully set forth herein.

1031.   By virtue of the unlawful and unfair conduct alleged herein, Defendants have each realized millions of dollars in revenue from their collection and use of the Personal Information of M.W. and Tennessee members through behavioral advertising and commercialization purposes derived from that Personal Information.

1032.   Defendants' ill-gotten gains were monetary benefits conferred upon Defendants by M.W. and members of the Tennessee class. It would be inequitable and unjust to permit any of the Defendants to retain the economic benefits they have obtained through advertising and commercialization derived from the Personal Information of M.W. and members of the Tennessee class.

1033.   Defendants are each independently liable because they each profited from the conduct alleged.

1034.   Defendants will each be unjustly enriched if they are permitted to retain the economic benefits conferred upon them by M.W. and members of the Tennessee class through Defendants' unlawful, unfair, unauthorized, and impermissible use of the Personal Information of M.W. and members of the Tennessee class, and allowing Defendants to retain the profits from their unlawful, unfair, unauthorized, and impermissible use of the Personal Information of M.W. and members of the Tennessee class would be unjust and contrary to public policy.

1035.   M.W. and members of the Tennessee class are therefore entitled to recover the amounts realized by each of the Defendants at the expense of M.W. and members of the Tennessee class.

1036.   M.W. and members of the Tennessee class do not seek recovery in this claim for their own economic harm and have no adequate remedy at law that would divest Defendants of their ill-gotten and unjust profits.   Moreover, even if money damages might otherwise provide an adequate remedy at law for this claim, there is at a minimum substantial doubt that any remedy at law is available, as the Court has ruled that the claims at law asserted by M.W. and members of the Tennessee class in their Fifth Amended Complaint do not satisfy the requisite elements for relief.  M.W. and members of the Tennessee class dispute the Court's holding and further believe that their claims at law as asserted in this Sixth Amended Complaint are legally and factually sufficient.  However, to the extent that money damages, if available, would constitute an adequate remedy at law barring recovery under this claim, M.W. and members of the Tennessee class assert their claim for non-restitutionary disgorgement as an alternative remedy pending a final determination of the availability of a remedy at law.

1037.   M.W. and members of the Tennessee class are entitled to non-restitutionary disgorgement of each Defendant's ill-gotten gains, and/or the imposition of a constructive trust to recover the amount of each Defendant's ill-gotten gains.

1 XX.   **Washington Claims**

2 <u>**Claim 40**</u>
3 **WASHINGTON INTRUSION UPON SECLUSION**
**(Against All Defendants on behalf of Plaintiffs M.W., B.N., W.N., and the Washington Class)**
4

5 1038.   Plaintiffs M.W., B.N., W.N., and members of the Washington class re-allege the foregoing
6 allegations as if fully set forth herein.

7 1039.   M.W., B.N., W.N., and members of the Washington class's private affairs, concerns, and
8 seclusion includes their interest in their Personal Information as defined by COPPA, which includes data
9 points concerning their location and online activity while using internet-connected devices.

10 1040.   Defendants each and in concert, through aid or assistance, or pursuant to a common
11 purpose with the knowledge of the others,  intentionally intruded upon the private affairs, concerns, and
12 seclusion of M.W., B.N., W.N., and members of the Washington class by improperly accessing their
13 Personal Information and using it for improper purposes, including by targeting M.W., B.N., W.N., and
14 members of the Washington class with behavioral advertising that would be highly offensive to a
15 reasonable person, constituting an egregious breach of social norms and/or enabling the targeting of
16 M.W., B.N., W.N., and members of the Washington class with such advertisements, as detailed herein.

