Jonathan K. Levine (SBN 220289)
Elizabeth C. Pritzker (SBN 146267)
Caroline C. Corbitt (SBN 305492)
PRITZKER LEVINE LLP
1900 Powell Street, Suite 450
Emeryville, CA 94608
Telephone: (415) 692-0772
Facsimile: (415) 366-6110
jkl@pritzkerlevine.com
ecp@pritzkerlevine.com
ccc@pritzkerlevine.com

David S. Golub (admitted *pro hac vice*)
Steven L. Bloch (admitted *pro hac vice*)
Ian W. Sloss (admitted *pro hac vice*)
SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491
Facsimile: (203) 325-3769
dgolub@sgtlaw.com
sbloch@sgtlaw.com
isloss@sgtlaw.com

*Attorneys for Plaintiffs and
the Proposed Classes*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NORTHERN CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| C.H., a minor, by and through their guardian ad litem NICHOLE HUBBARD, et al., <br><br>                 Plaintiffs, <br><br>     v. <br><br> GOOGLE LLC, et al. <br><br>                 Defendants. | Case No. 5:19-cv-07016-SVK <br><br> <u>CLASS ACTION</u> <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SIXTH AMENDED COMPLAINT** <br><br> Judge:      Hon. Susan van Keulen <br> Date:       October 22, 2024 <br> Time:       10:00 a.m. <br> Courtroom:  Courtroom 6 – 4th Floor |

1

## TABLE OF CONTENTS

2

INTRODUCTION ......................................................................................................... 1

3

ARGUMENT ................................................................................................................ 1

4

5

I.   The 6AC States Valid Claims for Injunctive Relief ..................................................1

6

II.   The 6AC States Valid Claims for Equitable Relief/Unjust Enrichment ................... 4

7

8

III.  The 6AC Shows that Defendants' Intrusion on Privacy Did Not Simply Involve "Routine Commercial Behavior" that Was Not Highly Offensive. ....................................... 8

9

10

   A.   The 6AC Establishes the Highly Offensive Nature of Defendants' Misconduct. ...........8

11

   B.   Plaintiffs Have Alleged a Reasonable Expectation of Privacy ...........................11

12

13

IV.  The 6AC Establishes that Plaintiffs and the Classes Have Suffered Loss Cognizable under the Applicable Consumer Protection Statutes........................................................ 13

14

15

   A.   Harm from Misappropriation and Exploitation of Plaintiffs' PI ..................................... 15

16

   B.   Diminution in Value of Plaintiffs' PI .................................................. 16

17

   C.   Destruction of Plaintiffs' Right to Privacy of Their PI ....................................... 17

18

V.   Plaintiffs State Claims Against The Channel Owner Defendants ....................................... 20

19

20

   A.   Plaintiffs Have Not "Waived" Their Contention that the Channel Owner Defendants Are Primarily Liable for Their Violations of Plaintiffs' Privacy Rights ................................. 20

21

22

   B.   COPPA Envisions that Channel Owners Will Be Primarily – and Strictly -- Liable for Violations of Children's Privacy .................................................................... 22

23

24

   C.   The Channel Owner Defendants Are Also Secondarily Liable ....................................... 23

25

CONCLUSION.................................................................................................. 25

26

27

28

# TABLE OF AUTHORITIES

### Cases

*Andino v. Apple, Inc.*, 2021 WL 1549667 (E.D. Cal. Apr. 20, 2021) ................................................. 5

*Bailey v. St. Louis*, 268 So.3d 197 (Fla. App. 2018) ........................................................................ 7

*Baton v. Ledger SAS*, 2024 WL 3447511 (N.D. Cal. July 16, 2024) ................................................ 10

*Bell Atlantic Corp. v. Twombley*, 550 U.S. 544 (2007) ................................................................. 27

*Brooks v. Thompson Reuters Corp.*, 2021 WL 3621837 (N.D. Cal. Aug. 16, 2021) ......................... 5

*Brown v. Google LLC*, 2021 WL 6064009 (N.D. Cal. Dec. 22, 2021) ....................................... 16, 18

*C. M. v. MarinHealth Med. Group, Inc.*, 2024 WL 217841 (N.D. Cal. Jan. 19, 2024) ..................... 9

*Calhoun v. Google LLC*, 526 F. Supp. 3d 605 (N.D. Cal. 2021) ....................................... 14, 18, 20

*Call One Inc. v. Berkley Ins. Co.*, 587 F. Supp.706 (N.D. Ill. 2022) ................................................ 7

*City Council of the City of Orange Twp. v. Edwards*, 189 A.3d 356 (N.J. Super. 2018) ................... 7

*CTC Real Estate Servs. v, Lepe*, 140 Cal. App. 4th 856 (2006) ............................................... 7, 17

*Doe v. Roblox*, 602 F. Supp.3d 1243 (N.D. Cal. 2022) .................................................................. 14

*Ex Parte AmSouth Mort. Co., Inc.*, 679 So.2d 251 (Ala. 1996) ...................................................... 7

*FTC v. Cephalon, Inc.*, 100 F. Supp.3d 433 (E.D. Pa. 2015) .......................................................... 7

*Gilkey v. Central Clearing Co.*, 202 F.R.D. 515 (E.D. Mich. 2001) ............................................... 21

*Governo Law Firm LLC v. Bergeron*, 166 N.E.3d 416 (Mass. 2021) .............................................. 7

*Griffith v. TikTok, Inc.*, 697 F.Supp.3d 963 (C.D. Cal. 2023) ...................................................... 17

*Guzman v. Polaris Indus., Inc.*, 49 F.4th 1308 (9th Cir. 2022) ..................................................... 9

*Hammerling v. Google, LLC*, 2024 WL 937247 (9th Cir. Mar. 5, 2024) ....................................... 14

*Harrington v. Fay Servicing, LLC*, 2019 WL 4750140, at *79 (N.D. Ill. Sept. 30, 2019) ............... 21

*Harris Group, Inc. v. Robinson*, 209 P.3d1188 (Colo. App. 2009) ................................................ 7

*Hershenow v. Enterprise Rent–A–Car Co. of Boston, Inc.*, 840 N.E.2d 526 (Mass. 2006) ............. 21

*Hitch Enterprises, Inc. v. Cimarex Energy Co.*, 859 F. Supp. 2d 1249 (W.D. Okla. 2012) .............. 7

*Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237 (3d Cir. 2010) ...................... 6

*Hubbard v. Google LLC*, 508 F. Supp.3d 623 (N.D. Cal.2020) .................................................... 23

*In re Facebook, Inc. Internet Tracking Litig.* ["*Facebook Tracking*"], 956 F.3d 589 (9th Cir. 2020).............................................................................................................passim

*In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125 (3d Cir. 2015).............. 12

*In re Mednax Svcs., Inc.*, 603 F. Supp.3d 1183 (S.D. Fla. 2022) ...................................................... 21

*In re Meta Pixel Tax Filing Cases* 2024 WL 1251350 (N.D. Cal. Mar. 25, 2024) .................... 17, 20

*In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262 (3d Cir. 2016) ...................................... 13

*In re Nifedine Antitr. Litig.*, 335 F. Supp.2d 6 (D.D.C. 2004) ............................................................ 6

*Jeong v. Nexo Financial LLC*, 2022 WL 174236, 2022 WL 174236 ................................................ 10

*Ketayi v. Health Enrollment Grp.*, 2021 WL 2864481 (S.D. Cal. Jul. 8, 2021)................................ 8

*Kwikset Corp. v. Superior Court,* 51 Cal. 4th 310  (2011) ............................................................... 18

*Linton v. Axcess Fin. Svcs.*, 2023 WL 4297568 (N.D. Cal. June 30, 2023) ...................................... 5

*Manigault-Johnson v. Google, LLC*, 2019 WL 3006646 (D.S.C. Mar. 31, 2019) .......................... 13

*Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036 (9th Cir. 2012) ...................................... 5

*Murphy v. Olly Public Benefit Corp.* 651 F. Supp.3d 1111 (N.D. Cal. 2023).................................. 10

*Nacarino v. Chobani, LLC*, 668 F. Supp.3d 881 (N.D. Cal. 2022)..................................................... 9

*Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171 (9th Cir. 20140...................................................... 14

*Nickelodeon. McDonald v. Kiloo ApS*, 385 F. Supp. 3d 1022 (N.D. Cal. 2019)............................. 13

*Opris v. Sincera Reproductive Medicine*, 2022 WL 1639417 (E.D. Pa. May 24, 2022)................... 22

*People v. Ernst & Young, LLP*, 980 N.Y.S. 456 (App. Div. 2014) ...................................................... 7

*People v. Stewart*, 113 Cal. App. 4th 242, 6 Cal.Rptr.3d 249 (2003)............................................... 20

*Pharmacia Corp. Supp. Pension Plan, ex rel. Pfizer Inc. v. Weldon*, 126 F. Supp.3d 1061 (E.D. Mo. 2015)..................................................................................................................................... 7

*Prager Univ. v. Google LLC*, 951 F.3d 991 (9th Cir. 2020)............................................................. 15

*Ramirez v. County of San Bernardino*, 806 F.3d 1002 (9th Cir. 2015) ............................................ 22

*Reid v. Johnson & Johnson*, 780 F.3d 952 (9th Cir. 2015)............................................................... 18

*Sagastume v. Psychemedics Corp.*, 2020 WL 8175597, at *7 (C.D. Cal. Nov. 30, 2020) ................. 9

*San Bernardino v. Walsh*, 158 Cal. App. 4th 533 (2007) ................................................................... 7

*Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, (9th Cir. 2020) .................................................... 5

*State v. $2,435 in U.S. Currency*, 220 N.E.3d 542 (Ind. 2023) .......................................................... 7

iii

*Turner v. Google LLC*, 2024 WL 3052969 (N.D. Cal. Mar. 25, 2024)............................................ 18

*Tyler v. Michaels Stores, Inc.,* 984 N.E.2d 737 (Mass. 2013) ........................................................ 21

*Zeiger v. WellPet LLC*, 526 F. Supp.3d 652 (N.D. Cal. 2021) ......................................................... 5

## RULES

Fed. R. Civ P. 8(a)(3)........................................................................................................................ 11

Fed. R. Civ. P. 9(b) ......................................................................................................................... 29

**INTRODUCTION**

In its July 1, 2024 Order Granting Motion to Dismiss with Limited Leave to Amend ("Order") (ECF 281), the Court identified deficiencies in Plaintiffs' Fifth Amended Complaint ("5AC") that might be cured by further amendment. Plaintiffs have cured these pleading deficiencies in their Sixth Amended Complaint ("6AC"), and for the reasons set forth below, Defendants' latest motion to dismiss (ECF 295) should be denied and the case allowed to proceed.

