| | |
|---|---|
| Jonathan K. Levine (SBN 220289) | David S. Golub (admitted *pro hac vice*) |
| Elizabeth C. Pritzker (SBN 146267) | Steven L. Bloch (admitted *pro hac vice*) |
| Caroline C. Corbitt (SBN 305492) | Ian W. Sloss (admitted *pro hac vice*) |
| PRITZKER LEVINE LLP | SILVER GOLUB & TEITELL LLP |
| 1900 Powell Street, Suite 450 | One Landmark Square, 15th Floor |
| Emeryville, CA 94608 | Stamford, CT 06901 |
| Telephone: (415) 692-0772 | Telephone: (203) 325-4491 |
| Facsimile: (415) 366-6110 | Facsimile: (203) 325-3769 |
| jkl@pritzkerlevine.com | dgolub@sgtlaw.com |
| ecp@pritzkerlevine.com | sbloch@sgtlaw.com |
| ccc@pritzkerlevine.com | isloss@sgtlaw.com |

*Attorneys for Plaintiffs and
the Proposed Classes*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NORTHERN CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| C.H., a minor, by and through their guardian ad litem NICHOLE HUBBARD; E.J., N.J., A.J., and L.J., minors, by and through their guardian ad litem CARA JONES; J.A.E. and J.R.E., minors, by and through their guardian ad litem JUSTIN EFROS; M.W., a minor, by and through their guardian ad litem RENEE GILMORE; A.G., a minor, by and through their guardian ad litem JAY GOODWIN; T.B. and S.B., minors, by and through their guardian ad litem DEREK BUCHANAN; D.T. and D.T., minors, by and through their guardian ad litem AMANDA SEELEY; B.H., a minor, by and through their guardian ad litem JASON HOFFMAN, P.A. and J.A., minors, by and through their guardian ad litem ANTONIO ALVAREZ, S.H. and D.M, minors, by and through their guardian ad litem VERONICA HICKS, C.L.P., a minor, by and through their guardian ad litem SARAH DUNAWAY, A.A., a minor, by and through their guardian ad litem PENNIE FRAZIER, J.C. and E.M., minors, by and through their guardian ad litem LEZLIE COLLINS, L.D., D.D., A.D, minors, by and through their guardian ad litem HOLLY DORSO, E.B., A.B., C.B., Z.B., and I.B., minors, by and through their guardian ad litem STEVEN BURDA, M.W., B.N., and W.N., minors, by and | Case No. 5:19-cv-07016-SVK<br><br>CLASS ACTION<br><br>**SEVENTH AMENDED COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

through their guardian ad litem MICHELLE WALL, , G.W., a minor, by and through their guardian ad litem DOUG WILKERSON, M.W.D., C.J.D., and C.A.D., minors, by and through their guardian ad litem BILLY DARDANELLI, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

GOOGLE LLC and YOUTUBE LLC,

Defendants.

Minor Plaintiffs C.H., E.J., N.J., A.J., L.J, J.A.E., J.R.E., M.W., A.G., T.B., S.B., D.T., D.T, B.H, P.A, J.A., S.H., D.M., C.L.P., G.W., A.A., J.C., E.M., L.D., D.D., A.D., E.B., A.B., C.B., Z.B., I.B., M.W., B.N., W.N., M.W.D, C.J.D., and C.A.D. (collectively, "Minor Plaintiffs" or "Plaintiffs"), by and through their respective guardians ad litem and their undersigned counsel, hereby allege the following against Defendants Google LLC and YouTube LLC (collectively, "Google" or "Defendants") on behalf of themselves and all others similarly situated, based on personal knowledge, information and belief, the investigation of counsel, and public sources.

## NATURE OF THE ACTION

1.      This action arises out of Google's invasive and unfair business practices directed toward millions of American children under the age of 13 in violation of the law and societal norms. Specifically, from July 1, 2013 through April 1, 2020 (the "Class Period"), Google and the owners of many of the most popular YouTube video channels baited vulnerable children using cartoons, nursery rhymes, and other child-directed content to cause them to view YouTube video channels so that Google could collect intimate, deeply intrusive data points about them and their behavior without parental consent. Google engaged in this illegal conduct to feed its massively profitable advertising business, which was dependent on collecting this data.

2.      Google's conduct constituted an invasion of the right to privacy and reasonable expectation of privacy of millions of American children. Plaintiffs thus bring claims, on behalf of themselves and for all other similarly-situated children under the age of 13 injured by Google's conduct nationwide, arising out of Google's privacy violations.

3.      Google operates the video-sharing platform YouTube, which contains videos created by individuals and entities that have registered with YouTube and uploaded their videos and created a "channel." YouTube is accessible as a website (www.youtube.com), mobile application, or as an application on a set top streaming device.

4.      Individuals do not have to register or sign in to view videos uploaded to YouTube. Anyone, regardless of age, who visits the YouTube website can browse through and view videos that have been uploaded. And anyone using a device on which the YouTube app has been installed can watch videos on YouTube without verifying his or her age.

5.      YouTube is a top online destination for children.  Indeed, studies have shown that YouTube is "the #1 website regularly visited by kids."  Because of its popularity and its known regular use by children, popular child product brands, such as toy companies, and other producers of programing geared toward young children, maintain YouTube channels and create content specifically for their YouTube channels designed to attract child viewers.  By way of example, these YouTube channels included Hasbro, Mattel, The Cartoon Network, Chu Chu TV, DreamWorks, and "Ryan's World."

6.      During the Class Period, Google generated revenue from YouTube via YouTube channels whose owners agreed to "monetize" their channels – *i.e.*, agreed to allow Google to place paid advertising on their YouTube channels. Google and the owners of monetized YouTube channels shared the advertising revenue, with Google keeping 45% and the channel owners receiving 55%.

7.      Google gave owners of monetized channels a choice between two types of paid advertising to show on their monetized channels: (1) contextual advertising; or (2) behavior-based, or "behavioral" advertising. Contextual advertising (the less lucrative option) shows ads calculated to be of interest to the viewer based on the channel's content. Behavioral advertising (by far the more lucrative option) shows advertisements calculated to be of interest to viewers based on the viewer's own personal information, including persistent identifiers, collected by Google.

8.      Behavioral advertising is the most valuable type of advertising to Google because past human behavior, which is what behavioral advertising relies upon, is considered the most effective method of inferring an individual's interests. It is also the most intrusive. When a YouTube channel owner elects to show behavioral advertising on its channel, Google collects all available information, including intrusive personal information such as persistent identifiers and geolocation data, available about the viewer. Google analyzes this data to infer, based on past behavior, which types of advertisements would most effectively influence that individual and accordingly displays that advertisement.

9.      Collection of this data allows Google to develop profiles of individuals over time by tracking their activities across multiple websites or internet-based services. Studies have found that Google is capable of tracking activity across 80% of the internet.

10.    During the Class Period, numerous child-directed content creator owners of YouTube channels (1) uploaded their child-directed content to their YouTube channels; (2) agreed to monetize their channels; and (3) elected to show behavioral advertising on their YouTube channels, enabling Google to collect the personal information of viewers of their child-directed content, including those viewers under the age of 13, for the purpose of showing behavioral advertising.

11.    Neither Google (nor the Channels) obtained verifiable parental consent (or any consent at all), to collect the personal information of children under 13 watching the YouTube channels' child-directed content on YouTube.

12.    This conduct contravenes the law and societal norms, and Google engaged in it to maximize profits. As FTC Commissioner Slaughter has noted: "YouTube has long allowed channel owners to turn off default behavioral advertising and serve instead contextual advertising that does not track viewers, but vanishingly few content creators would elect to do so, in no small part because they receive warnings that disabling behavioral advertising can 'significantly reduce your channel's revenue.' In short, both YouTube and the channels have a strong financial incentive to use behavioral advertising."[1]

13.    The Children's Online Privacy Protection Act ("COPPA"), 15 U.S.C. § 501, *et seq.*, protects children under 13 years old from having their personal information ("Personal Information") collected by operators of websites or online services directed to children, or operators with actual knowledge that they are collecting Personal Information online from children under 13, unless their parent has first given verifiable consent. The Federal Trade Commission ("FTC") has expressly interpreted COPPA as applying not only to YouTube, but to each individual YouTube channel as if it were its own standalone website or online service.

14.    Since 2013, persistent identifiers have been included within the definition of "Personal Information" that operators of websites and online services are barred by COPPA from collecting from children under 13 years old without verifiable parental consent.

---

[1] Dissenting Statement of FTC Commissioner Rebecca Kelly Slaughter *In the Matter of Google LLC and YouTube, LLC*, available for download at https://www.ftc.gov/system/files/documents/public_statements/1542971/slaughter_google_youtube_statement.pdf (accessed Jan. 14, 2021).

SEVENTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

15.     COPPA violations "shall be treated as a violation of a rule defining an unfair … act or practice prescribed under section 18(a)(1)(B) of the Federal Trade Commission Act (the "FTC Act"), 15 U.S.C. § 57a(a)(1)(B)." Thus, a violation of COPPA constitutes an unfair trade practice under Section 5 of the FTC Act. 15 U.S.C. § 45(a).

16.     As a result of the above-described conduct, on September 4, 2019, the FTC and the New York State Office of the Attorney General filed a Complaint for Permanent Injunction, Civil Penalties, and Other Equitable Relief (the "FTC Complaint") against Google, complaining of Google's wrongful collection and misuse of minors' Personal Information without parental consent in violation of COPPA.

17.     Google entered into a Judgment on September 4, 2019, agreeing to pay $170 million as a civil penalty for its misconduct, but did not agree to immediately cease the misconduct, enabling Google to collect and misuse Personal Information about millions of minors for continuing improper financial gain. Instead, Google agreed to stop the data collection practices complained of by the FTC after four months from the Judgment, and to comply with COPPA going forward.

18.     The above-described conduct engaged in by Google not only violates COPPA, but also independently violates the state privacy laws nationwide.

19.     During the Class Period, Plaintiffs and Class members watched monetized YouTube channels and, while Plaintiffs and Class members viewed videos on YouTube, Google engaged in a uniform, nationwide practice of unfairly and unlawfully collected Plaintiffs' and Class members' Personal Information, including persistent identifiers to deliver targeted advertisements to Plaintiffs that were intended to influence their behavior.

20.     Accordingly, Plaintiffs, through their parents and guardians, bring this action for the relief asserted herein, on behalf of themselves and the Classes of similarly-situated minors whose privacy rights have, like Plaintiffs, been violated by a uniform, common course of conduct by Google, for damages, restitution, and all other appropriate relief to address Google's unlawful practices.[2]

---

[2] Plaintiffs bring this Seventh Amended Complaint, for settlement purposes only, asserting individual and nationwide class claims for intrusion upon seclusion, invasion of privacy, and privacy rights

1

## **JURISDICTION AND VENUE**

2  21. This Court has general personal jurisdiction over Defendants Google LLC and YouTube

3 LLC because their principal places of business are in California. Additionally, all Defendants are subject

4 to specific personal jurisdiction in this State because a substantial part of the events and conduct giving

5 rise to Plaintiffs' claims occurred in this State.

6  22. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C

7 §1332(d), because the amount in controversy for the Classes exceeds $5,000,000 exclusive of interest

8 and costs, there are more than 100 potential class members, defined below, and minimal diversity exists

9 because the majority of potential class members are citizens of a state different than Defendants Google

10 LLC and YouTube LLC.

11  23. This Court also has jurisdiction pursuant to 28 U.S.C §1332(d), because the amount in

12 controversy exceeds $75,000 and is between citizens of different states.

13  24. Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because a substantial

14 portion of the conduct described in this Complaint was carried out in this District. Furthermore,

15 Defendants Google LLC and YouTube LLC are headquartered in this District and subject to personal

16 jurisdiction in this District.

17

## **INTRADISTRICT ASSIGNMENT**

18  25. Assignment to the San Jose Division is proper under Northern District of California Civil

19 Local Rule 3-2(c) because a substantial part of the events or omissions which give rise to the claims

20 asserted herein occurred in Santa Clara County and Defendant Google LLC's principal place of business

21 is located in Santa Clara County, California. Under Civil Local Rule 3-2(e), all civil actions which arise

22 in the County of Santa Clara shall be assigned to the San Jose Division.

23

24 _____

25

26 violations, against Defendants Google and YouTube only, as set forth herein.  In the event any final
27 order of settlement in this matter is vacated, modified in a manner deemed material by any party, or
reversed, in whole or in part, on appeal or otherwise, Plaintiffs expressly reserve the right to proceed on
28 any and all claims asserted in the Sixth Amended Class Action Complaint (ECF No. 286), and reserve
all rights to appeal claims previously dismissed by the Court.

1

2                                    **PARTIES**

3    **I.    Plaintiffs**

4         26.    Plaintiff C.H. is a natural person and is a resident and citizen of the State of California.

5    C.H. was under the age of 13 during the Class Period. C.H.'s parent and legal guardian is Nichole

6    Hubbard, who is also a resident and citizen of the State of California.

7         27.    Plaintiffs E.J, N.J, A.J, and L.J are natural persons and are residents and citizens of the

8    State of Colorado. E.J, N.J, A.J, and L.J were under the age of 13 during the Class Period. Their parent

9    and legal guardian is Cara Jones, who is also a resident and citizen of the State of Colorado.

10        28.    Plaintiffs J.A.E. and J.R.E. are natural persons and are residents and citizens of the State

11   of New Jersey. J.A.E. and J.R.E. were under the age of 13 during the Class Period. Their parent and

12   legal guardian is Justin Efros, who is also a resident and citizen of the State of New Jersey.

13        29.    Plaintiff M.W. is a natural person and is a resident and citizen of the State of Tennessee.

14   M.W. was under the age of 13 during the Class Period. M.W.'s parent and legal guardian is Renee

15   Gilmore, who is also a resident and citizen of the State of Tennessee.

16        30.    Plaintiff A.G. is a natural person and is a resident and citizen of the Commonwealth of

17   Massachusetts. A.G. was under the age of 13 during the Class Period. A.G.'s parent and legal guardian

18   is Jay Goodwin, who is also a resident and citizen of the Commonwealth of Massachusetts.

19        31.    Plaintiffs T.B. and S.B. are natural persons and are residents and citizens of the State of

20   Indiana. T.B. and S.B. were both under the age of 13 during the Class Period. T.B. and S.B.'s parent

21   and legal guardian is Derek Buchanan, who is also a resident and citizen of the State of Indiana.

22        32.    Plaintiffs D.T. and D.T. are natural persons and residents and citizens of the State of

23   Alabama. D.T. and D.T. were under the age of 13 during the Class Period. D.T.'s and D.T.'s parent and

24   legal guardian is Amanda Seeley, who is also a resident and citizen of the State of Alabama.

25        33.    Plaintiff B.H. is a natural person and is a resident and citizen of the State of Florida. B.H.

26   was under the age of 13 during the Class Period. B.H's parent and legal guardian is Jason Hoffman, who

27   is also a resident and citizen of the State of Florida.

28        34.    Plaintiffs P.A. and J.A. are natural persons and are residents and citizens of the State of

Illinois. P.A. and J.A. were under the age of 13 during the Class Period. P.A.'s and J.A.'s parent and legal guardian is Antonio Alvarez, who is also a resident and citizen of the State of Florida.

35.    Plaintiffs S.H. and D.M. are natural persons and are residents and citizens of the State of Kansas. S.H. and D.M. were under the age of 13 during the Class Period. S.H.'s and D.M.'s parent and legal guardian is Veronica Hicks, who is also a resident and citizen of the State of Kansas.

36.    Plaintiff G.W. is a natural person and is a resident and citizen of the State of Michigan. G.W. was under the age of 13 during the Class Period. A.A.'s parent and legal guardian is Doug Wilkerson, who is also a resident and citizen of the State of Michigan.

37.    Plaintiff A.A. is a natural person and is a resident and citizen of the State of Mississippi. A.A. was under the age of 13 during the Class Period. A.A.'s parent and legal guardian is Pennie Frazier, who is also a resident and citizen of the State of Mississippi.

38.    Plaintiffs J.C. and E.M. are natural persons and are residents and citizens of the State of Missouri. J.C. and E.M. were under the age of 13 during Class Period. J.C.'s and E.M.'s parent and legal guardian is Lezlie Collins, who is also a resident and citizen of the State of Missouri.

39.    Plaintiffs L.D., D.D., and A.D., are natural persons and are residents and citizens of the State of New Hampshire. L.D., D.D., and A.D. were under the age of 13 during the Class Period. L.D.'s, D.D.'s, and A.D.'s parent and legal guardian is Holly Dorso, who is also a resident and citizen of the State of New Hampshire.

40.    Plaintiffs M.W.D., C.J.D., and C.A.D. are natural persons and are residents and citizens of the State of New York. M.W.D., C.J.D., and C.A.D. were under the age of 13 during the Class Period. M.W.D., C.J.D., and C.A.D.'s parent and legal guardian is Billy Dardanelli, who is also a resident and citizen of the State of New York.

41.    Plaintiff C.L.P. is a natural person and is a resident and citizen of the State of Oklahoma. C.L.P. was under the age of 13 during the Class Period. C.L.P..'s parent and legal guardian is Sarah Dunaway, who is also a resident and citizen of the State of Oklahoma.

42.    Plaintiffs E.B., A.B., C.B., Z.B., and I.B. are natural persons and are residents and citizens of the Commonwealth of Pennsylvania. E.B., A.B., C.B., Z.B., and I.B. were under the age of 13 during the Class Period. E.B., A.B., C.B., Z.B., and I.B.'s parent and legal guardian is Steven Burda,

who is also a resident and citizen of the Commonwealth of Pennsylvania.

43.    Plaintiffs M.W., B.N., and W.N. are natural persons and are residents and citizens of the State of Washington.  M.W., B.N., and W.N. were under the age of 13 during the Class Period. M.W.'s, B.N.'s, and W.N.'s parent and legal guardian is Michelle Wall, who is also a resident and citizen of the State of Washington.

## II.    Defendants

### A.    Google Defendants

44.    Defendant Google LLC is a business incorporated under the laws of the State of Delaware with its principal place of business in Mountain View, California. Google LLC is a wholly-owned subsidiary of Alphabet, Inc. and is the parent company of Defendant YouTube LLC.

45.    Defendant YouTube LLC is a wholly-owned subsidiary of Google LLC, incorporated under the laws of the State of Delaware with its principal place of business in San Bruno, California. At all times mentioned herein, acting alone or in concert with Google LLC, YouTube LLC has advertised, marketed, and distributed its YouTube video sharing platform to consumers throughout the United States.

## FACTUAL BACKGROUND

### I.    Google and YouTube

46.    Google is a multinational internet technology and advertising company that owns the world's two most-visited internet webpages: www.google.com and www.youtube.com. Google is best known for operating a search engine that catalogues websites and organizes information on the internet to allow Google users to search the internet's content. Google uses information that it learns from Google users' searches and web traffic patterns on websites it owns (including YouTube) and websites that use Google's advertising services to deliver targeted advertisements. Advertising is Google's primary source of revenue, accounting, for example, for approximately $116 billion out of Google's $136.2 billion in revenue in 2018.

47.    YouTube LLC operates YouTube, an online video-sharing platform. YouTube allows its visitors and/or users to view user-generated content that has been uploaded by registered YouTube users to YouTube.

48.    YouTube videos are viewable by anyone who accesses YouTube by visiting www.youtube.com or using the YouTube mobile or streaming device app. During the Class Period, individuals did not have to be registered with Google, nor signed into YouTube, to view YouTube videos. And Google did not verify the age of an individual opening an already-installed YouTube mobile app on a mobile device or through other electronic media, including computers.

49.    Google was, at all times throughout the Class Period, aware that minor children access YouTube's channels and actively sought to increase viewing on YouTube by children through content directed toward those children, while publicly representing that such minors were not permitted to access YouTube – and has been very successful attracting this young viewership.

## II.    Google's Advertising Practices

50.    Google offers a number of services, such as YouTube and the email service Gmail, free of charge. Google earns revenue from these services via advertising.

### A.    Google's Data Collection Practices

51.    During the Class Period, Google collected Personal Information from individuals who accessed YouTube for purposes of showing behavioral advertising to those individuals. The Personal Information was collected by Google from the vast network of websites and online services that used Google's advertising services.

52.    Google collected, *inter* alia, the following information about YouTube's users for purposes of showing them behavioral advertising:

- **User Activity**: searches run, videos watched, views and interactions with content and ads, voice and audio information, purchase activity, people with whom a user communicated, browsing history, and activity on third-party sites and apps that used Google services, which includes Google's advertising services;

- **Location Information:** GPS, internet protocol ("IP") address, device sensor data, and data from devices located near a user;

- **Unique Identifiers:** cookie ID, advertising ID, device ID, among others.[3]

    **i.        Cookies**

53.     Google stores some unique identifiers in a text file stored on an individual's browser. These text files are known as "cookies." The type of information stored in cookies can include websites the user has previously visited, the duration of website visits, videos viewed, advertisements viewed, duration of video views, and advertisements clicked, among other information. One popular use of cookies is to enable an individual to visit a series of affiliated websites, for example Gmail and YouTube, without having to re-enter his or her user name and password on each. Each cookie contains a string of characters, or a "cookie ID," that allows the website or service to recognize that specific browser. Cookies, and the unique identifiers stored in cookies, can generally be deleted.

    **ii.       Persistent Identifiers**

54.     Some data and/or information Google collects cannot be easily deleted or reset. Because these data points remain constant, or "persist," they are colloquially referred to as "persistent identifiers." Since persistent identifiers are difficult to change or reset, they are seen by advertisers as a more reliable method of identifying and tracking users over time than cookies.

55.     One example of a persistent identifier collected by Google during the Class Period was a user's IP address. An IP address is a numerical label assigned to each device connected to a computer network, such as the internet. Another example of a persistent identifier collected by Google was a device's International Mobile Equipment Identity ("IMEI") number. Every mobile phone and smartphone is assigned a unique IMEI that cannot be changed.

56.     During the Class Period, Google used persistent identifiers to track individuals' internet behavior. For example, a website that used Google's advertising services to deliver ads to its visitors would send Google its visitors' IP address and/or IMEI number. When another website that used Google's advertising services sent Google the same IP address or IMEI number, Google knew that

---

[3] During the Class Period, Google defined the term "unique identifiers" as a string of characters that can be used to uniquely identify a browser, app, or device.  Unique identifiers can arise from a variety of applications, websites, sensors, and devices.

individual had visited both websites. Studies have found that Google is capable of tracking individuals *over 80% of the internet*.[4]

57.    Google uses this information to build detailed individual profiles that include identifiers correlating with individual users. Most individuals have no idea that Google is tracking their activity across the internet, and virtually no minor child would have had any understanding of this activity. The data that Google gathers is stitched into a single profile of a user which gives Google the most accurate, up-to-date, snapshot of a user's attributes and behaviors. Google uses this data to deliver targeted advertisements to YouTube video viewers based on preferences inferred from their profiles. User profiles such as those developed by Google have been called the "holy grail" of advertising[5] and allows Google to charge advertisers increased advertising rates.

58.    Google uses unique and persistent identifiers to track individuals' activity on any webpage that was using Google's advertising services. An individual's activity on those websites is shared with Google:

**Your activity on other sites and apps**

This activity might come from your use of Google services, like from syncing your account with Chrome or your visits to sites and apps that partner with Google. Many websites and apps partner with Google to improve their content and services. For example, a website might use our advertising services (like AdSense) or analytics tools (like Google Analytics), or it might embed other content (such as videos from YouTube). These services may share information about your activity with Google and, depending on your account settings and the products in use (for instance, when a partner uses Google Analytics in conjunction with our advertising services), this data may be associated with your personal information.[6]

---

[4] Steven Englehardt & Arvin Narayanan, *Online Tracking: A 1-million-site Measurement and Analysis*, Princeton University WebTAP Project, http://randomwalker.info/publications/OpenWPM_1_million_site_tracking_measurement.pdf (accessed Oct. 21, 2019) (emphasis added).

[5] Randell Cotta, Sr., *Overcoming the Last Hurdle in the Quest for the "Holy Grail" of Marketing*, KD NUGGETS, https://www.kdnuggets.com/2017/02/quest-holy-grail-marketing.html (accessed Oct. 21, 2019).

[6] Google Privacy Policy (accessed Oct. 21, 2019).

SEVENTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

59. During the Class Period, Google stated that it used these profiles to deliver "more relevant search results and ads" to YouTube video viewers.[7] To illustrate this point, Google offered the following example: "if you watch videos about baking on YouTube, you may see more ads which relate to baking as you browse the web."[8]

60. Google did not have a separate data collection policy for minor children as of October 2019 or later. Google applied the data collection practices described herein to each individual who visited YouTube, Google, or any website using any of Google's services during the Class Period, irrespective of that individual's age – even for viewers of children's content on YouTube, for which the primary audience, as Google knew full well, was children, including children under the age of 13.[9]

61. After settling with the FTC and the New York Attorney General in fall 2019, Google announced that it would begin complying with COPPA on YouTube for the first time beginning in January 2020:

> ***We are changing how we treat data for children's content on YouTube.*** Starting in about four months, we will treat data from anyone watching children's content on YouTube as coming from a child, regardless of the age of the user. This means that we will limit data collection and use on videos made for kids only to what is needed to support the operation of the service. We will also stop serving personalized ads on this content entirely, and some features will no longer be available on this type of content, like comments and notifications. In order to identify content made for kids, creators will be required to tell us when their content falls in this category, and we'll also use machine learning to find videos that clearly target young audiences, for example those that have an emphasis on kids characters, themes, toys, or games.[10] (emphasis added).

YouTube also committed to introducing a new annual training for its teams regarding COPPA.

62. Subsequent to the filing of Plaintiffs' initial complaint, Google also created a "Privacy Notice for Google Accounts Managed with Family Link, for Children under 13 (or applicable age in

---

[7] *Id.*

[8] *Ads you'll find most useful*, Google Privacy & Terms, https://policies.google.com/privacy/example/ads-youll-find-most-useful?hl=en (accessed Oct. 16, 2019) (emphasis added).

[9] *An update on kids and data protection on YouTube*, YouTube Official Blog, Sept. 4, 2019, https://youtube.googleblog.com/2019/09/an-update-on-kids.html (accessed Jan. 20, 2021).

[10] *Id.*

your country).[11] In this Privacy Notice, Google admitted to collecting minor children's Personal Information and tracking their activities across the Internet, including to provide recommendations, personalized content, and customized search results.[12] In the Notice, Google represented that it would change its prior tactics, and "will not serve personalized ads to your child, which means ads will not be based on information from your child's account. Instead, ads may be based on information like the content of the website or app your child is viewing, the current search query, or general location (such as city or state)."[13] Google also now purports to allow children or parents to delete minor children's activity.[14] None of these disclosures about its collection and tracking of minor children's Personal Information and internet activities or purported creation of a right to delete collected information about minor children existed during the Class Period or at the time this action was filed.

### B. Google's Targeted Advertising Techniques

63.    During the Class Period, advertising on YouTube could be either behavioral or contextual targeting. Behavioral targeting is the delivery of advertisements to individuals based on that user's personal information, which is tracked across multiple websites, apps, and devices. The information Google collected was incorporated into an algorithm which inferred which types of advertisements were likely to have the greatest impact on the user associated with the information (*i.e.,* most likely to be clicked).

64.    Google preferred showing behavior-based, or "behavioral" advertising because it was the most lucrative for both Google and YouTube channel owners. Because of this, Google programmed behavioral advertising as the default method of advertising employed on monetized YouTube channels, but gave channel owners the ability to choose the form of advertising to show and opt out of behavioral advertising, instead showing contextual advertising.

---

[11] https://families.google.com/familylink/privacy/child-policy/ (accessed Dec. 2, 2020).