17 1041.   Defendants' intrusions upon the private affairs, concerns, and seclusion of M.W., B.N.,
18 W.N., and members of the Washington class were substantial, and would be highly offensive to a
19 reasonable person, constituting an egregious breach of social norms, as is evidenced by countless
20 consumer surveys, studies, and op-eds decrying the online tracking of children, centuries of common
21 law, state and federal statutes and regulations including COPPA and FTC regulations, legislative
22 commentaries, enforcement actions undertaken by the FTC, industry standards and guidelines, scholarly
23 literature on consumers' reasonable expectations., the fines imposed on Google by the FTC and the NY
24 AG, as well as the reforms required by the Order & Injunction entered into by Google.

25 1042.   As children aged 13 or younger, M.W., B.N., W.N., and members of the Washington class
26 lacked the ability to form expectations about reasonable privacy or to consent to Defendants' actions.

27 1043.   Neither M.W., B.N., W.N., members of the Washington class, nor their parents and/or
28 guardians consented to Defendants' intrusions upon their private affairs, concerns, and seclusions.

1044.   M.W., B.N., W.N., and members of the Washington class suffered actual and concrete injury as a result of Defendants' intrusions upon M.W., B.N., W.N., and members of the Washington class's  private affairs, concerns, and seclusion.

1045.   M.W., B.N., W.N., and members of the Washington class seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate them for the harm to their privacy interests, risk of future invasions of privacy, and the mental and emotional distress caused by Defendants' invasions of privacy, as well as disgorgement of profits made by Defendants as a result of their intrusions upon M.W., B.N., W.N., and members of the Washington class's private affairs, concerns, and seclusion.

**Claim 41**
**WASHINGTON CONSUMER PROTECTION ACT,**
**Wash. Rev. Code Ann. § 19.86.020, *et seq*.**
**(Against All Defendants on behalf of Plaintiffs M.W., B.N., W.N., and the Washington Class)**

1046.   Plaintiffs M.W., B.N., W.N., and members of the Washington class incorporate the foregoing allegations as if fully set forth herein.

1047.   M.W., B.N., W.N., and members of the Washington Class are or were residents of Washington and/or viewed child-directed content in Washington hosted by Defendant and on YouTube and created by each of the Channel Owner Defendant.

1048.   Wash. Rev. Code Ann. § 19.86.020 provides "[u]nfair methods of competition and unfair … acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

1049.   Wash. Rev. Code Ann. § 19.86.020 provides "[t]he courts be guided by final decisions of the federal courts and final orders of the [FTC] interpreting the various federal statutes dealing with the same or similar matters[.]"

1050.   At all times mentioned herein, Defendants each engaged in "trade" or "commerce" in Washington in that they engaged in the advertising, offering for sale, sale, and distribution of property or any other articles, commodities, or things of value in Washington.

1051.   Defendants each violated Wash. Rev. Code Ann. § 19.86.020 by engaging in the unfair acts or practices proscribed by Wash. Rev. Code Ann. § 19.86.020 outlined herein.

1052.  Defendants each engaged in consumer-oriented acts through the offering, promoting, and/or distributing of YouTube and child-directed content hosted thereon, which significantly impacted the public because YouTube is used nationwide, including in Washington, and there are millions of users, including M.W., B.N., W.N., and members of the Washington class.

1053.  Defendants at all relevant times knowingly violated legal duties and public policy by unfairly and unlawfully collecting the Personal Information of children under 13 and tracking, profiling, and targeting those children with behavioral advertising for Defendants' commercial financial gain.

1054.  As outlined herein, Defendants each at all times had actual knowledge of their own non-compliance with COPPA and other applicable privacy-related laws. Further, Defendants each at all times had actual knowledge of their own collection—via the election of each of the Channel Owner Defendants to serve behavioral advertising rather than contextual advertising to their viewers—of the Personal Information from M.W., B.N., W.N., and members of the Washington class by the Channel Owner Defendants on YouTube, and the tracking, profiling, and targeting of those children for lucrative behavioral advertising.

1055.  As outlined herein, Google intentionally designed YouTube to, among other things, attract children under 13 by making child-directed content available to them so that Google could collect the Personal Information of those children under 13 and serve them with lucrative, intrusive, behavioral advertising for substantial commercial gain.