**ARGUMENT**

**I.      The 6AC States Valid Claims for Injunctive Relief**

In its Order, the Court stated that Plaintiffs "do not convincingly explain why the FTC Order, which enjoins Google from using the misappropriated information, does not neuter their position that they cannot receive adequate recovery while Google retains their information." Order at 8-9. The Court further held that Plaintiffs had failed "to describe any non-economic harm that may stem" from Google's continued possession or ongoing collection of such information. *Id.* at 9. The 6AC addresses both of these perceived defects in Plaintiffs' prior allegations.

First, Plaintiffs show that the FTC Order precluding Google from using or benefiting from their Personal Information ("PI") *only* applies to information collected on YouTube channels *if* the channel owner affirmatively designated its channel as child-directed by Dec. 10, 2019. 6AC, ¶¶ 299-300.  The FTC Order does not require any channel owner to make such designation even if its channel was child-directed, nor require Google to take any steps to obtain accurate designations. *Id.*, ¶ 300. The FTC Order, thus, "leaves Google free to continue to use any of Plaintiffs' or the Classes' [PI] obtained by Google in violation of COPPA if a channel owner failed to provide Google with a timely designation of its channel as child-directed." *Id.* This gaping loophole in the FTC Order was expressly recognized by dissenting FTC Commissioner Slaughter, who noted the significant financial incentive for channel owners to fail to self-designate. *Id.*, ¶¶ 301-02.

Second, because the FTC Order does not require Google to destroy any of the wrongly collected PI, there is risk that Google, a serial violator of COPPA and *of FTC consent orders*, will intentionally misuse the PI in the future. (*Id.*, ¶¶ 308-09). Published reports document that Google continues to "engag[e] in ongoing COPPA-violative YouTube data collection practices. *Id.*, ¶¶ 314-

27. These reports have been confirmed by Plaintiffs' expert. *Id.*, ¶ 317.

The 6AC also details the insidious use Google makes of the wrongfully-obtained PI it retains (and remains free to use), not only to profile and target Plaintiffs with behavioral advertising, but "to fuel YouTube's 'Recommendation Engine' – a feature that feeds a continuing series of targeted videos to minors" and is specifically designed to promote minors' compulsive use of YouTube and maximize exposure to advertisements. *Id.*, ¶¶ 275-86. The Recommendation Engine (described by one scientist as an "addiction engine") continuously directs "inappropriate, harmful content," including "obscene" and "unsafe, disturbing videos" to young children, (*id.*, ¶¶ 220, 287-88), and "once a child YouTube user watches one harmful recommended video, the Recommendation Engine is likely to suggest similar harmful content to watch next, pushing children down 'rabbit holes,' which '[lead] viewers to incrementally more extreme videos or topics, which ... hook them in.'" *Id.*, ¶¶ 293-94 & nn. 162-66. Studies have shown that the compulsive viewing and harmful content promoted by the Recommendation Engine has adverse effects on the development and mental health of children. *Id.*, ¶¶ 289-97. Absent injunctive relief, this conduct will continue to go undeterred.

These future harms to children caused by Google's use of their wrongly-collected PI need to be prevented – not simply "paid for" by imposing legal damages on Google. As alleged, "Money damages will not protect Plaintiffs and the members of the Classes from the non-economic harms discussed herein ... and Plaintiffs and the Classes, thus, have no adequate remedy at law." *Id.*, ¶ 311.

Numerous courts have recognized that invasions of privacy can never be fully remedied through damages. *See, e.g., Meyer v. Portfolio Recovery Assocs., LLC,* 707 F.3d 1036, 1045 (9th Cir. 2012) (violation of privacy is "irreparable harm"); *Brooks v. Thompson Reuters Corp.,* 2021 WL 3621837, at *10–11 (N.D. Cal. Aug. 16, 2021) ("Even if Plaintiffs could obtain damages [for] the unauthorized sale of their personal information to third parties, that amount will not compensate them adequately for the irreparable loss of their privacy").

Courts have further held that to the extent *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020), applies to claims for injunctive relief, it does not apply to preclude claims for injunctive relief to bar ongoing or future harm because monetary damages "compensate consumers for past [harm] whereas injunctive relief" pertains to future conduct. *Linton v. Axcess Fin. Svcs.*, 2023

WL 4297568, at *3 (N.D. Cal. June 30, 2023); *see Brooks*, 2021 WL 3621837, at *10–11 ("Without an injunction . . . there is no way the Court can ensure that [defendant] will stop selling Plaintiffs' personal information without their consent.  Damages for past [harm] are not likely to dissuade [defendant] from continuing this behavior in the future"); *Andino v. Apple, Inc*., 2021 WL 1549667, at *5 (E.D. Cal. Apr. 20, 2021) (*Sonner* does not warrant dismissal of claims for injunctive relief because "[m]oney damages are an inadequate remedy for future harm, as they will not prevent Defendant from continuing the allegedly deceptive practice."); *Zeiger v. WellPet LLC*, 526 F. Supp.3d 652, 687 (N.D. Cal. 2021) (even if *Sonner* applies to injunctive relief, monetary damages would still be an inadequate remedy because damages compensate consumers for past harm, whereas injunctive relief prevents future harm).

In their motion, Defendants assert a new argument against injunctive relief  – that Plaintiffs cannot establish Article III standing because they cannot show any "certainly impending" threat of injury, or a sufficient likelihood that Plaintiffs "will again be wronged in a similar way," because Google is already subject to the FTC Order.  Def. Br. 9.  However, as Plaintiffs allege (and discuss above), there are crucial gaps in the protections provided by the FTC Order (6AC ¶¶ 300-9; "there is substantial credible evidence that the FTC Injunction has not deterred Google from continuing to violate COPPA" (*id*. ¶¶ 313-27); and Defendants have a well-documented history of recidivism in connection with privacy violations: Google is a serial violator of privacy regulations and FTC consent orders (*id*. ¶ 309) and Hasbro and Mattel have a similar history of violating children's privacy (*id*. ¶¶ 137-40, 145-47).  Moreover, "private and public injunctions may exist concomitantly," *Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc*., 602 F.3d 237, 249 (3d Cir. 2010), and "the mere existence of the Consent Order does not preclude private injunctive relief." *In re Nifedine Antitr. Litig*., 335 F. Supp.2d 6, 17 (D.D.C. 2004).  At the pleading stage, Defendants' history of repeated violations of privacy rights and settlements protecting such rights suffice to show a "cognizable danger of a recurrent violation." *Id.*

Defendants contend that Plaintiffs are not at "immediate risk" of harm because they only allege that they are "likely to use YouTube" at some indeterminate point "in the future." Def. Br. 9. But Plaintiffs further allege that they "continue to use YouTube ... and have a legitimate desire to

1    avoid having their profiles used by Google for advertising or other intrusive purposes," and "seek

2    protection from Google's continuing violations of COPPA protections." 6AC ¶ 328, 331.

3        Lastly, Defendants argue that the D.C. Court retained jurisdiction "for purposes of

4    construction, modification, and enforcement" of the FTC Order. Def. Br. 9-10.  But there is no private

5    enforcement mechanism in the FTC Order (6AC ¶ 306), and thus no jurisdictional impediment to this

6    Court issuing injunctive relief.

7    **II.    The 6AC States Valid Claims for Equitable Relief/Unjust Enrichment**

8        The Court held, with respect to Plaintiffs' equitable claims for disgorgement and unjust

9    enrichment claims, that Plaintiffs "allege they suffered economic harm, and damages serve as an

10   adequate remedy for that harm."  Order at 19. Plaintiffs' amendments make clear that they seek

11   equitable orders of non-restitutionary disgorgement, (6AC ¶¶ 310, 312, 332, 335), and expressly

12   allege that such relief is warranted as a matter of public policy to prevent Defendants from profiting

13   from their misconduct, not based on any corresponding harm suffered by Plaintiffs from Defendants'

14   receipts of such profits.  *Id., ¶¶* 310, 332.  Because Defendants' wrongful profits are unrelated to any

15   economic harm that Plaintiffs may have suffered, no remedy at law is available to reach Defendants'

16   impermissible profits from their misconduct.  *Id., ¶¶* 311, 334.