[12] *Id.*

[13] *Id.*

[14] *Id.*

65.     Contextual targeting is a process by which Google matches advertisements to relevant YouTube channels using keywords provided by the advertiser. Google's system analyzes the content of a YouTube channel to determine its central theme, which is then matched to an advertiser's advertisements using a variety of factors including keywords and topic selections. Contextual targeting does not rely on user-specific data to provide ads.

66.     Because behavioral advertising is more effective than contextual targeting, advertisers paid Google more to run behavioral advertising, and Google in turn paid YouTube channel owners more for allowing Google to run behavioral advertising on their channels than they would have paid them for only allowing contextual advertising.

### C.     YouTube Channel Monetization

67.     YouTube channel owners that pass a viewership threshold set by Google can choose to "monetize" their channel by allowing Google to run advertisements on that channel. Advertisements can take the form of a video clip played before, during, or after the channel owner's video is played, or can be displayed as a banner. Google and the owners of monetized YouTube channels share the advertising revenue, with Google keeping 45% and the channel owners receiving 55%.[15]

68.     Owners of monetized YouTube channels could then elect which type of advertisements to show to viewers of their content: contextual advertising or behavioral advertising. As early as January 2016, all monetized channel owners, including each of the Channel Owner Defendants, were given the option to disable behavioral advertising on their monetized channels. To turn off behavioral ads, the channel owners were required to actively check a box in the "Advertisements" section of YouTube's "Advanced Video Manager Options" menu. The checkbox that allowed the channel owner to opt out of behavioral advertising contained text stating that doing so "may significantly reduce [the] channel's revenue." When a channel owner opted out of behavioral advertisements on a monetized channel,

---

[15] *See* Eric Rosenberg, *How YouTube Ad Revenue Works*, INVESTOPEDIA (Oct. 7, 2018), https://www.investopedia.com/articles/personal-finance/032615/how-youtube-ad-revenue-works.asp (accessed Oct. 24, 2019).

Google served contextual advertising instead, which generated less revenue for the channel owner and Google.

69.    As FTC Commissioner Kelly Slaughter stated, "YouTube has long allowed channel owners to turn off default behavioral advertising and serve instead contextual advertising that does not track viewers, but vanishingly few content creators would elect to do so, in no small part because they receive warnings that disabling behavioral advertising can 'significantly reduce your channel's revenue.' In short, both YouTube and the channels have a strong financial incentive to use behavioral advertising."[16]

## III.    The Children's Online Privacy Protection Act of 1998

70.    Congress passed COPPA, codified at 15 U.S.C. § 6501, *et seq.,* in 1998 in response to concerns that children's online activities were being tracked by operators of websites and online services. COPPA is intended to "maintain the security of personally identifiable information of children collected online" and to "protect children's privacy by limiting the collection of personal information from children without parental consent."[17]   The standards in COPPA have given rise to, and correlate with, accepted norms throughout society for defining the expectations of privacy for minor children.

71.    COPPA applies to any operator of a commercial website or online service directed to children under 13 years of age that collects, uses, and/or discloses Personal Information from children. The FTC considers parties with actual knowledge that they are collecting Personal Information from users of a child-directed site or service as "operators" under COPPA.

72.    COPPA "prohibits unfair … acts or practices in connection with the collection, use, and/or disclosure of personal information from and about children on the Internet." 16 C.F.R. § 312.1.

73.    COPPA provides, in pertinent part, that:

It is unlawful for an operator of a website or online service directed to children, or any operator that has actual knowledge that it is collecting personal information from a child,

---

[16] Dissenting Statement of FTC Commissioner Rebecca Kelly Slaughter *In the Matter of Google LLC and YouTube, LLC*, available for download at https://www.ftc.gov/system/files/documents/public_statements/1542971/slaughter_google_youtube_statement.pdf (accessed Jan. 14, 2021).

[17] 144 CONG. REC. S12787.

to collect personal information from a child in a manner that violates the regulations prescribed [by the Federal Trade Commission]. 15 U.S.C. § 6502(a).

74.    COPPA thus prohibits, *inter alia*, the collection of persistent identifiers for behavioral advertising absent notice and verifiable parental consent. 16 C.F.R. §§ 312.5(c)(7), 312.2.

75.    COPPA specifically requires an "operator" covered by COPPA to give notice to parents and obtain their verifiable consent before collecting children's Personal Information online. 16 C.F.R. §§ 312.4 and 312.5. This includes but is not limited to:

> a.    Posting a privacy policy on its website or online service providing clear, understandable, and complete notice of its information practices, including what information the website operator collects from children online, how it uses such information, its disclosure practices for such information, and other specific disclosures set forth by COPPA;

> b.    Providing clear, understandable, and complete notice of its information practices, including specific disclosures directly to parents; and

> c.    Obtaining verifiable parental consent prior to collecting, using, and/or disclosing Personal Information from children.

76.    The FTC has interpreted "operators of website or online services directed to children" and "operators with actual knowledge that they are collecting personal information online from children under 13" as used under COPPA to include YouTube and channel owners. In fact, the FTC has interpreted COPPA as viewing "content creators and channel owners" as both "standalone 'operators' under COPPA, subject to strict liability for COPPA violations."[18]

77.    Websites or online services that collect Personal Information from users of other child-directed websites or online services are deemed as "child-directed" if the website or online service "has actual knowledge that it is collecting personal information directly from users of another Web site or

---

[18] Statement of Joseph J. Simons & Christine S. Wilson, *Regarding FTC and People of the State of New York v. Google LLC and YouTube, LLC*, FEDERAL TRADE COMMISSION, https://www.ftc.gov/system/files/documents/public_statements/1542922/simons_wilson_google_youtube_statement.pdf (accessed Oct. 21, 2019).

online service directed to children." 16 C.F.R. § 312.2.

78.    In order to determine whether a website or online service is "directed to children" the FTC will:

> [C]onsider [the website's or online service's] subject matter, visual content, use of animated characters or child-oriented activities and incentives, music or other audio content, age of models, presence of child celebrities or celebrities who appeal to children, language or other characteristics of the Web site or online service, as well as whether advertising promoting or appearing on the Web site or online service is directed to children.

16 CFR § 312.2.

79.    In 2013, COPPA was enhanced (the "2013 COPPA Enhancement") to provide further protection for children against online tracking and to "giv[e] parents greater control over the online collection of their children's personal information." The 2013 enhancement widened the definition of children's "Personal Information" to include "persistent identifiers" such as cookies that track a child's activity online, geolocation information, photos, videos, and audio recordings.

80.    The 2013 COPPA Enhancement was the culmination of two years of rulemaking by the FTC and reflected society's growing recognition of the surreptitious surveillance tactics used by advertising companies to track children online and advertise to them while using the internet.

81.    For example, the FTC published a 2012 report entitled *Mobile Apps for Kids: Disclosures Still Not Making the Grade* (the "FTC Kids Mobile App Report") addressing privacy dangers for children using mobile devices with persistent identifiers to access the internet. The FTC Kids Mobile App Report warned that companies like Google link persistent identifiers and geolocation data they collect with additional Personal Information such as name, address, and email address—allowing those entities and their partners to identify individual users whom they profile with indisputably individual specificity.

82.    By expressly including persistent identifiers and geolocation data in COPPA's definition of Personal Information, the FTC intended to deter advertising companies and advertising network operators such as Google from exploiting young children via tracking, profiling, and advertising online.

83.    Pursuant to Section 1303(c) of COPPA, 15 U.S.C. § 6502(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of COPPA constitutes an unfair … act or practice in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

17

84.     While COPPA does not itself provide a private right of action for individuals to seek redress for harms arising from COPPA violations, and contains a limited preemption clause barring the imposition of liability by states and local governments "inconsistent" with COPPA (15 U.S.C. § 6502(d)), the United States Court of Appeals for the Ninth Circuit has held that "COPPA's preemption clause does not bar state-law causes of action that are parallel to, or proscribe the same conduct forbidden by, COPPA." *Jones v. Google LLC*, 73 F.4th 636 (9th Cir. 2023).

85.     Therefore, individuals harmed by conduct which violates COPPA such as the conduct described herein may seek redress for harms via state law causes of action.

## SUBSTANTIVE ALLEGATIONS

### I.     Google Knowingly Targeted and Tracked Children Under 13 on YouTube

86.     On September 4, 2019, Google issued a statement in conjunction with its settlement with the FTC and New York Attorney General's office for alleged violations of COPPA that included, inter alia, the following:

> From its earliest days, YouTube has been a site for people over 13, but with a boom in family content and the rise of shared devices, the likelihood of children watching without supervision has increased. We've been taking a hard look at areas where we can do more to address this, informed by feedback from parents, experts, and regulators, including COPPA concerns raised by the U.S. Federal Trade Commission and the New York Attorney General that we are addressing with a settlement announced today. [19]

87.     But the facts establish that Google has always targeted children as a core audience on YouTube. During the Class Period, Google solicited and encouraged the creation of content that was directly aimed at children under 13 and made that content available on YouTube for the purpose of attracting young children to YouTube.

### A.     Google Lured Children to YouTube with Child-Directed Content

88.     During the Class Period, and as part of a uniform nationwide practice, Google engaged in a concerted effort to lure millions of minor children, including minor children under the age of 13, to

---

[19] *An update on kits and data protection on YouTube*, YouTube Official Blog, Sept. 4, 2019, https://youtube.googleblog.com/2019/09/an-update-on-kids.html (accessed Oct. 22, 2019).

use YouTube so that Google could collect their Personal Information, track them across the internet, and show them advertisements for profit, which they shared with YouTube channel owners to gain their participation.

89.    For example, YouTube created a rating system whereby channel owners could signal that their videos were intended for children under 13. The ratings options were Y (generally intended for ages 0-7); G (intended for any age); PG (generally intended for ages 10+); Teen (generally intended for ages 13+); MA (generally intended for ages 16+); and X (generally intended for ages 18+). At one point, YouTube also used the classification "Made for Kids" for certain videos shown on YouTube.

90.    Google not only encouraged content creators to accurately categorize their content so that they could properly target child viewers with advertisements, but Google also reviewed *all* content uploaded to YouTube to provide an additional layer of analysis of the content for advertising purposes.

91.    To further promote the creation of child-directed content for YouTube, Google created the "YouTube Academy" to offer advice on creating "family-friendly" content to YouTube channel owners to enable them be more successful (*i.e.*, get more views and earn more money). As the screenshot below formally contained on YouTube's website shows (the page has now been removed from YouTube's website), the YouTube Academy provided specific guidance on creating content intended for young children on YouTube (not YouTube Kids).

92.    Google also used the creation and existence of the YouTube Kids App as a guise to generate child-directed content which was then shown on YouTube. YouTube Kids' was YouTube's application "Made Just for Kids," and was "designed to be a safer and simpler place for kids to explore their interests through online video."[20] Yet every video that was available on the YouTube Kids App was also uploaded to YouTube. Because every video on the YouTube Kids App was directed towards young children, this necessarily meant that Google was knowingly uploading content to YouTube that was designed specifically to attract child viewers and was thus "child-directed" as defined under

---

[20] https://www.youtube.com/intl/ALL_us/kids/safer-experience/?gclid=Cj0KCQiAjKqABhDLARIsABbJrGmo2SCCYT5X9FGB8mJtmE14Y-AE2-H1IfLOdYEFfTO513LmMMpO7rYaAmiJEALw_wcB&gclsrc=aw.ds (accessed Jan. 22, 2021.)

SEVENTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

COPPA. Despite this knowledge, Google tracked every single viewer of these child-directed videos on YouTube. And, as described herein, the viewership of YouTube – the new "Saturday Morning Cartoons" – dwarfed that of YouTube Kids.

93. Significantly, until 2019, the YouTube Kids App was *only* available as a mobile app (meaning it was harder to access), and was *not* accessible via web browser. This meant that when a child searched (likely using Google) for his or her favorite show on a web browser, the child would be shown links to child-directed content hosted on YouTube and not the YouTube Kids App, which Google did not use to employ its tracking and behavioral advertising scheme. If the child clicked any of those links and watched those videos, they would be tracked as if they were an adult YouTube user.

94. As the screenshot below shows (the page has now been removed from YouTube's website), Google was aware and encouraged content creators to post child-directed content on YouTube – YouTube Academy provided specific guidance on creating content intended for young children on YouTube (not YouTube Kids):



95.     While the YouTube channel owners signaled what age groups their videos were intended for, Google viewed and "rate[d] all videos uploaded to YouTube, as well as the channels as a whole. Defendants assign[ed] each channel and video a rating . . . Defendants assign[ed] these ratings through both automated and manual review." Through this process, Google acquired actual knowledge of the child-directed nature of this content.

**B.      Google Was Aware It Was Tracking Children**

96.     Google knew that the unfair and unlawful tactics it employed to bait, steer, and lure children to YouTube as part of a uniform nationwide practice were successful in drawing millions of American children to use YouTube, and that far fewer children used YouTube Kid's compared to YouTube. For example, an August 2019 study that ranked 350 children's brands across 19 consumer categories ranked YouTube #1 and YouTube Kids #50.  Another study found that almost twice as many children used YouTube (83%) as used YouTube Kids (45%).

97.    Additional studies confirm that Google's efforts throughout the Class Period to attract young children to YouTube were successful. For example:

- A 2014 study by The Marketing Store and Kid Say ("2014 Global Kids Study") found that YouTube was voted as the unanimous favorite website of kids 2-12 and that 93% of tweens (children aged 8-11) used YouTube;[21]

- A 2015 study by Nielson MRI ("2015 Nielson Study") found that YouTube was the "leader in reaching children age 6-11 against top TV channels. The study found that 63% of children age 6-11 watched YouTube, tying TV channel Nickelodeon and beating the Disney Channel (57%) and Cartoon Network (49%);[22]

- A 2016 study by LMX ("2016 LMX Study") found that YouTube was "the #1 website regularly visited by kids," beating out the likes of Disney, Cartoon Network, PBS, and Amazon;[23]

- A July 2016 Google Consumer Survey ("2016 Google Consumer Survey") of 1683 parents of children ages 2-14 found that "YouTube is the #1 source where children discovery new toys + games;"[24]

- A 2017 study by Smarty Pants ("2017 Smart Pants Study") found that 96% of children ages 6-12 were aware of YouTube and that 94% either love (71%) or like (24%) YouTube.[25] The same study found that 90% of the children that know YouTube say they use it, 83% of whom use it *daily*;[26] and

---

[21] *Complaint for Permanent Injunction, Civil Penalties, and other Equitable Relief* ("FTC Complaint") – Ex. B, No. 19-cv-2642, ECF No. 3-1, Sept. 4, 2019 ("FTC Exhibit B").

[22] *FTC Complaint – Ex. A*, ("FTC Exhibit A").

[23] FTC *Complaint – Ex. C*, ("FTC Exhibit C").

[24] *Id.*

[25] Smarty Pants, *2017 Brand Love Study: 2017 Kid & Family Trends*, at 7 (2017), https://daks2k3a4ib2z.cloudfront.net/5435eb4d1e426bb420ac990f/5a316f4f4a2f7d000196532b_2017%20Kid%20and%20Family%20Trends%20Report%20EXCERPT.PDF (emphasis added).

[26] *Id.*

---

- A 2019 by Pew Research ("2019 Pew Study") study found that videos that "videos that were directly aimed at a young audience and *also* featured a child under the age of 13 were more popular than any other type of content identified in [the] analysis as measured by view counts."[27]

98.    As one of the world's most sophisticated advertising and data companies, Google did not need these studies to know that it was successfully attracting millions of child viewers to YouTube. However, in case there was any doubt as to Google's awareness of YouTube's popularity among young children, evidence establishes that Google used these very studies to market YouTube to companies that make toys and other children's products, including Defendants Hasbro and Mattel, as a top destination for children. For example, Google gave a presentation entitled "Insight on Families Online" to Mattel and cited the 2015 Nielsen Study.[28] Mattel's YouTube presence includes several channels directed towards children, including: Barbie, Monster High, and Thomas & Friends.

99.    Google also included a section called "Stat Pack: Additional insight into mobile usage among parents + children" in a presentation to the Hasbro Defendants. In the presentation, Google cited the 2014 Global Kids Study. In a second presentation to the Hasbro Defendants, Google included a section entitled "2016 Kids + Family Digital Trends" and cited both the 2016 LMX Study and Google's own 2016 Google Consumer Survey.[29]

100.    While Google was citing these studies privately to toy companies, it was simultaneously reiterating publicly the false contention that YouTube was not intended for children. For example, when a consumer advocacy group filed a complaint with the FTC over YouTube's data collection practices, a YouTube spokesman told the New York Times: "Because YouTube is not for children, we've invested significantly in the creation of the YouTube Kids app to offer an alternative specifically designed for

---

[27] Patrick Van Kessel, *A Week in the Life of Popular YouTube Channels*, PEW RESEARCH CENTER, July 25, 2019, https://www.pewinternet.org/2019/07/25/a-week-in-the-life-of-popular-youtube-channels/ (accessed Oct. 16, 2019) (emphasis in original).

[28] FTC Exhibit A.

[29] FTC Exhibit C.

SEVENTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

children." This was misleading at best because what YouTube Kids really allowed Google to do was to openly solicit the development of more child-directed content from the YouTube channels partners that could also be posted on YouTube for their mutual profit through behavioral advertising targeting young children.

101.    As a result of the above-described, Google had actual knowledge that children under 13 were using YouTube, yet did not obtain verifiable parental consent before collecting the Personal Information of those children in violation of COPPA and the FTC Act, which constituted an intrusion upon the seclusion of children under 13 watching videos on YouTube as well as a violation of their reasonable expectation of privacy.

## II.    Economic Incentives Caused YouTube Channels to Bait and Exploit Children Using Nursery Rhymes, Cartoons, and Other Child-Directed Content

102.    YouTube channel owners recognized the economic benefits of creating child-directed YouTube content that could be used to track Personal Information of minor children and entered into agreements with Google to monetize their YouTube channels during the Class Period. By choosing to monetize their YouTube channels and allow Google to employ the more lucrative behavioral targeted advertising, YouTube channel owners knew (or should have known) that given the nature of the behavioral targeted advertising, Google was in fact targeting minor children, including children under the age of 13, by tracking Personal Information about those children.  As discussed above, to further their unity of purpose, Google shared 55% of the advertising revenue with YouTube channel owners, which benefited when their content successfully lured children on to YouTube and Google showed children viewing these channels behavioral targeted advertisements.  These practices and conduct by Google and YouTube during the Class period were uniform across the country.

103.    YouTube channel owners created content intentionally designed to attract children, including especially children under the age of 13, with content featuring nursery rhymes and children's songs, toys, and already-popular cartoons. Google knew this, as confirmed by the Attorney General of New York's discovery that a "well-known channel owner . . . repeatedly informed Google and YouTube

that its videos were directed to children younger than 13-years-old."[30]

104.    This exploitation and manipulation of children constitutes unfair, and unconscionable conduct, and was an egregious invasion of privacy.

105.    As discussed above, during the Class Period, Plaintiffs viewed YouTube channels showing child-directed content on YouTube that elected to monetize their channels through behavioral advertising, including the following representative channels:

**A.    ChuChuTV**

106.    ChuChuTV created the ChuChuTV Nursey Rhymes & Kids Songs YouTube channel in 2013[31] and opted to monetize the channel the Class Period. ChuChuTV is thus a "content creator[] who upload[ed] child-directed content and monetize[ed] [its] channels with behavioral advertising that uses persistent identifiers to track children without verifiable parental consent" described by FTC Commissioner Rebecca Kelly Slaughter as the primary violators of COPPA on YouTube.[32]

107.    Google gave ChuChuTV the option to turn off behavioral advertising and to instead show contextual advertising to its viewers, thus giving ChuChuTV the ability to control the unfair and unlawful conduct at issue. Upon information and belief, because it would have earned less revenue, ChuChuTV agreed to allow behavioral advertising to viewers on YouTube.

108.    ChuChuTV's child-directed YouTube channels were included as part of the Google's

---

[30] Letitia James, *Google and YouTube to Pay Record Figure For Illegally Tracking And Collecting Personal Information From Children,* New York State Office of the Attorney General, Sept. 4, 2019, https://ag.ny.gov/press-release/2019/ag-james-google-and-youtube-pay-record-figure-illegally-tracking-and-collecting (accessed Oct. 21, 2019).

[31] Alexis C. Madrigal, *Raised by* YouTube, THE ATLANTIC (Nov. 2018), http://www.theatlantic.com/magazine/archive/2018/11/raised-by-youtube/570838/ (accessed Oct. 21, 2019).

[32] *See* Rebecca Kelly Slaughter, *Dissenting Statement of Commissioner Rebecca Kelly Slaughter In the Matter of Google LLC and YouTube, LLC*, FEDERAL TRADE COMMISSION (Sept. 4, 2019), https://www.ftc.gov/system/files/documents/public_statements/1542971/slaughter_google_youtube_statement.pdf ("YouTube is likely the online service that today hosts the most violations of COPPA. Those violations are primarily committed by content creators who upload child-directed content and monetize their channels with behavioral advertising that uses persistent identifiers to track children without verifiable parental consent.")

Preferred "Parenting & Family" Lineup as of March 2018.[33] Because advertisers signing up to advertise to Google Preferred Lineups had the option to serve behavior-based targeted advertising to viewers of those channels, upon information and belief, a channel could not be part of Google's Preferred "Parenting & Family" Lineup without enabling behavioral advertising on its channel.[34]

109.    During the Class Period, ChuChuTV Nursery Rhymes & Kids Songs YouTube channel had over 27 million subscribers and 18 billion views.[35] ChuChuTV Nursery Rhymes & Kids Songs' homepage features digital animal cartoons and cartoons of children. The "About" section of ChuChuTV Nursery Rhymes & Kids Songs' YouTube channel states:

> ChuChuTV is designed to engage children through a series of upbeat nursery rhymes and educational songs with colorful animations. Our ChuChuTV characters will teach kids their favorite nursery rhymes, colors, shapes, numbers etc. and more importantly good human values which we feel is very important for the next generation champions.[36]

110.    ChuChuTV's first YouTube video featured a character named Chu Chu modeled after ChuChuTV's founder's baby daughter (whose nickname was Chu Chu) "dancing to the popular . . . Indian nursery rhyme "Chubby Cheeks ("Curly hair, very fair / Eyes are blue, lovely too / Teacher's pet, is that you?")."[37] Within a few weeks of the upload of its first video, ChuChuTV had amassed 300,000 views and 5,000 followers.[38] Despite the fact that ChuChuTV's video was clearly directed towards young children – whom Google claims are not allowed to and do not use YouTube – a YouTube

---

[33] *See In the Matter of Request to Investigate Google's YouTube Online Service and Advertising Practices for Violating the Children's Online Privacy Protection Act,* Center for Digital Democracy, *et al.,* p. 12.

[34] *See, e.g.* Tim Peterson, *With an eye on TV ad budgets, YouTube debuts search-based video ad targeting,* DIGIDAY (Mar. 13, 2018), https://digiday.com/future-of-tv/youtube-adds-search-based-targeting-tv-style-google-preferred-ad-program/; ("the Google-owned video service is adding the search-based targeting option to its Google Preferred ad-buying program, which packages the most popular 5 percent of YouTube channels into category-specific bundles that brands can advertise against.").

[35] ChuChu TV Nursery Rhymes & Kids Songs, *About Section*, YOUTUBE, https://www.youtube.com/user/TheChuChuTV/about (accessed Oct. 21, 2019).

[36] *Id.*

[37] *Id.*

[38] *Id.*

SEVENTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

1    representative contacted ChuChuTV shortly after its launch to say "[y]ou guys are doing some magic

2    with your content."[39]

3    **B.    Ryan's World**

4    111.    YouTube channel Ryan's World (f/k/a Ryans ToysReview) features videos of Ryan Kaji

5    (a minor child during the Class Period) unboxing toys and other children's products. Ryan's World agreed

6    to monetize its channel during the Class Period. Ryan's World is thus a "content creator[] who upload[ed]

7    child-directed content and monetize[ed] their channels with behavioral advertising that uses persistent

8    identifiers to track children without verifiable parental consent."[40]

9    112.    Ryan's World's first video was posted in 2015. During the Class Period, Ryan's World

10   became the second most popular YouTube channel, with approximately 22.5 million subscribers and

11   over 33 billion views.[41]

12   113.    Throughout the Class Period, Ryan's World lured young children to the Ryan's World

13   YouTube channel by frequently posting disguised advertising directed at children under the age of five

14   to its YouTube channel using popular children's products. These practices have been the subject of a

15   formal complaint letter filed by Truth in Advertising, Inc. ("TINA") with the FTC and "misleadingly

16   blurs the distinction between advertising and organize content" for Ryan's World's audience and was

17   intended to overcome preschooler's lack of ability to identify and understand that they are being

18   presented with marketing materials.

19   114.    A review by TINA of videos posted to the Ryan's World YouTube channel concluded

20   that "[t]he target audience for [Ryan's World] is preschool children, i.e., children under the age of five

21   . . . an appraisal of every video published on [Ryan's World] between January 1 and July 31, 2019

22   reveals that 92 percent promote at least one product or television/YouTube program that is appropriate

23   for – and targeted at – children under the age of five."

24   115.    Google gave Ryan's World the option to turn off behavioral advertising and to instead

25

26   [39] *Id.*

27   [40] *See* fn. 31 above.

28   [41] Ryan ToysReview, *About Section*, YᴏᴜTᴜʙᴇ, https://www.youtube.com/channel/UChGJGh
     Z9SOOHvBB0Y4DOO_w/about, (accessed Oct. 21, 2019).

show contextual advertising to its viewers, thus giving Ryan's World the ability to control the unfair and unlawful conduct at issue. Upon information and belief, because they would have earned less revenue, Ryan's World opted to allow behavioral advertising to viewers on YouTube.

116.    Ryan's World's "About" section described itself as "Ryan loves Toys. Toys Review for kids by a kid! Join Ryan to see him play with toys and review toys for kids! Ryan will also love doing fun and easy science experiments for kids!" Ryan's World generated over $11 million in revenue in 2018 and over $22 million in 2019.[42] Because Google takes 45% of all ad revenues,[43] Google earned approximately $15 million from Ryan's World alone in 2018-2019.

### C.    Hasbro

117.    Hasbro created the My Little Pony Official YouTube channel in 2013 and opted to monetize the channel during the Class Period. Hasbro is thus a "content creator[] who upload[ed] child-directed content and monetize[ed] their channels with behavioral advertising that uses persistent identifiers to track children without verifiable parental consent."[44]

118.    Hasbro's YouTube offerings channels included the following: Play-Doh, Official Play-Doh How To Videos, Baby Alive Official, NERF Official, and TRANSFORMER OFFICIAL. According to Hasbro, the target demographic for My Little Pony is children ages 5-8. During the Class Period, My Little Pony's About section read:

> Welcome to the official home of My Little Pony & Equestrian Girls! Discover the magic of friendship with Twilight Sparkle, Rainbow Dash, Pinkie Pie, Rarity, Fluttershy, Applejack and friends. Join the #RainbowSquad and subscribe today![45]

---

[42] Amanda Perelli, *The world's top-earning YouTube star is an 8-year-old boy who made $22 million a single year reviewing toys,* BUSINESS INSIDER, https://www.businessinsider.com/8-year-old-youtube-star-ryan-toysreview-made-22-million-2019-10 (accessed Oct. 21, 2019).

[43] Eric Rosenberg, *How YouTube Ad Revenue Works*, INVESTOPEDIA (Oct. 7, 2018), https://www.investopedia.com/articles/personal-finance/032615/how-youtube-ad-revenue-works.asp. (accessed Jan. 13, 2021).

[44] *See* fn. 31 above.