1056.  The inherent characteristics, content, and features of YouTube as designed by Google, including the names, designs, cartoon elements, children's themes, and children's songs, evince that YouTube hosted child-directed content. That is, YouTube was plainly intended for and meant to attract children under 13, collect the Personal Information of those children, and serve those children behavioral advertising for substantial commercial gain.

1057.  As outlined herein, each of the Channel Owner Defendants knowingly and intentionally created child-directed video content and made that child-directed content available on YouTube with the specific purpose of attracting child viewers under 13 to their respective YouTube channels.

1058.  The inherent characteristics, content, and features of each of the Channel Owner Defendants' YouTube channels and the content hosted thereon, including the names, designs, cartoon

elements, children's themes, and children's songs, evince that the Channel Owner Defendants' content posted to and made available on YouTube was child-directed content.

1059.   That is, each of the Channel Owner Defendants' YouTube channels and the child-directed content the Channel Owner Defendants uploaded to, hosted on, and made viewable on their YouTube channels was plainly intended for and meant to attract children under 13 for the purpose of collecting the Personal Information of those children to serve those children behavioral advertising for substantial commercial gain.

1060.   Along with Google, each of the Channel Owner Defendants is individually considered by the FTC to be "operators" as defined under COPPA and FTC regulations.

1061.   Each of the Channel Owner Defendants collected—including directing Google to collect— Personal Information from children under 13 through YouTube channels created, hosted, and maintained by each of the Channel Owner Defendants, which were directed to children under 13.

1062.   In particular, Defendants each and in concert, through aid or assistance, or pursuant to a common purpose with the knowledge of the others, systematically collected, used, and/or disclosed Personal Information from children under 13 in violation of COPPA, and therefore the FTC Act, to serve them targeted, behavioral advertising by inter alia:

    a.    Failing to provide sufficient notice of the information Defendants collected, or the information that was collected on Defendants' behalf, online from children under 13, how Defendants used such information, their disclosure practices, and all other required content, in violation of Section 312.4(d) of COPPA, 16 C.F.R. § 312.4(d);

    b.    Failing to provide direct notice to parents of the information Defendants collected, or the information that was collected on Defendants' behalf, online from children under 13, how Defendants used such information, their disclosure practices, and all other required content, in violation of Section 312.4(b) and (c) of COPPA, 16 C.F.R. § 312.4(b)-(c);

    c.    Failing to obtain verifiable parental consent before any collection or use of Personal Information from children under 13, in violation of Section 312.5 of COPPA, 16 C.F.R. § 312.5; and

d.      Failing to establish and maintain reasonable procedures to protect the confidentiality, security, and integrity of Personal Information collected from children under 13, in violation of Section 312.8 of COPPA, 16 C.F.R. § 312.8.

1063.  Violations of COPPA and the accompanying FTC regulations "shall be treated as a violation of a rule defining an unfair … act or practice prescribed under 15 U.S.C. § 57a(a)(1)(B)." 15 U.S.C. § 6502(c).  These rules define unfair acts or practices in or affecting commerce within the meaning of 15 U.S.C. § 45(a)(1), which is the model for the various consumer protection statutes in the several states, including the Wash. Rev. Code Ann. § 19.86.020, et seq. [196]

1064.  Accordingly, Defendants each individually engaged in unfair and unlawful trade acts or practices in violation of Wash. Rev. Code Ann. § 19.86.020, et seq., which is modeled after, proscribes the same conduct as, and gives deference to the definitions of the FTC Act.

1065.  Defendants' conduct is unfair, immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers, and there are no greater countervailing benefits to consumers or competition.   Further, M.W., B.N., W.N., and members of the Washington class could not have reasonably avoided injury because Defendants each took advantage of the lack of knowledge, ability, experience, and/or capacity of consumers—in this case children under 13—to their detriment.