17       Plaintiffs' claims for equitable relief for non-restitutionary disgorgement to recover

18   Defendants' ill-gotten gains are clearly actionable.  The Ninth Circuit, in a similar case involving

19   Facebook's tracking of customers' browsing histories and its monetization of plaintiff's information

20   to earn advertising revenue, has held that "California law recognizes a right to disgorgement of profits

21   resulting from unjust enrichment, even where an individual has not suffered a corresponding loss."

22   *In re Facebook, Inc. Internet Tracking Litig.* ["*Facebook Tracking*"], 956 F.3d 589, 599- 600 (9th

23   Cir. 2020), citing *San Bernardino v. Walsh*, 158 Cal. App. 4th 533, 542 (2007). As the court stated in

24   *San Bernardino,* where "a benefit has been received by the defendant but the plaintiff has not suffered

25   a corresponding loss, or in some cases, any loss, but nevertheless the enrichment of the defendant

26   would be unjust…[t]he defendant may be under a duty to give to the plaintiff the amount by which

27

28

[the defendant] has been enriched." *Id.*[1] These principles are well-established, *see* Restatement (First) Restitution, § 1, cmt. e (1937), and have been widely adopted in the states whose laws are at issue in this case.[2]  Defendants contention that "equitable and legal relief are different avenues of making injured parties whole" (Def. Br. 7), is incorrect insofar as non-restitutionary disgorgement is sought.

Plaintiffs likewise have amended their unjust enrichment claims to make clear that they "do not seek recovery in this claim for their own economic harm and have no adequate remedy at law that would divest Defendants of their ill-gotten gains and unjust profits." *See e.g.*, 6AC ¶ 514 (Alabama). As with Plaintiffs' injunctive relief claims for disgorgement, Plaintiffs' unjust enrichment claims do not require Plaintiffs to have incurred economic loss, *Facebook Tracking*, 956 F.3d at 599-600, and

---

[1] Similarly, California law "requires the disgorgement of unjustly earned profits regardless of whether a defendant's actions caused a plaintiff to directly expend his or her own financial resources or whether a defendant's actions directly cause the plaintiff's property to become less valuable." *Facebook Tracking*, 956 F.3d at 600, citing *CTC Real Estate Servs. v, Lepe*, 140 Cal. App. 4th 856, 860-61 (2006).

[2] *See, e.g., Bailey v. St. Louis*, 268 So.3d 197, 201 (Fla. App. 2018) ("the point of disgorgement is to deter wrongdoers by stripping them of the gains from their conduct"); *Call One Inc. v. Berkley Ins. Co.*, 587 F. Supp.706, 714 (N.D. Ill. 2022) (the focus of disgorgement as a remedy typically is on the benefit accrued to the violator rather than the harm incurred by any victim of its actions."); *State v. $2,435 in U.S. Currency*, 220 N.E.3d 542, 557 (Ind. 2023) ("Disgorgement is a form of restitution in which a defendant is ordered to surrender gains unjustly obtained even if the plaintiff suffered no loss"); *Governo Law Firm LLC v. Bergeron*, 166 N.E.3d 416, 428 (Mass. 2021) ("A monetary award based on a disgorgement of profits is measured by the defendant's gain, rather than by the plaintiff's loss."); *Pharmacia Corp. Supp. Pension Plan, ex rel. Pfizer Inc. v. Weldon*, 126 F. Supp.3d 1061, 1069 (E.D. Mo. 2015) ("Equitable restitution 'seeks to punish the wrongdoer by taking his ill-gotten gains' whereas legal restitution 'seek[s] to recover in money the value of the harm done' to the plaintiff"); *City Council of the City of Orange Twp. v. Edwards*, 189 A.3d 356, 366 (N.J. Super. 2018) ("Disgorgement is an equitable claim 'grounded in the theory that a wrongdoer should not profit from its wrongdoing regardless of whether the innocent party suffered any damages"); *People v. Ernst & Young, LLP*, 980 N.Y.S. 456 (App. Div. 2014) ("Disgorgement is distinct from the remedy of restitution because it focuses on the gain of the wrongdoer as opposed to the loss to the victim"). *Ex Parte AmSouth Mort. Co., Inc.*, 679 So.2d 251, 255 (Ala. 1996) (restitution designed to force a "defendant to return benefits that it would be unjust to allow the defendant to keep; the law of restitution is not intended to compensate the plaintiff"); *Harris Group, Inc. v. Robinson*, 209 P.3d1188, 1205 (Colo. App. 2009) (a defendant claimed to have been unjustly enriched "is normally required to make restitution in the amount of the enrichment the defendant received"); *Hitch Enter.s, Inc. v. Cimarex Energy Co.*, 859 F. Supp. 2d 1249, 1258 (W.D. Okla. 2012) ("Disgorgement is also an equitable remedy , the purpose of which is not to compensate; an aggrieved party, but to deprive the alleged wrongdoer of any ill-gotten gains"); *FTC v. Cephalon, Inc.*, 100 F. Supp.3d 433, 435, n. 2 (E.D. Pa. 2015) (Disgorgement "wrests ill-gotten gains from the hands of the wrongdoer.  It is an equitable remedy meant to prevent the wrongdoer from enriching himself by his wrongs").

1   Plaintiffs do not allege or rely on any harm they incurred from the loss of value of their PI (or their

2   harm from privacy invasions) as a basis for their unjust enrichment claims. Rather, Plaintiffs rely on

3   the public policy principle that a "person acting in conscious disregard of the rights of another should

4   be required to disgorge all profit" because that "deters the perpetrator from committing the same

5   unlawful actions again." *San Bernadino*, 158 Cal. App. 4th at 542.

6       Defendants' reliance on *Ketayi v. Health Enrollment Grp*., 2021 WL 2864481, at *9-10 (S.D.

7   Cal. Jul. 8, 2021), Def. Br. 7, is misplaced. While *Ketayi* held that restitution and damages claims in

8   that case were duplicative even though they sought different amounts of damages, the court explained

9   that the question to be determined in assessing whether a damages claim duplicates an equitable remedy

10  of restitution is "whether the [complaint] states a claim for restitution that *differs* from their claim for

11  damages." *Id*. at *9. The salient point from *Ketayi* is that the disgorgement of Defendants' ill-gotten

12  behavioral advertising revenue sought in this case is *different* from Plaintiffs' claims for damages

13  based on the loss of the value of their PI (or invasions of privacy). As the Ninth Circuit recognized,

14  to assert a non-restitutionary disgorgement claim, Plaintiffs need not have suffered a "corresponding

15  loss" or, for that matter, "any loss." *Facebook Tracking*, 956 F.3d at 599-600.

16      The 6AC alleges specific facts "plausibly" showing that Plaintiffs "lack adequate legal

17  remedies" to match their equitable claim for non-restitutionary disgorgement. Plaintiffs allege that

18  there is no remedy at law available to compel disgorgement of a defendant's illicitly-gained profits.

19  *See e.g.*, 6AC ¶ 514. In addition, Plaintiffs allege that, "even if money damages might otherwise

20  provide an adequate remedy at law for this claim, there is at a minimum substantial doubt that any

21  remedy at law is available, as the Court has ruled that the claims at law as asserted [by Plaintiffs] . . .

22  in their [5AC] do not satisfy the requisite elements for relief." *Id*.  Moreover, "[t]o the extent that

23  money damages, if available, would constitute an adequate remedy at law barring recovery [for unjust

24  enrichment, Plaintiffs] assert their claim for non-restitutionary disgorgement as an alternative remedy

25  pending a final determination of the availability of a remedy at law." *Id*.

26      Fed. R. Civ. P. 8(a)(3) authorizes Plaintiffs to plead "a demand for relief sought, which may

27  include relief in the alternative or different types of relief." As numerous courts have recognized,

28  "*Sonner* does not hold that plaintiffs may not seek alternative remedies at the pleading stage."

1   *Nacarino v. Chobani, LLC*, 668 F. Supp.3d 881, 896 (N.D. Cal. 2022), citing *Sagastume v.*

2   *Psychemedics Corp.*, 2020 WL 8175597, at *7 (C.D. Cal. Nov. 30, 2020); *see also C. M. v.*

3   *MarinHealth Med. Group, Inc.,* 2024 WL 217841, at *6 (N.D. Cal. Jan. 19, 2024) ("With respect to

4   Sonner… at the pleading stage all a plaintiff needs to allege is inadequate remedies at law to pursue

5   equitable claims").

6          Defendants contend that Plaintiffs "speculating about what the Court may do cannot elide that

7   'Plaintiffs have not pled facts' showing the inadequacy of legal remedies." Def. Br. 8. But Plaintiffs

8   are not speculating. The Court has dismissed Plaintiffs' claims for damages as legally insufficient

9   and may once again dismiss those damages claims, despite Plaintiffs' best efforts to amend their

10  complaint to satisfy the Court's requirements. Defendants' reliance on *Sonner* and *Guzman v. Polaris*

11  *Indus., Inc.*, 49 F.4th 1308, 1312 (9th Cir. 2022), for the proposition that "the subsequent

12  unavailability of a legal claim does not make legal remedies sought through that claim inadequate" is

13  not supported by either of those cases – and is overreaching.  Neither *Sonner* nor *Guzman* involved a

14  situation where a court determines that no legal claim is available as a matter of law.   As the court

15  aptly stated in *Nacarino*:

16         [W]hile a plaintiff may not through actions within its control forsake an adequate legal
           remedy and then claim it has no legal remedy, thereby opening the door to otherwise
17         identical equitable relief, the analysis is less clear where the legal remedy has been
           denied despite plaintiff's best efforts.
18

19  668 F. Supp.3d at 895.  Based on that distinction, the *Nacarino* court declined to dismiss the complaint

20  at the pleading stage.  *Id.*; *see Guzman*, 49 F.3d at 1313 ("*Sonner's* holding applies to equitable claims

21  UCL claims when there is a *viable* CLRA damages claim").  While the issue of what should be done

22  "where the legal remedy has been denied despite plaintiff's best efforts" does not appear to have been

23  definitively resolved, courts have generally agreed with *Nacarino* that dismissal at the pleading stage

24  is inappropriate. *See, e.g.*, *Murphy v. Olly Public Benefit Corp.* 651 F. Supp.3d 1111, 1128-29 (N.D.