[45] My Little Pony, About section, YOUTUBE, https://www.youtube.com/user/mlpequestriagirls/about (accessed Oct. 21, 2019).

119.    Google gave Hasbro the option to turn off behavioral advertising and to instead show contextual advertising to its viewers, thus giving Hasbro the ability to control the unfair and unlawful conduct at issue. Upon information and belief, because they would have earned less revenue, Hasbro agreed to allow behavioral advertising to viewers on YouTube.

120.    The FTC's complaint against Google specifically cited Hasbro as part of a group of YouTube channel owners that hosted child-directed content and knowingly assisted Google to collect the Personal Information of viewers of Hasbro's YouTube channel(s) to show behavioral advertising, resulting in "close to $50 million" in revenue for Google.[46]

121.

**D.    Mattel**

122.    Mattel operated several monetized YouTube channels during the Class Period, including Barbie, Monster High, Hot Wheels, and Thomas & Friends. Mattel is thus a "content creator[] who upload[ed] child-directed content and monetize[ed] [its] channels with behavioral advertising that uses persistent identifiers to track children without verifiable parental consent."[47]

123.    Google gave Mattel the option to turn off behavioral advertising and to instead show contextual advertising to its viewers, thus giving Mattel the ability to control the unfair and unfair and unlawful conduct at issue. Upon information and belief, because it would have earned less revenue, Mattel agreed to allow behavioral advertising to viewers on YouTube.

124.    The FTC's complaint against Google specifically cited Mattel as part of a group of YouTube channel owners that hosted child-directed content and knowingly assisted Google to collect

---

[46] *See* FTC Complaint, ¶ 31 (describing Hasbro's YouTube channel content); *see also* FTC Complaint ¶ 41 ("[Google] earned close to $50 million from behavioral advertising on these channels, which represent only a few examples of the possible universe of child-directed content on YouTube."). Under their revenue sharing agreements with Google, channel owners obtained roughly an additional $60 million from that behavioral advertising.

[47] *See* fn. 31 above.

SEVENTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

the Personal Information of viewers of Mattel's YouTube channel to show behavioral advertising, resulting in "close to $50 million" in revenue for Google.[48]

125.    During the Class Period, Mattel's YouTube channels had tens of millions of subscribers and billions of views. Each channel showed child-directed content featuring popular children's toys belonging to Mattel's brands. For example, the Barbie YouTube channel featured animated videos of Barbie and related toys, including the "Junior Rainbow Princesses." The Barbie YouTube channel also featured episodes of "Barbie Dreamtopia," a show that, according to the FTC and New York Attorney General, Mattel described as "targeting 3-6 year olds."

### E.    The Cartoon Network

126.    The Cartoon Network operated several monetized YouTube channels directed towards children during the Class Period, including Steven Universe, the Powerpuff Girls, and Teen Titans Go. The Cartoon Network is thus a "content creator[] who upload[ed] child-directed content and monetize[ed] their channels with behavioral advertising that uses persistent identifiers to track children without verifiable parental consent."[49]

127.    Google gave the Cartoon Network the option to turn off behavioral advertising and to instead show contextual advertising to their viewers, thus giving the Cartoon Network the ability to control the unfair and unlawful conduct at issue. Upon information and belief, because they would have earned less revenue, the Cartoon Network agreed to allow behavioral advertising to viewers on YouTube.

128.    The FTC's complaint against Google specifically cited the Cartoon Network as part of a group of YouTube channel owners that hosted child-directed content and knowingly assisted Google to

---

[48] *See* FTC Complaint, ¶ 29 (describing Mattel's YouTube channel content); *see also* FTC Complaint ¶ 41 ("[Google] earned close to $50 million from behavioral advertising on these channels, which represent only a few examples of the possible universe of child-directed content on YouTube.")

[49] *See* fn. 31 above.

collect the Personal Information of viewers of the Cartoon Network's YouTube channel to show behavioral advertising, resulting in "close to $50 million" in revenue for Google.[50]

129.    During the Class Period, the Cartoon Network's YouTube channel had over 6 million subscribers and its content had been viewed over 5.3 billion times. According to the FTC and New York Attorney General, Google selected a clip from the Cartoon Network YouTube channel in a "Creating for Kids Playbook," as an example of family-friendly content and also marketed the Cartoon Network YouTube channel as a "popular YouTube Channel[] kids are watching."

**F.    DreamWorks**

130.    DreamWorks operated the child-directed monetized DreamWorksTV YouTube channel during the Class Period. The DreamWorks TV YouTube channel's content included several popular children's shows, including Race to the Edge, Trollhunters, and Shrek. DreamWorks is thus a "content creator[] who upload[ed] child-directed content and monetize[ed] their channels with behavioral advertising that uses persistent identifiers to track children without verifiable parental consent."[51]

131.    The "About" section of the DreamWorks TV YouTube channel described the channel as "made just for kids!" throughout the Class Period. The DreamWorksTV YouTube channel had 6.3 million subscribers and its content had been viewed over 4.7 billion times during the Class Period.

132.    Google gave DreamWorks the option to turn off behavioral advertising and to instead show contextual advertising to their viewers, thus giving DreamWorks the ability to control the unfair and unlawful conduct at issue. Upon information and belief, because they would have earned less revenue, DreamWorks agreed to allow behavioral advertising to viewers on YouTube.

133.    The FTC's complaint against Google specifically cited DreamWorks as part of a group of YouTube channel owners that hosted child-directed content and knowingly assisted Google to collect

---

[50] *See* FTC Complaint, ¶ 30 (describing the Cartoon Network's YouTube channel content); *see also* FTC Complaint ¶ 41 ("[Google] earned close to $50 million from behavioral advertising on these channels, which represent only a few examples of the possible universe of child-directed content on YouTube.")
[51] *See* fn. 31 above.

SEVENTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

the Personal Information of viewers of DreamWorks' YouTube channel to show behavioral advertising, resulting in "close to $50 million" in revenue for Google.[52]

### III.    Economic Incentives Caused Google to Unlawfully Track, Profile, and Target Children with Behavioral Targeting

134.    The design and marketing of channels such as ChuChuTV Nursery Rhymes & Kids Songs, Ryan ToysReview, My Little Pony Official, Barbie, and Monster High, among others, as well as each of the YouTube channel's own categorization of their videos, clearly provided notice to Google that children, including children under the age of 13, were viewing these channels.

135.    As described below, Plaintiffs watched many of the representative YouTube channels (and others) during the Class Period, and were therefore subjected to Google's behavioral targeting, which included collection of their Personal Information. Google used behavioral targeting to show minor children advertisements that were uniquely tailored to them for Google's (and the YouTube channel owners') financial gain.

136.    Targeting advertisements to children adds more value than targeting to adults because children are generally unable to distinguish between content and advertisements. This is especially true in the digital realm, where children are less likely to identify and counteract the persuasive intent of advertising. This results in children, especially those under the age of eight, accepting advertising information in commercials "uncritically . . . [and as] truthful, accurate, and unbiased."[53]

137.    Despite their knowing collection of Personal Information about minor children, including children under the age of 13, Google (and the YouTube channel owners) knowingly disregarded their obligation to comply with federal and state laws designed to protect children's privacy by claiming no children watched videos on YouTube. Google did so because it knew it could not both abide by federal and state law *and* offer highly profitable behavioral targeting of children.

---

[52] *See* FTC Complaint, ¶ 32 (describing DreamWorks' YouTube channel content); *see also* FTC Complaint ¶ 41 ("[Google] earned close to $50 million from behavioral advertising on these channels, which represent only a few examples of the possible universe of child-directed content on YouTube.")

[53] Report of the APA Task Force on Advertising and Children (American Psychological Association, Feb. 20, 2004), at pp.7-8, available at https://www.apa.org/pi/families/resources/advertising-children.pdf (accessed October 14, 2025).

138.    As the Attorney General of New York put it, Google knew that stopping the illegal tracking, profiling, and targeting practices would result in a substantial loss of revenue:

> Google and YouTube knowingly and illegally monitored, tracked, and served targeted ads to young children just to keep advertising dollars rolling in . . . These companies put children at risk and abused their power, which is why we are imposing major reforms to their practices and making them pay one of the largest settlements for a privacy matter in U.S. history.[54]

139.    Faced with a choice between complying with federal and state privacy laws and their advertising revenue, Google (and the YouTube channel owners that elected to show behavioral advertising) chose the money. During the Class Period, Google (and these YouTube channel owners) realized hundreds of millions of dollars, if not more, resulting from their practices.

140.    The harmful intrusions of personal privacy of the Minor Plaintiffs, and all similarly-situated children they seek to represent, resulting from Google's uniform conduct and actions cannot be overstated. During the Class Period, Google collected the Personal Information of millions of children, including but not limited to children under the age of 13, who viewed monetized YouTube channels. This included the collection of persistent identifiers, which Google used to track minor children across the internet, internally develop a profile of the inferred preferences and interests of those children, and target those children with advertisements designed to influence their behavior.

141.    And even though Google purported to give individuals some control over their data during the Class Period, it did "not disclose the full extent of the information it collects . . . nor the valuable inferences it draws from this data."[55] While Google claims to enable users to control their data, Google "*omits* much of the data the company collects, which is often far more invasive and revealing."[56]

---

[54] *Google and YouTube to Pay Record Figure For Illegally Tracking And Collecting Personal Information From Children,* NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL, Sept. 4, 2019, https://ag.ny.gov/press-release/2019/ag-james-google-and-youtube-pay-record-figure-illegally-tracking-and-collecting (accessed Oct. 21, 2019).

[55] Oracle, *Google's Shadow Profile: A Dossier of Consumers Online and Real World Life* (Feb. 2019), https://assets.publishing.service.gov.uk/media/5e1c4985e5274a06b7450a13/Oracle_-_Response_to_SoS_-_Appendix_4_-_Google_Shadow_Profiles.pdf (accessed Mar. 12, 2020).

[56] *Id.*

142.    Moreover, children themselves cannot properly consent to this profiling, and Google (and the YouTube channel owners) did not obtain parental consent to perform this profiling. Nonetheless, Google developed and used these profiles to manipulate and exploit children. Google makes more money through YouTube by capturing more of an individual's time. Google thus manipulated children using their Personal Information into extending their time on YouTube, which in turn increased the number of targeted advertisements shown to them, and increased the revenue earned by Google (and the YouTube channel owners that monetized their channels)

**IV.    Google's Tracking, Profiling, Targeting and Exploitation of Children Without Parental Consent Violated Plaintiffs' and Class Members' Reasonable Expectations of Privacy and is Highly Offensive**

143.    Google's violation of the privacy rights and reasonable expectations of privacy of Plaintiffs and Class members is particularly egregious because Google (by collecting and using the Personal Information) violated societal norms and laws designed to protect a group – children – that society has long recognized as vulnerable to exploitation and manipulation.

144.    Parents' interest in the care, custody, and control of their children is one of the most fundamental liberty interests recognized by society. It has long been recognized that parents should maintain control over who interacts with their children and how.

145.    Because children are more susceptible to exploitation than adults, society has recognized the importance of providing added legal protections for children, often in the form of parental consent requirements.

146.    In fact, as discussed above, the FTC's enhancements of COPPA in 2013 reflect the specific concern with mobile app tracking and tracking internet users via persistent identifiers, and reflect the offensiveness with which society regards this behavior.

147.    Children develop the ability to use smartphones and tablets by the age of two.[57] Almost every family with a child younger than eight in America has a smartphone (95%) and/or tablet (78%) in the household.[58]

148.    Often, children are given their own devices, with one 2015 study finding that by age four, 75% of children had their own tablet, smartphone, or iPod.[59]

149.    Nearly all parents in the United States (94%) say their children under 13 use online apps, with top apps used being video streaming (64%), video gaming (58%) and show/movie streaming (58%).[60]

150.    Four in five parents (80%) whose children under 13 use online apps say they worry about their children's privacy when using those apps,[61] with the top concern (69%) being data tracking.[62]

151.    Nearly 3 in 4 parents whose children under 13 use online apps (73%) say they are concerned about their children's location being tracked by those apps; those residing in urban or rural areas are more likely than those residing in suburban areas to share this sentiment (88% and 87% vs. 73%).[63]

---

[57] Elyse Wanshel, *10 Reason Why You Shouldn't Give a Child a Smartphone or Tablet*, LITTLE THINGS, https://www.littlethings.com/reasons-not-to-give-children-technology (accessed Oct. 21, 2019).

[58] Victoria Rideout, *The Common Sense Census: Media Use By Kids Age Zero To Eight*, COMMON SENSE MEDIA (2017) at 3, https://www.commonsensemedia.org/research/the-common-sense-census-media-use-by-kids-agezero-to-eight-2017 (accessed Oct. 21, 2019).

[59] *The Dangers of YouTube for Kids*, THE ATLANTIC (Nov. 2018), https://www.theatlantic.com/magazine/archive/2018/11/raised-by-youtube/570838/ (accessed Oct. 22, 2019) ("[A] team of pediatricians at Einstein Medical Center, in Philadelphia, found that YouTube was popular among device-using children under the age of 2. Oh, and 97 percent of the kids in the study had used a mobile device. By age 4, 75 percent of the children in the study had their own tablet, smartphone, or iPod. And that was in 2015.).

[60] https://www.pixalate.com/blog/childrens-online-privacy-harris-poll-recap.

[61] *Id.*

[62] https://www.cdpinstitute.org/news/childrens-privacy-data-tracking-is-a-big-concern-for-parents-and-trust-levels-in-companies-are-low/.

[63] https://www.pixalate.com/blog/childrens-online-privacy-harris-poll-recap.

152.    More than three-quarters (77%) of parents are concerned about protecting their family's digital privacy.[64]

153.    73% of parents are concerned about personal data being collected by third parties, without their consent.[65]

154.    And parents also recognize the importance of protecting their children's identity (90%), location (88%), health data (87%), age (85%), school records (85%), and browsing history (84%).[66]

155.    Additionally, as further evidence of Class Members' reasonable expectations with respect to children's privacy, a survey conducted by the Center for Digital Democracy ("CDD") and Common Sense Media of more than 2,000 adults found overwhelming support for the basic principles of privacy embedded in the California Constitution, state common law, as well as federal law.[67] The parents who were polled responded as follows when asked whether they agreed or disagreed with the following statements:

a.    "It is okay for advertisers to track and keep a record of a child's behavior online if they give the child free content."

- 5 percent strongly agree
- 3 percent somewhat agree
- 15 percent somewhat disagree
- **75 percent strongly disagree**
- 3 percent do not know or refused to answer

b.    "As long as advertisers don't know a child's name and address, it is okay for them to collect and use information about the child's activity online."

- 3 percent strongly agree

---

[64] https://trustedfuture.org/childrens-digital-privacy-and-safety.

[65] *Id*.

[66] *Id*.

[67] Center for Digital Democracy, *Survey on Children and Online Privacy, Summary of Methods and Findings*, https://www.democraticmedia.org/sites/default/files/COPPA%20Executive%20Summary%20and%20Findings.pdf (accessed Oct. 21, 2019).

SEVENTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

- 17 percent somewhat agree

- 10 percent somewhat disagree

- **69 percent strongly disagree**

- 1 percent do not know or refused to answer

c.    "It is okay for advertisers to collect information about a child's location from that child's mobile phone."

- 6 percent strongly agree

- 3 percent somewhat agree

- 7 percent somewhat disagree

- **84 percent strongly disagree**

- less than 1 percent do not know or refused to answer

d.    "Before advertisers put tracking software on a child's computer, advertisers should receive the parent's permission."

- **89 percent strongly agree**

- 5 percent somewhat agree

- 2 percent somewhat disagree

- 4 percent strongly disagree

- less than 1 percent do not know or refused to answer

e.    "There is a federal law that says that online sites and companies need to ask parents' permission before they collect Personal Information from children under age 13. Do you think the law is a good idea or a bad idea?"

- **93 percent said it was a good idea**

- 6 percent said it was a bad idea

- 1 percent did not know or refused to answer.

156.    The proliferation of internet-connected device usage by children under 13, coupled with the concerns expressed by parents, renders Google's conduct highly offensive and an egregious breach of social norms.

157.    Google's uniform practices and conduct exploited children under 13 for financial gain by luring them with child-directed content and manipulating them into remaining engaged with YouTube to the detriment of their mental health, so that they could earn advertising revenue.

158.    Google benefits from increased YouTube usage. The longer and more often a child views videos on YouTube, the more data Google can exfiltrate and the more advertisements they can show the child.

159.    Google (and the YouTube channel owners) thus were incentivized to develop ways to addict children to websites, apps, and online services such as YouTube, which operators of these services refer to as "retention."

160.    Google's unfair and unlawful collection of Personal Information and manipulative YouTube recommendation feature substantially affects the amount of time minor children, including children under the age of 13, spend on YouTube.

161.    Google's unfair and unlawful tracking, profiling, and targeting of children is all the more troubling in light of Google's inability to prevent obscene content from being uploaded on YouTube. For example, one report found that "hundreds of . . . videos of children's cartoon characters with inappropriate themes" such as graphic violence on YouTube.[68] The effect of this content – which Google (and the YouTube channel owners) apparently cannot prevent from being uploaded to YouTube – on children is profound. One child psychotherapist has stated that "over time the she has seen a rise in cases of children suffering from anxiety triggered by videos they have watched on YouTube" and that the children "exhibit loss of appetite, sleeplessness, crying fits and fear."[69]

162.    By failing to (i) obtain parental consent, (ii) disclose to parents the nature and purpose of their data collection practices (and use of that data), and (iii) take other steps to preclude the capture of

---

[68] Anisa Subedar & Will Yates, *The disturbing YouTube videos that are tricking children*, BBC TRENDING (Mar. 27, 2017), https://www.bbc.com/news/blogs-trending-39381889 (accessed Oct. 22, 2019).

[69] Josephine Bila, *YouTube's dark side could be affecting your child's mental health,* CNBC (Feb. 13, 2018), https://www.cnbc.com/2018/02/13/youtube-is-causing-stress-and-sexualization-in-young-children.html (accessed Oct. 23, 2019).

children's Personal Information, and by manipulating and exploiting the habits of minors for their economic gain, Google has breached the privacy rights and reasonable expectations of privacy of Plaintiffs' minor children and the millions of minors in the Classes who have viewed YouTube's monetized channels, in contravention of privacy norms that are reflected in consumer surveys, centuries of common law, state and federal statutes, legislative commentaries, industry standards and guidelines, and scholarly literature.

### A.  Targeting vulnerable, protected children transforms commercial activity into highly offensive, egregious conduct

163.  Google's pervasive, illegal tracking, profiling and targeting of children under 13 using YouTube online represents a stark deviation from the long-standing American societal and legal tradition of protecting minors from exposure to harmful and addictive activities and/or products. For decades, the United States has recognized the inherent vulnerability of children and has instituted robust regulatory frameworks to shield them from the harms associated with addictive substances and behaviors, such as tobacco, firearms, alcohol, and gambling.

164.  These protections include age restrictions on the use of addictive or dangerous products such as tobacco, firearms, alcohol, and gambling *and* restrictions on advertising directed towards young children concerning the same. This dual pronged approach of restricting access/use and advertising is rooted in American societal consensus that children, by virtue of their developmental stage, require heightened safeguards to ensure their health, well-being, and future potential.[70]

165.  Commercial actors who have ignored these societal values and regulations have been punished severely, reflecting society's view that commercially exploiting children by exposing them to harmful and/or dangerous activities and products is unacceptable. For example, the 1998 Master Settlement Agreement between the attorneys general of 46 states and the American tobacco industry

---

[70] *See, e.g. Family Smoking Prevention and Tobacco Control Act*, 21 U.S.C. §§ 387a-387u (restricting manufacture, marketing, and distribution of tobacco products to protect the public health generally and to reduce tobacco use by minors); *Stop Tobacco Access to Kids Enforcement (STAKE) Act,* Cal. Bus. & Prof. Code § 22958 (West 2023) (restricting sale of tobacco products in California to people 21 years of age or older); *National Minimum Drinking Age Act of 1984*, 23 U.S.C. § 158 (1984) (establishing minimum age requirement of 21 years old to drink alcohol).

condemned the cigarette companies' targeting of their harmful and addictive products to minors and resulted in a payment of over $206 billion over 25 years, and barred tobacco companies from using cartoon characters (such as Joe Camel), sponsoring youth-oriented events, and placing ads near schools.

166.    More recently, in 2022, Juul agreed to pay over $700 million ($438.5 million to settle investigations by 34 states and U.S. territories, and $300 to private plaintiffs) to settle litigation concerning its marketing and sales practices which were alleged to improperly target minors. Investigations had found that Juul's advertising appealed to young people, using influencers and social media to promote its products. The settlement included stringent restrictions on Juul's marketing, sales, and distribution practices to prevent future targeting of youth.

167.    Likewise, the egregiousness of Google's conduct here – which illegally tracked, profiled and targeted *tens of millions of young children under the age of 13* -- is confirmed by the FTC's enforcement action, which resulted in imposition of a $136 million civil penalty on Google in September 2019.  That fine was, at the time, by far the largest COPPA penalty ever imposed by the FTC (by a factor of over 20).[71]  And two FTC Commissioners dissented because they considered the fine inadequate to punish Google for its egregious misconduct and the enormous profits that misconduct had produced.[72]

168.    American society has, thus, long believed that children must be shielded from what would otherwise be considered routine commercial practices concerning addictive or harmful activities and/or

---

[71]  The largest fine imposed by the FTC pursuant to COPPA was previously a $5.7 million civil penalty imposed on TikTok based on the collection of COPPA-protected Personal Information by Tik Tok's former app, Musical.ly in February 2019. *See* FTC February 27, 2019 Press Release announcing COPPA civil penalty of $5.7 million imposed on Tik Tok and describing the fine as "the largest monetary recovery [by the FTC] in a COPPA case." Accessible at https://www.ftc.gov/news-events/news/press-releases/2019/02/video-social-networking-app-musically-agrees-settle-ftc-allegations-it-violated-childrens-privacy. The exponentially larger civil penalty imposed on Google may fairly be said to reflect the FTC's view of the far greater egregiousness of Google's misconduct, not just Google's greater size, as the FTC has imposed smaller COPPA penalties on comparably sized social media companies. See FTC May 31, 2023 Press Release announcing $25 million COPPA penalty imposed on Amazon, Inc., described in the press release as "one of the world's biggest retailers."    Accessible at https://www.ftc.gov/news-events/news/press-releases/2023/05/ftc-doj-charge-amazon-violating-childrens-privacy-law-keeping-kids-alexa-voice-recordings-forever

[72] *See* Slaughter & Chopra dissents, n.1, 31, 178, 179, and 182.

---

SEVENTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

products directed towards adults.  COPPA fits squarely within this tradition.

*Events leading up to the passage of COPPA*

169.    The events leading up to the adoption of COPPA make clear that parents, public interest groups, the FTC and members of Congress were motivated by precisely these long-standing concerns about the need to protect young children – this time, in the context of safeguarding their privacy rights — who were seen as uniquely vulnerable to marketing manipulation from new forms of online targeting.

170.    The Center for Media Education (CME), a nonprofit advocacy group, was one of the first to raise the alarm about online marketing to children in its report *Web of Deception: Threats to Children from Online Marketing* released in March 1996.  As CME explained:

> Armed with sophisticated new research, advertisers and marketers have begun to target the rapidly growing numbers of children online. World Wide Web sites and other interactive online services are being designed to capture the loyalty and spending power of the "lucrative cybertot category." A variety of new interactive advertising and marketing techniques have been developed specifically for this new medium. *Many of them threaten to manipulate children and rob them of their privacy*. If allowed to develop without any intervention, these practices will become widespread and even more egregious.[73]

171.    CME's investigation highlighted the threat to young children's existing privacy rights posed by new forms of online targeting.  The report "uncovered a number of disturbing new practices. They pose two kinds of threats: 1) invasion of children's privacy through solicitation of personal information and tracking of online computer use; and 2) exploitation of vulnerable, young computer users through new unfair and deceptive forms of advertising."[74]

172.    CME called on the FTC to conduct a comprehensive investigation of these practices and to create a set of effective policies designed to protect children from these new practices. Joining in this call were the National PTA, the Academy of Child and Adolescent Psychiatry, the American

---

[73] CME, *Web of Deception: Threats to Children from Online Marketing* (1986) at 1 (emphasis added).

[74] *Id*.  CME noted that "Marketers have developed a variety of techniques to collect detailed data and compile individual profiles on children.  …Tracking technologies make it possible to monitor every interaction between a child and an advertisement.  The ultimate goal is to create personalized interactive ads designed to 'microtarget' the individual child."

SEVENTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

Psychological Association, Center for Science in the Public Interest, Consumer Federation of America, and the Electronic Information Center.[75]

173.    CME's report was widely covered in the national press. *See, e.g.*, *Internet Marketing to Kids Is Seen as a Web Of Deceit*, L.A. Times, Mar. 29, 1996; *On-Line Marketing Aimed at Children Needs Federal Regulation, Groups Say*, Wall Street J. Mar. 29, 1996.

174.    Not long after, two members of Congress introduced bills that would require the FTC to take action to protect children's privacy.  On May 22, 1996, Rep. Franks (with others) introduced HR 3508, Children's Privacy Protection and Parental Empowerment Act of 1996.  On June 20, 1996, Rep. Markey introduced HR 3685, Communications Privacy and Consumer Empowerment Act.

*The FTC's Response*

175.    On June 4-5, 1996, the FTC's Bureau of Consumer Protection held a public workshop on consumer online privacy, and devoted a special session to the collection and use of information about children.[76] In a follow-up staff report issued in December 1996, the FTC specifically addressed the special, long-standing protections of the privacy rights of children:

> In law and policy, children are usually treated as a special, vulnerable class. This status is premised on the belief that children lack the analytical abilities and judgment of adults. It is evidenced by an array of federal and state laws, including those that ban sales of tobacco and alcohol to minors, prohibit child pornography, require parental consent for medical procedures, and make contracts with children voidable. In the specific arenas of marketing and privacy rights, moreover, several federal statutes and regulations recognize the need for special protections for children as well as the special role that parents have in implementing those protections.[77]

176.    The Workshop Report also observed the consensus of government, children advocacy organizations and industry that the special privacy protections long afforded to children should be maintained in online practices.  The Report noted:

---

[75] CME Press Release Mar. 28, 1996.

[76] FTC, Bureau of Consumer Protection, Public Workshop on Consumer Privacy on the Global Information Infrastructure ("Workshop Report") (footnotes omitted). Available at https://www.ftc.gov/reports/staff-report-public-workshop-consumer-privacy-global-information-infrastructure.

[77] FTC, Workshop Report at 30-31.

(1) children are a special audience; (2) information collection from children raises special concerns; (3) there is a need for some degree of notice to parents of Web sites' information practices; and (4) parents need to have some level of control over the collection of their children's information. As one industry participant observed, virtually all Workshop participants had essentially agreed that "Knowledge, Notice and No" are the paradigms to address information collection issues."[78]

### The Kidscom Complaint

177.    During this time frame, on May 13, 1996, CME filed a complaint with the FTC alleging that a child-directed internet site called KidsCom, which billed itself as an educational and entertainment site for children, was actually promoting products to and conducting market research on children.

178.    On July 15, 1997, the FTC's Director of Consumer Protection responded with a letter concluding that certain of Kidscom practices were deceptive and unfair in violation of Section 5 of the FTC Act.  Among other things, it was an unfair practice "to collect personally identifiable information (such as name, e-mail address, home address or phone number) from children and sell or otherwise disclose such identifiable information to third parties without providing parents with adequate notice, . . . and an opportunity to control the collection and use of the information."  Significantly, the FTC's statement of these principles reflected the FTC's view of the existing (*i.e*, pre-COPPA) privacy rights of children.