1066.  Defendants willfully engaged in the unfair and unlawful acts described herein and knew or recklessly disregarded the fact that they violated Wash. Rev. Code Ann. § 19.86.020, et seq.

1067.  M.W., B.N., W.N., and members of the Washington class were harmed by Defendants' practices described herein, which were a substantial factor and caused injury in fact and actual damages to M.W., B.N., W.N., and members of the Washington class.

1068.  As a direct and proximate result of Defendants' unfair and unlawful acts and practices in violation of Wash. Rev. Code Ann. § 19.86.020, et seq., M.W., B.N., W.N., and members of the Washington class have suffered and will continue to suffer an ascertainable loss of money or property, real or personal, and monetary and non-monetary damages, as described herein, including, inter alia, the

---

[196] *See* 16 C.F.R. § 312.1 (COPPA "prohibits unfair or deceptive acts or practices in connection with the collection, use, and/or disclosure or personal information from and about children on the internet.").

loss of the value and/or diminishment in value of their Personal Information and the loss of the ability to control the use of their Personal Information.

1069.   As outlined herein, there is tangible value in M.W., B.N., W.N., and members of the Washington class's Personal Information. M.W., B.N., W.N., and members of the Washington class have lost the opportunity to receive value in exchange for their Personal Information.

1070.   Defendants' monetization of M.W., B.N., W.N., and members of the Washington class's Personal Information demonstrates that there is a market for their Personal Information.

1071.   M.W., B.N., W.N., and members of the Washington class's Personal Information is now in the possession of Defendants, who have used and will use it for their financial gain.

1072.   Defendants' retention of M.W., B.N., W.N., and members of the Washington class's Personal Information presents a continuing risk to them as well as the general public. M.W., B.N., W.N., and members of the Washington class seek relief for the injuries they have suffered as a result of Defendants' unfair and unlawful acts and practices, as provided by Wash. Rev. Code Ann. § 19.86.020, et seq. and applicable law, including all actual damages and attorneys' fees and costs, treble damages, statutory damages, and restitution, as well as an injunction requiring Defendants to each permanently delete, destroy or otherwise sequester the Personal Information collected without parental consent, requiring Defendants to provide a complete audit and accounting of the uses of the Personal Information by Defendants and any other third parties, and other appropriate injunctive and/or declaratory relief.

### Claim 42
### WASHINGTON UNJUST ENRICHMENT
**(Against All Defendants on behalf of Plaintiffs M.W., B.N., W.N., and the Washington Class)**

1073.   Plaintiffs M.W., B.N., W.N., and members of the Washington class re-allege the foregoing allegations as if fully set forth herein.

1074.   By virtue of the unlawful and unfair conduct alleged herein, Defendants have each realized millions of dollars in revenue from their collection and use of the Personal Information of M.W., B.N., W.N., and members of the Washington class through behavioral advertising and commercialization purposes derived from that Personal Information.

1075.   Defendants' ill-gotten gains were monetary benefits conferred upon Defendants by M.W., B.N., W.N., and members of the Washington class. It would be inequitable and unjust to permit any of the Defendants to retain the economic benefits they have obtained through advertising and commercialization derived from the Personal Information of M.W., B.N., W.N., and members of the Washington class.

1076.   Defendants are each independently liable because they each profited from the conduct alleged.

1077.   Defendants will each be unjustly enriched if they are permitted to retain the economic benefits conferred upon them by M.W., B.N., W.N., and members of the Washington class through Defendants' unlawful, unfair, unauthorized, and impermissible use of the Personal Information of M.W., B.N., W.N., and members of the Washington class, and allowing Defendants to retain the profits from their unlawful, unfair, unauthorized, and impermissible use of the Personal Information of M.W., B.N., W.N., and members of the Washington class would be unjust and contrary to public policy.