25  Cal. 2023) (collecting cases); *Jeong v. Nexo Financial LLC*, 2022 WL 174236, at *27 (collecting

26  cases); *Baton v. Ledger SAS*, 2024 WL 3447511, at *35 (N.D. Cal. July 16, 2024) (where court had

27  dismissed the complaint with leave to amend, it reserved judgment on whether plaintiff's CLRA

28  claim provided an adequate remedy at law under *Sonner* until the pleadings were settled).

1  Accordingly, at a minimum, the Court should permit Plaintiffs to plead their equitable remedies in

2  the alternative at this juncture. [3]

3      Finally, Defendants argue that the Court should dismiss Plaintiffs' equitable claims *with*

4  prejudice.  Def. Br. 6. Even assuming *arguendo* that Plaintiffs' equitable relief claims remain

5  insufficient under *Sonner*, it would be error to dismiss with prejudice. As the Ninth Circuit instructed

6  in *Guzman*, where equitable jurisdiction is lacking under *Sonner*, it is inappropriate for the Court to

7  make a merits determination, and any dismissal must be <u>without</u> prejudice, so that Plaintiffs can refile

8  their equitable claims in state court. *Guzman*, 49 F.4[th] at 1314.

9  **III.    The 6AC Shows that Defendants' Intrusion on Privacy Did Not Simply Involve**
   **"Routine Commercial Behavior" that Was Not Highly Offensive.**
10

11      **A.      The 6AC Establishes the Highly Offensive Nature of Defendants' Misconduct.**

12      As the basis for dismissing Plaintiffs' invasion of privacy claims, the Court held that Plaintiffs

13  had failed to establish that Defendants' collection and exploitation of Plaintiffs' PI was highly

14  offensive because such collection of such data is "routine commercial behavior" in the internet

15  industry (Order at 12-13), even when the behavior is directed at young children (*id.* at 14), and

16  notwithstanding the provisions of federal law (COPPA) intended to protect young children from

17  precisely such conduct. *Id.* at 13.  The Court permitted Plaintiffs to attempt to amend their allegations

18  to show something more than "routine commercial behavior" sufficient to "rise to the level of highly

19  offensive." *Id.* at 20.

20      Plaintiffs' amendments in their 6AC show the following:

21       – Unlike local "open container" laws (Order at 13 n. 10), COPPA represents a national

22  policy adopted by Congress, and supported by parents, public interest groups, the FTC, and *internet*

23  *industries themselves*, to protect important privacy rights of young children from the internet

24  industry's data collection practices towards adults (6AC, ¶¶ 227-45); COPPA's promulgations of

25  such protections for minors is consistent with the similar protections afforded minors from otherwise

26

27  [3] In their motion, Defendants repeat their state-specific challenges to unjust enrichment liability in
   some of the States at issue.  Def. Br. 17-19.  Plaintiffs previously addressed these challenges in their
28  opposition to Defendants' Motion to Dismiss the Fourth Amended Complaint ("4AC") (ECF 213) at
   12-14, and respectfully refer the Court to that filing.

permissible "routine commercial behavior" in other areas (*i.e.*, $206 billion paid by cigarette companies for illegal marketing to minors and $700 million paid by electronic cigarette company for targeting minors) (*id.*, ¶¶ 223-24); the FTC, COPPA's enforcer, has recognized the highly offensive nature of Defendants' behavior by imposing enormous civil penalties for the types of violations of COPPA at issue here, including a $136 million civil penalty on Google for its conduct here (*id.,* ¶ 225), and a $245 million civil penalty on Epic Games, Inc. for similar COPPA violations (*id.*, ¶ 246).

– Google's misconduct is particularly egregious because, to facilitate its unlawful collection and exploitation of minors' PI, Google lied to the public, to YouTube content creators, and to advertisers about Google's compliance with applicable laws including, in particular, YouTube's purported compliance with COPPA. *Id.*, ¶¶ 247-73. These lies included:

> Knowingly false public statements in 2018, when concerns about YouTube's violations of COPPA were being raised, that its practices on YouTube were in compliance with COPPA and that it did not allow advertisers on YouTube to deliver personalized ads to children under 13 or collect their personal information. *Id.*, ¶ 252.
>
> Knowingly false statements that YouTube was not intended for children under 13 (and thus not subject to COPPA's requirements), even while Google was promoting YouTube to content creators and advertisers as the #1 site for reaching such young children. *Id.*, ¶¶ 256-75.
>
> Knowingly false statements that YouTube was COPPA compliant to advertisers and content creators. *Id.*
>
> And, while knowing that it was illegally tracking, profiling, and targeting young children in violation of COPPA, Google repeatedly assured its consumers that it was committed to its obeying the law and complied with all applicable data protection laws, which include COPPA. *Id.*, ¶¶ 249-253.

The offensiveness of Google's unlawful collection of COPPA-protected information is exacerbated by the insidious use Google makes of minors' PI.  As discussed above, Google uses the PI not only to develop individual profiles that serve as the basis for targeted behavioral advertising, but also to enable Google's Recommendation Engine to send targeted videos to vulnerable minors, engendering compulsive watching of YouTube to the detriment of minors' development and mental health, to increase Google's advertising sales and profits. *Id.,* ¶¶ 220, 75-97.

Finally, the egregiousness of Google's conduct is heightened by the deliberate nature of its

1    violations of COPPA to garner the enormous financial benefits of behavioral advertising. As the 6AC

2    alleges, Google's conduct was not inadvertent – it was undertaken in knowing and intentional

3    violation of COPPA, with reckless disregard for the harm it would cause to millions of young children

4    and with calculated lies to the public, to content creators and to advertisers to enable the scheme to

5    succeed. *Id.,* ¶¶ 249-53, 256-75.

6           Even if an industry's "routine commercial behavior" towards adults can justify a company's

7    violation of federal protections prohibiting such behavior towards minors, the factors discussed

8    above, at a minimum, raise a factual dispute that cannot be resolved at the pleading stage as to whether

9    Google's conduct was "highly offensive." "Characterized by deceit and disregard, the alleged conduct

10   raises different issues than tracking or disclosure alone." *In re Google Inc. Cookie Placement*

11   *Consumer Priv. Litig.*, 806 F.3d 125, 150 (3d Cir. 2015); s*ee Facebook Tracking*, 956 F.3d at 606.

12   ("The ultimate question of whether Facebook's tracking and collection practices could highly offend

13   a reasonable individual . . . cannot be resolved at the pleading stage").

14          Plaintiffs submit that the Court erred in determining, as a matter of law at the pleading stage,

15   that Defendants' conduct as alleged in the 5AC was not highly offensive. The *Facebook Tracking*

16   opinion, cited by the Court in the Order, does not support application of a bright line rule to determine

17   (at the pleading stage) the offensiveness of conduct that intrudes on privacy; instead, the Ninth Circuit

18   engaged in a holistic consideration of factors such as "the likelihood of serious harm to the victim,

19   the degree and setting of the intrusion, the intruder's motives and objectives, and whether

20   countervailing interests or social norms render the intrusion inoffensive." *Id*. at 606.  The Ninth

21   Circuit did not hold that any particular "plus factors" or set of facts are required in cases concerning

22   online tracking. Rather, a "highly offensive analysis … involves a 'policy' determination as to

23   whether the alleged intrusion is highly offensive under the particular circumstances." *Id.*

24          As the 6AC establishes, the use of online apps by children is pervasive, and the vast majority

25   of parents are concerned about their children's privacy while using those apps—and are particularly

26   concerned about data tracking. 6AC ¶¶ 206-213. Society has long recognized children as uniquely

27   vulnerable to exploitation and manipulation, and thus has recognized the importance of added legal

28   protections for children—often in the form of parental consent requirements. *Id*, ¶¶ 202, 204. Parents

do not find it acceptable for advertisers to track children's behavior online, and 93 percent support a legal parental consent requirement. *See id.*, ¶ 214.

These parental views found unequivocal expression in Congress's adoption of COPPA as a national policy to protect young children's online privacy rights posed by new forms of online targeting. *Id.*, ¶¶ 228-233. In the lead up to COPPA, the FTC specifically recognized the existing (*i.e.*, pre-COPPA) privacy rights of children: "[i]n law and policy, children are usually treated as a special, vulnerable class" that parents have a "special role" in protecting. *Id.*, ¶ 234-37. Given the historical protections American society has always afforded young children, the Court's assessment of the offensiveness of Defendants' conduct, in undisputed violation of COPPA, on the basis of the internet industry's conduct towards adults is unsupportable.

But, in any event, the 6AC alleges plus-factors – including Google's intentionally pervasive lies to the public, to YouTube content creators, and to advertisers – sufficient for a fact-finder to determine that Defendants' alleged intrusion was highly offensive and an egregious breach of social norms and the law, and should not be dismissed at the pleading stage.[4]

## B.    Plaintiffs Have Alleged a Reasonable Expectation of Privacy.

Defendants argue that Plaintiffs' invasion of privacy claims fail because Google "indisputably" disclosed its collection of the Plaintiffs' PI at issue here. Def. Br. at 11-14. Defendants' argument is, essentially, that Plaintiffs knew and *consented* to their PI being tracked on YouTube. But unlike the adults in cases such as *Hammerling v. Google, LLC*, 2024 WL 937247, at *2 (9th Cir. Mar. 5, 2024) – who were required, in order to utilize Google's services, to establish a Google account and affirmatively consent to Google's policies – the 6AC alleges that "[d]uring the Class Period,

---

[4] That courts in other cases did not find defendants' conduct to be highly offensive in tracking children online based on the strength of the pleadings or arguments before them does not dictate the same result under the well-pleaded facts alleged here. *Cf., In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 294-95 (3d Cir. 2016); *Manigault-Johnson v. Google, LLC*, 2019 WL 3006646, at *6 (D.S.C. Mar. 31, 2019). And while the users' status as children in *McDonald v. Kiloo ApS* was not the "main driver" of the privacy analysis in that case, the *McDonald* court distinguished *Nickelodeon*, holding that the "persistent identifiers and other data harvested to track users"—the same kinds of PI at issue in this case—exceed the offensiveness of collecting the "cookies" at issue in *Nickelodeon*. *McDonald v. Kiloo ApS*, 385 F. Supp. 3d 1022, 1036 (N.D. Cal. 2019).

1   individuals did not have to be registered with Google, nor signed into YouTube to view YouTube
2   videos." (6AC ¶ 66.) Thus, neither adults nor children were required to read Google's Privacy Policy
3   before using YouTube or to take any action that could be construed as "consent" to Google's
4   appropriation of users' PI in order to use YouTube. Rather, Google's Privacy Policy, during the Class
5   Period, was, in effect, a form of "browsewrap" provision, which, as the Ninth Circuit has stated, does
6   "not require the user to manifest assent to the terms and conditions expressly." *Nguyen v. Barnes &*
7   *Noble Inc.*, 763 F.3d 1171, 1176 (9th Cir. 20140. And where a website (like YouTube) only "makes
8   its terms of use available via a . . . hyperlink . . . but otherwise provides no notice to users nor prompts
9   them to take any affirmative action to demonstrate assent . . . . This "is insufficient to give rise to
10  constructive notice." *Id.* at 1178-79. Rather, "the onus must be on the website owners to put users on
11  notice of the terms to which they wish to bind consumers." *Id.* at 1779.

12      Moreover, the defense of "consent" is inapplicable because minors are, as a matter of law,
13  incapable of entering into such agreements. *Doe v. Roblox*, 602 F. Supp.3d 1243, 1255-57 (N.D. Cal.
14  2022).  As the 6AC alleges, children under 13 "cannot properly consent to [defendants'] profiling"
15  and their parents' verifiable consent (as required by COPPA) should have been sought and obtained.
16  *See, e.g.,* 6AC ¶¶ 164, 336-461. Especially at the pleading stage, Defendants have not shown that
17  Plaintiffs or their parents knew of or consented to the terms of Google's Privacy Policy. Consent "can
18  be [express] or implied, but any consent must be actual." *Calhoun v. Google, LLC*, 2024 WL 3869446,
19  at *5 (9th Cir. Aug. 20, 2024) (citing cases).

20      Finally, even if children under 13 had the capacity to consent, Plaintiffs dispute that Google
21  openly and fully disclosed that its data tracking practices were directed to YouTube's child-directed
22  content (in violation of COPPA). In cases involving online data tracking, courts routinely review
23  terms of service and other disclosures to ascertain the expectations of a reasonable user reviewing
24  them. *Calhoun*, 2024 WL 3869446, at *6. However, this analysis does not exist in a vacuum:  Google,
25  which repeatedly touted its commitment to complying with the law as a fundamental guiding principle
26  of the company, cannot point to a single set of terms that advised children or parents that its data
27  tracking practices would not comply with COPPA. *See id.* at *7 (distinguishing cases including
28  *Hammerling,* 2024 WL 937247, at *2). The Ninth Circuit has instructed that a "district court should

1  . . . review[] the terms of the various disclosures and decide[] whether a reasonable user reading them

2  would think that he or she was consenting to the data collection." *Id.* at *6. Defendants do not explain

3  how the purported disclosures Google made about tracking of YouTube viewers – viewers who, as

4  Defendants note, Google specifies are *adults* (Def. Br. 13) – could have informed a reasonable person

5  that children's PI was being tracked on YouTube when watching video content intended for children,

6  particularly given that Google has disclaimed the very existence of child-directed content on

7  YouTube. And Google's purported disclosures must be read in conjunction with Google's other

8  disclosures, including its Code of Conduct and its Safety policy, which affirm Google's commitment

9  to complying with the law, including data privacy laws like COPPA, Contrary to Defendants'

10  argument, Google's oft-cited and oft-publicized commitment to complying with the law was not a

11  "lofty but vague statement," Def. Br. 11, citing *Prager Univ. v. Google LLC*, 951 F.3d 991, 1000 (9th

12  Cir. 2020), but rather one of the company's publicly and oft-proclaimed organizing principles. *See*

13  6AC, ¶¶ 250-51.[5]

14  **IV.    The 6AC Establishes that Plaintiffs and the Classes Have Suffered Loss Cognizable**
15  **under the Applicable Consumer Protection Statutes**

16  As the basis for its dismissal of Plaintiffs' consumer protection statute claims, the Court held

17  that Plaintiffs had failed to plead sufficient facts establishing that Defendants' alleged wrongful

18  conduct had caused Plaintiffs to suffer a "loss" or "injury," as required to establish standing under the

19  statutes. Order at 14-16. In particular, the Court read Plaintiffs' 5AC and opposition to Defendants'

20  motion to dismiss that complaint as asserting, without sufficient supporting detail, that Plaintiffs'

21  "sole loss … stems from the diminution in value of their information caused by Defendants'

22  misappropriation of that information." *Id.* at 14-15.

23  The 6AC clarifies that Plaintiffs' consumer protection statute claims are based on their loss

24  from (i) Defendants' misappropriation and exploitation of the PI without compensation, (6AC ¶¶ 169,

25  191-94), as well as on (ii) the destruction of the essential private quality of the PI (*id.*, ¶¶ 169, 195-

26  

---

27  [5] Defendants argue that Judge Freeman held that certain of Google's representations alleged in
Plaintiffs' Third Amended Complaint were not actionable. Def. Br. 11 (citing ECF 146 at 10).  But
28  Plaintiffs have, through discovery and investigation, identified additional misrepresentations and
further provided additional context for the lies, omissions and misrepresentations cited in the 6AC.

97, 199), and (iii) the diminution in value of the PI (*id.*, ¶¶ 169, 195-98, 200-01).

In support of these allegations, the 6AC details the basis for Plaintiffs' claims of loss, including allegations similar to those upheld in *Brown v. Google LLC*, 2021 WL 6064009, at *15 (N.D. Cal. Dec. 22, 2021) (denying motion to dismiss), and *id.*, 685 F. Supp. 3d 909, 942 (N.D. Cal. 2023) (denying summary judgment), cited by the Court in the Order (at 17-18). The 6AC details, as in *Brown*, the substantial evidence of the economic value of PI, and the existing markets and actual values the marketplaces have, in numerous instances, placed on PI, including the value that Google itself has ascribed to such data. 6AC ¶¶ 170-90. Plaintiffs further allege that Defendants' illegal misappropriation/exploitation of their PI, without compensation, has caused Plaintiffs to suffer economic loss. *Id.*, ¶¶ 191-94.

The 6AC further explains how Defendants' commercial exploitation of the PI has "destroyed the fundamental quality of the asset" – Plaintiffs' "right and privilege of ownership ... the right to maintain the privacy of their [PI] and NOT to sell it." 6AC ¶ 195. And, for those Plaintiffs "who would choose to sell their Personal Information in what is a well-established and readily available marketplace, Defendants' conduct has diminished the amount a knowledgeable buyer would be willing to pay for the Information." *Id*. The 6AC details, with citations to supporting literature authorities, how Defendants' wrongful exploitation of the PI diminishes its value. *Id.*, ¶¶ 196-97.

Courts in this district have recognized at least three forms of harm involving PI constituting economic injury: (1) a "benefit-of-the-bargain" theory, applicable even to *free* services, where "a user transacts with a business or other entity and their expectations regarding their personal data are not met as a result of conduct alleged to violate the UCL" because plaintiff had to "surrender…more, or acquire…less" than they otherwise would have in the transaction; (2) a "diminished value" theory, where a plaintiff alleges that they either "attempted or intended to participate" in the market for their data, "or otherwise to derive economic value from their PII;" and (3) a "right to exclude" theory, where a plaintiff's right to exclude a company from access to their PI is violated, constituting the diminishment of a "present or future property interest." *In re Meta Pixel Tax Filing Cases* 2024 WL 1251350, at *24-25 (N.D. Cal. Mar. 25, 2024). The allegations of the 6AC establish harm under each of these three standards.

**A.      Harm from Misappropriation and Exploitation of Plaintiffs' PI**

Consistent with Plaintiffs' allegations, courts have recognized that "internet users have a property interest in their [PI] and that [PI] is, thus, an asset with economic value," 6AC ¶ 168 & n. 61, citing *CTC Real Estate Servs. v. Lepe*, 140 Cal. App. 4th 856, 860 (2006) ("person's identifying information is a valuable asset"), and *Facebook Tracking*, 956 F.3d at 600 (plaintiffs suffered economic injury for purposes of Article III standing when Facebook took and earned unjust profits from monetizing plaintiffs' personal information for advertising purposes).

Plaintiffs' contention that they have standing to seek relief for Defendants' failure to compensate them for the profits Defendants garnered from their exploitation of Plaintiffs' PI is directly supported by the Ninth Circuit's holding in *Facebook Tracking*.  As the court stated, "Because California law recognizes a legal interest in unjustly earned profits, Plaintiffs have adequately pleaded an entitlement to Facebook's profits from users' personal data sufficient to confer Article III standing." *Facebook Tracking*, 956 F.3d at 600.

Plaintiffs are aware that there is a split of authority in this District on whether the economic harm from the exploitation of PI that the Ninth Circuit found sufficient in *Facebook Tracking* to establish standing under Article III satisfies the standing requirements of the UCL. *See, e.g.*, *Griffith v. TikTok, Inc.*, 697 F.Supp.3d 963, 976-78 (C.D. Cal. 2023) (citing cases). Courts declining to follow *Facebook Tracking* have done so because the California Supreme Court has held that standing under the UCL, which is limited to economic injury, is narrower than under Article III standing, which can be based on a "broad range of injuries." *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 324  (2011), including non-economic injury. But, as then-District Judge Koh held in *Brown*, the distinction between UCL and Article III standing noted in *Kwikset* derived from Article III's inclusion of non-economic injuries, not on a constricted view of economic injury under the UCL, which the California Supreme Court has held requires only "some form of economic injury."  *Brown*, 2021 WL 6064009, at *17.   As Judge Koh explained in *Brown*:

> UCL standing is narrower than Article III standing because Article III standing may be predicated on a broader range of injuries than UCL standing.  However, the economic injury required by the UCL is a classic form of injury in fact under Article III and there is no precedent that suggests that economic injury has a different meaning in the UCL context than it does in the Article III context.  Indeed, the Ninth Circuit has stated that

> the "UCL's 'economic injury-in-fact' requirement … demands no more than the corresponding requirement under Article III of the U.S. Constitution." *Reid v. Johnson & Johnson*, 780 F.3d 952, 958 (9th Cir. 2015) (emphasis added). Thus, cases discussing economic injury in the context of Article III have full application to a court's analysis of UCL standing.

*Brown*, 2021 WL 6064009, at *16-17 (cleaned up). Thus, to the extent courts have analyzed *economic injury* for standing purposes under the UCL as requiring something greater than economic injury under Article III, they are, as Judge Koh put it, "misread[ing] precedent." *Id*. at 17.

### B.    Diminution in Value of Plaintiffs' PI

Three cases *against Google* in this District have held that Google's misappropriation and exploitation of PI – like Plaintiffs incurred here – establishes economic injury under the UCL where plaintiffs have alleged a resulting diminution in value of the PI. See *Brown*, 2021 WL 6064009, at *15 (plaintiffs suffered cognizable injury to their "property interest" in their PI from Google's data collection and monetization practices), and *id.*, 685 F. Supp. 3d. at 942 (same); *Calhoun*, 526 F. Supp. 3d 605, 636 (N.D. Cal. 2021) ("plaintiffs who suffered a loss of their personal information suffered economic injury"); *Turner v. Google LLC*, 2024 WL 3052969, at *7 (N.D. Cal. Mar. 25, 2024) (economic injury under UCL adequately pled because plaintiffs can "no longer realize the full economic value of their [PI]" due to Google's data collection practices).

In *Brown*, Judge Koh relied on allegations closely similar to those now in Plaintiffs' 6AC to find cognizable loss under the UCL:

> Plaintiffs allege that the "cash value" of the data which Google collected "can be quantified" and that there is an active market for such data. *See [Brown]* SAC ¶¶ 123, 127. For example, a recent study found that internet users are willing to pay up to $52.00/year to keep their browsing histories private. *Id.* ¶ 128. Google itself has set up a project called "Google Screenwise Trends" which pays internet users "up to $3 per week" to "add a browser extension that shares with Google the sites they visit and how they use them." *Id.* ¶ 129–30. Indeed, "a number of platforms have appeared where consumers can and do directly monetize their own data." *Id.* ¶ 135. For example, a company called Brave now offers a web browser which "will pay users to watch online targeted ads, while blocking out everything else." *Id.* Several other companies, including a company called Killi, have launched exchange platforms that allow individuals to sell their data to third-party applications and websites. *See id.*

> These detailed allegations establish at least two cognizable theories of economic injury. First, because Google previously has paid individuals for browsing histories, it is plausible that, had Plaintiffs been aware of Google's data collection, they would have demanded payment for their data. Thus, by inducing Plaintiffs to give Google their data

- 16 -

without payment, Google caused Plaintiffs to "acquire in a transaction less[ ] than [they] otherwise would have." *Kwikset*, 51 Cal. 4th at 324. Second, because there are several browsers and platforms willing to pay individuals for data, it is plausible that Plaintiffs will decide to sell their data at some point. Indeed, each named Plaintiff has alleged that he or she is aware of these browsers and platforms. See SAC ¶¶ 170, 175, 180, 185, 190. Accordingly, by obtaining Plaintiffs' data and selling it to advertisers, Google "diminished" Plaintiffs' "future property interest." *Kwikset*, 51 Cal. 4th at 324.

*Brown,* 2021 WL 6064009, at *15.

Judge Gonzalez-Rogers affirmed Judge Koh's ruling in denying Google's subsequent motion for summary judgment on plaintiffs' UCL claim in *Brown*:

[Plaintiffs] argue their private browsing data has monetary value for which they were not paid and, because the California Consumer Privacy Act affords them the right to exclude Google from selling their data to third parties, they have a property interest in their data. …. Sufficient evidence exists that plaintiffs have suffered an injury in fact. Plaintiffs have shown that there is a market for their browsing data and Google's alleged surreptitious collection of the data inhibited plaintiffs' ability to participate in that market. Moreover, plaintiffs have identified an unopposed property interest for at least a portion of the class period under the California Consumer Privacy Act.

*Brown,* 685 F.Supp.3d at 942.

Plaintiffs' 6AC outlines the economic value of PI and the existing market for PI and the market value for the PI (and the potential value, specifically, of children's data), including the value that Google has assigned to such data, (*id*., ¶¶ 170-90;*see also Brown*, 2021 WL 6064009, at *15), and that Defendants' illegal misappropriation and exploitation of the PI, without compensating Plaintiffs, has caused Plaintiffs to suffer economic loss. *Id*., ¶¶ 191-94;*see also Brown*, 2021 WL 6064009, at *15. And for those Plaintiffs "who would choose to sell their Personal Information in a "well-established and readily available marketplace," Defendants' conduct "diminished the amount a knowledgeable buyer would be willing to pay for the Information," and thus diminished its economic value. 6AC ¶¶ 196-98; *Brown*, 2021 WL 6064009, at *15).

**C.    Destruction of Plaintiffs' Right to Privacy of Their PI**

The 6AC further alleges that Defendants' commercial exploitation of the PI has "destroyed the fundamental quality of the asset," *i.e.*, Plaintiffs' "right and privilege of ownership ... the right to maintain the privacy of their Personal Information and NOT to sell it." (6AC ¶¶ 195, 199). This allegation falls directly within the third category of economic harm to PI recognized in *Meta Pixel:*

"the right to exclude," *i.e.,* to maintain the privacy of their PI.    As the *Meta Pixel* court explained:

> The third [form of economic harm to PI] is a "right to exclude" theory. "California courts have ... acknowledged that users have a property interest in their personal information," *Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 635 (N.D. Cal. 2021) (collecting cases), so certain kinds of personal data may directly constitute property under the UCL. And "[o]ne of the main rights attaching to property is the right to exclude others." *People v. Stewart*, 113 Cal. App. 4th 242, 250, 6 Cal.Rptr.3d 249 (2003); *see* 2 William Blackstone, *Commentaries* 2 (1766) ("There is nothing which so generally strikes the imagination, and engages the affections of mankind, as the right of property; or that sole and despotic dominion which one man claims and exercises over the external things of the world, in total exclusion of the right of any other individual in the universe."). In challenging the unlawful disclosure of their sensitive financial information to Meta, plaintiffs effectively contend that they were deprived of their right to exclude Meta from that intangible property. The Court sees no reason why such a violation of plaintiffs' right to exclude would not constitute the diminishment of a "present or future property interest" for purposes of *Kwikset*'s second prong.

*Meta Pixel*, 2024 WL 1251350, at *25.

Moreover, Defendants' reliance on this District's UCL standing cases (based on the UCL's statutory requirement of "injury in fact and lost money or property") fails to recognize that the 13 other consumer protection statutes sued under by Plaintiffs do not limit standing in the same way as the UCL. The statutes in other states contain far broader standing provisions, authorizing standing where a plaintiff has been "injured"[6] or "damaged"[7] or simply suffered some form of "loss."[8] Consistent with the remedial purpose of these statutes, courts have applied a liberal construction of the statutory standing requirements. *See, e.g., Gilkey v. Central Clearing Co.*, 202 F.R.D. 515, 525-

---

[6] *See e.g.*, Mass. Gen. Laws. Ann. ch 93A, §9 (formerly required a "loss of money or property," but not only requires that the claimant have been "injured"); N.H. Rev. Stat. Ann. § 358-A:10 ("injured"); Wash. Rev. Code Ann. § 19.86.090 ("injured in his business or property")

[7] *See e.g.*, A.R.S.Z§ 44-1522 [interpreted by the Arizona courts to require the plaintiff be ("damaged" or suffer "some damage." *Peery v. Hansen*, 585 P.2d 574, 577 (Ariz. App. 1978)]); Fl 51.211(2) ("actual damages"); Ill. 815 ILCS 505/10a(a) ("actual damage"); IN Code § 24-5-.05-4(a) ("damages actually suffered" [interpreted by the Indiana courts to include any form of damages actually suffered other than punitive damages. *McCormick Piano & Organ Co., Inc. v. Geiger*, 412 N.E.2d 842, 852 (Ind. App. 1980]same.)

[8] *See e.g.*, Mich. Comp. Laws Ann. § 445.911 ("loss"); Miss. Code Ann. 75-24-15 ("ascertainable loss of money or property, real, personal"); Mo. Ann. Stat. § 407.025 (same); N.J. Stat. Ann. § 56:9-19 (same); 73 Pa. Stat. Ann. § 201-9.2 (same); Tenn. Code Ann. § 47-18-109 ("ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated")

26 (E.D. Mich. 2001) (Michigan CPA "should be construed liberally to broaden the consumer's remedy;" "a 'loss' under the MCPA 'does not require injury to the plaintiff's pocketbook"); *Harrington v. Fay Servicing, LLC,* 2019 WL 4750140, at *79 (N.D. Ill. Sept. 30, 2019) (allegations of "emotional distress, annoyance, aggravation, and inconvenience" constitute "actual damages" for purposes of Illinois consumer protection statute); *Hershenow v. Enterprise Rent–A–Car Co. of Boston, Inc.,* 840 N.E.2d 526, 532-34 (Mass. 2006) (holding that severe emotional distress or invasion of a legally protected interest can constitute an "injury" under the Massachusetts act "even if the consumer lost no 'money' or 'property' ").

Courts have found the misappropriation of PI to constitute cognizable injury under their consumer protection laws. *See Tyler v. Michaels Stores, Inc.,* 984 N.E.2d 737, 746 (Mass. 2013) ("When a merchant [unlawfully] acquires personal identification information . . . and uses the information for its own business purposes . . . the merchant has caused the consumer an injury that is . . . cognizable under [Mass. Gen. Laws Ch.] 93A, § 9]); *In re Mednax Svcs., Inc.*, 603 F. Supp.3d 1183, 1217-18 (S.D. Fla. 2022) (loss of value of PI is an "injury to . . . property" under Washington's consumer protection statute); *Opris v. Sincera Reproductive Medicine,* 2022 WL 1639417, at *12-13 (E.D. Pa. May 24, 2022) (upholding claim under Pennsylvania unfair trade practice statute based on value of lost PI).[9]

Plaintiffs' 6AC states detailed and plausible allegations of economic and other loss sufficient to establish standing under the UCL and other states' consumer protection statutes, including allegations specifically upheld in similar cases in this District against Google, and should be allowed

---

[9] In the Order, the Court held that *Tyler* was distinguishable because the holding on standing under Massachusetts' consumer protection law was based on defendants sending plaintiffs unwanted marketing materials or selling plaintiffs' information to third parties. Order at 18. The Massachusetts Supreme Court's holding was based on the merchant's "unlawful collection" of plaintiffs' PI and "use[] [of the] information for its own business purposes." 984 N.E.2d at 746. Moreover, precisely as in *Tyler*, Plaintiffs here allege that Defendants unlawfully collected and used their PI to bombard them with unwanted behavioral advertising. The Court also attempted to distinguish *Opris*, holding that standing under the Pennsylvania statute was based on the plaintiffs' costs of dealing with a data breach. Order at 18. But, while that was one aspect of the court's ruling, the court further upheld standing because "Plaintiffs have alleged lost property value to their PII and PHI, which serves as another form of lost property." *Opris*, 2022 WL 1639417, at *13.

1    to proceed.[10]

2    **V.    Plaintiffs State Claims Against The Channel Owner Defendants**

3        **A.    Plaintiffs Have Not "Waived" Their Contention that the Channel Owner
              Defendants Are Primarily Liable for Their Violations of Plaintiffs' Privacy
4              Rights**

5            In support of their argument that Plaintiffs have "waived" any claim that the Channel Owner

6    Defendants ("CODs") are subject to primary liability for their violations of Plaintiffs' privacy rights,

7    Defendants rely principally on the contention that  Plaintiffs "conced[ed]" in a 2021 brief that the

8    CODs "likely" did not "actually violate" COPPA. Def. Br. 21. For this, they cite Plaintiffs' opposition

9    to Defendants' motion to dismiss the *Third* Amended Complaint ("3AC") (ECF 127 at pp. 17 & 22).

10   However, the 3AC has now been superseded by subsequent complaints; it is, therefore, a nullity, *see,*

11   *e.g., Ramirez v. County of San Bernardino*, 806 F.3d 1002, 1008 (9th Cir. 2015) (a superseded

12   complaint "is treated as non-existent"). Plaintiffs, as they are entitled to do, have since altered their

13   theory of the case in subsequent amendments, and following the Ninth Circuit's reversal and remand

14   of this Court's dismissal of Plaintiffs' action on preemption grounds, Plaintiffs filed their 4AC, in

15   which they specifically alleged all of the facts necessary to establish that the CODs were "operators"

16   within the meaning of COPPA and its enabling regulations and were, therefore, subject to primary

17   liability for their violations of Plaintiffs' privacy rights. Plaintiffs' 2021 statements in support of their

18   superseded 3AC are irrelevant.

19          COPPA is explicitly designed to regulate the conduct of "Operators" in collecting or

20   maintaining the personal information of children.  *See, e.g.*, 15 U.S.C. § 6502 ("[a]cts prohibited"

21   under COPPA are acts by "Operators").  As the FTC has stated: "The definition of 'operator' is of

22   central importance because it determines who is covered by the Act [COPPA] and the Rule."  *See*

23   Children's Online Privacy Protection Rule, 64 Fed. Reg. 59888, 59891 (Nov. 3, 1999).

24          Section 6501(2) of COPPA provides, in pertinent part:

25          The term "operator" –

26   _____

27   [10] In their motion, Defendants repeat their state-specific challenges to consumer protection statutory
     liability in some of the States at issue.  Def. Br. 17.  Plaintiffs previously addressed these challenges
28   in their opposition to Defendants' motion to dismiss the 4AC (ECF 213 at 17-19), and respectfully
     refer the Court to that filing.

> (A) means any person who operates a website located on the Internet or an online service and who collects or maintains personal information from or about users ... *or on whose behalf such information is collected or maintained*, where such website ... is operated for commercial purposes… (Emphasis added).

Similarly, § 312.2 of Title 16 of the Code of Federal Regulations, states:

> Operator means any person who operates a Web site located on the Internet or an online service and who collects or maintains personal information from or about the users . . . *or on whose behalf such information is collected or maintained* ….
> Personal information is *collected or maintained* on behalf of an operator when:
>
> . . . .
>
> (2) The *operator benefits by allowing another person to collect information directly from users of such Web site or online service*. (Emphasis added).

*See also Hubbard v. Google LLC*, 508 F. Supp.3d 623, 626 (N.D. Cal.2020) (the FTC "has interpreted COPPA's definition of 'website or online service' to include individual channels on a general audience platform – according to the FTC, 'content creators and channel owners' are both 'standalone "operators" under COPPA, subject to strict liability for COPPA violations").

COPPA expressly provides that a violation of its provisions constitutes an unfair trade practice. 15 U.S.C. § 6502(c). Consistent with these principles, Plaintiffs' 4AC (and all subsequent amendments) clearly allege that the CODs are directly liable as "operators," because they "benefit[ted] by allowing [Google and You Tube] to collect information directly" from children using YouTube. *See* 16 C.F.R. § 312.2(2); *compare* 4AC ¶¶ 10-12, 89-91, 124-59. More specifically, the 4AC alleged that the CODs "(1) uploaded their child-directed content to their YouTube channels; (2) agreed to monetize their channels; and (3) elected to show behavioral advertising on their YouTube channels, thus directing Google to collect the personal information of viewers of their child-directed content, including those under the age of thirteen, for the purpose of showing behavioral advertising." 4AC ¶¶ 10, 73-74.

The 4AC further alleged that several of the CODs (including Hasbro and Mattel) received marketing presentations by Google designed to show that YouTube was a "top destination" for children. 4AC ¶¶ 118-20. The CODs were, therefore, fully aware that their child-directed programming being uploaded to YouTube would be viewed by children under 13, and they "knew or should have known that, given the nature of behavioral targeted advertising, Google was, in fact,

- 21 -

targeting minor children, including children under the age of 13, by tracking Personal Information about those children." *Id.* ¶ 124. Because the CODs split the revenue generated by their targeted behavioral advertising 55% (Channel Owners)/45% (Google), *id.* ¶¶ 6, 89, "[a]ll . . . Defendants acted with a common purpose and jointly economically benefitted when the Channel Owner Defendants' content successfully lured children onto YouTube and Google showed these children behavioral targeted advertising." *Id.* ¶ 124. Thus, "Google and each of the Channel Owner Defendants knowingly disregarded their obligation to comply with federal and state laws designed to protect children's privacy . . . ." *Id.* ¶ 163. These same allegations are carried forward in the 5AC and 6AC.[11] Since the 4AC (and subsequent amendments) superseded all prior complaints as a matter of law, *Ramirez,* 806 F.3d at 1008, the CODs' reliance on supposed "concessions" in a brief about an earlier complaint, *see* Def. Br. at 21, citing ECF 127 at 17, 22, is misplaced. Plaintiffs' subsequent amendments clearly assert a legal theory under which the CODs are primarily liable; any earlier statements are simply irrelevant.

**B.    COPPA Envisions that Channel Owners Will Be Primarily – and Strictly -- Liable for Violations of Children's Privacy**

At bottom, Defendants' arguments regarding the CODs' primary vs. secondary liability rest on an apparent assumption that, under COPPA, only Google – as the platform – can be primarily liable, and that the CODs can, at most, be secondarily liable. However, the FTC – the agency charged with administration of COPPA – has made it clear that this reflects a misunderstanding of COPPA. In a rule-making proceeding regarding the FTC's "Children's Online Privacy Protection Rule," the FTC discussed COPPA's scienter requirements as they relate to (1) "Child-Directed Content Sites" (of the type owned and operated by the CODs), and (2) "Operators Collecting Personal Information Through Child-Directed Sites and Online Services" (*i.e.*, Google). 78 Fed. Reg. 3972-01, 2013 WL 169584 (F.R.) (Jan. 17, 2013). The FTC concluded that persons operating "Child-Directed Content Sites" – like the CODs – are subject to strict liability for the unlawful collection of children's PI when (as

---

[11] *Compare* 6AC ¶¶ 6, 10, 69-70, 114-17, 120, 159. The 6AC contains all of the 4AC's allegations supporting the CODs primary liability.

here) they operate "child-directed sites and services *that allow other online services to collect personal information through their sites*." *Id.* at 3976 (emphasis added) (Congress did not intend a "loophole" that would allow "[p]ersonal information being collected from children through child-directed properties with no one responsible for such collection").[12] It further concluded that "Operators Collecting Personal Information Through Child-Directed Sites and Online Services" – *i.e.*, as Google does for the CODs child-directed sites – are subject to an "actual knowledge standard." *Id.* at 3977-78. Thus, contrary to Defendants' suggestion, the CODs are not only intended to be primarily liable under COPPA – they are <u>strictly</u> liable when children's PI is collected by other "operators" (like Google) based on their child-directed programming. The Court should reject any suggestion that – absent secondary liability – the CODs cannot be held liable for conduct violating the principles of privacy supported by COPPA.

In violating COPPA, the CODs' conduct also violated the "unlawful" prong of the UCL and other similar consumer protection statutes, *see* Cal. Bus. & Prof. Code ¶ 17200; invaded the privacy of Plaintiffs and class members in a manner highly offensive and contrary to their reasonable expectations, *see Facebook Tracking*, 965 F.3d at 601; and unjustly enriched CODs, *see id.* at 599-600 and *supra* n. 2.

### C.     The Channel Owner Defendants Are Also Secondarily Liable

Defendants' further argument that Plaintiffs "cannot establish a basis for secondary liability against the Channel Owners" (Def. Br. 22-24), is also incorrect. Just as the 6AC carries forward allegations supporting the CODs' primary liability, it also carries forward allegations from the 4AC which amply support their secondary liability.

Under the standards identified by Defendants, liability for "aiding and abetting" requires that a defendant have "actual knowledge" of the primary wrong; that it "substantially assisted" in the

---

[12] This is squarely at odds with the CODs' argument that they cannot be primarily liable for the alleged breaches of Plaintiffs' privacy rights because the 6AC "does not allege that the [CODs] unlawfully collected **any** data." Def. Br. 2. As the FTC has made clear, COPPA does not allow a "loophole," in which one party lures children onto a platform with child-directed programming while another assists that party by collecting the PI of those children. 78 Fed. Reg. 3972-01, at 3976.

1    commission of that wrong; and that it "acted with the intent of facilitating" that wrong.  Def. Br. 22.

2    The 6AC (like the 4AC) clearly alleges all these things.[13]  As to the CODs "actual knowledge" of

3    Google's violations of Plaintiffs' privacy rights, the 6AC asserts – in addition to the allegations noted

4    above (incorporated here by reference) – that all Defendants had "actual knowledge of their own non-

5    compliance with COPPA and other applicable privacy laws," and "of their own collection – via the

6    election of each of the Channel Owner Defendants to serve behavioral advertising rather than

7    contextual advertising to their viewers – of the Personal  Information" of minor children.  *See* 6AC

8    ¶¶ 542, 583, 625, 661, 714, 758.[14]

9        The 6AC also alleges that each of the CODs "knowingly" assisted in Google's wrongful

10   conduct by providing the child-directed content that baited the trap, enabling Google to access

11   Plaintiffs' PI.  *See id.* ¶¶ 502, 520, 528, 550, 563, 591, 612, 633.  And such assistance was plainly

12   "substantial," because – without child-directed programming – Plaintiffs would not have been

13   attracted to YouTube, and Google would not have been able to collect their PI.  And the 6AC also

14   alleges that the CODs "acted with the intent of facilitating the wrong," by alleging that – in addition

15   to "actual knowledge" of their wrongdoing – the CODs split the proceeds of their wrongdoing with

16   Google, receiving 55% of the take.  *Id.*, ¶ 6. These allegations are ample to support the CODs'

17   secondary liability.

18       Defendants further argue that Plaintiffs' allegations of the CODs' secondary liability based

19   on "aiding and abetting" or "common plan" are not "plausible." Def. Br. 22–24.  However, nothing

20   could be more "plausible" than the CODs – in response to Google's marketing YouTube based on its

21   status as a "top destination" for children (6AC ¶ 116), and Google's offer to split behavioral

---

[13] Defendants also argue that Plaintiffs have not pleaded a theory of secondary liability based on Defendants' "common plan."  In fact, the 6AC clearly alleges such a plan as follows: "Defendants' concert of action, unity of purpose or design, and acts in furtherance of a common purpose with the knowledge and consent of the others . . . exploited children under 13 for financial gain by luring them with child-directed content and manipulating them into remaining engaged with YouTube to the detriment of their mental health so they could earn advertising revenue," 6AC ¶ 216, which was then split between them 55% (CODs)/45% (Google).  *Id.* ¶ 6.

[14] Notably, even for a complaint pleading fraud, it is permissible to plead "intent, knowledge, and other conditions of a person's mind" generally.  Fed. R. Civ. P. 9(b).

1   advertising revenues with them 55/45 (*id*. ¶ 6) – created "child-directed" programming on YouTube

2   to lure children, including children under 13, to their channels where Google could misappropriate

3   their PI and use it to enhance the effectiveness of its behavioral advertising and increase the ad

4   revenues of both Google and the CODs, <u>and</u> to explicitly choose to allow behavioral advertising and

5   the tracking of minors' PI that accompanies it in order to gain the lucrative split of the advertising

6   revenue offered by Google (*id*. ¶¶ 106-64).  This theory, and the many facts supporting it, clearly state

7   a "plausible" claim that the CODs are liable for the privacy violations alleged in the 6AC.  *See Bell*

8   *Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (plausibility standard does not "impose a

9   probability requirement at the pleading stage….").

10          Defendants further argue that some of these allegations are "conclusory" or "formulaic," Def.

11  Br. 22, but that argument rings particularly hollow here.  Indeed, the FTC and the New York State

12  Attorney General have already pursued a closely related proceeding under COPPA, involving much

13  of the same conduct, and Google has settled that case and paid a $136 million civil penalty.  6AC ¶¶

14  16-17.  Defendants' pretense that they need further factual allegations to have "fair notice" of

15  Plaintiffs' claims against them, or that Plaintiffs' allegations are not "plausible" without further

16  details, are frivolous.[15]

17                                          **CONCLUSION**

18          For all the foregoing reasons, Defendants' motion to dismiss the 6AC should be denied.

19  Dated: September 3, 2024                      Respectfully submitted,

20                                                **PRITZKER LEVINE LLP**

21                                                */s/ Jonathan K. Levine*
                                                  _____

22                                                Jonathan K. Levine (SBN 220289)
                                                  Elizabeth C. Pritzker (SBN 146267)

23  _____

24  [15] The CODs further argue that "Plaintiffs' attempt to impose secondary liability on them would
    contravene the Ninth Circuit's preemption ruling" by seeking to hold the CODs liable for "concert of

25  action with Google in its violation of COPPA."  Def. Br. 24. But, as shown, Plaintiffs' state law

26  claims against the CODs are wholly consistent with COPPA's definition of "operator" and the FTC's
    imposition of a strict liability standard on content creators. Indeed, the CODs do not explain how

27  Plaintiffs' claims against them are in any way inconsistent with COPPA's provisions. *See Jones v.*
    *Google LLC*, 73 F.4th 636, 642-44 (9th Cir. 2023) (COPPA's preemption provision does "not bar

28  state tort or contract laws imposing obligations similar or identical to the substantive federal
    requirements").

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Caroline C. Corbitt (SBN 305492)
1900 Powell Street, Suite 450
Emeryville, CA 94608
Telephone: (415) 692-0772
Facsimile: (415) 366-6110
jkl@pritkzkerlevine.com
ecp@pritzkerlevine.com
ccc@pritzkerlevine.com

David S. Golub (admitted *pro hac vice*)
Steven L. Bloch (admitted *pro hac vice*)
Ian W. Sloss (admitted *pro hac vice*)
**SILVER GOLUB & TEITELL LLP**
1 Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491
Facsimile: (203) 325-3769
dgolub@sgtlaw.com
sbloch@sgtlaw.com
isloss@sgtlaw.com

*Attorneys for Plaintiffs and the Proposed Classes*