179.    Although this was not its usual practice, the FTC issued a Press Release about the Kidscom letter in order to publicly set forth the FTC's view of the existing privacy rights of children with respect to online collection of information from them.  It announced that

In response to a petition from the Center for Media Education, the staff of the Federal Trade Commission today released a letter that outlines several principles that it believes should generally apply to the collection of personally identifiable information from children online. The FTC staff letter concludes that it is a deceptive practice to represent that a Web site is collecting personally identifiable information from a child for a particular purpose, when the information also will be used for another purpose that parents would find material, in the absence of a clear and prominent notice to a parent regarding the practice. Additionally, the FTC staff letter concludes that a Web site that has collected identifiable information about children must obtain parental consent *prior* to releasing that identifiable

---

[78] *Id*. at 36 (footnotes omitted).

SEVENTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

information to third parties.[79]

*The FTC Report to Congress*

180.    In June 1998, the FTC issued a report calling on Congress to "develop legislation placing parents in control of the online collection and use of personal information from their children."[80]  In the Report, the FTC explained that

In making this recommendation, the Commission has drawn on its extensive experience in addressing business practices affecting children, as well as its three-year study of online privacy issues…. [T]he Commission has recognized a growing consensus reflected in consumer survey evidence and some industry self-regulatory guidelines that parental involvement is necessary in the collection and use of information from children. …. Accordingly, the Commission concludes that as a matter of policy additional steps should now be taken to ensure adequate online privacy protections for children.[81]

181.    The Report to Congress noted:

There is considerable concern about online collection practices that bypass parents, who have traditionally protected children from marketing abuses. Children generally lack the developmental capacity and judgment to give meaningful consent to the release of personal information to a third party. This is an even greater problem when children are offered an incentive for releasing personal information, or when release of personal information is a prerequisite to registering for a contest, joining a kid's club, or playing a game.[82]

The FTC recommended that Congress act now to adopt legislation placing parents in control of the online collection and use of information from their children.[83]

*Congress passes COPPA*

182.    The next month, on July 17, 1998, Senators Bryan, McCain and Burns introduced the "Children's Online Privacy Protection Act of 1998" (S. 2326) to protect the privacy of children under 16

---

[79] (https://www.ftc.gov/news-events/news/press-releases/1997/07/ftc-staff-sets-forth-principles-online-information-collection-children).

[80]    Privacy Online:  A Report to Congress at iii.  Survey data cited by the FTC in its Report confirmed that parents had long strongly believed that the collection and use of personal information from and about their children should be limited. For example, 97% of parents whose children use the Internet believe Web sites should not sell or rent personal information relating to children, and 72% object to a Web site's requesting a child's name and address when the child registers at the site, even if such information is used only internally.  *Id.* at 5-6 (footnotes omitted).

[81] *Id. at* 42.

[82] *Id.* at 5.

[83] *Id.* at 42.

SEVENTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

by, *inter alia*, requiring websites and online services to get verifiable parental consent before collecting personal information from children. In introducing the legislation, Senator Bryan explained,

> Unfortunately, the same marvelous advances in computer and telecommunication technology that allow our children to reach out to new resources of knowledge and cultural experiences are also leaving them unwittingly vulnerable to exploitation and harm by deceptive marketers and criminals. … Companies are attempting to build a wealth of information about you and your family without an adult's approval – a profile that will enable them to target and to entice your children to purchase a wide range of products. The Internet gives marketers the capability of interacting with your children and developing a relationship without your knowledge. Where can this interactive relationship go? Will your child be receiving birthday cards and communications with online cartoon characters for particular products?[84]

183. Then FTC Chairman Robert Pitofsky testified in support of S. 2326, stating:

> [The] Commission believes that legislation such as S. 2326 is important and necessary to protect the privacy of our youngest consumers when they go online. …. [T]he Internet's technology enables marketers to establish direct and ongoing one-to-one relationships with individual children in ways previously unavailable to traditional media. …. [The] increasing number of children online coupled with their growing economic impact create enormous opportunities for marketers to promote their products and services to an eager, targeted, and vulnerable audience. …. "In contrast to the real world, where such information ordinarily would be solicited from young children only with the involvement of a parent, in cyberspace the vast majority of children's sites collect personal information without notice to, or even an opportunity for control by parents. [85]

184. FTC Chairman Pitofsky cited parent support for protecting children's privacy, noting that the widespread collection of information from young children described in the Report contrasts sharply with the strongly expressed preferences of parents. Indeed, a Louis Harris and Associates survey found that 97% of parents whose children use the Internet believe Web sites should not sell or rent personal information relating to children, and 72% object to a Web site's requesting a child's name and address when the child registers at the site, even if such information is only used internally.[86]

---

[84] 144 Cong. Rec. S8482-83.

[85] September 23, 1988 Testimony of Robert Pitofsky before the Senate Commerce Committee, at 1-3

[86] *Id.* at 3.

45

SEVENTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

185.    In early October 1988, the Senate Commerce Committee unanimously voted to send a revised version of S. 2326 to the Senate floor. Senator Bryan introduced this version as an amendment to the Internet Tax Act on October 7, 1998.  He explained that:

> The goals of this legislation are: (1) to enhance parental involvement in a child's online activities in order to protect the privacy of children in the online environment; (2) to enhance parental involvement to help protect the safety of children in online fora such as chatrooms, home pages, and pen-pal services in which children may make pubic postings of identifying information; (3) to maintain the security of personally identifiable information of children collected online; and (4) to protect children's privacy by limiting the collection of personal information without parental consent.[87]

186.    The bill was passed as part of the Omnibus Appropriations Act and signed into law by President Clinton on October 21, 1998.  Pub. L. 105-277. The law directed the FTC to adopt implementing regulations within one year.

187.    The FTC has recognized the seriousness and highly offensive nature of violations of the privacy rights of minors protected by COPPA where a wrongdoer has, as here, engaged in large-scale tracking, profiling and targeting of young children.  Thus, in addition to the $136 million civil penalty imposed on Google by the FTC in this case, the FTC has taken measures to enforce COPPA and impose multi-million sanctions for similar conduct by other social media companies.

188.    In December 2022, the FTC brought a complaint against Epic Games, Inc. for tracking, profiling and targeting of young children using Epic's Fortnite game and imposed a $275 million fine for Epic's COPPA violations.[88]   In May 2023, the FTC fined Amazon $25 million based on Amazon's improper retention of minors' voice recordings and geolocation data captured by Amazon's Alexa voice

---

[87] 144 Cong. Rec. S12741 (Oct. 7, 1998) and the other is to page S11657 of the Cong. Rec. (Oct. 7, 1998).

[88] See FTC December 19, 2022 Press Release announcing imposition of $275 million fine for Epic Games, Inc. for COPPA violations.  Accessible at https://www.ftc.gov/news-events/news/press-releases/2022/12/fortnite-video-game-maker-epic-games-pay-more-half-billion-dollars-over-ftc-allegations.

SEVENTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

assistant in violation of COPPA.[89]

**B.    The Offensiveness and Egregiousness of Google's Conduct is Heightened by Google's Misrepresentations Regarding is Compliance With The Law.**

189.    Google's violations of the privacy rights of minors are even more egregious in light of Google's misstatements, to the public and to YouTube content creators and advertisers, about Google's compliance with legal requirements and, in particular, YouTube's compliance with COPPA.

**1.    Google's Misrepresentations to the Public.**

190.    Google has been aware, since its formation, of the public's concern with the privacy issues surrounding its business model and, while knowing that it was illegally tracking, profiling and targeting young children on YouTube in violation of COPPA, repeatedly assured the public that it was committed to complying with all privacy laws, including COPPA.

191.    Google's founders sought from the outset to assure the public that Google was different than other online operators (*i.e*, Facebook), that it was committed to assuring the rights of its users and that, to do so, Google would always comply with the highest standards of ethical conduct. The company publicly trumpeted a corporate motto of "Don't be evil" – in public statements, in SEC filings, and in a highly publicized Google Code of Conduct, which Google expressly stated was "meant for public consumption." As the company explained in the Preface to its Code of Conduct:

> Googlers generally apply those words to how we serve our users. But "Don't be evil" is much more than that. ...[I]t's also about doing the right thing more generally – following the law, acting honorably.

192.    In its Code of Conduct, Google made clear the company's core message: "Being Googlers means striving toward the highest possible standard of ethical business conduct," and emphasized that principle was to apply to all of the company's employees, officers and directors. Section VII of the Google Code of Conduct in place throughout the Class Period expressly affirmed Google's ethical value – and commitment – to obeying the law, stating: "Google takes its responsibilities to comply with the

---

[89] *See* DOJ July 19, 2023 Press Release announcing imposition of $25 million fine for Amazon for COPPA violations. Accessible at https://www.justice.gov/opa/pr/amazon-agrees-injunctive-relief-and-25-million-civil-penalty-alleged-violations-childrens.

SEVENTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

laws and regulations applicable to it very seriously." Google specifically acknowledged that its public reputation – and the success of its business – depended on such compliance: "We must all always remember that our reputation is the foundation of our present and future success – and that earning, and then, maintaining that reputation requires attention and effort to stay in compliance."

193.    These representations by Google extended to its compliance with laws pertaining to the privacy of user data: Google has publicly promised that it is "committed to complying with applicable data protection laws" and is "always working to stay compliant with applicable privacy regulations."[90]

194.    And, most important, when confronted in 2018 with a complaint by child advocacy groups and two congressmen that it was improperly collecting young children's personal information on YouTube in violation of COPPA, Google issued public statements falsely asserting that its practices on YouTube were in compliance with COPPA and falsely denying that it allowed advertisers on YouTube to deliver personalized ads to children under 13 or collect their personal information.[91]    These representations were knowingly false and were intended to reassure parents and induce them to continue to allow their young children to use YouTube.

### 2.    Google's Misleading Representations to Content Creators and Advertisers

195.    To lure children to YouTube, Google needed child-directed content. To obtain child-directed content, Google needed to persuade the creators of child-directed content to place their videos on YouTube.

196.    Google's YouTube marketing strategy predictably generated concerns from potential advertisers and content creators that a channel owner creating child-directed content would run afoul of COPPA if it placed its content on YouTube and then showed behavioral or "interest-based" advertising to the viewers of that content.

---

[90] *See, e.g.,* https://safety.google/privacy/data/, last accessed on July 20, 2024.

[91] New York Times, Maheshwari, Sapna, "New Pressure on Google and YouTube Over Children's Data," September 20, 2018.

197.    To counter these concerns and populate YouTube with popular children's content, Google developed a strategy of misrepresenting YouTube's COPPA compliance and/or YouTube's need to comply with COPPA at all to potential advertising and content creator partners.

198.    Google repeatedly and falsely stated that YouTube was COPPA compliant.  At other times, it acknowledged You Tube's lack of COPPA compliance, but disclaimed its need to comply with COPPA at all by making the incredible claim that YouTube *did not have any users who were under 13*. These misrepresentations were successful in enabling Google to procure sufficient child-directed content to drive American children to the YouTube platform.

199.    For example, in September 2014, YouTube was in discussions with a channel owner for the channel owner to create YouTube and YouTube Kids content and the channel owner wanted to know the implications of cross-promoting content between both YouTube and YouTube kids from a COPPA compliance perspective. Specifically, the channel owner asked YouTube the following via email:

> We are launching our [channel] on 10/1 and would like to cross promote/push Kid viewers from the YT Family Channel to our new … kids & family website. Until YouTube's COPPA compliant website launches, I don't believe we can push kid traffic between the two platforms, *because YT right now isn't COPPA compliant*. Is this correct? (or, since it's a "kids and families" website, would we get around these COPPA restrictions*)? I know from my time at [another company], that although we have a parents section on our kid-branded websites … they were still considered "kids" sites and therefore had to comply with COPPA guidelines*.[92]

200.    In response to the above question, Google made the following false claim designed to induce the channel owner into placing child-directed content on YouTube despite the channel owner's concerns that YouTube was not COPPA complaint:

> Both the YT main environment as well as the kids' product are COPPA compliant. We are aiming to roll out the kids' product in Q4.[93]

---

[92] GOOG-HUB-00163720 (emphasis added).

[93] *Id.*

201.    Google's misrepresentations successfully induced the channel owner to launch a YouTube "main" channel along with a YouTube Kids channel in October 2014.[94]

202.    Google repeated these, and other false claims to child-directed content creators and potential advertisers through the Class Period, and relied on these statements to convince content creators to place child-directed content on YouTube.

203.    As yet another example, in May 2016, another prominent children's content company took the position that "YouTube is not <u>COPPA compliant</u> and therefore for kids focused brands should avoid buying [ads] on YouTube and focus on COPPA compliant sites and channels" and that [i]n order to practice what they preach the management team at [the company] is also **mandating that [the company's] consumer marketing team do not buy YouTube advertising** for kids focused campaign."[95]

204.    Google responded to the company's position by developing and circulating the following "narrative" claiming YouTube was not in violation of COPPA:

**The narrative we need to tell:**

- YouTube is a MUST buy for kids 6-11
- YouTube Kids is a must buy
- And alternatively we have access to COPPA compliant sites and apps to extend reach leveraging private exchanges[96]

205.    Later in the same email thread on June 8, 2016, Google wrote the following:

I wanted to follow up and see if [the] official PV on the YT coppa compliancy concerns will be ready. I had a call late last week with [an executive] and she expressed that hearing from us with our policy and POV on YouTube and how we think about kids under 13 using the platform could be helpful in getting them to start advertising again . . . Again to reiterate their main concern is that they are trying to reach kids and YT not being

---

[94] GOOG-HUB-00163762.

[95] GOOG-HUB-00101976 (emphasis in original).

[96] *Id.*

coppa compliant potentially puts them in a liability since the platform it not . . . Let me know if we have an ETA for POV that we can share?[97]

206.    In response to the request for guidance on how to address COPPA compliance concerns, a Google executive provided the following "narrative" for Google employees to push on potential YouTube partners:

> Just to be clear – most of this team works on YouTube Kids, which *is* COPPA compliant and the best way to reach kids under 13. ***Any YouTube main usage is family usage and co-viewing, as YouTube main is for viewers who are over 13, making COPPA compliance not relevant***.[98]

207.    This statement was false and misleading. Obviously, this statement would only have been truthful if YouTube did not have a substantial number of users who were under 13 (it did and still does), or if YouTube was not intended and/or designed for users who are under 13 (it was and still is). Google knew this was not true, yet pushed this "narrative" anyway because it knew COPPA compliance would lead to a sharp decrease in the posting of child-directed content on YouTube and a reduction in advertising revenue.

208.    As yet another example of Google's campaign of deception, in February 2017, representatives from a channel owner asked Google for guidance on YouTube COPPA compliance and expressed the following concerns:

> [Our] global social team think that sequential targeting on YouTube is COPPA compliant. We have always been told that using viewing data to then serve another ad is not compliant with children's online protection laws.[99]

209.    A Google employee initially responded to the channel owner's inquiry by asserting Google was not "authorized to give legal advice and hence I need to reach out to our legal department" and "did this already last week, however their [turn around time] is quite long."[100]

---

[97] *Id.*
[98] *Id.*
[99] GOOG-HUB-00016578.
[100] GOOG-HUB-00016577.

SEVENTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

210.    A few weeks later, however, the same Google employee responded to [the channel owner] with the official position from Google's legal department, stating:

> "just received the answer . . . as we don't have users that are below 13 on YouTube and the platform/site is general audience, so there is no channel/content that is child-directed and no COPPA compliance is needed."[101]

211.    This statement, like the previously cited false statements Google made to potential child-directed content creator partners, was also obviously false and misleading. Not only did Google know YouTube had millions of users who were "below 13," but Google was in fact bragging about its popularity with those very children and promoting YouTube to advertisers based on such popularity. Indeed, during this time, Google pitched YouTube to several popular children's brands, boasting that YouTube "is today's leader in reaching children age 6-11;" "the new 'Saturday Morning Cartoons';" "unanimously voted as the favorite website of kids 2-12;" "the #1 website regularly visited by kids;" and used by "93% of tweens."[102]

212.    In a presentation to Hasbro, Google specifically boasted of YouTube's immense popularity among children, noting that it was "unanimously voted as the favorite website of kids 2-12" and that "93% of tweens" use the product.[103] Google's presentations led to Hasbro posting child-directed content on YouTube.

213.    In 2015, Google gave a similar presentation to Mattel highlighting children's widespread use of YouTube to persuade Mattel to display digital ads on the site.[104] Google's presentations and representations led to Mattel posting child-directed content on YouTube.

214.    These lies, or "narrative" were developed for the specific purpose of overcoming child content-creators hesitancy to post child-directed content on a non-COPPA-compliant platform and were

---

[101] GOOG-HUB-00016576.

[102] Complaint for Permanent Injunction, Civil Penalties, and Other Equitable Relief, *FTC v. Google LLC et al.*, No. 1-19-cv-02642-BAH, at 3,12, and 6-7 (D.D.C. Sept. 4, 2019) Dkt. #1-1. https://www.ftc.gov/system/files/documents/cases/youtube_complaint_exhibits.pdf.

[103] *Id.*

[104] *Id.*

a key to Google's ability to develop the content needed to attract young children, as many content creators would have opted not to post their content on YouTube, resulting in fewer children under 13 watching YouTube, and less advertising revenue for Google.

215.    Google's use of these lies to induce third parties to participate in Google's violations of COPPA was highly improper and adds to the offensiveness and egregiousness of Google's invasions of the privacy rights of Plaintiffs and the members of the Classes.

### C.    Google's Use of the Personal Information of Plaintiffs and Class Members to Foster Compulsive Use of YouTube is Highly Offensive.

216.    COPPA prohibits web operators from both *collecting* and *using* Personal Information of children under the age 13 viewing child-directed content without verifiable parental consent.  Plaintiffs have described above how Google unlawfully used young children's Personal Information to create profiles that enable targeted behavioral advertising. But that is not the only use Google made of the Personal Information, as Google also used these same profiles to fuel YouTube's "Recommendation Engine" – an insidious feature that feeds a continuing series of targeted videos to minors and is specifically designed to keep minors watching YouTube and maximize the children's exposure to advertisements.

217.    YouTube primarily generates revenue by selling advertising. The more people who use YouTube and spend time on the site, the more ads YouTube can sell.[105] To drive greater revenue, "YouTube . . . set a company-wide objective to reach one billion hours of viewing a day[.]"[106]  As Susan Wojcicki, YouTube's CEO explained, the goal of a "billion hours of daily watch time gave our tech people a North Star."[107] Google decided that "the best way to keep eyes on the site" was to introduce a feature that would "[recommend] videos, [that would play] after one was finished."[108]

---

[105] Mark Bergen, *YouTube Executives Ignored Warnings, Letting Toxic Videos Run Rampant*, Bloomberg (Apr. 2, 2019), https://www.bloomberg.com/news/features/2019-04-02/youtube-executives-ignored-warnings-letting-toxic-videos-run-rampant.

[106] *Id.*

[107] *Id.*

[108]  *Id.*

218.    YouTube's Recommendation Engine uses a recommendation algorithm to identify and push additional videos to users, which YouTube plays automatically, through a feature called "autoplay." Autoplay begins the next video as soon as the previous videos ends, creating a constant stream of content.

219.    YouTube's Recommendation Engine algorithm relies on Personal Information and other information collected from YouTube users to identify and push the additional videos to YouTube users. [109] Every YouTube user's Personal Information, regardless of age, is collected by Google and fed into the Recommendation Engine.

220.    Google misleadingly promotes the Recommendation Engine as designed to help YouTube users find videos they find interesting, stating, for example, that "[r]ecommendations help you discover more of the videos you love, whether it's a great new recipe to try or your next favorite song."[110]

221.    But this is false and misleading. YouTube's Recommendation Engine is designed to maximize user's YouTube watch time, which increases Google's revenues. As YouTube's Head of Content Creator Communications has admitted: "When we suggest videos, we focus on those that increase the amount of time that the viewer will spend watching videos on YouTube, not only on the next view, but also successive views thereafter." [111]

222.    YouTube's Recommendation Engine is incredibly effective at maximizing users' YouTube watch time. According to YouTube Chief Product Officer Neal Mohan, mobile device users watch YouTube for more than 60 minutes on average per session "because of what [YouTube's] recommendations engines are putting in front of [them]."[112] And, according to Mohan, the

---

[109] Alexis C. Madrigal, *How YouTube's Algorithm Really Works*, Atlantic (Nov. 8, 2018), https://www.theatlantic.com/technology/archive/2018/11/how-youtubes-algorithm-really-works/575212/; Paul Covington et al., *Deep Neural Networks for YouTube Recommendations*, Google (2016), https://storage.googleapis.com/pub-tools-public-publication-data/pdf/45530.pdf.

[110] https://www.youtube.com/howyoutubeworks/product-features/recommendations/#:~:text=How%20does%20YouTube's%20recommendation%20system,you%20may%20want%20to%20watch.
[111] https://blog.youtube/news-and-events/youtube-now-why-we-focus-on-watch-time/

[112] Joan E. Solsman, *YouTube's AI Is the Puppet Master over Most of What You Watch*, CNET (Jan. 20, 2018), https://www.cnet.com/tech/services-and-software/youtube-ces-2018-neal-mohan/

Recommendation Engine was responsible for more than 70% of users' time using the product.[113]  That is, more than 70% of the time users, including children under 13, spend on YouTube is the result of the YouTube's commendation Engine pushing videos on them, rather than individual selection.

223.    YouTube's Recommendation Engine works. Today, YouTube "has over 2 billion monthly logged-in users."[114] And that 2 billion figure does not capture all product usage because YouTube, by design, allows users to consume videos without logging in or registering an account.  And many of YouTube's most-viewed videos are kid-focused, and the most subscribed and highest paid YouTubers are children. With over 12 billion views, "Baby Shark Dance," a video aimed at toddlers, is the most viewed video in the history of YouTube– and it and five other child focused videos make up the top ten YouTube videos of all time.[115]

224.    Child creators, such as Ryan Kaji of Ryan's World, have been among YouTube's Top 10 most-subscribed channels in the United States since 2016.[116] Ryan started Ryan's World in 2015 when he was only 3. By 2017, his videos had over 8 billion views, and by 2018, he was the highest earning YouTuber in the world.[117]

---

[113] *Id.*

[114] *YouTube for Press*, YouTube, https://blog.youtube/press/. 770 Emily Vogels et al., *Teens, Social Media and Technology 2022*, Pew Rsch. Ctr. (Aug. 10, 2022), https://www.pewresearch.org/internet/2022/08/10/teens-social-media-and-technology-2022.

[115] Most Viewed Videos of All Time • (Over 700M views) - YouTube. https://www.youtube.com/playlist?list=PLirAqAtl_h2r5g8xGajEwdXd3x1sZh8hC.

[116] Madeline Berg, *The Highest-Paid YouTube Stars of 2019: The Kids Are Killing It*, Forbes (Dec. 18, 2019), https://www.forbes.com/sites/maddieberg/2019/12/18/the-highest-paid-youtube-stars-of-2019-the-kids-are-killing-it/?sh=4c3df9a438cd; Madeline Berg, *The Highest-Paid YouTube Stars 2017: Gamer DanTDM Takes The Crown With $16.5 Million*, Forbes (Dec. 7, 2017), https://www.forbes.com/sites/maddieberg/2017/12/07/the-highest-paid-youtube-stars-2017-gamer-dantdm-takes-the-crown-with-16-5-million/?sh=72de79413979.

[117] *Gamer DanTDM Takes The Crown With $16.5 Million*, Forbes (Dec. 7, 2017), https://www.forbes.com/sites/maddieberg/2017/12/07/the-highest-paid-youtube-stars-2017-gamer-dantdm-takes-the-crown-with-16-5-million/?sh=72de79413979; Natalie Robehmed & Madeline Berg, *Highest-Paid YouTube Stars 2018: Markiplier, Jake Paul, PewDiePie And More*, Forbes (Dec. 3, 2018), https://www.forbes.com/sites/natalierobehmed/2018/12/03/highest-paid-youtube-stars-2018-markiplier-jake-paul-pewdiepie-and-more/?sh=7d909c3f909a.

225.    Google's collection and analysis of users' Personal Information allows it to assemble virtual dossiers on the young children who watch YouTube child-content, covering hundreds if not thousands of user-specific data segments. This, in turn, allows advertisers to micro-target marketing and advertising dollars to very specific categories of users, who can be segregated into pools or lists using Google's data segments. Advertisers purchase ad real estate space on users' feeds, which allow them to place the right ads in front of these micro-targeted segments of users--including children, both in the main YouTube frame and in the YouTube Kids product. Only a fraction of these data segments come from content knowingly designated by users for publication or explicitly provided by users in their account profiles. Instead, many of these data segments are collected by YouTube through surveillance of each user's activity while using the product and even when logged off the product.[118]

226.    Google's secret virtual dossiers on its child users, developed from Google's illegal tracking and profiling, train YouTube's Recommendation Engine algorithms to direct constant streams of content to minor viewers.  A Google engineer explained in a 2014 presentation:

> What do I mean by a training example? It's a single-user experience. On YouTube, perhaps it's that one [Thomas the Tank Engine] webpage my son saw six months ago, along with all the recommendations that we showed him. We also record the outcome to know whether the recommendations we made are good or whether they're bad. That's a single training exercise. On a large property, you can easily get into hundreds of billions of these.[119]

227.    Through these and other efforts, YouTube has delivered massive amounts of advertising revenue to Google. In 2021 alone, YouTube generated about $29 billion in revenue selling ads on its site.[120]

---

[118] About Targeting for Video Campaigns, Google, https://support.google.com/youtube/answer/2454017?hl=en.
[119] Alex Woodie, *Inside Sibyl, Google's Massively Parallel Machine Learning Platform*, *Datanami* (Jul. 17, 2014) https://www.datanami.com/2014/07/17/inside-sibyl-googles-massively-parallel-machine-learning-platform/.
[120] Andrew Hutchinson, *YouTube Generated $28.8 Billion in Ad Revenue in 2021, Social Media Today* (Feb. 2, 2021), https://www.socialmediatoday.com/news/youtube-generated-288-billion-in-ad-revenue-in-2021-fueling-the-creator/618208/; Jennifer Elias, *YouTube Is a Media Juggernaut That Could Soon Equal Netflix in Revenue,* CNBC (Apr. 27, 2021), https://www.cnbc.com/2021/04/27/youtube-could-soon-equal-netflix-in-revenue.html.

228.    The Recommendation Engine's effectiveness has led to it being labeled "an addiction engine" by computer scientist Francis Irving, who has studied YouTube's software systems and raised concerns with YouTube staff, who responded to Irving with incredulity, indicating that they had no incentives to change how You Tube's software worked. After all, they explained, the algorithm works as intended: "it makes a lot of money."[121]

229.    YouTube's use of children's Personal Information to maximize the effectiveness of the Recommendation Engine is deeply disturbing because YouTube's Recommendation Engine regularly recommends inappropriate, harmful content to viewers of content *rated for toddlers.* That is, even if a YouTube viewer starts a viewing session with a video rated for 1-5 year olds, the Recommendation Engine frequently recommends unsafe disturbing videos next for that user. For example, the study *Disturbed YouTube for Kids: Characterizing and Detecting Inappropriate Videos Targeting Young Children* conducted a live simulation of a toddler's browsing on YouTube and concluded that any one toddler had a 3.5% chance of encountering an inappropriate video within ten "hop" or video changes from an initially benign, age-appropriate video. More disturbingly, the study "that most of the inappropriate videos are found early [in the viewing session] (*i.e.*, at the first hop) [which] highlight[s] that the problem of inappropriate videos on YouTube emerges quite early when users are browsing the platform starting from benign toddler-oriented search terms."[122] Thus, even a short browsing session can expose children to disturbing content, which can have detrimental effects on early childhood development.[123]

230.    Another comprehensive study by Muhsin Yesilada and Stephan Lewandowsky entitled *Systematic review: YouTube recommendations and problematic content* published in the Internet Policy Review in 2022 systematically reviewed the impact of YouTube's recommendation system on the

---

[121] Mark Bergen, *YouTube Executives Ignored Warnings, Letting Toxic Videos Run Rampant*, Bloomberg (Apr. 2, 2019), https://www.bloomberg.com/news/features/2019-04-02/youtube-executives-ignored-warnings-letting-toxic-videos-run-rampant.
[122] Kostantinos Papadamou et al., *Disturbed YouTube for Kids: Characterizing and Detecting Inappropriate Videos Targeting Young Children*, 14 Proc. Int'l AAAI Conf. on Web & Soc. Media 522 (2020).
[123] *Id.*

SEVENTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

accessibility of problematic content.[124] The authors analyzed 23 studies and found that YouTube's recommendation algorithms often lead users, *including children*, to inappropriate and harmful content, which can result in increased instances of mental health issues such as anxiety, depression, and behavioral problems.[125]

231.    Unsurprisingly, studies have found that exposure to harmful content on YouTube can have negative effects on YouTube user's mental health. For example, the study *The Impact of YouTube on Loneliness and Mental Health*, conducted by Luke Balcombe and Diego De Leo conducted an integrative review of 32 empirical and theoretical studies and found that while YouTube may social interaction and information, *its recommendation algorithms can expose vulnerable users, especially children and adolescents, to potentially harmful content*, promoting loneliness and mental health issues.[126]

232.    It is well-accepted that exposing children to age-inappropriate content can have harmful effects on their development and mental health, which is why American society has developed content rating systems for movies, video games, and is why YouTube offers age-rating on the platform. Recent studies have shown that children's exposure to harmful content in YouTube has had harmful effects on America's children. In 2021, the Mozilla Foundation studied 37,000 YouTube users, finding that 71% of all reported negative user experiences came from videos recommended to users by Google's recommendation algorithms. [127]  Mental health experts have warned that YouTube is a growing source

---

[124] Yesilada, Muhsin & Stephan Lewandowsky, *Systematic Review: YouTube Recommendations and Problematic Content*, 11 Internet Pol'y Rev. (2022), https://doi.org/10.14763/2022.1.1652.

[125] *Id.* (emphasis added).

[126] Balcombe, L., & De Leo, D. (2023). *The Impact of YouTube on Loneliness and Mental Health. Informatics*, 10(39). https://doi.org/10.3390/informatics10020039. (emphasis added)

[127] *YouTube Regrets: A crowdsourced investigation into YouTube's recommendation algorithm* at 13, Mozilla Found. (July 2021), ttps://assets.mofoprod.net/network/documents/Mozilla_YouTube_Regrets_Report.pdf.

SEVENTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

of anxiety in minors,[128]  with "increased rates of anxiety" causing minors to "exhibit loss of appetite, sleeplessness, crying fits and fear."[129]

233.    Indeed, one study determined that using YouTube's platform was "consistently and negatively related to sleep outcomes."[130] According to Dr. Alon Avidan, director of the UCLA Sleep Disorders Center, YouTube is particularly sleep disruptive because its recommendation algorithm and Autoplay feature make it "so easy to finish one video" and watch the next.[131] Sleep deprivation is, in turn, associated with poor health outcomes, as "insufficient sleep negatively affects cognitive performance, mood, immune function, cardiovascular risk, weight, and metabolism.[132]

234.    Compounding the harm caused by the Recommendation Engine is the fact that the harmful inappropriate content often produces a dopamine response, making it more likely that a user will watch the harmful video, which the algorithm interprets as signaling interest and preference.[133] Former Google engineers told the Wall Street Journal that "[t]he algorithm doesn't seek out extreme videos . . . but looks for clips that data show are already drawing high traffic and keeping people on the site. Those videos often tend to be sensationalist."[134] An investigation by *Bloomberg* put it simply: "In

---

[128] Josephine Bila, *YouTube's Dark Side Could be Affecting Your Child's Mental Health*, CNBC (Feb. 13, 2018), https://www.cnbc.com/2018/02/13/youtube-is-causing-stress-and-sexualization-in-young-children.html.

[129] *Id.*

[130] Meg Pillion *et al.*, *What's 'app'-ning to adolescent sleep? Links between device, app use, and sleep outcomes*, 100 Sleep Med. 174–182, 179 (Dec.2022), https://www.sciencedirect.com/science/article/abs/pii/S1389945722010991?via%3Dihub [https://perma.cc/PJ5C-CTMP].

[131] Cara Murez, *One App Is Especially Bad for Teens' Sleep*, U.S. News & World Rep. (Sept. 13, 2022), https://www.usnews.com/news/health-news/articles/2022-09-13/one-app-is-especially-bad-for-teens-sleep.

[132] Jessica C. Levenson *et al.*, *The association between social media use and sleep disturbance among young adults*, 85 Preventive Med. 36–41, 36 (2016), https://www.sciencedirect.com/science/article/abs/pii/S0091743516000025 [https://perma.cc/QYE5-92M4].

[133] Josephine Bila, *YouTube's Dark Side Could be Affecting Your Child's Mental Health*, CNBC (Feb. 13, 2018), https://www.cnbc.com/2018/02/13/youtube-is-causing-stress-and-sexualization-in-young-children.html.

[134] *Why is YouTube Suggesting Extreme and Misleading Content (2/7/2018)*, https://www.youtube.com/watch?v=7AjA3Df6i6o; *see also* Josephine Bila, *YouTube's Dark Side Could be Affecting Your Child's Mental Health*, CNBC (Feb. 13, 2018), https://www.cnbc.com/2018/02/13/youtube-is-causing-stress-and-sexualization-in-young-children.html.

---

SEVENTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

the race to one billion hours, a formula emerged: Outrage equals attention."[135] Thus, in order to increase the number of advertisements Google served to children, it exposed them to content that was more likely to frighten them.

235.    And once a child YouTube user watches one harmful recommended video, The Recommendation Engine is likely to suggest similar harmful content to watch next, pushing children down "rabbit holes," which "[lead] viewers to incrementally more extreme videos or topics, which . . . hook them in."[136] For example, a user might "[w]atch clips about bicycling, and YouTube might suggest shocking bike race crashes."[137] In this way, the algorithm makes it more likely that youth will encounter content that is violent, sexual, or encourages self-harm, among other types of harmful content – all for the purpose of serving children advertising.

236.    These effects combine to compel children to overuse YouTube, increasing children's exposure to unsafe, harmful, age inappropriate videos which in turn can adversely affect mental health. These harms to children are collateral damage for Google – the goal is to maximize ad delivery at all costs.

237.    These dangers were recently underscored by the United States Surgeon General's advisory entitled Social Media and Youth Mental Health, which observed, *inter alia*, that "[a]lthough age 13 is commonly the required minimum age used by social media platforms in the U.S.,3 nearly 40% of children ages 8–12 use social media" and that "[t]here are increasing concerns among researchers,

---

[135] Mark Bergen, *YouTube Executives Ignored Warnings, Letting Toxic Videos Run Rampant,* Bloomberg (Apr. 2, 2019), https://www.bloomberg.com/news/features/2019-04-02/youtube-executives-ignored-warnings-letting-toxic-videos-run-rampant.

[136] Max Fisher & Amanda Taub, *On YouTube's Digital Playground, an Open Gate for Pedophiles,* NY Times (June 3, 2019), https://www.nytimes.com/2019/06/03/world/americas/youtube-pedophiles.html.

[137] *Id.*

SEVENTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

parents and caregivers, young people, healthcare experts, and others about the impact of social media on youth mental health."[138]

238.    Google, through the unlawful collection and use of Personal Information, knowingly promoted compulsive use of YouTube by young children, knowing that such compulsive use exposed the young children to harmful content and promoted serious mental health problems.  Google's use of such Personal Information for these purposes not only violates the privacy rights of Plaintiffs and the members of the Classes but also is highly offensive and outrageous.

## V.    Plaintiffs and The Members of The Classes have Suffered Economic Loss and Injury as a Result of Google's Unfair and Deceptive Conduct.

239.    Courts have recognized that internet users have a property interest in their Personal Information and that Personal Information is, thus, an asset with economic value.[139]  Through its unfair and deceptive conduct, Google misappropriated the Personal Information of Plaintiffs and the members of the Classes, destroyed the principal aspect of the Personal Information that provided its value to Plaintiffs and the members of the Classes, and diminished the value of the Personal Information.

240.    As a result of Google's uniform, unfair and deceptive conduct, Plaintiffs and the members of the Classes have, thus, suffered economic loss and injury in one or more of the following respects:

a.    Google unlawfully took possession of and commercially exploited the Personal Information of Plaintiffs and the members of the Classes without their permission and without compensation; and

b.    Google's unlawful collection and exploitation of the Personal Information of Plaintiffs and the members of the Classes have destroyed the private quality of the Personal Information and have deprived Plaintiffs and the members of the Classes of the ability to

---

[139] *See CTC Real Estate Servs. v. Lepe*, 140 Cal. App. 4th 856, 860, 44 Cal.Rptr.3d 823 (2006) ("A person's identifying information is a valuable asset."); *accord In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 600 (9th Cir. 2020) (citing *Lepe* and holding that the plaintiffs had suffered economic injury after Facebook allegedly took their personal information in a similar process to that alleged here).
[139] *See CTC Real Estate Servs. v. Lepe*, 140 Cal. App. 4th 856, 860, 44 Cal.Rptr.3d 823 (2006) ("A person's identifying information is a valuable asset."); *accord In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 600 (9th Cir. 2020) (citing *Lepe* and holding that the plaintiffs had suffered economic injury after Facebook allegedly took their personal information in a similar process to that alleged here).

determine whether or not to keep their Personal Information private and when or if to sell their Personal Information -- valuable aspects of their rights of ownership that were of paramount importance to Plaintiffs and the members of the Classes in this case – and, thus, diminished the value of the Personal Information.

### A. Personal Information is an Asset that has Economic Value.

241. The information Google collects and uses had and continues to have massive economic value during the Class Period. This value is well understood in the e-commerce industry, and Personal Information is now viewed as a form of currency.

242. Research on the market for Personal Information dates back well before the Class Period,[140] and demonstrates a growing consensus that consumers' sensitive and valuable Personal Information would become the new frontier of financial exploit.

243. Professor Paul M. Schwartz noted in the Harvard Law Review:

> Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information.[141]

244. Likewise, in *The Wall Street Journal*, former fellow at the Open Society Institute (and current principal technologist at the ACLU) Christopher Soghoian noted:

> The dirty secret of the Web is that the "free" content and services that consumers enjoy come with a hidden price: their own private data. Many of the major online advertising companies are not interested in the data that we knowingly and willingly share. Instead, these parasitic firms covertly track our web-browsing activities, search behavior and geolocation information. Once collected, this mountain of data is analyzed to build digital dossiers on millions of consumers, in some cases identifying us by name, gender, age as well as the medical conditions and political issues we have researched online.

245. Although we now regularly trade our most private information for access to social-

---

[140] "Markets and Privacy" by Kenneth C Laudon, Communications of the ACM, 1996. https://canvas.harvard.edu/files/4164376/download?download_frd=1.

[141] Paul M. Schwartz, Property, *Privacy and Personal Data*, 117 HARV. L. REV. 2055, 2056–57 (2004).

networking sites and free content, the terms of this exchange were never clearly communicated to consumers.[142]

246.    As the thirst has grown for Personal Information,[143] it has become apparent that the world's most valuable resource is no longer oil, but instead consumers' data in the form of their Personal Information.[144]

247.    The cash value of the Personal Information unlawfully collected by Google during the Class Period can be quantified.  For example, in a study authored by Tim Morey, researchers studied the value that 180 internet users placed on keeping personal data secure.[145] Contact information of the sort that Google requires was valued by the study participants at approximately $4.20 per year. Demographic information was valued at approximately $3.00 per year. However, web browsing histories were valued

---

[142] Julia Angwin, *How Much Should People Worry About the Loss of Online Privacy?*, THE WALL STREET JOURNAL (Nov. 15, 2011).

[143] *Exploring the Economic of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD Digital Economy Paper No. 220 at 7 (Apr. 2, 2013), http://dx.doi.org/10.1787/5k486qtxldmq-en; *Supporting Investment in Knowledge Capital, Growth and Innovation*, OECD, at 319 (Oct. 13, 2013), https://www.oecd.org/sti/inno/newsourcesofgrowthknowledge-basedcapital.htm; Pauline Glickman and Nicolas Glady, *What's the Value of Your Data?* TechCrunch (Oct. 13, 2015). https://techcrunch.com/2015/ 10/13/whats-the-value-of-your-data/; Paul Lewis and Paul Hilder, *Former Cambridge Analytica exec says she wants lies to stop*, The Guardian (March 23, 2018) https://www.theguardian.com/uk-news/2018/mar/ 23/former-cambridge-analytica-executive-brittany-kaiser-wants-to-stop-lies; Shoshanna Zuboff, *The Age of Surveillance Capitalism 166* (2019).

[144] *The world's most valuable resource is no longer oil, but data*, The Economist (May 6, 2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data.

[145] Tim Morey, *What's Your Personal Data Worth?* DESIGN MIND (Jan. 18, 2011), https://web.archive.org/web/20131206000037/http://designmind.frogdesign.com/blog/what039s- your-personal-data-worth.html.

SEVENTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

at a much higher rate: $52.00 per year. The chart below summarizes the findings:



248.    Similarly, the study *Your Browsing Behavior for a Big Mac: Economics of Personal Information Online* by Juan Pablo Carrascal and colleagues employed a detailed methodology to understand how users their Personal Information in exchange for internet-based services.[146] Participants installed a browser plugin that logged their web browsing activities, including the URLs visited and the time of access.[147] The plugin also categorized the websites into eight predefined categories: Email, Entertainment, Finance, News, Search, Shopping, Social, and Health and asked participants questions designed to gather information about their perceptions of privacy, their knowledge of how their Personal Information might be monetized, and their valuation of specific pieces of PI as they visited certain websites.[148] To calculate the value users placed on their Personal Information, Carrascal and colleagues employed a reverse second-price auction mechanism in which participants bid on the minimum amount of money they would accept to sell specific pieces of their Personal Information in exchange for internet-based services they were using.[149]

---

[146] Juan Pablo Carrascal et al., *Your Browsing Behavior for a Big Mac: Economics of Personal Information Online*, arXiv preprint arXiv:1112.6098 (2011), https://arxiv.org/abs/1112.6098.
[147] *Id.*
[148] *Id.*
[149] *Id.*

SEVENTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

249.    The results of Carrascal's study were the following Personal Information valuations:

    a.    Offline information (age address, economic stats): €25

    b.    Browsing History: €7

    c.    Interactions on social networks: €12

    d.    Search History: €2

    e.    Shopping Activity: €5

250.    What these studies, and others[150] show is that individuals place an economic value on their Personal Information, and are willing to engage in economic transactions in which they will grant access to their Personal Information in exchange for internet-based services. Google's unauthorized collection of their Personal Information deprived individuals of this opportunity.

251.    On the open market, Personal Information is often mined, compiled, and resold by data brokers. Further, there is a market for consumers to monetize Personal Information and the behavioral preferences that Google has usurped. Published analyses and studies have placed a value in excess of $200 on an individual's Personal Information.[151]

252.    A child's Personal Information has equivalent (or potentially greater) value than that of an adult. It is well-established that children are more susceptible to being influenced by advertisements and often cannot tell the difference between content and advertisements in child-directed videos.[152] And Defendants may be able to utilize children's Personal Information to show them behavior-targeted advertising for the duration of their lives.

---

[150] Jacopo Staiano et al., *Money Walks: A Human-Centric Study on the Economics of Personal Mobile Data*, arXiv preprint arXiv:1407.0566 (2014), https://arxiv.org/abs/1407.0566 (finding that location information is the most valued type of personal data, with a median value of approximately €25, and that participants showed significant sensitivity towards monetizing their personal information collected via mobile phones).

[151] *Can you Put a Price on Your Personal Data*, June 28, 2019, NYTimes, https://www.nytimes.com/2019/06/28/technology/data-price-big-tech.html.

[152] Google is well aware of the special vulnerability of minors when it comes to behavioral advertising. As an internal Google presentation produced in discovery emphasizes, "What makes kids different" are certain qualities associated specifically with minor children, including that: they are "extremely impressionable"; evidence a "lack of judgment"; have "no self control"; and are "subject to exploitation". *See* GOOG-HUB-00005818.

253.    The value of user-correlated internet browsing history can also be quantified, because Google itself has been willing to pay users for the exact type of information that Google has illegally used to develop profiles of Plaintiffs and the other members of the Classes during the Class Period.

254.    For example, Google has a product called "Google Screenwise Trends" which is designed "to learn more about how everyday people use the Internet." Upon becoming a panelist, internet users add a browser extension that shares with Google the sites they visit and how they use them. The panelists consent to Google tracking such information for three months in exchange for one of a number of "gifts," including gift cards to retailers such as Barnes & Noble, Walmart, and Overstock.com. After three months, Google also agreed to pay panelists additional gift cards "for staying with" the panel. These gift cards, mostly valued at exactly $5, demonstrate that internet industry participants understand the enormous value in internet users' browsing habits. Google has paid Screenwise panelists up to $3 per week to be tracked.

255.    Personal Information also has a value based on consumers' privacy interests. In a recent study by the Pew Research Center, 93% of Americans said it was "important" for them to be "in control of who can get information" about them. Seventy-four percent said it was "very important." Eighty-seven percent of Americans said it was "important" for them not to have someone watch or listen to them without their permission. Sixty-seven percent said it was "very important." And 90% of Americans said it was "important" that they be able to "control[] what information is collected about [them]." Sixty-five percent said it was very important. [153]

256.    Likewise, in a 2011 Harris Poll study, 76% of Americans agreed that "online companies, such as Google or Facebook, control too much of our personal information and know too much about our browsing habits."[154]

---

[153]  https://www.pewresearch.org/internet/2015/05/20/americans-attitudes-about-privacy-security-and-surveillance/#:~:text=93%25%20of%20adults%20say%20that,it%20is%20%E2%80%9Csomewhat%20important.%E2%80%9D.

[154]    https://www.prnewswire.com/news-releases/majorities-think-some-online-companies-are-too-powerful-121986453.html

SEVENTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

257.    Google itself has placed a value on consumers' willingness to give up their privacy interests in their Personal Information by paying users specifically for their browsing data.[155]

258.    Google has further recognized – and quantified -- the economic value of Plaintiffs' and the Classes' privacy interests in their Personal Information: in 2014, Google established a YouTube Premium service and in 2018, it established a YouTube Premium Student Plan, both of which provide YouTube programming without advertising for a monthly subscription fee (currently $13.99 for YouTube Premium, discounted for YouTube Premium Student Plan).  User/parent willingness to pay these amounts to avoid the targeted advertising that minor YouTube users were bombarded with based on the profiles developed from their tracked Personal Information provides a further basis for determining the economic value of Plaintiffs' and Class members' privacy interests in in maintaining uncollected/unexploited Personal Information.

259.    During the Class Period, a number of platforms have appeared that allow consumers to directly monetize their own data and prevent tech companies from targeting them absent their express consent:

    a.    Brave's web browser, for example, will pay users to watch online targeted ads, while blocking out everything else.[156]

    b.    Loginhood states that it "lets individuals earn rewards for their data and provides website owners with privacy tools for site visitors to control their data sharing," via a "consent manager" that blocks ads and tracking on browsers as a plugin.[157]

---

[155] Jack Marshall, *Google Pays Users for Browsing Data,* DigiDay (Feb. 10, 2012), https://digiday.com/media/google-pays-users-for-browsing-data/.

[156] Get Paid to Watch Ads in the Brave Web Browser, at: https://lifehacker.com/get-paid-to- watch-ads-in-the-brave-web-browser-1834332279#:~:text=Brave%2C%20a%20chromium-based%20web%20browser%20that%20boasts%20an,a%20more%20thoughtful%20way%20than%20we%E2%80%99re%20accustomed%20to (Lifehacker, April 26, 2019) ("The model is entirely opt-in, meaning that ads will be disable by default. The ads you view will be converted into Brave's cryptocurrency, Basic Attention Tokens (BAT), paid out to your Brave wallet monthly").

[157] https://loginhood.io/. *See also*, https://loginhood.io/product/chrome-extension ("[s]tart earning rewards for sharing data – and block others that have been spying on you. Win-win.").

c.    Andrew Yang's "Data Dividend Project" aims to help consumers, "[t]ake control of your personal data. If companies are profiting from it, you should get paid for it."[158]

d.    Killi is a new data exchange platform that allows consumers to own and earn from their data.[159]

e.    Similarly, BIGtoken "is a platform to own and earn from your data. You can use the BIGtoken application to manage your digital data and identity and earn rewards when your data is purchased."[160]

f.    The Nielsen Company, famous for tracking the behavior of television viewers' habits, has extended its reach to computers and mobile devices through the Nielsen Computer and Mobile Panel. By installing the application on a consumer's computer, phone, tablet, e-reader, or other mobile device, Nielsen tracks the user's activity, enters that user into sweepstakes with monetary benefits, and allows the user to earn points worth up to $50 per month.[161]

260.    Technology companies recognize the monetary value of users' Personal Information, insofar as they encourage users to install applications explicitly for the purpose of selling that information to technology companies in exchange for monetary benefits.[162]

---

[158] How Does It Work, at: https://www.datadividendproject.com/ ("Get Your Data Dividend…We'll send you $$$ as we negotiate with companies to compensate you for using your personal data.").

[159] https://killi.io/earn/.

[160] https://bigtoken.com/faq#general_0 ("Third-party applications and sites access BIGtoken to learn more about their consumers and earn revenue from data sales made through their platforms. Our BIG promise: all data acquisition is secure and transparent, with consumers made fully aware of how their data is used and who has access to it.").

[161] Kevin Mercandante, Ten Apps for Selling Your Data for Cash, Best Wallet Hacks (June 10, 2020), https://wallethacks.com/apps-for-selling-your-data/.

[162] *Kari Paul, Google launches app that will pay users for their data*, The Guardian (June 11, 2019), https://www.theguardian.com/technology/2019/jun/11/facebook-user-data-app-privacy- study; Saheli Roy Choudhury and Ryan Browne, *Facebook pays teens to install an app that could collect all kinds of data*, CNBC (Jan. 30, 2019), https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html; Jay Peters, *Facebook will now pay you for your voice recordings*, The Verge (Feb. 20, 2020), https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-pronunciations-app.

261.    The California Consumer Protection Act ("CCPA") recognizes that consumers' personal data is a property right. Not only does the CCPA prohibit covered businesses from discriminating against consumers that opt-out of data collection, the CCPA also expressly provides that: "[a] business may offer financial incentives, including payments to consumers as compensation, for the collection of personal information, the sale of personal information, or the deletion of personal information." Cal. Civ. Code § 1798.125(b)(1). The CCPA provides that, "[a] business shall not use financial incentive practices that are unjust, unreasonable, coercive, or usurious in nature." Cal. Civ. Code § 1798.125(b)(4).

**B.    Google Has Taken Possession of and Commercially Exploited the Personal Information of Plaintiffs and the Members of the Class without Permission and Without Compensation.**

262.    Through its uniform conduct and practices as alleged herein, Google has unlawfully taken possession of and commercially exploited the Personal Information of Plaintiffs and the members of the Classes without their permission and without compensating them for the use of their assets. As Google's advertising revenue (of $116 billion in 2018) tellingly demonstrates, this information has tremendous value to Google and advertisers.

263.    Google's illegal and improper collection of children's Personal Information also has given them a significant "first mover" advantage that cannot be undone. Google operates the first and second-most visited websites in the world, and as a result of its unlawful conduct, Google's algorithms now incorporate ill-gotten data from billions of children's YouTube video views. The deep insights gleaned from these viewing sessions will enable Google to keep children viewing YouTube, to use the Personal Information of children for potentially the duration of their lives, and will solidify Google's dominance in the market for child-related content.

264.    Google's exploitation of Plaintiffs' and the members of the Classes' Personal Information, without compensation, has caused Plaintiffs and the members of the Classes to suffer economic loss and injury.

265.    Google's exploitation of Plaintiffs' and the members of the Classes' Personal Information, without compensation, has caused Plaintiffs and the members of the Classes to suffer ascertainable losses.

C.    **The Unlawful Collection and Exploitation of Plaintiffs' and Class Members' Personal Information Has Deprived Them of the Value of Protecting That Information From Being Sold and Exploited in the Digital Information Marketplace, and Has Diminished its Value, Causing Economic Loss and Injury.**

266.    Google's unlawful collection and commercial exploitation of the Personal Information of Plaintiffs' and the members of the Classes has deprived Plaintiffs and Class members of the right and privilege of ownership that was most important to them – the right to maintain the privacy of their Personal Information and NOT to sell it. Google's conduct has thus destroyed the fundamental quality of the asset, and diminished its value to Plaintiffs and the Class members. And, for those Plaintiffs and Class members who would choose to sell their Personal Information in what is a well-established and readily available marketplace, Google's conduct has diminished the amount a knowledgeable buyer would be willing to pay for the Information.

267.    Once a child's Personal Information has been collected and exploited by Google, it is no longer possible for the child or the child's parents to maintain the confidentiality of the data – the aspect of the data that provides the major component of its value to the children and their parents and that, correspondingly, determines the price a seller would be willing to accept – and that a buyer would need to offer – for the data. Researchers have explored the economic implications and market dynamics under such circumstances and have determined that Google's conduct thus diminishes the value of the child's Personal Information since a knowledgeable buyer of the data would understand that the data has been deprived of its primary value to the user and would decrease the amount it would be willing to pay – and the amount the user would be willing to accept – for the data.[163]

268.    The value of the Personal Information of Plaintiffs' and the members of the Classes has also been diminished by Google's wrongful conduct because, as a consequence of gathering the Personal Information of a massive number of child YouTube users, Google has been able to develop large subsets of YouTube users with correlated interests – *i.e.*, users who share interests in similar (or opposite) areas

---

[163] "Too Much Data: Prices and Inefficiencies in Data Markets," by Daron Acemoglu (MIT), Ali Makhdoumi (Duke University), Azarakhsh Malekian (University of Toronto), and Asu Ozdaglar (MIT), American Economic Journal: Microeconomics, 14(4), 218–256, 2022, https://www.aeaweb.org/articles?id=10.1257/mic.20200200, accessed 7/14/24.

and who can be expected to respond similarly to behavioral advertising or to targeted programming. [164] Researchers have also studied the market dynamics in such a scenario for additional members of such subsets whose preferences correlate with other users in a given subset.[165] Because Google already possesses tracking information from other members of the subset sufficient to identify user preferences, Google has and other market participants have less need for the Personal Information of additional subset members and the value of their Personal Information is, thus, decreased.[166]

269.    In both of the above scenarios, the desire/willingness of the user to protect his or her data from exposure is diminished, and the amount of compensation required to cause the user to expose (*i.e.*, sell) the data – and the amount of a buyer would need to offer -- is diminished.  And, because the user's data is now available to either Google or a competitor at a reduced price, the value of the correlated data of all of the other members of the subset is, likewise, diminished.

270.    For children (or their parents) for whom the sole value of the Personal Information derives from maintaining user privacy, the economic value of the Personal Information has been completely destroyed by Google's collection and use of it.

271.    Through its uniform conduct and practices, Google's unlawful exploitation of the Personal Information of Plaintiffs and Class members has, thus, diminished the value of their Personal Information, causing Plaintiffs and Class members to suffer economic loss and injury for which Plaintiffs and Class members can never be made whole.

---

[164]    *See, e.g.*,  https://www.indexexchange.com/2023/12/12/google-privacy-sandbox-get-started/ (accessed 7/14/24), https://developers.google.com/privacy-sandbox/overview/relevance-and-measurement-faqs (accessed 7/14/24), and https://developers.google.com/privacy-sandbox/relevance/protected-audience (accessed 7/14/24).

[165]    *See, e.g.*,  https://www.indexexchange.com/2023/12/12/google-privacy-sandbox-get-started/ (accessed 7/14/24), https://developers.google.com/privacy-sandbox/overview/relevance-and-measurement-faqs (accessed 7/14/24), and https://developers.google.com/privacy-sandbox/relevance/protected-audience (accessed 7/14/24).

[166] *See* fn. 82. *See, also*, "Privacy and personal data collection with information externalities," by Jay Pil Choi, Doh-Shin Jeon and Byung-Cheol Kim, Journal of Public Economics, 173, 113–124, 2019.

272.    Google's unlawful exploitation of the Personal Information of Plaintiffs and the members of the Classes has, thus, diminished the value of their Personal Information, causing Plaintiffs and the members of the Classes to suffer ascertainable economic loss.

## ALLEGATIONS RELATING TO PLAINTIFFS

**A.    Plaintiff C.H.**

273.    During the Class Period, Plaintiff C.H. watched videos and advertisements on YouTube.

274.    C.H. viewed child-directed content on multiple monetized YouTube channels, including:

   a.    **ChuChuTV-owned Channels:** ChuChu Nursery Rhymes & Kids Songs;

   b.    **Hasbro-owned Channels:** Hasbro: My Little Pony;

   c.    **Ryan's World Channels:** Ryan's World: Ryan Toys Review

275.    Google, ChuChuTV, Hasbro, and Ryan's World collected and enabled collection of C.H.'s Personal Information for the purposes of tracking, profiling, and targeting C.H. with advertisements as C.H. watched ChuChuTV's, Hasbro's, and Ryan's World child-directed content on these YouTube channels.

276.    Neither Google, ChuChuTV, Hasbro, or Ryan's World obtained verifiable parental consent prior to the collection of C.H.'s Personal Information.

277.    Neither Plaintiff C.H. nor their parent and guardian Nichole Hubbard could have reasonably discovered this conduct earlier through investigation. Plaintiff C.H. is a minor unable to consent to or understand the tracking of her Personal Information, and Google (and the channels) concealed from and misled Nichole Hubbard about the tracking, profiling, and targeting of her child.

278.    The tracking, profiling, and targeting of C.H. without parental consent is highly offensive and constitutes an invasion of C.H.'s privacy.

**B.    Plaintiffs E.J., N.J., A.J, and L.J.**

279.    During the Class Period, Plaintiffs E.J., N.J., A.J., and L.J. watched videos and advertisements on YouTube.

280.    E.J., N.J., A.J., and L.J. viewed child directed content on multiple monetized YouTube channels, including:

   a.    **Hasbro-owned Channels:** Hasbro and Hasbro: My Little Pony;

    b. **ChuChu TV-owned Channels**: ChuChu Nursery Rhymes & Kids Songs, ChuChu TV Surprise Egg Toys, and ChuChu TV Funzone;

    c. **Dreamworks-owned Channels:** Dreamworks TV World;

    d. **Ryan's World Channels:** Ryan's Toy Review;

281. Google, ChuChu TV, Hasbro, Dreamworks, and Ryan's World collected and enabled collection of E.J.'s, N.J.'s, A.J.'s, and L.J.'s Personal Information for the purposes of tracking, profiling, and targeting E.J., N.J., A.J., and L.J. with advertisements as they watched ChuChu TV's, Hasbro's, Dreamworks, and Ryan's World's child directed content on these YouTube channels.

282. Neither Google, ChuChu TV, Hasbro, Dreamworks, nor Ryan's World obtained verifiable parental consent prior to the collection of E.J., N.J., A.J., and L.J.'s Personal Information.

283. Neither Plaintiffs E.J., N.J., A.J., and L.J. nor their parent and guardian Cara Jones could have reasonably discovered this conduct earlier through investigation. Plaintiffs E.J., N.J., A.J., and L.J. are minors unable to consent to or understand the tracking of the Personal Information, and Google (and the channels) concealed from and misled Cara Jones about the tracking, profiling, and targeting of her children.

284. The tracking, profiling, and targeting of E.J., N.J., A.J., and L.J. without parental consent is highly offensive and constitutes an invasion of E.J.'s, N.J.'s, A.J.'s, and L.J.'s privacy.

**C.    Plaintiffs J.A.E. and J.R.E.**

285. During the Class Period, Plaintiffs J.A.E. and J.R.E. watched videos and advertisements on YouTube.

286. J.A.E. and J.R.E. viewed child-directed content on multiple monetized YouTube channels, including:

    a. **Mattel-owned Channels:** Thomas & Friends;

    b. **Cartoon Network-owned Channels:** Cartoon Network, The Amazing World of Gumball, and Boomerang Official;

    c. **Ryan's World Channels:** Ryan's Toy Review

287. Google, Mattel, Cartoon Network, and Ryan's World collected and enabled collection of J.A.E.'s and J.R.E.'s Personal Information for the purposes of tracking, profiling, and targeting J.A.E.

and J.R.E. with advertisements as they watched Mattel's, Cartoon Network's, and Ryan's World's child-directed content on these YouTube channels.

288.    Neither Google, Mattel, Cartoon Network, nor Ryan's World obtained verifiable parental consent prior to the collection of J.A.E.'s and J.R.E.'s Personal Information.

289.    Neither Plaintiffs J.A.E. and J.R.E. nor their parent and guardian Justin Efros could have reasonably discovered this conduct earlier through investigation. Plaintiffs are minors unable to consent to or understand the tracking of Personal Information, and Google (and the channels) concealed from and misled Justin Efros about their tracking, profiling, and targeting of his children.

290.    The tracking, profiling, and targeting of J.A.E. and J.R.E. without parental consent is highly offensive and constitutes an invasion of J.A.E.'s and J.R.E.'s privacy.

**D.    Plaintiff M.W.**

291.    During the Class Period, Plaintiff M.W. watched videos and advertisements on YouTube.

292.    M.W. viewed child-directed content on multiple monetized YouTube channels, including:

    a.    **Mattel-owed Channels:** Barbie, and Polly Pocket;

    b.    **Cartoon Network-owned Channels:**  Amazing World of Gumball;

    c.    **Hasbro-owned Channels:** Transformers, Play Doh, Baby Alive, and My Little Pony;

    d.    **Ryan's World Channels**: Ryan's Toy Reviews;

293.    Google, Mattel, Cartoon Network, Hasbro, and Ryan's World collected and enabled collection of M.W.'s Personal Information for the purposes of tracking, profiling, and targeting M.W. with advertisements as M.W. watched Mattel's, Cartoon Network's, Hasbro's, and Ryan's World's child-directed content on these YouTube channels.

294.    Neither Google, Mattel, Cartoon Network, Hasbro, or Ryan's World obtained verifiable parental consent prior to the collection of M.W.'s Personal Information.

295.    Neither Plaintiff M.W. nor their parent and guardian Renee Gilmore could have reasonably discovered this conduct earlier through investigation. Plaintiff is a minor unable to consent to or understand the tracking of Personal Information, and Google (and the channels) concealed from

and misled Renee Gilmore about their tracking, profiling, and targeting of her child.

296.    The tracking, profiling, and targeting of M.W without parental consent is highly offensive and constitutes an invasion of M.W's privacy.

**E.    Plaintiff A.G.**

297.    During the Class Period, Plaintiff A.G. watched videos and advertisements on YouTube.

298.    A.G. viewed child-directed content on multiple monetized YouTube channels, including:

    a.    **Mattel-owned Channels:** American Girl Wellwisher;

    b.    **Cartoon Network-owned Channels:** DC Super Hero Girls;

    c.    **Ryan's World:** Ryan's Toy Reviews

299.    Google, Mattel, Cartoon Network, and Ryan's World collected and enabled collection of A.G.'s Personal Information for the purposes of tracking, profiling, and targeting A.G. with advertisements as A.G. watched Mattel's, Cartoon Network's, Chad Alan's, and Ryan's World's child-directed content on their YouTube channels.

300.    Neither Google, Mattel, Cartoon Network, or Ryan's World obtained verifiable parental consent prior to the collection of A.G.'s Personal Information.

301.    Neither Plaintiff A.G. nor their parent and guardian Jay Goodwin could have reasonably discovered this conduct earlier through investigation. Plaintiff is a minor unable to consent to or understand the tracking of Personal Information, and Google (and the channels) concealed from and misled Jay Goodwin about their tracking, profiling, and targeting of his child.

302.    The tracking, profiling, and targeting of A.G. without parental consent is highly offensive and constitutes an invasion of A.G.'s privacy.

**F.    Plaintiffs T.B. and S.B.**

303.    During the Class Period, Plaintiffs T.B. and S.B. watched videos and advertisements on YouTube.

304.    T.B. and S.B.  viewed child-directed content on multiple monetized YouTube channels, including:

    a.    **Mattel-owned Channels:** Barbie, Fisher Price, and Polly Pocket;

    b.    **Hasbro-owned Channels:** Hasbro, Transformers, Play Doh, and My Little Pony;

SEVENTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

    c.   **Cartoon Network-owned Channels:** Cartoon Network, Adventure Time, The Amazing World of Gumball, Ben 10, DC Super Hero, Powerpuff and Boomerang;

    d.   **Ryan's World Channels:**  Ryan's Toy Review;

    e.   **Dreamworks-owned Channels:** Dreamworks TV;

    f.   **ChuChu TV:** Storytime – Bedtime Stories & Cartoon Shows

305. Google, Mattel, Hasbro, Cartoon Network, Ryan's World, Dreamworks, and ChuChu TV collected and enabled collection of T.B.'s and S.B.'s Personal Information for the purposes of tracking, profiling, and targeting them with advertisements as they watched the child-directed content on these YouTube channels.

306. Neither Google nor the Cartoon Network obtained verifiable parental consent prior to the collection of T.B and S.B.'s Personal Information.

307. Neither Plaintiffs T.B. and S.B. nor their parent and guardian Derek Buchanan could have reasonably discovered this conduct earlier through investigation. Plaintiff is a minor unable to consent to or understand the tracking of Personal Information, and Google (and the channels) concealed from and misled Derek Buchanan about their tracking, profiling, and targeting of his children.

308. The tracking, profiling, and targeting of T.B. and S.B. without parental consent is highly offensive and constitutes an invasion of T.B's and S.B's privacy.

**G.**    **Plaintiffs D.T. and D.T.**

309. During the Class Period, Plaintiffs D.T. and D.T. watched videos and advertisements on YouTube.

310. D.T. and D.T. viewed child-directed content on multiple monetized YouTube channels, including:

    a.   **Mattel-owned Channels:** Mattel, Hot Wheels, Fisher-Price, Thomas & Friends, American Girl, and Mattel Action;

    b.   **Hasbro-owned Channels:** Hasbro, Transformers Official, Nerf Official, Play Doh, Official Play Doh, Baby Alive, and My Little Pony;

    c.   **Cartoon Network-owned Channels:** Cartoon Network, Adventure Time, The

SEVENTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

Amazing World of Gumball, Ben 10, DC Super Hero, Power Players, Powerpuff, Steven Universe, and Boomerang Official;

    d. **Dreamworks-owned Channels:** Dreamworks.

311. Google, Mattel, Hasbro, Cartoon Network, and Dreamworks collected and enabled collection of D.T.'s and D.T. 's Personal Information for the purposes of tracking, profiling, and targeting D.T. and D.T. with advertisements as D.T. and D.T. watched Mattel's, Hasbro's, Cartoon Network's, and Dreamworks' child-directed content on these YouTube channels .

312. Neither Google, Mattel, Hasbro, Cartoon Network, nor Dreamworks obtained verifiable parental consent prior to the collection of D.T.'s and D.T.'s Personal Information.

313. Neither Plaintiffs D.T. and D.T. nor their parent and guardian Amanda Seeley could have reasonably discovered this conduct earlier through investigation. Plaintiffs are minors unable to consent to or understand the tracking of Personal Information, and Google (and the channels) concealed from and misled Amanda Seeley about their tracking, profiling, and targeting of her children.

314. The tracking, profiling, and targeting of D.T. and D.T. without parental consent is highly offensive and constitutes an invasion of D.T.'s and D.T.'s privacy.

**H.    Plaintiff B.H.**

315. During the Class Period, Plaintiff B.H. watched videos and advertisements on YouTube.

316. B.H. viewed child-directed content on multiple monetized YouTube channels, including:

    a. **Mattel-owned Channels:** Thomas & Friends and Polly Pocket;

    b. **Hasbro-owned Channels:** Hasbro, Play Doh, and Official Play Doh;

    c. **ChuChu TV-owned Channels:** ChuChu;

    d. **Cartoon Networked-owned Channels:** Cartoon Network, Adventure Time, Gumball, Ben 10, and Power Players;

    e. **Dreamworks Animation-owned Channels:**  Dreamworks;

    f. **Ryan's World Channels:** Ryan's Toy Reviews.

317. Google, Mattel, Hasbro, ChuChu TV, Cartoon Network, Dreamworks, and Ryan's World collected and enabled collection of B.H.'s Personal Information for the purposes of tracking, profiling, and targeting B.H. with advertisements as B.H. watched Mattel's, Hasbro's, ChuChu TV's, Cartoon

Network's, Dreamwork's, and Ryan's World's child-directed content on these YouTube channels.

318.    Neither Google, Mattel, Hasbro, ChuChu TV, Cartoon Network, Dreamworks, nor Ryan's World obtained verifiable parental consent prior to the collection of B.H.'s Personal Information.

319.    Neither Plaintiff B.H. nor Plaintiff B.H.'s parent and guardian Jason Hoffman could have reasonably discovered this conduct earlier through investigation. Plaintiff is a minor unable to consent to or understand the tracking of Personal Information, and Google (and the channels) concealed from and misled Jason Hoffman about their tracking, profiling, and targeting of his child.

320.    The tracking, profiling, and targeting of B.H. without parental consent is highly offensive and constitutes an invasion of B.H.'s privacy.

**I.    Plaintiffs P.A. and J.A.**

321.    During the Class Period, Plaintiffs P.A. and J.A. watched videos and advertisements on YouTube.

322.    P.A. and J.A. viewed child-directed content on multiple monetized YouTube channels, including:

        a.    **Ryan's World Channels:** Ryan's Toy Reviews;

        b.    **Hasbro-owned Channels:** Hasbro, Play Doh, Official Play Doh How To Videos, Baby Alive, and My Little Pony;

        c.    **Mattel-owned Channels:** Mattel, Barbie, Hot Wheels, Thomas & Friends, American Girl, American Girl Welliewishers, and Polly Pocket;

        d.    **ChuChu TV-owned Channels:** ChuChu TV, ChuChu TV Nursery Rhymes & Kids Songs, ChuChu TV Surprise Egg Toys, Storytime – Bedtime Stories & Cartoon Shows, and ChuChu TV Funzone

323.    Google, Ryan's World, Hasbro, Mattel, and ChuChu TV collected and enabled collection of P.A.'s and J.A.'s Personal Information for the purposes of tracking, profiling, and targeting P.A. and J.A. with advertisements as P.A. and J.A. watched Ryan's World's, Hasbro's, Mattel's, and ChuChu TV's child-directed content on these YouTube channels.

324.    Neither Google, Ryan's World, Hasbro, Mattel, or ChuChu TV obtained verifiable parental consent prior to the collection of P.A.'s and J.A.'s Personal Information.

325.    Neither Plaintiffs P.A. and J.A. nor their parent and guardian Antonio Alvarez could have reasonably discovered this conduct earlier through investigation. Plaintiffs are minors unable to consent to or understand the tracking of Personal Information, and Google (and the channels) concealed from and misled Antonio Alvarez about their tracking, profiling, and targeting of his children.

326.    The tracking, profiling, and targeting of P.A. and J.A. without parental consent is highly offensive and constitutes an invasion of P.A.'s and J.A.'s privacy.

**J.    Plaintiffs S.H. and D.M.**

327.    During the Class Period, Plaintiffs S.H. and D.M. watched videos and advertisements on YouTube.

328.    S.H. and D.M. viewed child-directed content on multiple monetized YouTube channels, including:

a.    **Mattel-owned Channels:** Mattel, Barbie, Hot Wheels, Fisher-Price, Thomas & Friends, American Girl, American Girl Wellwisher, Mattel Action, Max Steel, and Polly Pocket;

b.    **Hasbro-owned Channels:** Hasbro, Nerf Official, Play Doh, Play Doh Official, and My Little Pony;

c.    **Cartoon Network-owned Channels:** Cartoon Network, Adventure Time, Gumball, Ben 10, DC Super Hero, Powerpuff, and Steven Universe,

329.    Google, Mattel, Hasbro, and Cartoon Network collected and enabled collection of S.H.'s and D.M.'s Personal Information for the purposes of tracking, profiling, and targeting S.H. and D.M. with advertisements as S.H. and D.M. watched Mattel's, Hasbro's, and Cartoon Network's child-directed content on these YouTube channels.

330.    Neither Google, Mattel, Hasbro, or Cartoon Network obtained verifiable parental consent prior to the collection of S.H.'s and D.M.'s Personal Information.

331.    Neither Plaintiffs S.H. and D.M. nor their parent and guardian Veronica Hicks could have reasonably discovered this conduct earlier through investigation. Plaintiffs are minors unable to consent to or understand the tracking of Personal Information, and Google (and the channels) concealed from and misled Veronica Hicks about their tracking, profiling, and targeting of her children.

332.    The tracking, profiling, and targeting of S.H. and D.M. without parental consent is highly offensive and constitutes an invasion of S.H.'s and D.M.'s privacy.

**K.    Plaintiff G.W.**

333.    During the Class Period, Plaintiff G.W. watched videos and advertisements on YouTube.

334.    G.W. viewed child-directed content on multiple monetized YouTube channels, including:

a.    **Mattel-owned Channels:** Barbie and American Girl Welliewishers;

b.    **Hasbro-owned Channels:** Official Play Doh and My Little Pony;

c.    **Cartoon Networked-owned Channels:** Cartoon Network,

335.    Google, Mattel, Hasbro, and Cartoon Network collected and enabled collection of G.W.'s Personal Information for the purposes of tracking, profiling, and targeting G.W. with advertisements as G.W. watched Mattel's, Hasbro's, and Cartoon Network's child-directed content on these YouTube channels.

336.    Neither Google, Mattel, Hasbro, and Cartoon Network obtained verifiable parental consent prior to the collection of G.W.'s Personal Information.

337.    Neither Plaintiff G.W. nor Plaintiff G.W.'s parent and guardian Doug Wilkerson could have reasonably discovered this conduct earlier through investigation. Plaintiff is a minor unable to consent to or understand the tracking of Personal Information, and Google (and the channels) concealed from and misled Doug Wilkerson about their tracking, profiling, and targeting of his child.

338.    The tracking, profiling, and targeting of G.W. without parental consent is highly offensive and constitutes an invasion of G.W.'s privacy.

**L.    Plaintiff A.A.**

339.    During the Class Period, Plaintiff A.A. watched videos and advertisements on YouTube.

340.    A.A. viewed multiple monetized YouTube channels owned by Channel Owner Defendants during the Class Period, including

a.    **Mattel**: Thomas & Friends,

b.    **Hasbro**: Transformers Official, Nerf Official,

c.    **Cartoon Network**: Boomerang Official,

d.    **DreamWorks**: Dream-Works TV, Ethan Gamer, Gamer Chad, and

e.  **Ryan's World**: Ryan Toys Review.

341.  Google and these channels collected and enabled collection of A.A.'s Personal Information for the purposes of tracking, profiling, and targeting A.A. with advertisements as A.A. watched these YouTube channels and videos.

342.  Neither Google nor these channels obtained verifiable parental consent prior to the collection of A.A.'s Personal Information.

343.  Neither Plaintiff A.A. nor Plaintiff A.A.'s parent and guardian Pennie Frazier could have reasonably discovered this conduct earlier through investigation. Plaintiff is a minor unable to consent to or understand the tracking of Personal Information, and Google (and the channels) concealed from and misled Pennie Frazier about their tracking, profiling, and targeting of her child.

344.  The tracking, profiling, and targeting of A.A. without parental consent by is highly offensive and constitutes an invasion of A.A.'s privacy.

**M.  Plaintiffs J.C. and E.M.**

345.  During the Class Period, Plaintiffs J.C. and E.M. watched videos and advertisements on YouTube.

346.  J.C. and E.M. viewed child-directed content on multiple monetized YouTube channels, including:

a.  **Mattel-owned Channels:** Mattel, Barbie, Hot Wheels, Fisher-Price, Thomas & Friends, American Girl, and American Welliewishers;

b.  **Hasbro-owned Channels:** Hasbro, Transformers Official, Nerf Official, Play Doh, Official Play Doh, Baby Alive, and My Little Pony;

c.  **Cartoon Network-owned Channels:** Cartoon Network, Adventure Time, Gumball, Ben 10, DC Superhero, Power Players, Powerpuff, Steven Universe, and Boomerang;

d.  **Dreamworks-owned Channels:** Dreamworks TV;

e.  **Ryan's World Channels:** Ryan's Toy Reviews.

347.  Google, Mattel, Hasbo, Cartoon Network, Dreamworks, and Ryan's World collected and enabled collection of J.C. and E.M.'s Personal Information for the purposes of tracking, profiling, and

targeting J.C. and E.M. with advertisements as J.C. and E.M. watched Mattel's, Hasbro's, Cartoon Network's, Dreamworks', and Ryan's World's child-directed content on these YouTube channels.

348.    Neither Google, Mattel, Hasbo, Cartoon Network, Dreamworks, nor Remka obtained verifiable parental consent prior to the collection of J.C.'s and E.M.'s Personal Information.

349.    Neither Plaintiffs J.C. and E.M. nor their parent and guardian Lezlie Collins could have reasonably discovered this conduct earlier through investigation. Plaintiffs are minors unable to consent to or understand the tracking of Personal Information, and Google (and the channels) concealed from and misled Lezlie Collins about their tracking, profiling, and targeting of her children.

350.    The tracking, profiling, and targeting of J.C. and E.M. without parental consent is highly offensive and constitutes an invasion of J.C.'s and E.M.'s privacy.

**N.    Plaintiffs L.D., D.D., and A.D.**

351.    During the Class Period, Plaintiffs L.D., D.D., and A.D. watched videos and advertisements on YouTube.

352.    L.D., D.D., and A.D. viewed child-directed content on multiple monetized YouTube channels, including:

> a.    **Mattel-owned Channels:** Fisher-Price and Barbie;
>
> b.    **Cartoon Network-owned Channels:** Cartoon Network, Adventure Time, The Amazing World of Gumball, DC Super Hero Girls, and The Powerpuff Girls;
>
> c.    **Hasbro-owned Channels:** Baby Alive, My Little Pony, and Hasbro;
>
> d.    **ChuChu TV-owned Channels:** ChuChu TV Nursery Rhymes & Kids Songs, ChuChu TV Surprise Egg Toys; Storytime – Bedtime Stories and Cartoon Shows, and ChuChu TV Funzone.

353.    Google, Mattel, Cartoon Network, Hasbro, and ChuChu TV collected and enabled collection of L.D.'s, D.D.'s, and A.D. 's Personal Information for the purposes of tracking, profiling, and targeting L.D., D.D., and A.D. with advertisements as L.D., D.D., and A.D. watched Mattel's, Cartoon Network's, Hasbro's, and ChuChu Tv's child-directed content on these YouTube channels.

354.    Neither Google Mattel, Cartoon Network, Hasbro, or Remka obtained verifiable parental consent prior to the collection of L.D.'s, D.D.'s, and A.D.'s Personal Information.

355. Neither Plaintiffs L.D., D.D., and A.D. nor their parent and guardian Holly Dorso could have reasonably discovered this conduct earlier through investigation. Plaintiffs are minors unable to consent to or understand the tracking of Personal Information, and Google (and the channels) concealed from and misled Holly Dorso about their tracking, profiling, and targeting of her children.

356. The tracking, profiling, and targeting of L.D., D.D., and A.D. without parental consent is highly offensive and constitutes an invasion of L.D.'s, D.D.'s, and A.D.'s privacy.

**O.    Plaintiff C.L.P.**

357. During the Class Period, Plaintiff C.L.P. watched videos and advertisements on YouTube.

358. C.L.P. viewed child-directed content on multiple monetized YouTube channels, including:

    a. **Mattel-owned Channels:** Thomas & Friends, and Max Steel;

    b. **Hasbro-owned Channels:** Hasbro, Nerf, Transformers;

    c. **Cartoon Network-owned Channels:** Cartoon Network, Ben 10, DC Super Hero, Powerpuff Girls, Steven Universe, Adventure Time, and Boomerang;

    d. **Ryan's World Channels:** Ryan's Toy Reviews;

    e. **Dreamworks-owned Channels:** Dreamworks TV

    f. **ChuChu TV:** Nursery Rhymes & Kids Songs, Storytime – Bedtime Stories & Cartoon Shows, and Funzone.

359. Google, Mattel, Hasbro, Cartoon Network, Ryan's World, Dreamworks and ChuChu TV each and together collected and enabled collection of C.L.P.'s Personal Information for the purposes of tracking, profiling, and targeting C.L.P. with advertisements as C.L.P. watched Mattel's Hasbro's, Cartoon Network's,Remka's, Dreamworks' and ChuChu TV's child-directed content on these YouTube channels.

360. Neither Google, Mattel, Hasbro, Cartoon Network, Remka, Dreamworks nor ChuChu TV obtained verifiable parental consent prior to the collection of C.L.P.'s Personal Information.

361. Neither Plaintiff C.L.P. nor Plaintiff C.L.P.'s parent and guardian Sarah Dunaway could have reasonably discovered this conduct earlier through investigation. Plaintiff is a minor unable to

1    consent to or understand the tracking of Personal Information, and Google (and the channels) concealed

2    from and misled Sarah Dunaway about their tracking, profiling, and targeting of his child.

3    362.    The tracking, profiling, and targeting of C.L.P. without parental consent is highly

4    offensive and constitutes an invasion of C.L.P.'s privacy.

5    **P.    Plaintiffs E.B., A.B., C.B., Z.B., and I.B.**

6    363.    During the Class Period, Plaintiffs E.B., A.B., C.B., Z.B., and I.B. watched videos and

7    advertisements on YouTube.

8    364.    E.B., A.B., C.B., Z.B., and I.B. viewed child-directed content on multiple monetized

9    YouTube channels, including:

10    a.    **Mattel-owned Channels:** Barbie, American Girl, Hot Wheels, Thomas &

11    Friends, and Mattel Action

12    b.    **Hasbro-owned Channels:** Hasbro,, Play Doh, My Little Pony, and

13    Transformers;

14    c.    **Cartoon Network-owned Channels:** Cartoon Network, Amazing World of

15    Gumball, Ben 10, DC Super Hero, Powerpuff Girls, Steven Universe, and

16    Adventure Time;

17    d.    **Ryan's World Channels:** Ryan's Toy Review

18    e.    **ChuChu TV:** Nursery Rhymes & Kids Songs, Surprise Egg Toys, Storytime –

19    Bedtime Stories & Cartoon Shows, and Funzone.

20    365.    Google, Mattel, Hasbro, Cartoon Network, Ryan's World and ChuChu TV collected and

21    enabled collection of E.B.'s, A.B.'s, C.B.'s, Z.B.'s, and I.B.'s Personal Information for the purposes of

22    tracking, profiling, and targeting E.B., A.B., C.B., Z.B., and I.B. with advertisements as E.B., A.B.,

23    C.B., Z.B., and I.B. watched Mattel's, Hasbro's, Cartoon Network's, Ryan's World's and ChuChu TV's

24    child-directed content on these YouTube channels.

25    366.    Neither Google, Mattel, Hasbro, Cartoon Network, Remka, nor ChuChu TV  obtained

26    verifiable parental consent prior to the collection of E.B.'s, A.B.'s, C.B.'s, Z.B.'s, and I.B.'s Personal

27    Information.

28    367.    Neither Plaintiffs E.B., A.B., C.B., Z.B., and I.B. nor their parent and guardian Steven

Burda could have reasonably discovered this conduct earlier through investigation. Plaintiffs are minors unable to consent to or understand the tracking of Personal Information, and Google (and the channels) concealed from and misled Steven Burda about their tracking, profiling, and targeting of his children.

368.    The tracking, profiling, and targeting of E.B., A.B., C.B., Z.B., and I.B. without parental consent is highly offensive and constitutes an invasion of E.B.'s, A.B.'s, C.B.'s, Z.B.'s, and I.B.'s privacy.

**Q.    Plaintiffs M.W., B.N., and W.N.**

369.    During the Class Period, Plaintiffs M.W., B.N., and W.N. watched videos and advertisements on YouTube.

370.    M.W., B.N., and W.N. viewed child-directed content on multiple monetized YouTube channels, including:

   a.    **Mattel-owned Channels:** Barbie;

   b.    **Hasbro-owned Channels:** Baby Alive;

   c.    **Cartoon Network-owned Channels:** Cartoon Network and Adventure Time;

   d.    **Ryan's World Channels:** Ryan's Toys Review.

371.    Google, Mattel, Hasbro, Cartoon Network, and Ryan's World collected and enabled collection of M.W.'s, B.N.'s, and W.N.'s Personal Information for the purposes of tracking, profiling, and targeting M.W., B.N., and W.N. with advertisements as M.W., B.N., and W.N. watched Defendant Mattel's, Hasbro's, Cartoon Network's, and Remka's child-directed content on these YouTube channels.

372.    Neither Google, Mattel, Hasbro, Cartoon Network, or Ryan's World obtained verifiable parental consent prior to the collection of M.W.'s, B.N.'s, and W.N.'s Personal Information.

373.    Neither Plaintiffs M.W., B.N., and W.N. nor their parent and guardian Michelle Wall could have reasonably discovered this conduct earlier through investigation. Plaintiffs are minors unable to consent to or understand the tracking of Personal Information, and Defendants concealed from and misled Michelle Wall about their tracking, profiling, and targeting of her children.

374.    The tracking, profiling, and targeting of M.W., B.N., and W.N. without parental consent is highly offensive and constitutes an invasion of M.W.'s, B.N.'s, and W.N.'s privacy.

R.    **Plaintiffs M.W.D., C.J.D., and C.A.D.**

375.    During the Class Period, Plaintiffs M.W.D., C.J.D., and C.A.D. watched videos and advertisements on YouTube.

376.    M.W.D., C.J.D., and C.A.D. viewed child-directed content on multiple monetized YouTube channels, including:

      a.    **Mattel-owned Channels:** Barbie, American Girl/Wellwisher, Hot Wheels, Fisher Price, Thomas & Friends, Max Steel, Polly Pocket, and Mattel Action;

      b.    **Hasbro-owned Channels:** Hasbro, Nerf Official, Play Doh, My Little Pony, Transformers, Baby Alive Official;

      c.    **Ryan's World Channels:** Ryan's Toy Review

      d.    **Cartoon Network-owned Channels:** Cartoon Network, Adventure Time, DC Super Hero, and The Powerpuff Girls;

      e.    **Dreamworks-owned Channels:** DreamWorks TV World;

      f.    **ChuChu TV:** Nursery Rhymes & Kids Songs, Storytime-Bedtime Stories & Cartoon Shows.

377.    Google, Mattel, Hasbro, Cartoon Network, Ryan's World, ChuChu TV, and Dreamworks collected and enabled collection of M.W.D., C.J.D., and C.A.D.'s Personal Information for the purposes of tracking, profiling, and targeting M.W.D., C.J.D., and C.A.D. with advertisements as M.W.D., C.J.D., and C.A.D. watched Defendant Mattel's, Hasbro's, Cartoon Network's, Ryan's World's, ChuChu TV's, and Dreamworks' child-directed content on these YouTube channels.

378.    Neither Google, Mattel, Hasbro, Cartoon Network, Ryan;s World, ChuChu TV, or Dreamworks obtained verifiable parental consent prior to the collection of M.W.D., C.J.D., and C.A.D.'s Personal Information.

379.    Neither Plaintiff M.W.D., C.J.D., and C.A.D. nor their parent and guardian Billy Dardanelli could have reasonably discovered this conduct earlier through investigation. Plaintiffs are minors unable to consent to or understand the tracking of Personal Information, and Defendants concealed from and misled Billy Dardanelli about their tracking, profiling, and targeting of his children.

380.    The tracking, profiling, and targeting of M.W.D., C.J.D., and C.A.D. without parental

consent is highly offensive and constitutes an invasion of M.W.D., C.J.D., and C.A.D.'s privacy.

**TOLLING, ESTOPPEL AND RELATION BACK**

**I.    Discovery Rule Tolling**

381.    Plaintiffs and the Classes had no way of knowing about Google's conduct with respect to the collection and impermissible and unauthorized use of, and profit from, the Personal Information of Plaintiffs and the members of the Classes.

382.    Neither Plaintiffs nor any other members of the Classes, through the exercise of reasonable diligence, could have discovered the conduct alleged herein. Further, Plaintiffs and the members of the Classes did not discover, and did not know of facts that would have caused a reasonable person to suspect, that Google was engaged in the conduct alleged herein.

383.    For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims asserted by Plaintiffs and the Classes.

**II.    Fraudulent Concealment Tolling**

384.    By failing to provide notice of the collection and use of the Personal Information and obtain verifiable consent, in violation of COPPA and societal norms and conventions, Google concealed the conduct and the existence of the claims asserted herein from Plaintiffs and the members of the Classes.

385.    Upon information and belief, Google intended by its acts to conceal the facts and claims from Plaintiffs and members of the Classes.  Plaintiffs and the members of the Classes were unaware of the facts alleged herein without any fault or lack of diligence on their part and could not have reasonably discovered Google's conduct. For this reason, any statute of limitations that otherwise may apply to the claims of Plaintiffs or members of the Classes should be tolled.

**III.    Estoppel**

386.    Despite their duties and obligations under COPPA, Google failed to provide notice of the collection and use of the Personal Information and obtain verifiable consent in breach and violation thereof.

387.    Google therefore are estopped from relying on any statutes of limitations in defense of this action.

## IV.    Relation Back

388.    The claims asserted by Plaintiffs D.T. and D.T. (Alabama), B.H. (Florida), P.A. and J.A. (Illinois), S.H. and D.M. (Kansas), G.W. (Michigan), A.A. (Mississippi), J.C. and E.M. (Missouri), L.D., D.D., and A.D. (New Hampshire), M.W.D., C.J.D., and C.A.D. (New York), C.L.P. (Oklahoma), E.B., A.B., C.B., Z.B., and I.B. (Pennsylvania), and M.W., B.N. and W.N. (Washington) relate back to, at least, January 19, 2021 (prior to the filing of the Third Amended Complaint ("TAC") on January 22, 2021) pursuant to Federal Rule of Civil Procedure 15(c) because these claims arose out of the same conduct and occurrences set forth in the TAC, Google had adequate notice of the claims of the Plaintiffs set forth above, Google will not be unfairly prejudiced by the inclusion of these claims, and there is an identity of interests between the Plaintiffs in the TAC and the Plaintiffs set forth above.

## CLASS ACTION ALLEGATIONS

389.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3).

## I.    Nationwide Class

390.    Plaintiffs, by and through their respective parents and guardians seek certification of a nationwide class, comprised of two multi-state subclasses, defined as follows:

> All persons in the United States who, at any time during the Class Period, were under 13 years old, and watched content allegedly directed to children on YouTube.

## II.    The Intrusion Upon Seclusion Multi-State Subclass

391.    Plaintiffs. by and through their respective parents and guardians, seek class certification of the common law claim of intrusion upon seclusion under the laws of 38 states and the District of Columbia – Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Georgia, Hawaii, Idaho, Illinois, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Minnesota, Mississippi, Missouri, Nevada, New Hampshire, New Jersey, New Mexico, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Dakota, Tennessee, Texas, Utah, Vermont, Washington, West Virginia, and Wyoming – which follow Restatement (Second) of Torts, § 652B, on behalf of the Multi-State Intrusion Upon Seclusion Subclass defined as follows:

All persons residing in the States of Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Georgia, Hawaii, Idaho, Illinois, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Minnesota, Mississippi, Missouri, Nevada, New Hampshire, New Jersey, New Mexico, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Dakota, Tennessee, Texas, Utah, Vermont, Washington, West Virginia, and Wyoming, who, at any time during the Class Period, were under 13 years old, and watched content allegedly directed to children on YouTube.

## III.    The Privacy Law Violation Multi-State Subclass

392.    Plaintiffs, by and through their respective parents and guardians, seek class certification of substantially similar common law and statutory claims for privacy violations arising under the laws of 12 states – Florida, Indiana, Massachusetts, Michigan, Montana, Nebraska, New York, North Dakota, Rhode Island, South Carolina, Virgina, and Wisconsin – on behalf of the Multi-State Privacy Law Violations Subclass, defined as follows:

All persons residing in the States of Florida, Indiana, Massachusetts, Michigan, Montana, Nebraska, New York, North Dakota, Rhode Island, South Carolina, Virgina, and Wisconsin, who, at any time during the Class Period, were under 13 years old, and watched content allegedly directed to children on YouTube.

393.    Excluded from the Classes and Subclasses are: (a) any Judge or Magistrate Judge presiding over this action and members of their staff, as well as members of their families; (b) Defendants and Defendants' predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which any Defendant or its parents have a controlling interest, as well as Defendants' current or former employees, agents, officers, and directors; (c) persons who properly execute and file a timely request for exclusion from the Classes; (d) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (e) counsel for Plaintiffs and Defendants; and (f) the legal representatives, successors, and assigns of any such excluded persons.

394.     **Ascertainability**. The proposed Classes are readily ascertainable because they are defined using objective criteria so as to allow class members to determine if they are part of a Class. Further, the Classes can be identified through records maintained by Defendants.

395.     **Numerosity (Rule 23(a)(1))**. The Classes are so numerous that joinder of individual members herein is impracticable. The exact number of members of the Classes, as herein identified and described, is not known, but download figures indicate that Google has collected information on millions of children.

396.     **Commonality (Rule 23(a)(2))**. Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Class members, including the following:

    a.   Whether Defendants collected the Personal Information of children under 13;

    b.   Whether Defendants operate a website or online service that is directed to children under 13 as defined by COPPA;

    c.   Whether Defendants had knowledge they were collecting the Personal Information of children under 13;

    d.   Whether Defendants obtained parental consent to collect the Personal Information of children under 13;

    e.   Whether Defendants' collection of Personal Information of children without parental consent violated COPPA;

    f.   Whether the collection of Personal Information of children without parental consent is highly offensive to a reasonable person;

    g.   Whether the collection of Personal Information of children without parental consent is sufficiently serious and unwarranted as to constitute an egregious breach of social norms;

    h.   Whether Defendants' conduct constituted an invasion of privacy and children's privacy rights;

    i.   Whether Defendants fraudulently concealed their conduct; and

    j.   Whether Plaintiffs are entitled to damages and the measure of those damages.

397. **Typicality (Rule 23(a)(3))**. Plaintiffs' claims are typical of the claims of the other members of the proposed Classes and Subclasses. Plaintiffs and members of the Classes and Subclasses were all persons who, at any time during the Class Period, were under 13 years old and watched content allegedly directed to children on YouTube. Defendants conduct as alleged herein was uniform throughout the United States, including as to Plaintiffs and the other members of the proposed Classes and Subclasses. Plaintiffs and members of the Classes and Subclasses (as applicable) similarly suffered an intrusion upon seclusion or invasion of privacy and injuries as a result of Defendants' wrongful conduct that is uniform across the Classes.

398. **Adequacy (Rule 23(a)(4))**. Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Classes. Plaintiffs have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs have no interest that is antagonistic to those of the Classes, and Defendants have no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Classes, and they have the resources to do so. Neither Plaintiffs nor Plaintiffs' counsel have any interest adverse to those of the other members of the Classes.

399. **Predominance (Rule 23(b)(3))**. Google's business practices and conduct during the Class Period as alleged herein were uniform across the nation. Plaintiffs, Class members and Subclass members are all minor children who, during the Class Period, watched content allegedly directed to children on YouTube. As a result of the uniform conduct and practices alleged herein, Google commonly intruded upon the private affairs, concerns and seclusions of Plaintiffs, Class members and Subclass members, and/or violated the rights of privacy of Plaintiffs, Class members and Subclass members, in substantially the same way, by improperly accessing their Personal Information and using it for improper purposes, including by targeting them with behavior advertising, without first obtaining their parents or legal guardian's verifiable consent -- all in violation of common law, state and federal statutes and regulations, including COPPA. Further, as a result of Google's uniform conduct and practices alleged herein, Plaintiffs and Class members have suffered substantially the same injury, such that Plaintiffs', Class members' and Subclass members' claims are capable of classwide resolution.

400.    **Substantial Benefits**. This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Classes is impracticable. The prosecution of separate actions by individual members of the Classes would impose heavy burdens upon the Courts and Defendants, would create a risk of inconsistent or varying adjudications of the questions of law and fact common to members of the Classes, and would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

401.    Class certification, therefore, is appropriate under Fed. R. Civ. P. 23(b)(3) because the above common questions of law or fact predominate over any questions affecting individual members of the Classes, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

### Claim 1
### INTRUSION UPON SECLUSION
### (Against Defendants on behalf of Plaintiffs
### and the Intrusion Upon Seclusion Subclass)

402.    Plaintiffs and members of the Intrusion Upon Seclusion Subclass re-allege the foregoing allegations as if fully set forth herein.

403.    Under the laws of States of Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Georgia, Hawaii, Idaho, Illinois, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Minnesota, Mississippi, Missouri, Nevada, New Hampshire, New Jersey, New Mexico, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Dakota, Tennessee, Texas, Utah, Vermont, Washington, West Virginia, and Wyoming, which follow Restatement (Second) of Torts, § 652B, Plaintiffs and the similarly-situated members of the Intrusion Upon Seclusion Subclass assert claims for intrusion upon seclusion as provided for in the Restatement.

404. Plaintiffs and similarly-situated members of the Intrusion Upon Seclusion Subclass' private affairs, concerns, and seclusion includes their interest in their Personal Information as defined by COPPA, which includes, which includes data points concerning their location and online activity while using internet-connected devices.

405. As a result of the uniform conduct and practices alleged herein, Google intentionally intruded upon the seclusion of the Plaintiffs' and Intrusion Upon Seclusion Subclass' seclusion by improperly collecting and using their Personal Information without obtaining consent.

406. Google intentionally intruded upon the seclusion of the Plaintiffs' and similarly-situated members of the Intrusion Upon Seclusion Subclass' seclusion by improperly collecting and using their Personal Information, without providing direct notice to their parents and obtaining verifiable parental consent, as required by COPPA.

407. As a result of the uniform conduct and practices alleged herein, Google's intrusion upon seclusion of the Plaintiffs and similarly-situated members of the Intrusion Upon Seclusion Subclass was substantial, and would be highly offensive to a reasonable person, constituting an egregious breach of social norms, as is evidenced by consumer surveys, academic studies detailing the harms of tracking children online, centuries of common law, scholarly literature on consumers' reasonable expectations, state and federal statutes and regulations including COPPA and FTC regulations, legislative commentaries, enforcement actions undertaken by the FTC, industry standards and guidelines, the fines imposed by the FTC and NY AG predicated on Google's conduct, and the reforms required by the Order & Injunction entered into by Google.

408. As a result of the uniform conduct and practices alleged herein, Google's intrusion upon seclusion of the Plaintiffs and similarly-situated members of the Intrusion Upon Seclusion Subclass was also substantial and highly offensive to a reasonable person, constituting an egregious breach of social norms, because Google used the Personal Information for an improper purpose, including by targeting the Plaintiffs and members of the Intrusion Upon Seclusion Subclass with behavioral advertising.

409. As similarly-situated minor children, Plaintiffs and the members of the Intrusion Upon Seclusion Subclass lacked the ability to form expectations about reasonable privacy or to consent to Defendants' actions.

410.    Neither Plaintiffs nor the similarly-situated members of the Intrusion Upon Seclusion Subclass, nor their parents and/or guardians, consented to Defendants' intrusions upon their private affairs, concerns, and seclusions.

411.    Neither Plaintiffs nor the similarly-situated members of the Intrusion Upon Seclusion Subclass, nor their parents and/or guardians, consented to Google's collection and use of their Personal Information.

412.    Plaintiffs and members of the Intrusion Upon Seclusion Subclass suffered actual and concrete injury as a result of Google's intrusion upon their seclusion.

413.    On behalf of themselves and the similarly-situated members of the Intrusion Upon Seclusion Subclass, Plaintiffs seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate them for the harm to their privacy interests, risk of future invasions of privacy, and the mental and emotional distress caused by Google's invasions of privacy, as well as disgorgement of profits realized by Google as a result of their Intrusion Upon Seclusion of Plaintiffs' and members of the Intrusion Upon Seclusion Subclass' private affairs, concerns, and seclusion.

### Claim 2
### FLORIDA INVASION OF PRIVACY
### (Against Defendants on behalf of the Plaintiffs
### and the Privacy Law Violations Subclass)

414.    Plaintiffs and the Privacy Law Violations Subclass re-allege the foregoing allegations as if fully set forth herein.

415.    The private affairs, concerns, and seclusion of Privacy Law Violations Subclass members who reside in Florida include their interest in their Personal Information as defined by COPPA, which includes data points concerning their location and online activity while using internet-connected devices.

416.    The private affairs of Privacy Law Violations Subclass members who reside in Florida include their behavior on their mobile devices and computers, as well as any other behavior that may be monitored by the surreptitious tracking employed or otherwise enabled by Google.

417.    The parents and guardians of Privacy Law Violations Subclass members who reside in Florida have reasonable expectations of privacy in their children's mobile devices and their online behavior and activities, generally.

418.    As a result of the uniform conduct and practices alleged herein, Google intentionally intruded upon the private affairs, concerns, and seclusion of Plaintiffs and the Privacy Law Violations Subclass members who reside in Florida, including by electronic means while they were in private and in their personal quarters, by improperly accessing their Personal Information and using it for improper purposes, including by targeting them with behavioral advertising that would be highly offensive to a reasonable person, constituting an egregious breach of social norms and/or enabling the targeting of Plaintiffs and the Privacy Law Violations Subclass members who reside in Florida with such advertisements, as detailed herein.

419.    Google's intrusions upon the private affairs, concerns, and seclusion of Plaintiffs and the Privacy Law Violations Subclass members who reside in Florida were substantial, and would be highly offensive to a reasonable person, constituting an egregious breach of social norms, as is evidenced by countless consumer surveys, studies, and op-eds decrying the online tracking of children, centuries of common law, state and federal statutes and regulations including COPPA and FTC regulations, legislative commentaries, enforcement actions undertaken by the FTC, industry standards and guidelines, scholarly literature on consumers' reasonable expectations, the fines imposed on Google by the FTC and the NY AG, as well as the reforms required by the Order & Injunction entered into by Google.

420.    As minor children, Plaintiffs and the Privacy Law Violations Subclass members who reside in Florida lacked the ability to form expectations about reasonable privacy or to consent to Google's actions.

421.    Neither Plaintiffs and the Privacy Law Violations Subclass members who reside in Florida, nor their parents and/or guardians consented to Google's intrusions upon their private affairs, concerns, and seclusions.

422.    Privacy Law Violations Subclass members who reside in Florida suffered actual and concrete injury as a result of Google's intrusions upon the private affairs, concerns, and seclusion and Plaintiffs and the Privacy Law Violations Subclass members who reside in Florida.

423.    Plaintiffs and the Privacy Law Violations Subclass members reside in Florida seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate them for the harm to their privacy interests, risk of future invasions of privacy, and the mental and

emotional distress caused by Google's invasions of privacy, as well as disgorgement of profits made by Defendants as a result of their intrusions upon the private affairs, concerns, and seclusion of Plaintiffs and the Privacy Law Violations Subclass members who reside in Florida.

### Claim 3
### INDIANA INVASION OF PRIVACY
**(Against Defendants on behalf of the Plaintiffs
and the Privacy Law Violations Subclass)**

424.    The Plaintiffs and the Privacy Law Violations Subclass members re-allege the foregoing allegations as if fully set forth herein.

425.    The private affairs, concerns, and seclusion of Plaintiffs and similarly-situated Privacy Law Violations Subclass members who reside in Indiana include their interest in their Personal Information as defined by COPPA, which includes data points concerning their location and online activity while using internet-connected devices.

426.    The private affairs of Plaintiffs and similarly-situated Privacy Law Violations Subclass members who reside in Indiana include their behavior on their mobile devices and computers, as well as any other behavior that may be monitored by the surreptitious tracking employed or otherwise enabled by Google.

427.    The parents and guardians of Plaintiffs and of similarly-situated Privacy Violations Subclass members who reside in Indiana have reasonable expectations of privacy in their children's mobile devices and their online behavior and activities, generally.

428.    As a result of the uniform conduct and practices alleged herein, Google intentionally intruded upon the private affairs, concerns, and seclusion of Plaintiffs and the Privacy Law Violations Subclass members who reside in Indiana, including by monitoring and tracking their online activity while they were in private and at home, by improperly accessing their Personal Information and using it for improper purposes, including by targeting them with behavioral advertising that would be highly offensive to a reasonable person, constituting an egregious breach of social norms and/or enabling the targeting of Plaintiffs and the Privacy Law Violations Subclass members who reside in Indiana with such advertisements, as detailed herein.

429.    As a result of the uniform conduct and practices alleged herein,  Google's intrusions upon the private affairs, concerns, and seclusion of Plaintiffs and similarly-situated Privacy Law Violations Subclass members who reside in Indiana were substantial, and would be highly offensive to a reasonable person, constituting an egregious breach of social norms, as is evidenced by countless consumer surveys, studies, and op-eds decrying the online tracking of children, centuries of common law, state and federal statutes and regulations including COPPA and FTC regulations, legislative commentaries, enforcement actions undertaken by the FTC, industry standards and guidelines, scholarly literature on consumers' reasonable expectations, the fines imposed on Google by the FTC and the NY AG, as well as the reforms required by the Order & Injunction entered into by Google.

430.    As similarly-situated minor children, Plaintiffs and the Privacy Law Violations Subclass members who reside in Indiana lacked the ability to form expectations about reasonable privacy or to consent to Google's actions.

431.    Neither Plaintiffs nor similarly-situated Privacy Law Violations Subclass members who reside in Indiana, nor their parents and/or guardians, consented to Google's intrusions upon their private affairs, concerns, and seclusions.

432.    As a result of the uniform conduct and practices alleged herein,  Plaintiffs and similarly-situated Privacy Law Violations Subclass members who reside in Indiana suffered actual and concrete injury as a result of Google's intrusions upon their private affairs, concerns, and seclusion.

433.    On behalf of Privacy Law Violations Subclass members who reside in Indiana, Plaintiffs seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate them for the harm to their privacy interests, risk of future invasions of privacy, and the mental and emotional distress caused by Google's invasions of privacy, as well as disgorgement of profits made by Defendants as a result of their intrusions upon their private affairs, concerns, and seclusion.

### Claim 4
### MASSACHUSETTS INVASION OF PRIVACY
#### (Against Defendants on behalf of the Plaintiffs
#### and the Privacy Law Violations Subclass)

434.    Plaintiffs and the Privacy Law Violations Subclass members re-allege the foregoing allegations as if fully set forth herein.

435.    The Massachusetts Privacy Act creates a right against unreasonable, substantial or serious interference with a person's privacy. Mass. Gen. Laws ch. 214 § 1B.

436.    The private affairs, concerns, and seclusion of Plaintiffs and similarly-situated Privacy Law Violations Subclass members who reside in Massachusetts include their interest in their Personal Information as defined by COPPA, which includes data points concerning their location and online activity while using internet-connected devices.

437.    The private affairs of Plaintiffs and similarly-situated Privacy Law Violations Subclass members who reside in Massachusetts include their behavior on their mobile devices and computers, as well as any other behavior that may be monitored by the surreptitious tracking employed or otherwise enabled by Google.

438.    The parents and guardians of Plaintiffs and similarly-situated Privacy Law Violations Subclass members who reside in Massachusetts have reasonable expectations of privacy in their children's mobile devices and their online behavior and activities, generally.

439.    As a result of the uniform conduct and practices alleged herein, Google intentionally intruded upon the private affairs, concerns, and seclusion of Plaintiffs and similarly-situated Privacy Law Violations Subclass members who reside in Massachusetts by improperly accessing their Personal Information and using it for improper purposes, including by targeting them with behavioral advertising that would be highly offensive to a reasonable person, constituting an egregious breach of social norms and/or enabling the targeting of Plaintiffs and similarly-situated Privacy Law Violations Subclass members who reside in Massachusetts with such advertisements, as detailed herein.

440.    As a result of the uniform conduct and practices alleged herein, Google's intrusions upon the private affairs, concerns, and seclusion of Plaintiffs and similarly-situated Privacy Law Violations Subclass members who reside in Massachusetts were substantial, and would be highly offensive to a reasonable person, constituting an egregious breach of social norms, as is evidenced by countless consumer surveys, studies, and op-eds decrying the online tracking of children, centuries of common law, state and federal statutes and regulations including COPPA and FTC regulations, legislative commentaries, enforcement actions undertaken by the FTC, industry standards and guidelines, scholarly

literature on consumers' reasonable expectations, the fines imposed on Google by the FTC and the NY AG, as well as the reforms required by the Order & Injunction entered into by Google.

441.    As similarly-situated minor children, Plaintiffs and the Privacy Law Violations Subclass who reside in Massachusetts lacked the ability to form expectations about reasonable privacy or to consent to Google's actions.

442.    Neither Plaintiffs not similarly-situated Privacy Law Violations Subclass members who reside in Massachusetts, nor their parents and/or guardians, consented to Google's intrusions upon their private affairs, concerns, and seclusions.

443.    As a result of the uniform conduct and practices alleged herein , Plaintiffs and the Privacy Law Violations Subclass members who reside in Massachusetts suffered actual and concrete injury as a result of Google's intrusions upon their private affairs, concerns, and seclusion.

444.    On behalf of Privacy Law Violations Subclass members who reside in Massachusetts, Plaintiffs seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate them for the harm to their privacy interests, risk of future invasions of privacy, and the mental and emotional distress caused by Google's invasions of privacy, as well as disgorgement of profits made by Defendants as a result of Defendants' intrusions upon the private affairs, concerns, and seclusion of Plaintiffs and the Privacy Law Violations Subclass members who reside in Massachusetts.

## Claim 5
### MICHIGAN INVASION OF PRIVACY
### (Against Defendants on behalf of the Plaintiffs
### and the Privacy Law Violations Subclass)

445.    Plaintiffs and the Privacy Law Violations Subclass members re-allege the foregoing allegations as if fully set forth herein.

446.    The private affairs, concerns, and seclusion of Plaintiffs and the similarly-situated Privacy Law Violations Subclass members who reside in Michigan include their interest in their Personal Information as defined by COPPA, which includes data points concerning their location and online activity while using internet-connected devices.

447.    The private affairs of Plaintiffs and the similarly-situated Privacy Law Violations Subclass members who reside in Michigan include their behavior on their mobile devices and computers, as well

as any other behavior that may be monitored by the surreptitious tracking employed or otherwise enabled by Google.

448.    The parents and guardians of Plaintiffs and the similarly-situated Privacy Law Violations Subclass members who reside in Michigan have reasonable expectations of privacy in their children's mobile devices and their online behavior and activities, generally.

449.    As a result of the uniform conduct and practices alleged herein, Google intentionally intruded upon the private affairs, concerns, and seclusion of Plaintiffs and the similarly-situated Privacy Law Violations Subclass members who reside in Michigan by improperly accessing their Personal Information and using it for improper purposes, including by targeting them with behavioral advertising that would be highly offensive to a reasonable person, constituting an egregious breach of social norms and/or enabling the targeting of Plaintiffs and the similarly-situated Privacy Law Violations Subclass members who reside in Michigan with such advertisements, as detailed herein.

450.    As a result of the uniform conduct and practices alleged herein, Google's intrusions upon the private affairs, concerns, and seclusion of Plaintiffs and the similarly-situated Privacy Law Violations Subclass members who reside in Michigan were substantial, and would be highly offensive to a reasonable person, constituting an egregious breach of social norms, as is evidenced by countless consumer surveys, studies, and op-eds decrying the online tracking of children, centuries of common law, state and federal statutes and regulations including COPPA and FTC regulations, legislative commentaries, enforcement actions undertaken by the FTC, industry standards and guidelines, scholarly literature on consumers' reasonable expectations, the fines imposed on Google by the FTC and the NY AG, as well as the reforms required by the Order & Injunction entered into by Google.

451.    As similarly-situated minor children, Plaintiffs and the Privacy Law Violations Subclass members who reside in Michigan lacked the ability to form expectations about reasonable privacy or to consent to Google's actions.

452.    Neither Plaintiffs nor the similarly-situated Privacy Law Violations Subclass members who reside in Michigan, nor their parents and/or guardians, consented to Google's intrusions upon their private affairs, concerns, and seclusions.

453.    Plaintiffs and the similarly-situated Privacy Law Violations Subclass members who reside in Michigan suffered actual and concrete injury as a result of Google's intrusions upon their private affairs, concerns, and seclusion.

454.    On behalf of Privacy Law Violations Subclass members who reside in Michigan, Plaintiffs seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate them for the harm to their privacy interests, risk of future invasions of privacy, and the mental and emotional distress caused by Google's invasions of privacy, as well as disgorgement of profits made by Defendants as a result of their intrusions upon the private affairs, concerns, and seclusion of Privacy Law Violations Subclass members who reside in Michigan.

### Claim 6
### MONTANA INVASION OF PRIVACY
### (Against Defendants on behalf of the Plaintiffs
### and the Privacy Law Violations Subclass)

455.    Plaintiffs and the Privacy Law Violations Subclass re-allege the foregoing allegations as if fully set forth herein.

456.    The private affairs, concerns, and seclusion of the Plaintiffs and the similarly-situated Privacy Law Violations Subclass members who reside in Montana include their interest in their Personal Information as defined by COPPA, which includes data points concerning their location and online activity while using internet-connected devices.

457.    The private affairs of Plaintiffs and the similarly-situated Privacy Law Violations Subclass members who reside in Montana include their behavior on their mobile devices and computers, as well as any other behavior that may be monitored by the surreptitious tracking employed or otherwise enabled by Google.

458.    The parents and guardians of Plaintiffs and the similarly-situated Privacy Law Violations Subclass members who reside in Montana have reasonable expectations of privacy in their children's mobile devices and their online behavior and activities, generally.

459.    As a result of the uniform conduct and practices alleged herein, Google intentionally intruded upon the private affairs, concerns, and seclusion of Plaintiffs and similarly-situated Privacy Law Violations Subclass members who reside in Montana, including by monitoring and tracking their online

activity while they were in private and at home, by improperly accessing their Personal Information and using it for improper purposes, including by targeting them with behavioral advertising that would be highly offensive to a reasonable person, constituting an egregious breach of social norms and/or enabling the targeting of Plaintiffs and the Privacy Law Violations Subclass members who reside in Montana with such advertisements, as detailed herein.

460.    As a result of the uniform conduct and practices alleged herein, Google's intrusions upon the private affairs, concerns, and seclusion of Plaintiffs and the similarly-situated Privacy Law Violations Subclass members who reside in Montana were substantial, and would be highly offensive to a reasonable person, and would cause outrage, mental suffering, shame, or humiliation to an ordinary person, constituting an egregious breach of social norms, as is evidenced by countless consumer surveys, studies, and op-eds decrying the online tracking of children, centuries of common law, state and federal statutes and regulations including COPPA and FTC regulations, legislative commentaries, enforcement actions undertaken by the FTC, industry standards and guidelines, scholarly literature on consumers' reasonable expectations, the fines imposed on Google by the FTC and the NY AG, as well as the reforms required by the Order & Injunction entered into by Google.

461.    As similarly-situated minor children, Plaintiffs and the Privacy Law Violations Subclass members who reside in Montana lacked the ability to form expectations about reasonable privacy or to consent to Google's actions.

462.    Neither Plaintiffs not the similarly-situated Privacy Law Violations Subclass who reside in Montana, nor their parents and/or guardians, consented to Google's uniform conduct, practices and intrusions upon their private affairs, concerns, and seclusions.

463.    Plaintiffs and the similarly-situated Privacy Law Violations Subclass members who reside in Montana suffered actual and concrete injury as a result of Google's intrusions upon their private affairs, concerns, and seclusion.

464.    On behalf of Privacy Law Violations Subclass members who reside in Montana, Plaintiffs seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate them for the harm to their privacy interests, risk of future invasions of privacy, and the mental and emotional distress caused by Google's invasions of privacy, as well as disgorgement of profits made

by Defendants as a result of their intrusions upon the private affairs, concerns, and seclusion of Privacy Law Violations Subclass who reside in Montana.

## Claim 7
### NEBRASKA INVASION OF PRIVACY
### (Against Defendants on behalf of Plaintiffs
### and the Privacy Law Violations Subclass)

465.    Plaintiffs and the Privacy Law Violations Subclass re-allege the foregoing allegations as if fully set forth herein.

466.    Neb. Rev. Stat. § 20–203 provides that "Any person, firm, or corporation that trespasses or intrudes upon any natural person in his or her place of solitude or seclusion, if the intrusion would be highly offensive to a reasonable person, shall be liable for invasion of privacy."

467.    The private affairs, concerns, and seclusion of Plaintiffs and similarly-situated Privacy Law Violations Subclass members who reside in Nebraska include their interest in their Personal Information as defined by COPPA, which includes data points concerning their location and online activity while using internet-connected devices.

468.    The private affairs of the Plaintiffs and similarly-situated Privacy Law Violations Subclass who reside in Nebraska include their behavior on their mobile devices and computers, as well as any other behavior that may be monitored by the surreptitious tracking employed or otherwise enabled by Google.

469.    The parents and guardians of the Plaintiffs and similarly-situated Privacy Law Violations Subclass members who reside in Nebraska have reasonable expectations of privacy in their children's mobile devices and their online behavior and activities, generally.

470.    As a result of the uniform conduct and practices alleged herein, Google intentionally intruded upon the private affairs, concerns, and seclusion of Plaintiffs and similarly-situated Privacy Law Violations Subclass members who reside in Nebraska by improperly accessing their Personal Information and using it for improper purposes, including by targeting them with behavioral advertising that would be highly offensive to a reasonable person, constituting an egregious breach of social norms and/or enabling the targeting of Plaintiffs and similarly-situated Privacy Law Violations Subclass members who reside in Nebraska with such advertisements, as detailed herein.

471.    As a result of the uniform conduct and practices alleged herein, Google's intrusions upon the private affairs, concerns, and seclusion of Plaintiffs and similarly-situated Privacy Law Violations Subclass members who reside in Nebraska were substantial, and would be highly offensive to a reasonable person, constituting an egregious breach of social norms, as is evidenced by countless consumer surveys, studies, and op-eds decrying the online tracking of children, centuries of common law, state and federal statutes and regulations including COPPA and FTC regulations, legislative commentaries, enforcement actions undertaken by the FTC, industry standards and guidelines, scholarly literature on consumers' reasonable expectations, the fines imposed on Google by the FTC and the NY AG, as well as the reforms required by the Order & Injunction entered into by Google.

472.    As similarly-situated minor children, Plaintiffs and Privacy Law Violations Subclass members who reside in Nebraska lacked the ability to form expectations about reasonable privacy or to consent to Google's actions.

473.    Neither Plaintiffs nor similarly-situated Privacy Law Violations Subclass members who reside in Nebraska, nor their parents and/or guardians, consented to Google's intrusions upon their private affairs, concerns, and seclusions.

474.    Plaintiffs and similarly-situated Privacy Law Violations Subclass members who reside in Nebraska suffered actual and concrete injury as a result of Google's intrusions upon their private affairs, concerns, and seclusion.

475.    On behalf of Privacy Law Violations Subclass members who reside in Nebraska, Plaintiffs seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate them for the harm to their privacy interests, risk of future invasions of privacy, and the mental and emotional distress caused by Google's invasions of privacy, as well as disgorgement of profits made by Defendants as a result of their intrusions upon the private affairs, concerns, and seclusion of the Privacy Violations Subclass members who reside in Nebraska.

SEVENTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

**Claim 8**
**NEW YORK TRESPASS TO CHATTELS**
**(Against Defendants on behalf of Plaintiffs**
**and the Privacy Law Violations Subclass)**

476.     Plaintiffs and the Privacy Law Violations Subclass re-allege the foregoing allegations as if fully set forth herein.

477.     Plaintiffs and similarly-situated Privacy Law Violations Subclass members who reside in New York have a property interest in their Personal Information, which is an asset with value that Plaintiffs and Privacy Law Violations Subclass members who reside in New York possess.

478.     As a result of the uniform conduct and practices alleged herein, Google unlawfully took possession of and commercially exploited Plaintiffs and similarly-situated Privacy Law Violations Subclass members who reside in New York, including by using that Personal Information for purposes of targeted behavioral advertising, without their consent or permission, and without compensating them for the use of their assets.

479.     Through the uniform conduct and practices alleged herein, Google interference with the property interest in the Personal Information that Plaintiffs and Privacy Violations Subclass members who reside in New York lawfully possessed was intentional, and in violation of COPPA, and Google's use of the Personal Information was for improper purposes, including by targeting Plaintiffs and similarly-situated Privacy Violations Subclass members who reside in New York with behavioral advertising

480.     As a result of the uniform conduct and practices alleged herein, Google's conduct caused harm, in that it damaged, diminished, impaired, and/or destroyed the value of the Personal Information in Plaintiffs and similarly-situated Privacy Law Violations Subclass members who reside in New York have a possessory interest.

481.     Plaintiffs seeks appropriate relief for that injury on behalf of Privacy Law Violations Subclass members who reside in New York, , including but not limited to (i) damages that will reasonably compensate Privacy Law Violations Subclass members who reside in New York for the harm to their interests in their Personal Information, and (ii) disgorgement of profits made by Defendants as a result of Defendants' intentional interference with their Personal Information.

1
2
3

**Claim 9**
**NORTH DAKOTA TRESPASS TO CHATTELS**
**(Against Defendants on behalf of Plaintiffs**
**and the Privacy Law Violations Subclass)**

4       482.    Plaintiffs and the Privacy Law Violations Subclass re-allege the foregoing allegations as
5  if fully set forth herein.

6       483.    Plaintiffs and similarly-situated Privacy Law Violations Subclass members who reside in
7  North Dakota have a property interest in their Personal Information, which is an asset with value that
8  Plaintiffs and Privacy Law Violations Subclass members who reside in North Dakota possess.

9       484.    As a result of the uniform conduct and practices alleged herein, Google unlawfully took
10 possession of and commercially exploited Plaintiffs and similarly-situated Privacy Law Violations
11 Subclass members who reside in North Dakota, including by using that Personal Information for purposes
12 of targeted behavioral advertising, without their consent or permission, and without compensating them
13 for the use of their assets.

14       485.    Through the uniform conduct and practices alleged herein, Google interference with the
15 property interest in the Personal Information that Plaintiffs and Privacy Violations Subclass members
16 who reside in North Dakota lawfully possessed was intentional, and in violation of COPPA, and Google's
17 use of the Personal Information was for improper purposes, including by targeting Plaintiffs and
18 similarly-situated Privacy Violations Subclass members who reside in North Dakota with behavioral
19 advertising

20       486.    As a result of the uniform conduct and practices alleged herein, Google's conduct caused
21 harm, in that it damaged, diminished, impaired, and/or destroyed the value of the Personal Information
22 in Plaintiffs and similarly-situated Privacy Law Violations Subclass members who reside in North Dakota
23 have a possessory interest.

24       487.    Plaintiffs seek appropriate relief for that injury on behalf of Privacy Law Violations
25 Subclass members who reside in North Dakota, including but not limited to: (i) damages that will
26 reasonably compensate Privacy Law Violations Subclass members who reside in North Dakota for the
27 harm to their interests in their Personal Information, and (ii) disgorgement of profits made by Defendants
28 as a result of Defendants' intentional interference with the possession of their Personal Information.

SEVENTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Claim 10**
## RHODE ISLAND INVASION OF PRIVACY
### (Against Defendants on behalf of Plaintiffs
### and the Privacy Law Violations Subclass)

488.    Plaintiffs and the Privacy Law Violations Subclass re-allege the foregoing allegations as if fully set forth herein.

489.    R.I. Gen. Laws 1956, § 9-1-28.1 provides for the right to be secure from unreasonable intrusion upon one's physical solitude or seclusion.

490.    The private affairs, concerns, and seclusion of Plaintiffs and similarly-situated Privacy Violations Subclass members who reside in Rhode Island include their interest in their Personal Information as defined by COPPA, which includes data points concerning their location and online activity while using internet-connected devices.

491.    The private affairs of the Plaintiffs and similarly-situated Privacy Violations Subclass members who reside in Rhode Island include their behavior on their mobile devices and computers, as well as any other behavior that may be monitored by the surreptitious tracking employed or otherwise enabled by Google.

492.    The parents and guardians of the Plaintiffs and similarly-situated Privacy Violations Subclass members who reside in Rhode Island have reasonable expectations of privacy in their children's mobile devices and their online behavior and activities, generally.

493.    As a result of the uniform conduct and practices alleged herein, Google intentionally intruded upon the private affairs, concerns, and seclusion of Plaintiffs and similarly-situated Privacy Violations Subclass members who reside in Rhode Island, including by monitoring and tracking their online activity while they were in private and at home, by improperly accessing their Personal Information and using it for improper purposes, including by targeting them with behavioral advertising that would be highly offensive to a reasonable person, constituting an egregious breach of social norms and/or enabling the targeting of Plaintiffs and similarly-situated Privacy Violations Subclass members who reside in Rhode Island with such advertisements, as detailed herein.

494.    As a result of the uniform conduct and practices alleged herein, Google's intrusions upon the private affairs, concerns, and seclusion of Plaintiffs and similarly-situated Privacy Violations

Subclass members who reside in Rhode Island were substantial, and would be highly offensive to a reasonable person, constituting an egregious breach of social norms, as is evidenced by countless consumer surveys, studies, and op-eds decrying the online tracking of children, centuries of common law, state and federal statutes and regulations including COPPA and FTC regulations, legislative commentaries, enforcement actions undertaken by the FTC, industry standards and guidelines, scholarly literature on consumers' reasonable expectations, the fines imposed on Google by the FTC and the NY AG, as well as the reforms required by the Order & Injunction entered into by Google.

495.    As similarly-situated minor children, Plaintiffs and similarly-situated Privacy Violations Subclass members who reside in Rhode Island lacked the ability to form expectations about reasonable privacy or to consent to Google's actions.

496.    Neither Plaintiffs nor similarly-situated Privacy Violations Subclass members who reside in Rhode Island, nor their parents and/or guardians, consented to Google's intrusions upon their private affairs, concerns, and seclusions.

497.    As a result of Google's uniform conduct and practices alleged herein, Plaintiffs and similarly-situated Privacy Violations Subclass members who reside in Rhode Island suffered actual and concrete injury as a result of Google's intrusions upon their private affairs, concerns, and seclusion,

498.    On behalf of Privacy Law Violations Subclass members who reside in Rhode Island, Plaintiffs seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate them for the harm to their privacy interests, risk of future invasions of privacy, and the mental and emotional distress caused by Google's invasions of privacy, as well as disgorgement of profits made by Defendants as a result of their intrusions upon the private affairs, concerns, and seclusion of Privacy Law Violations Subclass members who reside in Rhode Island.

**Claim 11**
**SOTH CAROLINA INVASION OF PRIVACY**
**(Against Defendants on behalf of Plaintiffs**
**and the Privacy Law Violations Subclass)**

499.    Plaintiffs and the Privacy Law Violations Subclass re-allege the foregoing allegations as if fully set forth herein.

108

500.    The private affairs, concerns, and seclusion of Plaintiffs and similarly-situated Privacy Law Violations Subclass members who reside in South Carolina include their interest in their Personal Information as defined by COPPA, which includes data points concerning their location and online activity while using internet-connected devices.

501.    The private affairs of Plaintiffs and similarly-situated Privacy Law Violations Subclass who reside in South Carolina include their behavior on their mobile devices and computers, as well as any other behavior that may be monitored by the surreptitious tracking employed or otherwise enabled by Google.

502.    The parents and guardians of Plaintiffs and similarly-situated Privacy Law Violations Subclass members who reside in South Carolina have reasonable expectations of privacy in their children's mobile devices and their online behavior and activities, generally.

503.    As a result of the uniform conduct and practices alleged herein, Google intentionally intruded upon the private affairs, concerns, and seclusion of Plaintiffs and similarly-situated Privacy Law Violations Subclass members who reside in South Carolina, including by monitoring and tracking their online activity while they were in private and at home, by improperly accessing their Personal Information and using it for improper purposes, including by targeting them with behavioral advertising that would be highly offensive to a reasonable person, constituting an egregious breach of social norms and/or enabling the targeting of Plaintiffs and similarly-situated Privacy Law Violations Subclass members who reside in South Carolina with such advertisements, as detailed herein.

504.    As a result of the uniform conduct and practices alleged herein, Google's intrusions upon the private affairs, concerns, and seclusion of Plaintiffs and similarly-situated Privacy Law Violations Subclass members who reside in South Carolina were substantial, were in blatant and shocking disregard of their rights, would be highly offensive to a reasonable person, and would cause outrage, mental suffering, shame, or humiliation to an ordinary person, constituting an egregious breach of social norms, as is evidenced by countless consumer surveys, studies, and op-eds decrying the online tracking of children, centuries of common law, state and federal statutes and regulations including COPPA and FTC regulations, legislative commentaries, enforcement actions undertaken by the FTC, industry standards and guidelines, scholarly literature on consumers' reasonable expectations, the fines imposed on Google

by the FTC and the NY AG, as well as the reforms required by the Order & Injunction entered into by Google.

505.    As similarly-situated minor children, Plaintiffs and similarly-situated Privacy Law Violations Subclass members who reside in South Carolina lacked the ability to form expectations about reasonable privacy or to consent to Google's actions.

506.    Neither the Plaintiffs nor similarly-situated Privacy Law Violations Subclass members who reside in South Carolina, nor their parents and/or guardians, consented to Google's intrusions upon their private affairs, concerns, and seclusions.

507.    Plaintiffs and similarly-situated Privacy Violations Subclass members who reside in South Carolina suffered actual and concrete injury as a result of Google's intrusions upon their private affairs, concerns, and seclusion.

508.    On behalf of Privacy Law Violations Subclass members who reside in South Carolina, Plaintiffs seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate them for the harm to their privacy interests, risk of future invasions of privacy, and the mental and emotional distress and humiliation caused by Google's invasions of privacy, as well as disgorgement of profits made by Defendants as a result of their intrusions upon the private affairs, concerns, and seclusion of Privacy Law Violations Subclass members who reside in South Carolina.

### Claim 12
### VIRGINIA TRESPASS TO CHATTELS
### (Against Defendants on behalf of Plaintiffs
### and the Privacy Law Violations Subclass)

509.    Plaintiffs and the Privacy Law Violations Subclass re-allege the foregoing allegations as if fully set forth herein.

510.    Plaintiffs and similarly-situated Privacy Law Violations Subclass members who reside in Virginia have a property interest in their Personal Information, which is an asset with value that the Plaintiffs and Privacy Law Violations Subclass members who reside in Virginia possess.

511.    As a result of the uniform conduct and practices alleged herein, Google unlawfully took possession of and commercially exploited the Personal Information of Plaintiffs and similarly-situated Privacy Law Violations Subclass members who reside in Virginia, including by using that Personal

Information for purposes of targeted behavioral advertising, without their consent or permission, and without compensating them for the use of their assets.

512.    As a result the uniform conduct and practices alleged herein, Google interference with the property interest in the Personal Information that Plaintiffs and similarly-situated Privacy Law Violations Subclass members who reside in Virginia lawfully possessed was intentional, and in violation of COPPA, and Google's use of the Personal Information was improper purposes, including by targeting the Additional Privacy Violations Subclass members who reside in Virginia with behavioral advertising

513.    As a result of the uniform conduct and practices alleged herein, Google's conduct caused harm, in that it damaged, diminished, impaired, and/or destroyed the value of the Personal Information in which Plaintiffs and similarly-situated Privacy Law Violations Subclass members have a possessory interest, and/or dispossessed Plaintiffs and Privacy Law Violations Subclass members who reside in Virginia of the value of their Persona Information.

514.    Plaintiffs seek appropriate relief for that injury on behalf of Privacy Law Violations Subclass members who reside in Virginia, including but not limited to: (i) damages that will reasonably compensate Privacy Law Violations Subclass members who reside in Virginia for the harm to their interests in their Personal Information, and (ii) disgorgement of profits made by Defendants as a result of Defendants' intentional interference with the possession of their Personal Information.

### Claim 13
### WISCONSIN INVASION OF PRIVACY
### (Against Defendants on behalf of Plaintiffs
### and the Privacy Law Violations Subclass)

515.    Plaintiffs and the Privacy Law Violations Subclass re-allege the foregoing allegations as if fully set forth herein.

516.    Wis. Stat. § 995.50(2) provides a right of action based on the intrusion upon the privacy of another.

517.    The private affairs, concerns, and seclusion of Plaintiffs and similarly-situated Privacy Law Violations Subclass members who reside in Wisconsin include their interest in their Personal Information as defined by COPPA, which includes data points concerning their location and online activity while using internet-connected devices.

518.    The private affairs of Plaintiffs and similarly-situated Privacy Law Violations Subclass members who reside in Wisconsin include their behavior on their mobile devices and computers, as well as any other behavior that may be monitored by the surreptitious tracking employed or otherwise enabled by Google.

519.    The parents and guardians of t Plaintiffs and similarly-situated Privacy Law Violations Subclass members who reside in Wisconsin have reasonable expectations of privacy in their children's mobile devices and their online behavior and activities, generally.

520.    As a result of the uniform conduct and practices alleged herein, Google intentionally intruded upon the private affairs, concerns, and seclusion of Plaintiffs and similarly-situated Privacy Law Violations Subclass members who reside in Wisconsin, including by monitoring and tracking their online activity while they were in private and at home, by improperly accessing their Personal Information and using it for improper purposes, including by targeting them with behavioral advertising that would be highly offensive to a reasonable person, constituting an egregious breach of social norms and/or enabling the targeting of Plaintiffs and similarly-situated Privacy Law Violations Subclass members who reside in Wisconsin with such advertisements, as detailed herein.

521.    As a result of the uniform conduct and practices alleged herein, Google's intrusions upon the private affairs, concerns, and seclusion of Plaintiffs and similarly-situated Privacy Law Violations Subclass members who reside in Wisconsin were substantial, would be highly offensive to a reasonable person, constituting an egregious breach of social norms, as is evidenced by countless consumer surveys, studies, and op-eds decrying the online tracking of children, centuries of common law, state and federal statutes and regulations including COPPA and FTC regulations, legislative commentaries, enforcement actions undertaken by the FTC, industry standards and guidelines, scholarly literature on consumers' reasonable expectations, the fines imposed on Google by the FTC and the NY AG, as well as the reforms required by the Order & Injunction entered into by Google.

522.    As similarly-situated minor children, Plaintiffs and Privacy Law Violations Subclass members who reside in Wisconsin lacked the ability to form expectations about reasonable privacy or to consent to Google's actions.

523.    Neither Plaintiffs nor similarly-situated Privacy Law Violations Subclass members who reside in Wisconsin, nor their parents and/or guardians, consented to Google's intrusions upon their private affairs, concerns, and seclusions.

524.    As a result of the uniform conduct and practices alleged herein, Plaintiffs and similarly-situated Privacy Law Violations Subclass members who reside in Wisconsin suffered actual and concrete injury as a result of Google's intrusions upon their private affairs, concerns, and seclusion.

525.    On behalf of Privacy Law Violations Subclass members who reside in Wisconsin, Plaintiffs seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate them for the harm to their privacy interests, risk of future invasions of privacy, and the mental and emotional distress caused by Google's invasions of privacy, as well as disgorgement of profits made by Defendants as a result of their intrusions upon the private affairs, concerns, and seclusion of Privacy Law Violations Subclass members who reside in Wisconsin.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of themselves and the proposed Classes, respectfully request relief as follows:

A.    An order certifying this action as a class action, and certifying the Classes defined herein, designating Plaintiffs, as described above, as the representatives of the respective Classes defined herein, and appointing Plaintiffs' counsel as counsel for the Classes;

B.    An order declaring that Defendants' actions, as described above constitute breaches of the common law claim of intrusion upon seclusion as to the intrusion upon seclusion claims and the common law and state statutory claims for invasion of privacy and privacy violations set forth above.

C.    A judgment awarding Plaintiffs and the members of the Classes appropriate relief, including actual, compensatory, and/or statutory damages, and punitive damages (as permitted by law), in an amount to be determined at trial, disgorgement of Defendants' unlawful profits and gains, and restitution;

D.    A judgment awarding all costs, including experts' fees, attorneys' fees, and the costs of prosecuting this action, and other relief as permitted by law;

SEVENTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK

E.     Pre-judgment and post-judgment interest, as permitted by law; and

F.     Grant such other legal and equitable relief as the Court may deem appropriate.

### DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury for all issues so triable.

Dated:  October 14, 2025                                Respectfully submitted,

**PRITZKER LEVINE LLP**                                 **SILVER GOLUB & TEITELL LLP**

/s/ Jonathan K. Levine                                  /s/ Steven L. Bloch
Jonathan K. Levine (SBN 220289)                         David S. Golub (admitted *pro hac vice*)
Elizabeth C. Pritzker (SBN 146267)                      Steven L. Bloch (admitted *pro hac vice*)
Caroline C. Corbitt (SBN 305492)                        Ian W. Sloss (admitted *pro hac vice*)
1900 Powell Street, Suite 450                           1 Landmark Square, 15th Floor
Emeryville, CA 94608                                    Stamford, CT 06901
Telephone: (415) 692-0772                               Telephone: (203) 325-4491
Facsimile: (415) 366-6110                               Facsimile: (203) 325-3769
jkl@pritkzerlevine.com                                  dgolub@sgtlaw.com
ecp@pritzkerlevine.com                                  sbloch@sgtlaw.com
ccc@pritzkerlevine.com                                  isloss@sgtlaw.com

                                                        *Attorneys for Plaintiffs*
                                                        *and the Proposed Classes*

SEVENTH AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:19-cv-07016-SVK