1078.   M.W., B.N., W.N., and members of the Washington class are therefore entitled to recover the amounts realized by each of the Defendants at the expense of M.W., B.N., W.N., and members of the Washington class

1079.   M.W., B.N., W.N., and members of the Washington class do not seek recovery in this claim for their own economic harm and have no adequate remedy at law that would divest Defendants of their ill-gotten and unjust profits.   Moreover, even if money damages might otherwise provide an adequate remedy at law for this claim, there is at a minimum substantial doubt that any remedy at law is available, as the Court has ruled that the claims at law asserted by M.W., B.N., W.N., and members of the Washington class in their Fifth Amended Complaint do not satisfy the requisite elements for relief. M.W., B.N., W.N., and members of the Washington class dispute the Court's holding and further believe that their claims at law as asserted in this Sixth Amended Complaint are legally and factually sufficient. However, to the extent that money damages, if available, would constitute an adequate remedy at law barring recovery under this claim, M.W., B.N., W.N., and members of the Washington class assert their claim for non-restitutionary disgorgement as an alternative remedy pending a final determination of the availability of a remedy at law.

SIXTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

1080.   M.W., B.N., W.N., and members of the Washington class are entitled to non-restitutionary disgorgement of each Defendant's ill-gotten gains, and/or the imposition of a constructive trust to recover the amount of each Defendant's ill-gotten gains.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of themselves and the proposed Classes, respectfully request relief as follows:

A.   An order certifying this action as a class action, and certifying the Classes defined herein, designating Plaintiffs, as described above, as the representatives of the respective Classes defined herein, and appointing Plaintiffs' counsel as counsel for the Classes;

B.   An order declaring that Defendants' actions, as described above constitute: (i) breaches of the common law claim of intrusion upon seclusion as to the intrusion upon seclusion claims set forth above; (ii) violations of the state consumer protection statutes set forth above; (iii) a violation of the right to privacy under the California Constitution, Article I, Section 1; and (iv) that Defendants were unjustly enriched as a result of their actions.

C.   A judgment awarding Plaintiffs and the members of the Classes appropriate relief, including actual, compensatory, and/or statutory damages, and punitive damages (as permitted by law), in an amount to be determined at trial;

D.   A judgment awarding any and all equitable, injunctive, and declaratory relief as may be appropriate, including orders of disgorgement of Defendants' unlawful gains, and restitution;

E.   A judgment awarding injunctive relief as set forth above, non-restitutionary disgorgement of profits and unlawful gains, and such other equitable relief as the Court may deem proper;

F.   A judgment awarding all costs, including experts' fees, attorneys' fees, and the costs of prosecuting this action, and other relief as permitted by law;

G.   Pre-judgment and post-judgment interest, as permitted by law; and

H.   Grant such other legal and equitable relief as the Court may deem appropriate.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury for all issues so triable.

Dated:  July 22, 2024                                              Respectfully submitted,


**PRITZKER LEVINE LLP**                          **SILVER GOLUB & TEITELL LLP**

*/s/ Jonathan K. Levine*                             */s/ David S. Golub*
Jonathan K. Levine (SBN 220289)          David S. Golub (admitted *pro hac vice*)
Elizabeth C. Pritzker (SBN 146267)        Steven L. Bloch (admitted *pro hac vice*)
Caroline C. Corbitt (SBN 305492)          Ian W. Sloss (admitted *pro hac vice*)
1900 Powell Street, Suite 450                 1 Landmark Square, 15th Floor
Emeryville, CA 94608                            Stamford, CT 06901
Telephone: (415) 692-0772                     Telephone: (203) 325-4491
Facsimile: (415) 366-6110                      Facsimile: (203) 325-3769
jkl@pritkzerlevine.com                          dgolub@sgtlaw.com
ecp@pritzkerlevine.com                         sbloch@sgtlaw.com
ccc@pritzkerlevine.com                         isloss@sgtlaw.com

*Attorneys for Plaintiffs*
*and the Proposed Classes*

SIXTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK